**REED SMITH LLP**
*Formed in the State of Delaware*
Don A. Innamorato, Esq.
Saranne E. Weimer, Esq.
506 Carnegie Center, Suite 300
Princeton, New Jersey 08540
Tel. (609) 987-0050  Fax. (609) 951-0824
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JOSHUA MOSES,**<br><br>                    **Plaintiff,**<br>     **v.**<br><br>**DR. RAVI SOOD, DR. LOUIS G. FARES, DR. B. CHOWDHURY, NICOLETTA TURNER-FOSTER, DAVID ORTIZ, UNITED STATES OF AMERICA, and BUREAU OF PRISONS, JOHN/JANE DOES 1-10.**<br><br>                    **Defendants.** | **DOCUMENT ELECTRONICALLY FILED**<br><br>**CIVIL ACTION NO. 20-cv-1025**<br><br><br>**SECOND AMENDED COMPLAINT** |

Plaintiff Joshua Moses, by and through his counsel Reed Smith LLP, and by way of a Second Amended Complaint against the Defendants, states as follows:

PRELIMINARY STATEMENT

1.    Plaintiff Joshua Moses ("Plaintiff") is the victim of serious damage to his physical and mental well-being due to the deliberate indifference, gross negligence, and wilful and wanton conduct of the Defendants, individually and collectively, in connection with medical treatment he received or failed to receive while incarcerated at Federal Correctional Institution, Fort Dix, as well as due to the prison's failure to properly manage the COVID-19 pandemic.

2.      Plaintiff alleges that the medical program at FCI Fort Dix lacks sufficient policies, procedures and staffing to ensure that adequate medical care is provided to inmates, and that the medical staff at the facility is unqualified, inadequately trained, understaffed and lacking essential resources to meet the medical needs of the individuals incarcerated there – particularly inmates with specialized medical needs like Plaintiff.

3.      Plaintiff further failed to receive treatment for known and previously diagnosed conditions, despite his repeated complaints and requests for treatment.  Defendants repeatedly, and with deliberate indifference to his extreme pain, continued to deny Plaintiff access to simple diagnostic and palliative treatments, without reason or cause, leading to the degeneration of Plaintiff's basic bodily functions and his mental wellbeing.

4.      As a result of these deficiencies, and failures of basic standards of medical care, Plaintiff has suffered extreme pain and complications from his conditions that would not have occurred with proper care.

5.      These damages were caused by a Defendants' deliberate and knowing failure to follow the well-established standards of care.

6.      In addition, Plaintiff made numerous and repeated requests for medical attention to treat these severe conditions, which the medical staff and the Warden wilfully ignored, leaving his condition untreated for extended periods of time. The Defendants' treatment of Plaintiff not only deviated from accepted standards of medical care, but was so deficient that it rose to the level of a deliberate indifference to his medical needs in violation of his Fifth and Eighth Amendment rights.

7.     Because of this lack of adequate care, Plaintiff experienced extreme pain, suffering and emotional anguish for several months, and still has lasting and permanent effects to this day.

8.     Specifically, because of the conduct of the Defendants, Plaintiff suffers from the following:

(a) The continuing, and now worsening, state of the medical symptoms which caused Plaintiff to seek medical treatment;

(b) Extreme physical and mental distress and hardship due to his current medical conditions and the continued and likely permanent physical deterioration caused by the Defendants.

(c) Difficulty walking and the required assistance of a cane to walk;

9.     In addition, Defendants also wilfully failed to take proper actions to mitigate the spread of the SARS-CoV-2 ("COVID-19") virus.

10.    Because of Defendants' conduct, Plaintiff contracted COVID-19 and continues to experience symptoms more than five months later including: Difficulty breathing; chest pain; headaches, dizziness, and nausea.

11.    The Defendants' mishandling of the COVID-19 pandemic not only deviated from generally accepted standards of care, but was so deficient that it rose to the level of a deliberate indifference to his medical needs in violation of his Fifth and Eighth Amendment rights.

12.    But for the acts, or failures to act, by the Defendants, individually and collectively, as detailed above and below, Plaintiff would not be irreparably injured and damaged.

## JURISDICTION AND VENUE

13.    This action arises under the United States Constitution, particularly under the provisions of the Fourth Amendment, Fifth Amendment, Eighth Amendment, and Fourteenth

Amendment of the United States, and under federal law, particularly Title 42 of the United States Code §1983, the Federal Tort Claims Act, 28 U.S.C.S. §§1346(b), 2671-2680 and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

14.    This Court possesses jurisdiction for this case under the provisions of Title 28 of the United States Code, §1331, §1343 and §1346.

15.    The District of New Jersey is the appropriate venue under Title 28 U.S.C. §1391(b)(2) because all substantial parts of the events, or in some instances, omissions, giving rise to the claims occurred in this District.

16.    This Court has supplemental jurisdiction over Plaintiff's joined state law claims, pursuant to 28 U.S.C. § 1367.

PARTIES

17.    Plaintiff, Joshua Moses, is an adult individual, and at all times relevant hereto was committed as an inmate of the Federal Bureau of Prisons, Federal Correctional Institution – Fort Dix, 5756 Hartford St, Fort Dix, New Jersey 08640 ("FCI Fort Dix").

18.    Defendant Dr. Ravi Sood ("Dr. Sood") is an adult individual and medical doctor who treats inmates at FCI Fort Dix.  At all relevant times hereto, Dr. Sood acted in his individual capacity as a doctor, as well as an agent and employee of the Federal Bureau of Prisons and the United States of America.  Dr. Sood both directly treated and indirectly oversaw the treatment of Plaintiff during the relevant time period.

19.    Defendant Nicoletta A. Turner-Foster, M.D. ("Dr. Turner-Foster") is an adult individual and the Clinical Director at FCI Fort Dix.  Dr. Turner-Foster specializes in internal medicine, and, at all relevant times hereto, acted in her individual capacity as a doctor, as well as an agent and employee of the Federal Bureau of Prisons and the United States of America.  Dr.

Turner-Foster both directly treated and indirectly oversaw the treatment of Plaintiff during the relevant time period.

20.     Defendant Dr. Louis G. Fares, M.D. ("Dr. Fares) is an adult individual and a medical doctor, providing services at Robert Wood Johnson Hospital.  Dr. Fares is a General Surgery Specialist, and, at all relevant times hereto, acted in his individual capacity as a private medical doctor and/or as a contractor and agent of the Bureau of Prisons and the United States of America.  Dr. Fares both directly treated and indirectly oversaw the treatment of Plaintiff during the relevant time period.

21.     Defendant Dr. Banwarlal Chowdhury ("Dr. Chowdhury") is an adult individual and a medical doctor, providing services at St. Francis Hospital.  Dr. Chowdhury is a Gastroenterologist, and, at all relevant times hereto, acted in his individual capacity as a private medical doctor and/or as a contractor and agent of the Bureau of Prisons and the United States of America.  Dr. Fares both directly treated and indirectly oversaw the treatment of Plaintiff during the relevant time period.

22.     Defendant David Ortiz ("Warden Ortiz") was the Warden at FCI Fort Dix until he was temporarily reassigned in or around February 2021 following his negligent handling of the SARS-CoV2-2 ("COVID-19") outbreak at the prison.  At all relevant times hereto, Warden Ortiz acted in his individual capacity and as an agent and employee of the Federal Bureau of Prisons and the United States of America.  Warden Ortiz directly or indirectly refused to provide adequate medical care to Plaintiff at FCI Fort Dix.  Further, Warden Ortiz ignored Plaintiff's request for medical aid, did not investigate Plaintiff's claims, and improperly denied Plaintiff's attempts to obtain proper care through the Administrative Remedy Program by issuing decisions that were inconsistent with Plaintiff's medical history, records and his attempts to obtain care.  In

addition, Warden Ortiz failed to ensure that the proper safeguards were in place within FCI Fort Dix amid the COVID-19 pandemic, leading to the avoidable outbreak and infection of over half of the prison population, including Plaintiff.

23.     Defendant Bureau of Prisons ("BOP") is the United States federal law enforcement agency under the Department of Justice responsible for the care, custody and control of incarcerated individuals.  At all relevant times, Plaintiff was in the custody of the BOP.

24.     Defendant United States of America is the government of the United States of America.

FACTUAL ALLEGATIONS

25.     Plaintiff is an inmate currently incarcerated at FCI Fort Dix.

26.     FCI Fort Dix is a Federal Institution as defined in 28 C.F.R. § 500.1(d) and is subject to the standards or conduct and care mandated by 18 U.S.C § 4042.

27.     Under that Section, the Bureau of Prisons is responsible for the health care of a prisoner remanded to its custody.

28.     FCI Fort Dix employs and operates a medical unit, staffed with medical doctors (M.D.), mid-level providers (M.L.P.), Physician Assistants (P.A.), nursing staff and clerical support staff.

29.     Medical issues identified by staff medical providers in an area of speciality (such as gastroenterology or surgery), are referred to private practice doctors contracted with the Bureau of Prisons for medical consultations, diagnosis, or treatment in their respective area of speciality as medically necessary.

30.    Referrals to private practice doctors made by medical providers at FCI Fort Dix must be approved by an administrative panel, which includes the medical director.

*Plaintiff's Pertinent Medical History.*

31.    On or about August 9, 2009, Plaintiff was shot multiple times in his torso suffering injuries to his lungs, kidneys, liver, check, stomach, buttocks, and knees.  He was taken to Temple University Hospital in Philadelphia, Pennsylvania, in critical condition.

32.    Over the following year, Plaintiff underwent several operations to repair the injuries he sustained.  Plaintiff's injuries to his abdomen were so severe that he received food via a feeding tube for more than one year.

33.    Plaintiff suffered three enterocutaneous fistulas (a condition that causes the contents of the stomach or intestines to leak through the skin.  To treat this condition, Plaintiff underwent two bowel resections (removal of a part of the small intestine); a transverse colon resection (removal of part of the large intestine); an abdominal wall reconstruction with lateral rectus abdominis muscle releases (a complicated procedure to repair abdominal tissues injured by trauma); and a bioprosthetic mesh replacement (an implant of tissue-derived mesh) with skin grafts from both thighs placed over his abdomen.

34.    During the course of these surgeries, Plaintiff's surgeons had to remove his appendix and much of his small intestine, leaving him with only about one-third of his small intestine.

35.    Because of this circumstance, Plaintiff continually suffers from complicated medical conditions, including short-bowel syndrome, which requires ongoing treatment, including proper nutrition and medication to prevent infection, diarrhea, nausea, dehydration,

fluid and electrolyte imbalance, malnutrition, weight loss, and the development of additional fistulas or obstructions.

36.     In addition, Plaintiff has bullet fragments remaining in his right knee and his sacrum.

37.     Plaintiff was discharged to his home on or about October 5, 2010.

38.     Between October 5, 2010 and May 13, 2014, Plaintiff was able to manage his injuries and his short-bowel syndrome without notable discomfort with gastroesophageal reflux disease ("GERD") being his largest complaint.

*Plaintiff is Taken into Federal Custody*

39.     On or about May 13, 2014, Plaintiff was taken into federal custody and housed at the Federal Detention Center in Philadelphia, Pennsylvania.

40.     On or about May 26, 2015, Plaintiff was transferred to Federal Correctional Institute Cumberland, Maryland ("FCI Cumberland").

41.     Plaintiff remained at FCI Cumberland until on or about June 19, 2017.

42.     While incarcerated at FCI Cumberland, Plaintiff suffered from ongoing medical issues and complications related to his medical history and prior injuries.

43.     On or about May 18, 2017, Plaintiff underwent surgery related to these conditions, specifically to address an open wound in his stomach that was leaking and bleeding for approximately two years.

44.     On or about June 21, 2017, Plaintiff was transferred from FCI Cumberland to FCI Fort Dix, where he remains incarcerated.

*Plaintiff's Experiences at FCI Fort Dix*

45.     Upon arrival to FCI-Fort Dix in June of 2017, Plaintiff had an in initial 14 day clinical evaluation with Dr. Sood, concerning his ongoing serious health conditions and recent surgery only a month prior.

46.     Dr. Sood evaluated Plaintiff's stomach, including his large scar and lack of belly button.  During this evaluation, Dr. Sood, referring to Plaintiff's gastrointestinal history and medical conditions, told Plaintiff that "they did a number on you", "there's nothing I can do" and "I'm not touching that."

47.     Plaintiff's medical issues continued and shortly after arriving at FCI Fort Dix, Plaintiff reported to sick-call on several occasions with gastrointestinal complications, serious pain, diarrhea, vomiting, rapid weight loss, and inability to digest his food.

48.     Plaintiff reported to sick call approximately twice a month from June through December 2017.

49.     Plaintiff followed the BOP process for sick call, which required him to wake up early, wait in line with other inmates at the medical unit, report his complaints to a worker who wrote down his complaints and identifying information, and sent Plaintiff back to his unit to wait for a call from the medical workers.

50.     Despite Plaintiff's multiple attempts to obtain medical care, Dr. Sood, and the other medical staff at Fort Dix, under the authority of Dr. Turner, did not even evaluate Plaintiff, nor did they treat Plaintiff's serious health conditions or symptoms, or refer him to any outside specialists.

51.     In fact, other than the initial medical evaluation upon reporting to FCI Fort Dix, Plaintiff was only evaluated once by the medical staff, when he was seen by Dr. Sood in December 2017.

52.     Accordingly, Plaintiff began the Administrative Remedy Process to address his ongoing lack of access to appropriate medical care.

53.     The Bureau of Prisons Administrative Remedy Program is a multi-tier process that is available to inmates confined in institutions operated by the Bureau of Prisons for "review of an issue that relates to any aspect of their confinement." 28 C.F.R. §542.10.  An inmate must initially attempt to informally resolve the issue with institutional staff. 28 C.F.R. §542.13(a).

54.     If this informal resolution fails, an inmate may submit a BP-9 request to the institution staff member designated to receive such requests.  28 C.F.R. §542.14.

55.     An inmate who is dissatisfied with the response to a BP-9 may submit a BP-10 Appeal to the Regional Director of the BOP.  28 C.F.R. §542.15(a).

56.     An inmate may appeal to the BOP's general counsel on a BP-11 form.  This is the final administrative appeal.  28 C.F.R. §542.18.

57.     On or about January 10, 2018, after informal attempts to resolve these issues had failed, Plaintiff submitted a BP-8 request.

58.     In January 2018, Health System Administrator Jeffrey Wilk ("Mr. Wilk") responded and stated there was no documentation of sick call requests, despite the fact that Plaintiff had made numerous sick call requests, reporting to sick call approximately twice a month from June 2017 through December 2017.

59.     Although Mr. Wilk's response was dated January 11, 2018, Plaintiff was not provided with a copy of the response until January 30, 2018.

60.    Upon information and belief, Mr. Wilk knew or should have known upon reasonable investigation that Plaintiff had in fact made numerous sick call requests.

61.    Upon information and belief, Bureau of Prisons lost, destroyed, or intentionally ignored documentation of Plaintiff's attempts to seek medical care.

62.    Immediately upon receiving Mr. Wilk's improper denial, on January 30, 2018, Plaintiff appealed the response to Warden Ortiz.  At the same time, Plaintiff sent detailed e-mails to Associate Warden Charles Smith, explaining why the denial was incorrect.

63.    On February 12, 2018, after Plaintiff's grievance and appeal, Dr. Sood called Plaintiff for a medical evaluation.

64.    Dr. Sood evaluated Plaintiff.  Plaintiff explained his symptoms to Dr. Sood and Dr. Sood ordered an x-ray of Plaintiff's abdomen.

65.    On February 14, 2018, Plaintiff was finally x-rayed.  The x-ray technician noted that she saw something on the x-ray and was uncomfortable with Plaintiff leaving the medical unit.

66.    Upon information and belief, however, the technician's superiors, including Dr. Sood, instructed her to release Plaintiff without further care.

67.    The following day, February 15, 2018, Plaintiff was rushed to the Emergency Room at Robert Wood Johnson Hospital and admitted for a bowel obstruction.

68.    Despite Plaintiff's extensive gastrointestinal medical history dating back to 2009, Plaintiff had never suffered from a bowel obstruction prior to his confinement at FCI Fort Dix.

69.    The bowel obstruction was foreseeable and could have been prevented with proper medical care, which was denied to Plaintiff at FCI Fort Dix.

70.     While at Robert Wood Johnson, Plaintiff was treated by Dr. Fares.  Dr. Fares informed Plaintiff that he could not perform surgery because Plaintiff only had about 15% of his bowel remaining.  Dr. Fares also stated that Plaintiff required upper and lower endoscopies.

71.     Dr. Fares informed Plaintiff that he would be at Fort Dix five days later, on February 20, 2018.  Dr. Fares told Plaintiff that he would schedule the endoscopies, review Plaintiff's medical records, and provide the results of additional tests on February 20, 2018.

72.     None of this ever occurred.

73.     Upon information and belief, Dr. Fares was present at FCI Fort Dix on February 20, 2018.   However, Dr. Fares did not follow up with or examine Plaintiff on February 20, 2018. Dr. Fares also did not order either endoscopy, did not speak to Plaintiff's trauma doctors, did not review Plaintiff's medical records, and did not make any effort to follow through with Plaintiff's additional necessary treatment for his bowel obstruction.  Plaintiff did not see Dr. Fares again until Plaintiff was rushed to the hospital for a second time in April 2018 for another bowel obstruction.

*Plaintiff's Appeal is Denied Amidst these Ongoing Issues*

74.     On February 21, 2018, Warden Ortiz denied Plaintiff's appeal (No. 929968), claiming that there was "no evidence that Plaintiff ever complained of any symptoms described in this complaint."

75.     This statement was false, as Plaintiff had repeatedly complained of and sought treatment for his conditions since his arrival at FCI Fort Dix in June 2017, even reporting for sick call approximately twice a month between June 2017 and December 2017 with GI symptoms.

76.     Upon information and belief, Warden Ortiz knew or should have known upon reasonable investigation that Plaintiff had in fact repeatedly complained about the conditions described in his complaint.

77.     In a desperate attempt to quickly remedy the issue, Plaintiff emailed Assistant Warden Charles Smith on February 23, 2018 and February 28, 2018, seeking any relief that would allow Plaintiff to receive appropriate medical care.

78.     Assistant Warden Smith refused to intervene and told Plaintiff he needed to follow the Administrative Remedy Procedure.

79.     On March 1, 2018, Plaintiff appealed Warden Ortiz's February 21, 2018 denial of his request for an administrative remedy to the Northeast Regional Office.

80.     Plaintiff detailed everything that had taken place since his arrival at FCI Fort Dix, including his recent Emergency Room visit, Dr. Fares' recommendations, and lack of follow up. Plaintiff again requested to see a specialist and to see copies of his medical records from FTC Fort Dix.

81.     On April 4, 2018, the Regional Director denied Plaintiff's appeal stating that the surgeon recommended that EGD and Colonoscopy which were pending scheduling and are considered non-emergent.

*Plaintiff's Medical Issues Continue*

82.     Meanwhile, Plaintiff's medical condition continued to go untreated and/or under-treated.

83.     On February 27, 2018, Dr. Sood examined Plaintiff as a follow up for the February 15, 2018 Emergency Room visit.

84.     Perhaps recognizing the seriousness of Plaintiff's condition, Dr. Sood begrudgingly agreed that he would refer Plaintiff to a Gastroenterologist.  However, at the same time, Dr. Sood told Plaintiff that "nobody wants to touch [Plaintiff]" because of his condition and the lack of treatment options.  Dr. Sood also told Plaintiff that another surgery would kill him and that Plaintiff would "just have to deal with it" because "no one is going to touch" him.

85.     However, as of April 11, 2018, approximately six weeks after Dr. Sood indicated that he would refer Plaintiff to a Gastroenterologist, Plaintiff had still not been evaluated or seen by a specialist.

86.     Plaintiff continued to experience extreme pain and discomfort as well as other gastrological symptoms during this period, all of which were reported to the medical staff at FCI Fort Dix.

87.     On or about April 11, 2018, an x-ray at FCI Fort Dix showed another bowel obstruction.

88.     Plaintiff was again rushed to the Emergency Room for treatment.

89.     Plaintiff was treated at the hospital by Dr. Fares.  This was the first time Plaintiff had seen Dr. Fares since the last hospital visit. Dr. Fares had never completed the follow up from the February 2018 visit.

*The Administrative Remedy Procedure Continues to Fail Plaintiff*

90.     After returning to FCI Fort Dix from his recent emergency hospital visit, Plaintiff continued in his desperate attempts to use the Administrative Remedy Procedure to obtain proper medical care.

91.     On April 17, 2018, Plaintiff appealed the Regional Director's April 4, 2018 denial to the Central Office detailing the same ongoing health issues.

*Plaintiff Finally Sees a Specialist Who Refuses to Provide Proper Care*

92.     Meanwhile, on April 18, 2018, plaintiff finally had a consultation with a Gastroenterologist, Dr. Chowdury.

93.     Plaintiff explained his medical issues to Dr. Chowdhury.  Plaintiff further explained that Dr. Fares had recommended endoscopies on February 12, 2018 and February 15, 2018, respectively.

94.     Dr. Chowdhury was dismissive of Plaintiff's concerns and his condition.

95.     Dr. Chowdhury refused to perform the endoscopies.

96.     Dr. Chowdhury stated to plaintiff, without an exam, that plaintiff has short-gut syndrome and small bowel adhesions.  Dr. Chowdhury also told Plaintiff that he should "stay away from surgeons and maybe [he] would live longer."

97.     Dr. Chowdhury's treatment of plaintiff, the lack of examination, and his refusal to perform the necessary procedures was not in accordance with an acceptable standard of care.

*The Administrative Remedy Process Continues to Deny Plaintiff's Claims*

98.     On May 17, 2018, Central Office responded to Plaintiff's appeal stating that Plaintiff received medical care and treatment in accordance with evidenced based standards of care within the scope and services of the Federal Bureau of Prisons.

99.     Upon information and belief, the Central Office knew or should have known upon reasonable investigation that Plaintiff had not received proper medical care and treatment in accordance with evidence based standards of care.

*Plaintiff Requires Additional Treatment for his Medical Conditions*

100.    Plaintiff also suffers from knee, foot, back, and leg issues, stemming from ballistic fragments in his right knee and sacrum.

101. In 2018, Plaintiff made repeated claims of extreme pain and numbness of his right knee, back, and feet.

102. On May 9, 2018, the medical staff at FCI Fort Dix performed an x-ray of Plaintiff's knee and again confirmed the existence of the bullet fragment in his right knee. Plaintiff also complained of ongoing GI issues and the fact that he had still not received the endoscopies recommended by Dr. Fares in January 2018.

103. Dr. Sood examined Plaintiff for these issues on June 22, 2018 and June 29, 2018.

104. Dr. Sood referred Plaintiff to an Orthopedic Surgeon Thomas K. Bills ("Dr. Bills") and to General Surgeon, Dr. Fares.

105. On June 26, 2018, Dr. Fares examined Plaintiff at FCI Fort Dix. Dr. Fares told Plaintiff that he had requested Plaintiff's outside medical records but was still waiting to receive them.

106. However, Plaintiff's outside medical records have been in the possession of the Bureau of Prisons since June 2015 when plaintiff signed a release of information form.

107. Dr. Fares was aware that Plaintiff had already signed a release, that the Bureau of Prisons had all of Plaintiff's records, and that Plaintiff's outside medical records were always available to Dr. Fares at any time.

108. Upon information and belief, Dr. Fares' failure to review Plaintiff's records, despite treating Plaintiff on multiple occasions, fell below the applicable standard of care and constituted a deliberate indifference to Plaintiff's rights.

109. Dr. Fares' failure to review Plaintiff's medical records delayed proper care to Plaintiff and resulted in unnecessary pain and suffering.

110.    Dr. Fares also did not perform or schedule the endoscopies he recommended in February 2018.

111.    On August 1, 2018, Plaintiff had a consultation with Dr. Bills at FCI Fort Dix. Dr. Bills ordered additional tests on Plaintiff's knee.

112.    In early September, Plaintiff was again experiencing extreme gastrointestinal pain and other symptoms.

113.    Plaintiff had still not received the endoscopies recommended by Dr. Fares in February 2018.

114.    On September 6, 2018, FCI Fort Dix performed another x-ray on Plaintiff's stomach and kidneys that revealed abnormal results and a bigger obstruction.

115.    Surprisingly, the medical staff at FCI Fort Dix did not even send Plaintiff to the hospital for this issue or provide any type of treatment.  Instead, the medical staff told Plaintiff to drink a lot of water.

116.    Defendants' refusal to provide care for Plaintiff's bowel obstruction fell below the applicable standard of care constituted a deliberate indifference to Plaintiff's constitutional rights.

117.    Defendants' failure to obtain proper medical care for Plaintiff resulted in days of unnecessary pain and suffering that could have been treated at the hospital.  Instead, Plaintiff experienced multiple days of extreme pain, vomiting, and nausea.  Plaintiff also did not eat for multiple days attempting to allow the obstruction to pass.

118.    Plaintiff's knee, back, and foot issues also continued.  Dr. Bills also performed follow up tests on Plaintiff's knees, including a CT-Scan on November 6, 2018.

119.    Dr. Bills determined that the bullet fragment in Plaintiff's knee was causing arthritis and unnecessary pain and suffering.

120.    On November 21, 2018, Dr. Bills requested authorization for surgical excision of the bullet fragment.  The procedure was approved on December 21, 2019 and reapproved on February 27, 2019.

121.    In November 2018, Plaintiff was finally approved for upper and lower endoscopies, previously recommended in February 2018, approximately ten months earlier.

122.    The BOP and Plaintiff's medical providers, knew that these procedures were required in February 2018, but had nevertheless knowingly and intentionally delayed the procedure until November 2018.

123.    This delay was unnecessary, avoidable, fell below the applicable standard of care, and constituted a deliberate indifference to Plaintiff's constitutional rights.

124.    On November 30, 2018, Dr. Chowdhury, the same doctor who refused to perform the endoscopies in April 2018, performed the upper and lower endoscopies at St. Francis Medical Center.

125.    Dr. Chowdhury reported to Plaintiff that there was nothing wrong with him and to see him again in ten years.

126.    Upon information and belief, and based upon Plaintiff's extensive medical history, Dr. Chowdhury's care fell below the applicable standard of care.

127.    On December 6, 2018, Plaintiff was seen by Urologist Dr. Fingerman, who recommended an ultrasound on Plaintiff's kidneys based upon where Plaintiff was experiencing pain.

128. On January 17, 2019, Plaintiff had a follow up visit with Dr. Sood regarding the pending knee surgery as well as the x-ray on his kidneys. Dr. Sood resubmitted plaintiff for orthopedic surgery that was previously approved on December 21, 2018. The surgery was reapproved on February 27, 2019.

129. On January 18, 2019, the medical staff at FCI Fort Dix performed an Ultrasound on Plaintiff. The ultrasound technician told Plaintiff that Plaintiff had scars on his kidneys and the bowel was wrapped around his kidneys, which could be a significant source of the pain Plaintiff has endured.

130. None of the medical doctors ever provided further information about the Ultrasound technician's findings.

131. Upon information and belief, Plaintiff's medical doctors, including Dr. Sood, Dr. Chowdhury, Dr. Fares, and Dr. Turner-Foster knew or should have known that this issue could have been causing Plaintiff's pain.

132. Upon information and belief, the failure of Plaintiff's medical providers to diagnose this issue prior to January 18, 2019 fell below the applicable standard of care and resulted in unnecessary pain and suffering.

*Plaintiff has Orthopedic Surgery*

133. On January 25, 2019, the medical staff at FCI Fort Dix also performed an x-ray on Plaintiff's lower back and spine. The x-ray revealed defects in Plaintiff's spine.

134. Plaintiff's orthopedic surgery (previously approved on December 21, 2018 and re-submitted by Dr. Sood on January 17, 2019) was again reapproved on February 27, 2019.

135. On May 3, 2019, Plaintiff was taken off-site for knee surgery at Robert Wood Johnson Hospital to remove the bullet from the posteromedial section of his right knee.

136. The intraoperative findings also indicated that plaintiff had a grade 111 chondral lesion of the medial femoral condyle with a grade IV lesion of the lateral femoral condyle and a complex tear of the posterior horn and medial and lateral meniscus.

137. Plaintiff was transported back to FCI Fort Dix immediately after surgery with no instruction or follow up care. Plaintiff did not even have another evaluation until May 22, 2019.

138. Plaintiff now ambulates with difficulty.

139. Upon information and belief, failure to provide Plaintiff with instructions, follow up care, and physical therapy fell below the applicable standard of care.

140. Upon information and belief, if Plaintiff had been provided with postoperative care and physical therapy, he would have avoided unnecessary pain and suffering and ongoing problems with his gait and ability to ambulate autonomously.

141. Upon information and belief, the failure to provide Plaintiff with appropriate postoperative care fell below the acceptable standard of care and constitutes deliberate indifference to Plaintiff's rights.

142. Plaintiff complained about the inadequate care following this surgery. In response, they provided Plaintiff with a cane.

*Plaintiff's Gastrointestinal Issues Continue*

143. On June 19, 2019, Dr. Sood evaluated Plaintiff after Plaintiff made several additional complaints about his gastrointestinal issues.

144. On June 25, 2019, Plaintiff was sent for another surgical consultation with surgeon Dr. Rajiv Shah.

145. Plaintiff asked why he was not being seen by Dr. Fares. Dr. Shah responded that Dr. Fares was no longer available.

146. Dr. Shah noted Plaintiff's previous records showed chronic inflammation of the stomach and that Plaintiff's abdominal problems might be due to Plaintiff's stomach or scar tissue. Dr. Shah recommend a CT scan of Plaintiff's abdomen and pelvis to rule out any intra-abdominal pathology.

147. On June 28, 2019, FCI Fort Dix performed an x-ray which notes post-operative changes to Plaintiff's prior bowel resection.

148. The findings indicated Plaintiff had a "dilated small bowel with air-fluid levels and moderate to large retained stool throughout the colon." The report noted that the "findings may represent constipation and ileus verses early intermitted or partial bowel obstruction." The Radiologist recommended further evaluation with another CT-Scan.

149. Also on June 28, 2019, Plaintiff had a consultation with Urologist Michael Cohen who reviewed Plaintiff's previous ultrasound from January 2019 and strongly recommended a gastroenterological evaluation and surgical evaluation for Plaintiff's abdominal pain and discomfort.

150. Also on June 28, 2018, Plaintiff was seen by Dr. Sood as a follow up on his June 19, 2019 evaluation by Dr. Sood.

151. Dr. Sood requested an order for another CT-Scan due to Plaintiff's abdomen pain and adhesions.

152. On August 15, 2019, FCI Fort Dix performed a CT-Scan on Plaintiff. The findings noted that Plaintiff had, *inter alia*:

    a.    A linear area of increased density identified just under the anterior abdominal wall that could represent a postoperative change. This may represent surgical mesh or some post-operative calcifications;

b.     Large amount of colonic stool (a bowel condition in which dry stool becomes stuck in the colon or rectum, causing a build-up of waste); and

c.     Lung bases demonstrated linear basilar atelectasis (a type of lung collapse in the lower section of the lungs).

153.    Upon information and belief, these conditions would not have occurred if Plaintiff had received adequate and proper medical care for his conditions throughout his confinement at FCI Fort Dix.

154.    On August 21, 2019, Plaintiff had another consultation with Dr. Chowdhury concerning these findings, Plaintiff's chronic constipation, diarrhea, and short-bowel syndrome.

155.    Dr. Chowdhury ordered colace, fiber, and bentyl.

156.    Despite Dr. Chowdury's orders for Plaintiff, Dr. Sood cancelled these orders. Dr. Sood claimed that Plaintiff had an allergy to Bentyl, and that the medications would make Plaintiff's stomach bleed.

157.    Plaintiff did not have any documented allergy to Bentyl, and the medications had been ordered by Dr. Chowdhury who specializes in gastrointestinal issues.

158.    As Dr. Sood cancelled the orders, Plaintiff never received any of these medications.

159.    Upon information and belief, failure to provide Plaintiff with these medications fell below the applicable standard of care and resulted in unnecessary pain, suffering, and other damages, and constituted deliberate indifference to Plaintiff's rights.

160.    On August 27, 2019, Plaintiff was again seen by Dr. Shah, however, Plaintiff's previous CT-Scan results were unavailable to Dr. Shah.

161.    Dr. Shah's impression was that Plaintiff most likely had a partial bowel obstruction from adhesions and his short gut syndrome. Dr. Shah again recommended Plaintiff be sent for a GI evaluation for medical management.  Dr. Shah also requested that the CT-Scan report should be faxed to his office for evaluation.

162.    Dr. Shah also indicated that Plaintiff needed a small bowel series (x-ray examination of the small intestine using a special form of x-ray and orally ingested contrast) to evaluate the overall small intestine in the colon after his multiple surgeries.

163.    On September 9, 2019, a new consultation was requested for Gastroenterology and CT-Scan.

*Plaintiff's Final Administrative Appeal was Denied*

164.    On September 17, 2019, the Northeast Regional Office denied Plaintiff's Administrative Claim under the Federal Tort Claims Act.

165.    The denial stated that "[a] review of your medical records reveals you have been evaluated in Health Services on numerous occasions. The Bureau of Prisons has continued to provide you with medical care that is consistent with community standards and Bureau of Prisons policies.  There is no evidence you experienced a compensable loss as the result of negligence on the part of any Bureau of Prisons employee."

166.    Upon information and belief, the BOP knew or should have known upon reasonable investigation that the care provided to Plaintiff fell below the applicable standard of care for treatment of Plaintiff's conditions.

167.    The denial indicated that Plaintiff could bring a lawsuit in the appropriate U.S. District Court within six (6) months of the date of the letter.

168.    Plaintiff timely filed this lawsuit within six months of the date of the letter.

*Plaintiff's Medical Issues Continue*

169.    On October 31, 2019, a CT-Scan of Plaintiff's abdomen and pelvis with contrast was performed.  The CT-scan revealed:

    d.  bilateral basilar atelectasis (partial collapse of lower lungs),

    e.  contrast present in multiple small bowel loops,

    f.  stool scattered throughout the colon,

    g.  mild diffuse colonic distention,

    h.  A large amount of rectum and sigmoid colon stool

    i.  No definite free air or obvious point of bowel obstruction, although there is mild diffuse colonic distention and to a lesser extent some small bowel distention.

170.    Upon information and belief, these issues would not have occurred if Plaintiff had received timely and appropriate medical care.

171.    On October 31, 2019, shortly after the CT-Scan, plaintiff had another consultation with Dr. Chowdhury concerning short-bowel syndrome, weight loss, and adhesions. Dr. Chowdhury recommended Ensure, Multivitamins and low lactose diet.

172.    On November 16, 2019, Plaintiff had another surgical consultation with Dr. Bills concerning his knee surgery on May 3, 2019, approximately six months prior.

173.    Dr. Bills ordered meloxicam 15 mg for pain.

174.    Dr. Sood cancelled the order for meloxicam claiming that it can cause gastrointestinal bleeding.

175.    Plaintiff never received the meloxicam ordered by Dr. Bills.

176.    On November 7, 2019, the Central Office approved Ensure for Plaintiff, with an expiration date of January 6, 2020.

177.   On December 12, 13, 14, and 15, 2019, Plaintiff was denied Ensure by EMT G. Martin.  EMT G. Martin stated that he could not provide Ensure because someone did not update the order.

178.   Plaintiff informed G. Martin that Plaintiff received copies of his medical records from FCI Fort Dix and that the Ensure was approved by the Central Office with an expiration date of January 6, 2020, but EMT G. Martin refused to provide Plaintiff with Ensure.

179.   G. Martin knew or should have known that Plaintiff's medical providers ordered Ensure for him, and that the order was approved by the Central Office through January 6, 2020.

180.   Upon information and belief, the medical staff at FCI Fort Dix was withholding Ensure in retaliation against Plaintiff for his continued pursuit of adequate medical care, including his use of the Administrative Remedy Program.

181.   Plaintiff's Ensure approval was not renewed on the expiration date because FCI Fort Dix claimed that Plaintiff only had a 50% adherence rate.

182.   This statement was false, as Plaintiff's adherence rate was close to, if not at, 100%.

*A COVID-19 Outbreak Occurs at FCI Fort Dix*

183.    In January 2020, the COVID-19 virus was first reported in the United States.

184.   COVID-19 is an infectious disease caused by a newly discovered coronavirus.

185.   COVID-19 was first identified in Wuhan, China in December 2019.

186.   COVID-19 is a dangerous respiratory virus that can cause a range of symptoms. While some people experience mild or moderate symptoms, COVID-19 can also cause severe illness and death.

187.    As of April 2021, there are 136 million reported COVID-19 cases throughout the world, and 2.94 million deaths.

188.    COVID-19 is most commonly associated with fever, cough, shortness of breath, difficulty breathing, fatigue, muscle or body aches, headaches, loss of taste or smell, persistent pain or pressure in the chest, nausea, vomiting, and other "flu-like" and respiratory symptoms.

189.    In early 2020, the medical community, epidemiologists, and federal, state, and local officials warned of the highly contagious nature of the virus, which appeared to be transmitted via respiratory droplets, including through coughing, sneezing, and talking.

190.    On March 26, 2020, Attorney General William Barr issued a Memorandum to the Director of the Bureau of Prisons to ensure that the agency prioritizes the home confinement program to protect the health and safety of incarcerated individuals and BOP employees.

191.    The following week, on April 3, 2020, Attorney General Bar issued a subsequent Memorandum that urged BOP administrators at facilities significantly impacted by the virus to immediately maximize transfers of individuals to home confinement.

192.    The purpose of maximizing transfer of individuals to home confinement was to mitigate the spread of COVID-19.

193.    The Memorandums instructed prisons to give priority to inmates residing in low and minimum security facilities, such as FCI Fort Dix.

194.    Attorney General Barr's Memorandums laid out considerations to determine whether individuals were eligible for home confinement and "maximize" the transfers for those eligible.

195.    The factors to be considered included the security level of the facility, the inmate's conduct in prison, whether the inmate has demonstrated a verifiable re-entry plan, the

inmate's crime of conviction and assessment of the danger posed to the community, and whether a transfer to home confinement would increase the inmate's risk of contracting COVID-19.

196.    The Memorandums also noted that any outbreaks in the prison would also put the public at risk.

197.    Upon information and belief, FCI Fort Dix, through Warden Ortiz, did not abide by the directive to maximize transfers to home confinement.

198.    Instead, the decision-makers at FCI Fort Dix, including Warden Ortiz, only selected a very small number of individuals for home confinement, and did not abide by the Attorney General's guidelines.

199.    In addition, the staff at FCI Fort Dix, under the supervision and authority of Warden Ortiz, did not take adequate precautions to ensure that the prison population was reasonably protected from avoidable transmission of COVID-19 or to comply with guidelines issues by the Center for Disease Control (CDC).  This includes but is not limited to, FCI Fort Dix staff's:

  a.  Failure to utilize proper PPE, including face coverings, when dealing with or in close proximity to inmates.

  b.  Failure to timely isolate symptomatic prisoners.

  c.  Failure to timely quarantine prisoners with known or suspected exposure to COVID-19;

  d.  Mixing of inmates that were known or suspected to have been exposed to COVID-19 with healthy prisoners;

  e.  Failure to properly disinfect shared spaces and/or shared equipment, including phones, computers;

f.   Failure to ensure proper social distancing and encouraging or requiring inmates to gather in small spaces where social distancing is not feasible;

g.   Accepting of over 150 incarcerated individuals from FCI Elkton, despite the known risks of inter-facility transfers during the COVID-19 outbreak.

200.   These issues were ongoing and persistent from the start of the COVID-19 outbreak in early 2019 and are occurring through the present.

201.   FCI Fort Dix staff's reckless and egregious conduct in this regard caused COVID-19 to spread quickly throughout the prison.

202.   On October 7, 2020, the BOP website reported 4 inmates were confirmed positive for COVID-19 at FCI Fort Dix.

203.   By October 26, 2020, however, this number climbed to 54 confirmed cases.

204.   Then, by October 30, 2020, 165 inmates and 8 staff were positive for COVID-19.

205.   The exponential spread of COVID-19 within FCI Fort Dix was foreseeable and avoidable.

206.   In response to the outbreak, Plaintiff was housed separately with 71 of the "healthy" inmates.   However, FCI Fort Dix staff continued in their failure to take adequate precautions with respect to the "healthy" inmates as well.

207.   By November 2, 2020, 47 of the 71 "healthy" inmates had also tested positive for COVID-19, including Plaintiff, who tested positive on November 2, 2020.

208.   Plaintiff experienced shortness of breath, nausea, dizziness, and extreme headaches.   Plaintiff's shortness of breath and headaches continue to this day.

209.   This reckless and outrageous conduct caught the attention of the New Jersey Senators.

210.    On November 9, 2020, Senator Menendez wrote to the Director of the Bureau of Prisons ("Menendez Letter") and noted that despite the known risk of transferring incarcerated individuals between facilities in light of COVID-19, the BOP transferred more than 150 incarcerated individuals from FCI Elkton to FCI Fort Dix.

211.    Shortly after accepting these transfers, COVID-19 spread rapidly through the FCI Fort Dix population, putting the prisoners, staff, and the public at risk.

212.    On January 12, 2021, United States Senators Cory A. Booker and Robert Menendez ("Senators' Letter") jointly authored another letter directly to Warden Ortiz.

213.    The Senators' Letter requested information about the home confinement review process, the mitigation efforts utilized to limit the spread of COVID-19, and the treatment for inmates who tested positive.

214.    The Senators' Letter noted the prior directives of Attorney General Barr that required prisons to prioritize home confinement.

215.    The Senators' Letter noted that between April 16, 2020 and November 9, 2020 only 3.5% of the incarcerated population was actually granted home confinement, despite the fact that the facility is a low and minimum security prison.

216.    Further the Senators' Letter noted that the overwhelming majority of individuals granted home confinement were white, which does not match the overall prison headcount.

217.    Specifically, 66% of the released individuals were white, 29% were Black, 3% were Asian; and 2% were Native American.

218.    However, the overall makeup of FCI Fort Dix is 51% white, 29% Black, 1% Asian, and .4% Native American.

219. In other words, the process of transferring inmates to home confinement at FCI Fort Dix, disparately and negatively impacted Black inmates, who were selected at lower rates compared to their overall prison population compared to other races.

220. Plaintiff is a Black inmate.

221. Upon information and belief, Plaintiff should have been eligible for home confinement and should have been transferred to home confinement under the guidelines in the Memorandums.

222. It is unknown whether the Senators received a response to this letter.

223. In or around February 2021, the news media reported that Warden Ortiz was temporarily reassigned as a result of his handling of the COVID-19 pandemic.

224. Warden Ortiz's handling of the COVID-19 pandemic constituted deliberate indifference to the rights of Plaintiff, and has caused him unnecessary and ongoing pain and suffering.

225. On March 19, 2021, Plaintiff began the administrative remedy process with respect to the facilities handling of the COVID-19 pandemic. Plaintiff submitted a BP-8 with a three page written statement detailing the issues with FCI Fort Dix's handling of the pandemic, as well as 40 pages supporting his claims.

226. On March 30, 2021, Plaintiff's BP-8 was denied. The denial claimed that Plaintiff did not provide specific information about his request (despite his detailed written statement and pages of attachments). The denial also claimed that Plaintiff did not attempt informal resolution, despite Plaintiff's attempts at informal resolution for months. In fact, in connection with Plaintiff's criminal case and his attempt to secure home confinement in that matter, Judge Padvoa of the Eastern District of Pennsylvania found that Plaintiff had previously

exhausted his claims, as the BOP never responded to Plaintiff's attempts to secure home confinement to prevent the spread of the COVID-19 virus.

227. On March 30, 2021, Plaintiff filed a BP-9 as he was dissatisfied with the response to his BP-8.

228. On March 30, 2021, the BOP denied Plaintiff's BP-9.

229. On April 1, 2021, Plaintiff filed a BP-10 regarding these issues.

230. The response to Plaintiff's BP-10 is due within 30 calendar days.

231. Plaintiff has not yet received a response to the BP-10.

232. As a result of this initial deliberate indifference to the dangers of COVID-19, and refusal to follow the Attorney General's guidelines, Plaintiff was exposed to a potentially deadly virus, the long term effects of which remain unknown.

## CAUSES OF ACTION

**First Count:**
***Violation of Plaintiff's Constitutional Rights***
**Against Dr. Sood, Dr. Fares, Dr. Chowdhury, Dr. Turner-Foster, and David Ortiz**
**(*Bivens* Claim)**

233. Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of the Complaint, as if fully set forth here.

234. The individual defendants and Does 1-10 had a duty to ensure Plaintiff's health, safety and well-being by providing Plaintiff with adequate medical care, and timely access to the same, while he was incarcerated at FCI Fort Dix.

235. The individual defendants and Does 1-10 were acting under color of federal law when they treated Plaintiff.

236.   While incarcerated at Fort Dix, Plaintiff's medical needs became very serious and the individual defendants and Does 1-10 showed a deliberate indifference to Plaintiff's health, safety and medical needs as follows:

(a) Plaintiff's repeated requests for medical attention, or specific requests for scheduling of procedures or referrals to specialists, were consistently ignored or delayed;

(b) Defendants failed to protect Plaintiff from unnecessary pain and suffering;

(c) Defendants failed to provide proper treatment or diagnosis with respect to the reports of extreme pain and other gastrointestinal issues;

(d) Plaintiff experienced severe abdominal pain while incarcerated at FCI Fort Dix and went through the proper channels to request medical attention. Defendants repeatedly ignored Plaintiff's complaints and requests for medical treatment.

(e) Even when Plaintiff was seen and evaluated by Defendants, referrals to specialists were either mishandled, delayed, or denied, leading to inadequate medical care.

237.   Accordingly, Defendants violated Plaintiff's right to reasonable medical care under the Fifth and Eighth Amendments to the United States Constitution by their reckless or deliberate indifference to his known serious medical conditions.

238.   At all relevant times, Defendants had a duty to ensure Plaintiff received adequate medical care for his serious medical needs, including medical conditions that cause pain, discomfort or threaten good health, or that if left unattended would pose a substantial risk to the health of the Plaintiff.

239.   Defendants knew that Plaintiff was suffering from chronic and substantial pain and his condition was deteriorating and he was in need of medical care and treatment and was

not receiving it at FCI Fort Dix, but failed to take reasonable action to summon aid, or provide, or cause to be provided such medical care and treatment.

240.    Defendants knew or should have known that their failure to take steps to ensure Plaintiff received reasonable medical care created a constitutionally unreasonable risk of harm to Plaintiff while he remained and remains jailed at FCI Fort Dix.

241.    Defendants knowingly disregarded an excessive risk to Plaintiff's health and safety and knowingly subjected him to continuing pain and suffering, anxiety, anguish, feelings of unjust treatment, fear and neglect.  Defendants' failure to ensure timely medical care was wilful, intentional, wanton, reckless and in conscious disregard for Plaintiff's rights, warranting the award of punitive damages.

242.    The individual defendants' conduct described above individually and collectively constitutes a deliberate indifference to Plaintiff's serious medical needs and violates Plaintiff's clearly established Fifth and Eighth Amendment due process rights to adequate medical care.

243.    As a direct and proximate cause of the conduct of the individual defendants and Does 1-10, Plaintiff suffered and continues to suffer serious, painful injuries, great pain and suffering, anxiety, anguish, loss of bodily function and emotional distress.

244.    Defendants have thereby inflicted cruel and unusual punishment in violation of his rights under the Fifth and Eighth Amendments to the United States Constitution.

245.    In addition, Defendants' actions with respect to the COVID-19 outbreak were grossly negligent, reckless, and directly contrary to the guidance and directives of the Attorney General.

246.    The actions of the Defendants constitute deliberate indifference to Plaintiff's clearly established Fifth and Eighth Amendment rights.  The conduct further constitutes a pattern

and practice of unconstitutional and reckless behavior that continues to this day, and continues to harm Plaintiff.

247. As a direct and proximate cause of the conduct of the individual defendants and Does 1-10, Plaintiff suffered and continues to suffer serious, painful injuries, great pain and suffering, anxiety, anguish, loss of bodily function and emotional distress.

248. Plaintiff therefore demands judgment against the defendants together with compensatory damages, punitive damages, interest, attorney's fees and costs of suit.

**Second Count**
***Federal Tort Claims Act***
**Against the United States of America and the Bureau of Prisons as an Agent of the United States of America**

249. Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of the Second Amended Complaint, as if fully set forth here.

250. At all relevant times, the Individual Defendants were employed by the BOP and/or were acting as agents of the BOP.

251. At all relevant times, the Individual Defendants were acting within the course and scope of their office or employment.

252. The inappropriate treatment the Individual Defendants provided as part of their employment resulted in personal injuries and damages to Plaintiff.

253. The United States, if a private person, would be liable to Plaintiff in accordance with New Jersey state law.

254. Defendant, the United States of America, through its agency, the BOP, was negligent in providing substandard medical treatment to Plaintiff throughout his incarceration at FCI Fort Dix. The mistreatment of Plaintiff, while in the custody and control of the United

States, resulted in harm and substantial pain and suffering, thereby entitling Plaintiff to compensatory damages.

**Third Count**
*Medical Malpractice*
**Against Defendant Dr. Sood, Dr. Fares, Dr. Chowdhury, and Dr. Turner-Foster**

255.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of the Second Amended Complaint, as if fully set forth here.

256.    While Plaintiff was incarcerated in FCI Fort Dix, Defendants undertook to provide medical care to him.

257.    Defendants had a duty to provide adequate and proper medical care consistent with the standard of care for practitioners in the community.

258.    Defendants breached this duty when they delayed Plaintiff's care and failed to give appropriate and adequate treatment for Plaintiff's medical conditions.

259.    Defendants' failure to provide appropriate medical care and treatment to Plaintiff was the legal and proximate cause of his physical injuries, pain and suffering and severe emotional distress.

260.    The actions of the Defendants constitute a pattern and practice of unconstitutional and negligent behavior that continued through their treatment of Plaintiff, and continues to harm Plaintiff.

261.    Plaintiff demands judgment against Defendants together with compensatory damages, punitive damages, interest, attorney's fees and costs of suit.

**Fourth Count:**
*Negligent Infliction of Emotional Distress*
**Against Defendants Dr. Sood, Dr. Fares, Dr. Chowdhury, Dr Turner-Foster, and David Ortiz**

262.    Plaintiffs incorporate all allegations set forth in the preceding paragraphs as if fully set forth herein.

263.    Defendants owed Plaintiff a duty of care to avoid exposing him to foreseeable harm and further medical deterioration.

264.    Defendants Dr. Sood, Dr. Fares, Dr. Chowdhury, and Dr. Turner-Foster were negligent and fell below a reasonable standard of care when they subjected Plaintiff to blatant and prolonged medical neglect.

265.    Defendant Warden Ortiz was negligent in his handling of the COVID-19 pandemic at FCI Fort Dix.

266.    It was foreseeable that as a result of Defendants' actions and inactions, Plaintiff would suffer extreme emotional and psychological distress over the non-treatment of his medical conditions, and his increasing deterioration without response.

267.    The actions of the Defendant constitute a pattern and practice of unconstitutional and negligent behavior that continued through the course of Defendant's treatment of Plaintiff, and continues to harm Plaintiff.

268.    As a result of this malfeasance, Plaintiff is entitled to compensatory and punitive damages as allowed by law.

**Fifth Count**
*Intentional Infliction of Emotional Distress*
**Against David Ortiz**

269.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of the Second Amended Complaint, as if fully set forth here.

270. Defendant Ortiz woefully failed to properly handle the COVID-19 pandemic at FCI Fort Dix.

271. Further, Defendant Ortiz failed to implement the directives of Attorney General Barr in maximizing transfer to home confinement.

272. Upon information and belief, Warden Ortiz selected inmates for home confinement based on improper considerations, including race.

273. Defendant's conduct as alleged herein was outrageous.

274. In carrying out these acts, Defendant acted with reckless disregard of the probability that Plaintiff would suffer emotional distress.

275. As a direct and proximate cause of the acts by Defendant, Plaintiff suffered severe emotional distress.

276. The actions of the Defendant constitute a pattern and practice of unconstitutional and negligent behavior that continued through the course of Defendant's treatment of Plaintiff, and continues to harm Plaintiff.

277. As a direct and proximate result of the Defendant's actions alleged herein, Plaintiff is entitled to an award of compensatory damages for injuries suffered in an amount according to proof at trial.

278. The acts of Defendant, and each of them, as alleged herein, were malicious, oppressive and/or in reckless disregard of Plaintiff's state and federally protected rights. Plaintiff is entitled to an award of punitive damages for injuries suffered in an amount according to proof at trial.

**Sixth Cause of Action:**
*Negligent Supervision*
**Against Defendant Turner-Foster**

279.    Plaintiffs incorporate all allegations set forth in the preceding paragraphs as if fully set forth herein.

280.    Dr. Turner-Foster was responsible for supervising the medical staff at FCI Fort Dix.

281.    Dr. Turner-Foster knew or should have known that the care provided by her subordinates fell below the applicable standard of care.

282.    Dr. Turner-Foster should have foreseen that providing medical care below the applicable standard of care would cause harm to Plaintiff.

283.    Plaintiff suffered unnecessary pain and suffering and other damages as a proximate result of receiving medical care below the applicable standard of care.

284.    Plaintiff demands judgment against the defendants together with compensatory damages, punitive damages, interest, attorney's fees and costs of suit.

**Seventh Cause of Action***:*
*Discrimination in the Selection for Home Confinement in Violation of Plaintiff's Constitutional Rights*
**Against Defendant Davis Ortiz**

285.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of the Second Amended Complaint, as if fully set forth here.

286.    Black inmates were selected for home confinement at rates below inmates of other races, when compared to overall prison headcounts.

287.    Upon information and belief, Warden Ortiz selected inmates for home confinement based on improper considerations, including race.

288.    Such conduct violated Plaintiff's constitutional rights under the Fifth and Fourteenth Amendments.

289.    The actions of the Defendants constitute a pattern and practice of unconstitutional and negligent behavior that continues to this day, and continues to harm Plaintiff.

290.    Plaintiff therefore demands judgment against the Defendants together with compensatory damages, punitive damages, interest, attorney's fees and costs of suit.

**WHEREFORE,** Plaintiff Joshua Moses demands payment individually and collectively from each and every Defendant, jointly and severally, for compensatory damages, punitive damages, interest, attorneys' fees, and costs of suit, in an amount to be determined at trial, and such other and further relief as this court deems just.

<u>JURY DEMAND</u>

Plaintiff demands a trial by jury as to all issues herein permitted by law to be tried by a jury.

Respectfully submitted.

**REED SMITH LLP**

_/s/ Don A. Innamorato_____
Don A. Innamorato, Esq.
Saranne E. Weimer, Esq.
506 Carnegie Center, Suite 300
Princeton, NJ  08540
Tel. (609) 987-0050
Fax (609) 951-0824

Dated: April 22, 2021