# Exhibit 2

## Deposition Transcript of Banwarlal Chowdhury from June 6, 2023 and July 27, 2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JOSHUA A. MOSES, )
) 
Plaintiff, )
) CASE NO.
-vs- ) 20-cv-1025
)
DR. RAVI SOOD, DR. LOUIS G. FARES, DR. B. CHOWDHURY, NICOLETTA TURNER-FOSTER, DAVID ORTIZ, UNITED STATES OF AMERICA, and BUREAU OF PRISONS, JANE/JOHN DOES 1-10, )
)
Defendants. )
)

(VOLUME I)
*SWORN DEPOSITION TESTIMONY*
OF:
BHANWARLAL CHOWDHURY, M.D.

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before LYDIA F. McDONNELL, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, held at the office of LENOX, SOCEY, FORMIDONI, GIORDANO, LANG, CARRIGG & CASEY, LLC, 136 Franklin Corner Road, Unit B2, Lawrenceville, New Jersey, on Wednesday, June 7, 2023, commencing at 2:09 p.m.

A P P E A R A N C E S:

REEDSMITH, LLP
BY: DON A. INNAMORATO, ESQ.
500 Carnegie Center, Suite 300
Princeton, New Jersey 08540
609-987-0054
dinnamorato@reedsmith.com
Attorneys for the Plaintiff

LENOX, SOCEY, FORMIDONI, GIORDANO, LANG, CARRIGG & CASEY, LLC,
BY: MICHAEL A. PATTANITE, JR., ESQ.
136 Franklin Corner Road, Unit B2
Lawrenceville, New Jersey 08648
609-896-2000
mpattanite@lenoxlaw.com
Attorneys for the Defendant,
Dr. B. Chowdhury

UNITED STATES ATTORNEYS' OFFICE
DISTRICT OF NEW JERSEY
BY: MATTHEW J. MAILLOUX, ESQ.
970 Broad Street, Suite 700
Newark, New Jersey 07102
973-645-2937
matthew.mailloux@usdoj.gov
Attorneys for the Defendants,
Dr. Ravi Sood, Nicoletta Turner-Foster, David Ortiz, United States of America and Bureau of Prisons
(via teleconference)

ALSO PRESENT:
Saranne Weimer, Esq. - ReedSmith, LLP

I N D E X

WITNESS: BHANWARLAL CHOWDHURY, M.D.

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MR. INNAMORATO | 5 | | | |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Chowdhury-1 | Handwritten treatment notes Bates-stamped US000407 and US000408......................... | 79 |
| Chowdhury-2 | Surgical Consultation Bates-stamped US000470 and US000471......................... | 111 |
| Chowdhury-3 | Final Report Bates-stamped US000478 through US000480....... | 117 |

(Exhibits attached to transcript.)

SPECIAL REQUESTS

(No special requests)

B H A N W A R L A L C H O W D H U R Y, M.D., having been duly sworn by the Notary Public, testified as follows:

DIRECT EXAMINATION BY MR. INNAMORATO:

Q. Good afternoon, Dr. Chowdhury. My name is Don Innamorato, and I represent the Plaintiff in this case, Joshua Moses, which I believe was a former patient of yours.

Have you ever been deposed before like this?

A. Yes, I have been.

Q. Okay. And what was that in connection with?

A. Malpractice.

Q. Okay. I'll get to that in a moment, but regardless of how many times you've testified, I want to give you the rules that I use for the deposition today, okay?

If you don't hear or understand a question that I ask you, just let me know --

A. Okay.

Q. -- okay?

We have to give verbal answers --

A. Right.

Q. -- to every question. And so, you know,

a shrug of the shoulders may not work. All right?

A. Right. That's right. Yeah.

Q. I will not talk over you, and I hope you won't talk over me, although it's gonna happen. It happens every time. All right. But we'll try to limit that.

And if we review documents during the deposition, I want you to take the time that you need to review it to make sure that -- that you understand, you know, what the document states. All right?

A. Right.

Q. Okay. And if at any time you want to take a break, just let me know.

A. Right.

Q. Okay. Can you state your name for the record, please?

A. Bhanwarlal Chowdhury.

Q. And, Doctor, have you taken any medications today that might interfere with your ability to hear my questions or understand them?

A. No, I have not.

Q. Okay. And what is your age, Doctor?

A. Eighty-four.

Q. Do you have -- before coming here today,

did you do any preparation for your deposition? And I'm gonna warn you, don't tell me anything that your lawyer told you. All right? But did you do preparation for this?

A. I did.

Q. Okay. Did you meet with your lawyer?

A. Pardon me?

Q. Did you meet with your lawyer?

A. Meet with?

Q. Meet with your lawyer?

A. I did.

Q. Okay. All right. How many times?

A. One time.

Q. Okay. That's enough, right?

MR. PATTANITE: Never enough.

A. Yes.

Q. And did you review any records during your -- your prep session?

A. I did.

Q. All right. Do you remember what -- what these were?

A. That was Mr. Moses' deposition, and an article from Wikipedia.

Q. Okay. I want to get a little bit about your background, and I'm not going all the way back.

Where did you attend medical school?

A. It was SMS Medical College, Jaipal, India.

Q. All right. And when did you graduate that?

A. 1964.

Q. And was that -- have you had any specialties in the area of medicine?

A. I am a gastroenterologist.

Q. All right. Are you board certified or have you --

A. I am board certified.

Q. Okay. Has that been continuous since you originally got your --

A. Continuous ever since I got my board, yeah.

Q. All right. And when were you first board certified in -- in gastroenterology?

A. '76 -- 1978.

Q. Okay. Have you -- where do you currently -- where are you currently licensed to practice medicine?

A. At present I'm working as an internist in a clinic, AZZ Medical. That's the name of the clinic.

Q. Okay. And do you hold a license in New Jersey to practice medicine?
A. I do.
Q. Any other states?
A. None.
Q. Okay. Now, have any of your licenses ever been revoked or suspended for any reason?
A. No.
Q. And have you been -- ever been disciplined by any governmental board or agency?
A. No.
Q. You just told me where you are practicing medicine. How long have you been there?
A. This place, I've been there for one year.
Q. Where did you practice? What -- what type of practice did you have before?
A. I practiced as an internist and a gastroenterologist in my own private practice.
Q. All right. And how long have you had your own private practice?
A. Since 1978 --
Q. And --
A. -- up until -- up until 1920 (sic).
Q. Okay.

A. Or -- sorry -- 2020.
Q. 2020. Right.
Now, do you have or hold what's known as "privileges" at any hospital?
A. I did, at St. Francis Medical Center in Trenton, New Jersey.
Q. In Trenton, okay.
A. The hospital is closed now.
Q. How long has it been where you have not practiced at St. Francis, I guess when it closed?
A. Since 1920 (sic).
Q. 2020?
A. Twenty now, right. 2020. Sorry. 2020.
Q. That's quite all right.
A. I'll have to write it down now. 2020, yes. Yeah. When Covid hit, they stopped the procedure. I -- I used to do endoscopies and colonoscopies. But during the Covid time, they were -- they were sharing beds -- sharing beds for the Covid patients, so we were not allowed to do endoscopy.
Q. Okay. And then why is that? In terms of do you know why they stopped doing endoscopies?
A. Because they used the beds for the -- beds and the facility for the Covid patients.

Q. I see. I see. So it was a capacity --
A. Yes.
Q. -- issue.
A. So that -- that -- that was the time when I closed my practice because -- because of my -- my age and my doctor's -- my own doctor's recommendation. I was not supposed to be in close contact with any patients, so I closed my practice --
Q. And that was --
A. -- in 2020.
Q. Okay. And that was because of the higher risk --
A. Higher risk, yeah.
Q. -- for Covid?
A. Yeah.
Q. Okay. How many --
A. Age- --
Q. I'm sorry. Go ahead.
A. Age-related higher risk. How about that?
Q. All right. How long did you practice at or through St. Francis?
A. Since 1978.
Q. And have your privileges at St. Francis ever been suspended or withdrawn?

A. No.
Q. Have you ever held privileges -- had privileges at any other hospital?
A. I did.
Q. And where was that?
A. Robert Wood Johnson University Hospital at Hamilton.
Q. And -- and what was the -- the time period for that?
A. Since 1978 up until, I think, 2015.
Q. Okay. And were your privileges at Robert Wood Johnson ever revoked or suspended?
A. No.
Q. Any other hospitals that you've had privileges or....
A. Briefly at Helene Fuld Medical Center in Trenton, New Jersey.
Q. Okay. And do you remember just the approximate period for that?
A. I don't. It was, as I said, for a brief time.
Q. Okay. Was there a reason why you ended that privilege?
A. Because of my age, I did not want to move around too much in three hospitals, so I decided

not to go there anymore. Same reason for not going to Robert Wood Johnson Hospital in Hamilton.

Q. Okay.

A. I --

Q. It's a long trip for you, right, to Hamilton?

A. Well, it's a -- yeah. It's a long trip, so I limited myself to my office and St. Francis Medical Center before I closed my practice.

Q. And when -- what year did you close your practice again? I'm sorry.

A. 2020.

Q. Okay. All right. Doctor, other than Mr. Moses's lawsuit, the one that we're here for today, have you ever been a defendant in a medical malpractice lawsuit?

A. Yes, I have.

Q. Okay. And can you give me a description of how many? Is it more than one?

A. More than one you can write, yes.

Q. Okay. Did they -- did that lawsuit involve an inmate?

A. No.

Q. All right. Can you just give me a -- a thumbnail sketch as to what was alleged in that case?

A. One patient was transferred from hospital to a nursing home; and after three, four days of stay in the nursing home, her condition declined, and she was sent back to the hospital. And unfortunately, she passed away in the hospital --

Q. Okay.

A. -- so the family brought a malpractice case against me.

Q. All right.

A. But I saw her only once in the nursing home.

Q. Okay. Do you remember approximately when that lawsuit was? How many years ago?

A. I don't. I wish I -- I could tell you all the -- all the detail, but I don't -- I don't have the dates.

Q. Okay. More than ten years ago?

A. More than ten years ago --

Q. Okay.

A. -- yeah.

More than 20 years ago.

Q. All right. Other than that malpractice lawsuit, have you ever been sued for malpractice in any other way -- any other time?

A. There was a patient who I did

colonoscopy and he had a bleeding from a polyp that I removed, and then that's when he required surgery and there was multiple complications. That was -- that was another case.

Q. In either of the two cases, did they ever go to trial?

A. They did.

Q. Okay. And did you testify at the trial?

A. I did.

Q. Can you tell me what the result was?

A. Both cases I was held not guilty.

Q. Okay.

A. It was a jury trial --

Q. Okay.

A. -- on both cases.

Q. All right. And these are both more than ten years ago?

A. More than 20 years ago.

Q. All right. Are those the only two cases that you've been involved with for malpractice --

A. There --

Q. -- other than this one?

A. There was one patient in a nursing home where I replaced her feeding tube. And unfortunately, the feeding tube went the wrong way

and I had to send to hospital.

Q. And -- and approximately when was that?

A. Twenty years ago.

Q. And other than medical malpractice cases have you ever been a defendant in a lawsuit?

A. No other lawsuit, no.

Q. All right. Even as a -- have you ever been a plaintiff in a lawsuit?

A. What is a plaintiff? I....

Q. Oh. I'm sorry. The one who brings -- I'm sorry. The one who brings the lawsuit.

A. You mean I brought a lawsuit?

Q. You sued somebody.

A. I did not.

Q. Okay.

A. I'm very religious person.

(Reporter requests repeat.)

A. I'm a very religious person. I don't believe in lawsuits against anybody.

THE WITNESS: Put it in capital letters.

MR. INNAMORATO: You're gonna put Mike and I out of business.

(Laughter.)

THE WITNESS: I had a sticker one time. I attended a malpractice conference --

MR. INNAMORATO: Right.

THE WITNESS: -- and the sticker said: Become a Doctor -- and within parentheses, the next line was -- and Support a Lawyer.

(Laughter.)

Q. Have you ever --

MR. PATTANITE: That's good.

Q. Either in your private practice or through St. Francis or Robert Wood or the other hospital, have you ever been investigated by any federal or state agencies for Medicare fraud, that type of thing?

A. No.

Q. Now, Doctor, have you ever provided care to prison inmates as part of your practice?

A. Yes, I did.

Q. And when did you first start that?

A. Again, I don't have the exact date, but maybe 2015 to 2020.

Q. Okay. Was that the only time that you gave care to -- to inmates?

A. That's right.

Q. And was that care provided at St. Francis?

A. That's right.

Q. Okay. And was that continuous from 2015 to 2020?

A. It was, yes. Uh-huh.

Q. And what type of care did you provide for prison inmates?

A. Well, two types: One is when they came to the St. Francis Hospital and they required gastroenterology consultation or procedures, I performed them for -- I performed those procedures, and that was part of -- you know, one part of the care. And the other -- other was that they had clinics there in the prison system where I would usually, once a month or so, sometimes once in two months, I will go to the prisons and provide care --

Q. Okay.

A. -- and consultation services.

Q. I'm sorry. Was there any particular prison that you visited through the clinic?

A. One was Fort Dix prison, and the -- and the -- the other was the State prisons where I -- I basically did the TeleMed. I did not go to the sites.

Q. So it was telemedicine you mean?

A. Right.

Q. Okay. Was that back in 2015 or was

that --

A. 2015 to 2020 you can say.

Q. All right. Was telemedicine back then visual or was it more by phone? Just audio?

A. Visual. Uh-huh.

Q. Okay. During that period, that five-year period that you provided care to prison inmates, about what percentage of your total practice time was devoted to that?

A. Maybe 5 to 10 percent.

Q. All right. And sort of getting a feel for that 5 to 10 percent, how many inmates a month would you generally be seeing on average?

A. I couldn't tell you these numbers now.

Q. Was it every month?

A. Depending upon who came to the hospital for sickness --

Q. All right.

A. -- unless I do GI tract.

Q. Okay. And --

A. And then the outpatient endoscopy procedures were also scheduled under my name.

Q. All right. In terms of -- I'm trying to get a -- get a sense of the number of inmate patients that you had.

A. You could say five -- three to five patients per week.

Q. During -- during the average -- that would be an average.

A. Right.

Q. Okay. And of that, did you have more that would be coming to the clinic -- and that would be -- the clinic would be going out to Fort Dix, for example, correct?

A. Pardon me?

Q. You would actually go to Fort Dix?

A. Go to Fort Dix, yes. Uh-huh.

Q. Okay. Was there any other physicians with you in that part of the clinic?

A. There were physicians from all specialties there: surgery, foot doctor, psychiatry. Different -- different fields.

Q. Would you go out together or just....

A. No. Own -- we had our own schedule.

Q. Okay. To your knowledge, Doctor -- well, let me ask you this: Was that work pro bono, meaning free, or was there some type of compensation given to either you or St. Francis for the inmate work?

A. Inmate work was compensated by the

prison system.

Q. All right. And are you aware of any kind of contractual arrangement between the Bureau of Prisons and St. Francis or the clinic?

A. With St. Francis, I do not know. I have no knowledge what system they had.

Q. How about the -- the clinic that you....

A. The clinic that I conducted was the -- they paid me directly. The prison system paid me for the visit to the clinic.

Q. For each visit of an inmate?

A. Not each inmate, but for -- for the -- that -- that day's clinic they would pay me a flat amount.

Q. Oh. A flat fee. That's what I was trying to get at.

A. Right.

Q. Okay. And the flat fee would be paid whether you saw one or more? It's the same flat fee, so you're not being paid individually per inmate?

A. No.

Q. Okay. Had that been the arrangement throughout your time doing the clinic at Fort Dix?

A. Yes.

Q. And without getting into amounts, the

flat fee that the Bureau -- the Bureau of Prisons paid you at the clinic, was that at a higher rate than you would normally charge or a lower rate or the same for the patient visits?

A. You mean the hourly rate here?

Q. Yeah. If you -- if you can -- if you can distill it down to an hourly rate.

A. I never worked at this hourly rate with any other organization, so I cannot give you a calculated figure.

Q. Okay. So you -- you can't really tell whether the flat fee, if you broke it down per patient, was more or less than your normal patients.

A. No, I cannot.

Q. All right. Other than the flat fee during your work for the Bureau of Prisons, were you given any type of budget you had to stay within other than the flat fee?

A. I didn't understand your question.

Q. I'm sorry.

A. I was....

Q. I know that -- we're talking -- we're discussing the clinic that you --

A. Right. Right.

Q. And you were given a flat fee. Was that

monthly or yearly?

A. Monthly.

Q. Monthly. Did it go up or down?

A. No, it did not. It was fixed.

Q. Okay. So if you saw no patients for the month, it would -- you would still be paid a flat fee.

A. No. I will not be paid.

Q. Okay. Was there any type of -- number of patients that would trigger a flat fee?

A. No. I don't think so. They usually would have maybe five, ten patients. I -- I couldn't tell you the number usually, but the only -- only time I would go there is if there's a patient; otherwise, I will not go there. Fort Dix is about 35 miles away from -- from St. Francis Hospital.

Q. Right. I guess what I'm trying to get at is, if you saw only one patient a month, would you be paid the same flat fee if you saw ten?

A. That never happened.

Q. Okay. So there's -- there's -- we can't distill it down to an hourly rate. We know that.

A. Per patient, no, you cannot, yeah.

Q. But do you remember any time when you only saw one patient and still got the flat fee?

A. No. I did not see one patient.

Q. All right. Now, during that -- that -- in that system with the flat fee in the Bureau of Prisons, did the Bureau of Prisons ever give you any limits on the type of care whether it's tests to be ordered that you felt were appropriate?

A. That was basically a recommendation from my side. I will not schedule any patient from -- from the clinic.

Q. It would have to go through the -- for example -- let's do a hypothetical. You have a patient who comes in and you're gonna recommend an endoscopy performed by you, because you perform them, correct?

A. Right.

Q. Did you just go ahead and schedule it or did you have to communicate with the Bureau of Prisons?

A. I will recommend on my recommendation note and give it to the nurse who is in charge of the clinic, and then from that point onwards, it -- it -- it was not my responsibility to follow up on that. The prison system did not say the doctor's there. They have got their -- their own doctors who -- who will schedule the patient. And I think they're

required a preauthorization kind of thing before they can schedule a patient for any procedure.

Q. Just giving you a hypothetical so I understand that arrangement: If a patient, you believe, truly needs an endoscopy, for example, for a suspected malignant tumor, okay, do you follow up on that with the Bureau of Prisons or do you just wait for their approval?

A. I wait for him to come to the hospital for the endoscopic procedure.

Q. Okay. So another way of saying that is that your hands are tied. You make a recommendation, and even in a situation where there may be potential cancer, you still have to await for the Bureau of Prisons.

A. That's right.

Q. Okay. That's what I wanted to get at.

A. My office will coordinate the scheduling with the prison scheduler when -- when the patient can -- can be scheduled for the procedure.

Q. Have you ever, when you were at the clinic treating inmates, recommended that they go to the ER, for example?

A. This did not happen with me, but that's a possibility.

Q. All right. So if, in fact, you believe -- and this is under the arrangement with the BOP. If you believe that immediate care was needed, you would take that step yourself or would you still have to go through the prison?

A. I will recommend that to the prison -- prison system, yes.

Q. Do you ever remember any incidents where you made a recommendation on an emergency basis and it wasn't fulfilled by the Bureau of Prisons?

A. I don't remember that situation, no.

Q. All right. Have you ever encountered a scenario where you recommended, for example, an endoscopy for a patient and the Bureau of Prisons denied that request?

A. I would not -- I would never know about it.

Q. What if it was you who were gonna perform the endoscopy? Would you know that?

So a patient comes in at the clinic. You evaluate him or her, and you believe that an endoscopy is needed. If it were, in fact, rejected -- have you ever had that situation where it would be rejected by the -- the Bureau of Prisons?

A. I wouldn't know about it because I -- I

did not follow the patient. Once I -- I give a recommendation, I have no -- no regular follow-up. Unlike an office patient where I see my patients on a regular basis, I don't see the prisoners on a regular basis. I go once in a month, I recommend, and the rest of it is left to the prison system, with the doctors or who saw, whether it's the -- the scheduler or -- or whatever arrangement they have.

Q. Okay. And I think that now explains it for me. So as opposed to patients in your private practice that you follow, that you continue to supervise their care, when you do the work at the clinic through the Bureau of Prisons, you're not following up with them as your own particular patient.

A. No, I'm not.

Q. All right. Has that ever been in writing where that's not your obligation?

A. No. It's not in writing, no. I don't think so.

Q. All right. No contract or anything that you've signed with the Bureau of Prisons or arrangement?

A. No. But it -- I do not know whether it was mentioned in the contract or not. I could not

tell you that.

Q. Did you actually have to sign a contract with the Bureau --

A. I did, yes.

Q. Okay. Do you still -- still have a copy of that?

A. No, I don't. I -- I -- I submitted it to them and it -- it was with them. I didn't keep a copy, no.

Q. All right. Do you remember how long ago you signed that?

A. I don't know.

Q. Would it be at least -- it had to be 2015 or after, though, correct?

A. Around that time, yes. Uh-huh.

Q. All right. Have you ever seen inmates -- and we're only talking about inmates right now. Have you ever seen an inmate more than once during the clinic?

A. Unusual.

Q. Is it unusual?

A. Unlikely, yes.

Q. All right.

A. Uh-huh.

Q. And the other option there would be that

you would see them after the request was approved. For example, to perform an endoscopy. You would see them after that request was approved by the Bureau of Prisons?

A. I would see them in the hospital in the endoscopy suite.

Q. All right. So that's one time where you're, in a sense, following up with the patient because you're seeing them twice. Were there any other times where you would be following the patient?

A. If they are admitted to the hospital and they are inpatient in the hospital and they require a GI follow-up or a GI situation, then I'll see them more than once or every day on that basis just like any -- any non-prisoner -- non-prisoner patient that you see in the -- I see in the office.

Q. Okay. But while they're in the -- the hospital, they're under your care?

A. No. They are -- there's a primary care physician. There is a hospitalist who -- who admits them and takes care of them. If they have GI issues, then only they put a consult for me to see the patient. Then I go see the patient as a GI consultant.

Q. All right. How about with regard to the

clinic itself? Have you seen the same patients over and over?

A. I told you, it's very unlikely. I don't remember seeing a patient again and again, no.

Q. All right.

A. I go to the clinic usually once in a month, and if they had any -- any issue or situation that -- you know, the -- the prison system takes care of it at that stage.

Q. Was there a reason why -- and you -- you described one scenario where you have a patient that you've seen at the clinic, an inmate patient at the clinic, and then you would be called to perform the service out of the hospital. Were you tied to them in some way? Why is it that you were called as opposed to another GI doctor?

A. Actually, I had the -- I -- I had the contract with them to see the prisoners, so they would call me.

Q. Okay. So through the contract, you were on call, effectively, to treat prisoners whether or not you may have seen them during the clinic.

A. That's right.

Q. Okay. That makes sense. And I apologize if I've asked this before, but do you ever

recall an incident where you strongly recommended a particular procedure be performed and you learned later that it was denied by the prison?

A. I don't recall any situation like that.

Q. All right. Okay. Are you familiar with a Dr. Ravi Sood?

A. Pardon me?

Q. Are you familiar with a physician named Dr. Ravi Sood?

A. I am, yes.

Q. And -- and who is Dr. Sood?

A. Dr. Sood is a primary care physician with the prison system.

Q. To your knowledge or your understanding, he actually works for the Bureau of Prisons as an employee?

A. He does.

Q. All right. And have you and Dr. Sood treated the same patients or patient in the past?

A. Well, Dr. Sood would refer the patient for GI evaluation to me. And as I told you before, I usually don't follow them on a regular basis or a monthly basis, so once I give my recommendation, the rest of the -- or whatever the recommendations are, are taken care of by the primary care physicians who

are with the prison system --

Q. Okay.

A. -- and Dr. Sood is one of them.

Q. So in the normal course, Dr. Sood would evaluate a patient, and then, if needed, refer them to you.

A. Right.

Q. And that's through the contract you had with the Bureau of Prisons.

A. Correct.

Q. Okay. Do you know if Dr. Sood has any particular specialty? Board certification?

A. No. I don't know.

Q. Do you understand him to be an internist?

A. I -- that's what I thought; he's an internist, yeah.

Q. And physically, do you know where Dr. Sood has worked?

A. What is his work?

Q. His location of work. Where does he work from?

A. He works from Fort Dix.

Q. Okay. So he's actually on staff on the grounds.

A. On -- on the grounds, yes. Uh-huh.
Q. All right. How -- let me -- let me ask you this: Was there any other primary care or internist at Fort Dix that you also shared patients with or would have referrals?
A. One was Dr. Patel, P-A-T-E-L.
Q. All right.
A. And there was a lady doctor. I don't remember her name. She was -- she was a medical director, and she would also see patients there.
Q. Would that be Dr. Foster?
A. Foster, right. Right. Right. Right. Uh-huh.
Q. And to your -- your understanding is that she also worked for -- directly for the Bureau of Prisons as an employee?
A. She did, yeah. I knew that, yeah.
Q. Dr. Turner-Foster?
A. Turner-Foster, that's right.
Q. Based on your past collaborations with Dr. Sood with patients, do you trust his clinical expertise and judgment?
A. Very difficult to say.
Q. Have you ever had --
A. I can't answer that question.

Q. Is it -- is it too broad, the question?
A. I'm not -- I'm not working with him. I'm not seeing patients like he sees the patients on a daily basis, so it's very difficult for me to -- to -- to assess his -- I don't go over his notes, so....
Q. When -- well, let me ask you this: When he refers patients to you or he has referred patients to you, did you ever disagree with his initial diagnosis?
A. No. I did not, no.
Q. All right. Do you remember any time when you had any dispute with Dr. Sood regarding an inmate patient?
A. No.
Q. In your work for -- through the contract for the Bureau of Prisons, were there any other -- did Dr. -- Dr. Patel you mentioned, right?
A. Right. Right.
Q. Okay. Was Dr. Patel board certified in any --
A. I do not --
Q. -- area?
A. -- know.
Q. Okay. How about Dr. Louis Fares? Do

you know him?
A. Dr. Louis Fares is a -- is a surgeon who also sees patients.
Q. All right. And these patients would be inmate patients?
A. Pardon me?
Q. The -- the patients that Dr. Fares sees, they would be inmates as well?
A. Inmates. Yeah. Uh-huh.
Q. All right. And does Dr. Fares operate outside of the Bureau of Prisons or, like you, through a contract, or is he actually employed by the Bureau of Prisons?
A. He's just like me. He -- he's a consultant with them. He's not employed by Bureau of Prisons, no.
Q. All right.
A. He has his own private practice.
Q. How long have you been working in -- or through that arrangement with Dr. Fares?
A. Not a joint arrangement, but Dr. Fares has been a surgeon with St. Francis Hospital for many -- 35-plus years.
Q. Okay. Dr. Fares is at St. Francis?
A. St. Francis. I knew his father also who

was.
Q. You've been there a long time.
A. I've been there too long a time, yeah. That's right. Yeah.
Q. All right. You're gonna have to use the -- the younger Louis Fares.
A. This is -- this is the younger Louis Fares, yeah.
Q. All right. Had the two of you ever shared patients before? Treated the same patient?
A. Well, if they had a surgical situation, then -- and a GI situation, we might have seen them together and they are inpatient in the hospital.
Q. Okay. Was there any time that you can recall where you and I -- you and Dr. Fares were treating the same patient and you disagreed with any diagnosis he may have had or recommendation?
A. I don't recollect that situation, no.
Q. Okay. Generally speaking, did you feel Dr. Fares was a capable surgeon?
A. I would say so, yes.
Q. Was his father a surgeon too?
A. His father was a surgeon, yeah. Uh-huh.
MR. PATTANITE: Family business.
MR. INNAMORATO: Yeah. Exactly.

Q. Now, in terms of connections between you and Dr. Fares compared to Dr. Sood, did -- did you have less contact with Dr. Fares than Dr. Sood with regard to the inmate patient base?

A. I had more contact with Dr. Fares because of St. Francis Hospital.

Q. And this would be with inmate patients?

A. Inmate patients, yeah.

Q. All right.

A. And -- and surgical patients. If my patient needed -- my office patient needed a surgical procedure, I might refer him to Dr. Fares.

Q. Okay. He was just down the hallway basically, right?

A. Huh?

Q. He was just down the hallway in St. Francis.

A. Right.

Q. You did feel he was a capable surgeon then, I assume?

A. He's a good surgeon, yeah. Uh-huh.

Q. All right. Do you know if Dr. Fares was board certified in -- in surgery?

A. That, I do not know.

Q. All right. Do you remember any time --

and this would be limited to inmate patients -- where Dr. Fares made a recommendation about a particular inmate, surgical intervention, and you disagreed with him?

A. No. I don't remember a situation, no.

Q. Okay. I want to talk a little bit about the general procedures you follow when you're treating a patient for the first time. All right?

First of all, do you follow any different procedures when you're treating inmates versus your private patients?

A. No. It's the same practice.

Q. All right. Do you take an oral history from the patient?

A. I do.

Q. Why is that important, Doctor?

A. Well, in the clinical practice we have to find out from the patient what his complaints are, what his problems are.

Q. And do you review their past medical records?

A. If they are available, yes. Uh-huh.

Q. All right. When you worked at the clinic at Fort Dix, did you have a particular file system there for those patients?

A. No. They -- I think they are -- they are -- most things are computerized in their system.

Q. Okay. I guess my question is, if you're treating an inmate patient at the clinic at Fort Dix and you want to look at their medical records, were they available to you then?

A. Yeah. They will make them available for me, yes. Uh-huh.

Q. All right. Was that -- were they available at the time you saw the patient or did you have to request them after the visit?

A. I -- I can't answer that question. I -- it could be either way, you see. Either while I'm there if they have the record they can show it to me or they can print it for me from the computer or -- or -- or they can get it to me later on, yeah.

Q. Was there staff there at the clinic that would assist you in that type of thing?

A. They do. They do. Uh-huh.

Q. Okay.

A. Especially lab, X-rays, et cetera.

Q. All right.

A. They will -- they will print the report for me.

Q. All right. And these would be nurses or

other doctors?

A. Nurses.

Q. Nurses, okay. And with regard to the medical records of the patient, is that important for you to review?

A. It is.

Q. And why is that?

A. Well, to get some information about their ailments.

Q. Okay. Do you also perform some form of physical exam on patient?

A. I do.

Q. And why can that be important?

A. To have an idea about their complaints as well as the physical examination, listen to the heart, listen to the lungs, check their belly, et cetera.

Q. And checking the belly is with your specialty in particular, I would take it, right?

A. Right.

Q. Okay. Do you also consider whether -- additional testing, medical testing for the patient from time to time?

A. I -- I would make the recommendations, yes.

Q. All right. And that would include something like, you know, X-rays, for example. Would you recommend that from time to time?
A. X-rays, CAT scans, ultrasound.
Q. Ultrasound. Are you familiar with the -- the term "enterology"?
A. Pardon me?
Q. Are you familiar with the term "enterology"?
A. Enterology?
Q. Yeah. CT or MR enterology?
A. I'm familiar with colonography, but enterology....
Q. When you -- when you say CT, that would be CT scan, right?
A. Right.
Q. Okay. And would you ever do MRIs, magnetic resonance?
A. Right.
Q. Okay. And you've actually recommended those in the past?
A. Yes, I did. Yeah.
Q. Did you ever perform those tests yourself or this is for a radiologist?
A. For the radiologist to perform.

Q. Okay. And would you ever recommend endoscopies?
A. I would, yes. Uh-huh.
Q. All right. I just had a couple of questions about medical testing.
MR. MAILLOUX: Sorry. Before we begin could I just quickly request a two-minute break?
MR. INNAMORATO: By all means. Sure. Doctor, you've got to stop me or I'll keep going. We'll take a five-minute break, Matt.
MR. MAILLOUX: Thanks.
MR. INNAMORATO: No problem.
(Break: 2:53 p.m.)
(Resume: 3:02 p.m.)
BY MR. INNAMORATO:
Q. All right. Doctor, I just had a couple of questions related to the topic of testing that we just kind of broached.
If a GI patient visits you complaining of, you know, GI distress, when would you send him or her for an X-ray based on that visit?
A. Well, first, we do clinical examination and history-taking.
Q. Right.
A. How long the symptoms have been and how

serious are the symptoms and if any labs were drawn in -- you know, recent labs, we go over the labs also to see what's going on.
If the person has stomach -- upset stomach for three days, we give them some medication and then upset goes away and everything goes away, then we don't pursue it any further. If person has stomach pain for one month and getting worse and they tried some over-the-counter medications and they did not help it, then that might be a situation where he might require some more testing done.
Q. Okay.
A. Which is -- which could include X-rays or endoscopy.
Q. When you're looking at an X-ray, what are you -- what would the X-ray reveal consistent -- and we're talking about a hypothetical patient. I understand that.
A. Yeah.
Q. But what would the X-ray reveal that could contribute or cause the --
A. Well --
Q. -- the etiology of the symptoms?
A. So -- so -- you know we do an ultrasound of the gallbladder to see if he has gallstones.

Q. Okay.
A. If we find gallstones, we can blame them for the patient's symptoms. If that is not there, then, you know, we do an upper GI series, you know, with the barium swallow and take pictures of the stomach and see if there's any ulcer or any deformity or any problem there. And if that does not give any answer, then we send the patient for an endoscopic examination to look inside the stomach with a scope.
Q. Okay.
A. Uh-huh.
Q. You mentioned the term "CT scan" before. What is that for a layman -- in layman's terms?
A. Well, it's a computerized tomographic scan. That is CT scan where the -- the -- the body -- body parts are sliced just like you slice a cucumber, you see --
Q. Right.
A. -- and you -- you look -- you look at the slice and see if you find any abnormality. These days, the CT scan is put on a computer, and the radiologist can -- by scrolling, he can see slice by slice by slice every part of the -- you know, the system that you are looking for whether it is a CT for different parts of the body: head, chest,

abdomen, pelvis, et cetera.

Q. And focusing on a CT scan of the abdomen, for example, what types of things would that reveal that an X-ray wouldn't reveal?

A. If -- if they have growth there in the abdomen, the X-ray -- plain X-ray might not show it, you see. CT scan will -- chances are it will show -- show that, yeah.

Q. When would you use magnetic -- or an MRI?

A. MRI is better than CT scan. Sometimes some -- some clinicians will order MRI only and not a CT scan.

Q. Why is that?

A. It's more -- more -- more -- I should say it gives more details.

Q. I see.

A. Uh-huh.

Q. Would the -- the procedure then be X-ray, CT scan, MRI if nothing's found, or you could pick them, you know, interchangeably? Would they -- I guess what I'm asking is what would point you in the direction of a CT scan versus an MRI?

A. I can't tell you exactly where we do the MRI and not do the CT scan. But as I said, MRI is

more -- more -- more sophisticated. It gives more information. So some -- it's a clinic -- it's a practice, individual habit also, that someone will order MRI only and no CT scan.

Q. Just to jump to the best.

A. Jump to the best, yeah.

Q. Right.

A. Uh-huh.

Q. Okay. Were you ever limited by your contract with the BOP in recommending any tests?

A. There is no limit or recommendation. I could recommend the heavens for the prisoners you see, but -- but they won't get to the heavens.

(Reporter requests repeat.)

A. I could recommend to the heavens. They -- they -- there's no limit to the heavens, so they can go there, so -- so no. But there's no limit. I mean, I only recommend. I do not perform. So -- so....

Q. You don't approve.

A. Huh?

Q. You don't actually approve.

A. I don't approve, yeah.

Q. Right.

A. But they have a system of approval, and

sometimes they will -- they -- I used to get from -- you know, information through my secretary that such-and-such procedure was or was not approved.

There's kind of a committee they have, you see, or a group of people who sit together and decide whether the person should go for this test or not.

Q. Is that for every -- every test like a CT scan or an MRI?

A. I -- I do not know for what procedures, but they -- I -- I heard about the approvals and they will wait -- they wait for the approval. And then when the approval comes, then they call my office to schedule the patient for the procedure.

Q. Was there any --

A. I'm talking about the endoscopic procedure.

Q. Correct. Right. That was my next one, for endoscopies. But did you ever have the ability to disagree with the Bureau of Prisons on behalf of a patient?

A. Not really. I don't recollect any situation like that.

Q. All right. And what's an endoscopy? We've been talking about that term. I'd like to know

what it is.

A. Look into the stomach with a scope.

Q. Okay. And is that upper and lower stomach?

A. Upper and lower, yeah.

Q. All right.

A. Two separate scopes.

Q. And you are qualified to perform those yourself?

A. I was, yeah. I am, I should say.

Q. You are and you am. That's right.

Okay. All of the procedures that we were just discussing, the potential CT scan, MRI, endoscopies, X-rays, do you follow the -- the same progression with inmates as opposed to your private --

A. That's right.

Q. They're all treated the same?

A. Same way, yes. Uh-huh.

Q. With your private patients, do you ever have a scenario where you believe an endoscopy is necessary, but for example, the insurance company didn't approve it?

A. That's a very unusual situation where the insurance will say no. They -- they might

recommend another alternative test which costs less money, but -- or -- or -- or sometimes they -- some of the insurance companies have a doctor like a gastro -- GI doctor who is their consultant. I'll talk to him on the phone, and then, you know, he will suggest, Why don't you try this for two weeks and see what happens. And if the person doesn't get any better after two weeks, you can do the procedure.

Q. Okay.

A. This was in the beginning of the HMO, you see --

Q. Right. Right.

A. -- where they used to restrict procedures, but I haven't seen that lately.

Q. In the last ten years, you haven't seen that?

A. No.

Q. Okay. Doctor, outside of the -- the medical testing, the outside testing that we just discussed where there's an approval process that the Bureau of Prisons has to approve, has the -- has the contract with the prison ever restricted you from any other normal procedures you would follow with a -- with an inmate?

A. You mean to examine the prisoner?

Q. Right. Review their records.

A. Or review their records, no. I don't think there was any restriction, no.

Q. Okay. And that would be all included with the flat fee that you're....

A. Right.

Q. Okay. All right. And, Doctor, as part of your normal exam in your first visit with a patient, do you make notes and any records of that?

A. I do.

Q. All right. And why is that important?

A. Well, that's how I communicate with the -- with the prison doctor.

Q. Okay. Is that every time that you have an inmate patient you communicate with, for example, Dr. Sood?

A. Right. Dr. Sood or it could be another doctor, yeah.

Q. Dr. Patel, for example?

A. Right. Right.

Q. Okay. So each time you see an inmate prisoner, there'll be some record of that visit.

A. That's right, yeah.

Q. Okay.

A. Uh-huh.

Q. In your area of medicine, are there certain conditions that can be very painful to the patient? I know it's a broad question, but....

How about this --

A. Gallstones are very painful.

Q. All right. How about something like diverticulitis?

A. Diverticulitis can also be very painful, yes.

Q. I say that from personal experience. I can confirm that.

A. Okay.

Q. Bowel blockages, can they be very painful?

A. Bowel blockage is an acute situation. The patient will 99.9 percent end up in the emergency room.

Q. Okay. How about something called adhesions in the GI tract? Can that be painful?

A. Adhesions can be painful. And unfortunately, there is no easy solution to that, yeah.

Q. Is it -- is it true that adhesions can really only be found through exploratory surgery?

A. That's right. Yeah. Uh-huh.

Q. And the treatment for adhesions --

A. Needs another exploratory surgery.

Q. Is there ever a way of -- of reducing or eliminating adhesions?

A. No, there is not.

Q. Are there surgeries to attempt that?

A. To....

Q. Acceptable surgeries to try and attempt to....

A. To -- to -- to --

Q. Remove scar tissue.

A. Remove the scar tissue, that's right.

Q. Okay. In your subspecialty -- and we're just talking about painful conditions, GI conditions -- do you ever refer them out to a pain specialist? A physiatrist?

A. I have never done that in my practice, no.

Q. Okay. Are you capable of pain management through your own license?

A. I don't do pain management.

Q. Okay. As a GI doctor, can you prescribe pain medication? Are you capable of doing that?

A. I am capable of. I am licensed to prescribe pain medication.

Q. All right. And have you done that in the past? And what I'm saying about pain medications, as opposed to like a Tylenol, an NSAID. Something like opioids.

A. I try not to.

Q. All right. Obviously for addiction purposes, right?

A. It is for addiction, yes.

Q. All right. Have you ever encountered patients either in your private practice or the inmate side of it -- have you ever encountered patients with extreme pain where you did prescribe some type of opioid or stronger pain reliever?

A. I don't recollect that. You see, in office practice it is a -- it's an elective visit. If that's -- if they have such serious pain that they require narcotics, they usually end up in the hospital in the emergency room.

Q. Okay.

A. If someone calls me that I'm having a lot of pain and I can't tolerate it anymore, I tell him, Go to the emergency room. I specifically tell him not to come to my office.

Q. Why? Because of the pain -- the narcotic issue?

A. I cannot help him much in my office practice because I have no -- no X-rays and no -- no -- no equipment to look into the situation.

Q. Am I gathering from -- from what you're saying that you're -- you're very not inclined to prescribe narcotic pain relievers for your patients?

A. I am -- that's very true.

Q. Okay. Have you ever done it in -- in a particular case?

A. For a -- for a very short time.

Q. A small --

A. Five days --

Q. -- prescription.

A. Five days, seven days.

Q. Okay. And that would be the maximum of the prescription that you would give.

A. Right.

Q. Okay. And is there a reason why you're -- you're disinclined? Is it the addiction issue? That you don't want your patients to be addicted, or is it something else that....

A. Well, basically, it's the addiction issue.

Q. Okay.

A. People who have chronic pain, they --

they get hooked to narcotics, and that's a sad situation. Uh-huh.

Q. Okay. With regard to the inmate patients, were you ever counseled by the Bureau of Prisons not to engage in pain management through narcotics?

A. No. It was never discussed with me, no.

Q. Have you made referrals to -- of your patients to physiatrists? Pain doctors?

A. From the prison system, you mean?

Q. Yes.

A. No. I have not referred anybody, no.

Q. Is there a reason for that?

A. I -- I don't see them on a regular basis. I see them only as a consultant in a very sporadic -- sporadic fashion, you see. So it's not like I'm a regular doctor for them from -- from month to month or day to day or week to week so that situation did not arise. Let's put it this way.

Q. When you do see them, though, you -- you have prescribed medication or at least requested that the Bureau of Prisons provide certain medication?

A. I -- I recommend only. I do not prescribe.

Q. Right. Okay. And I -- I just forgot

your answer about physiatrists. Do you ever refer a patient out to a physiatrist?

A. No. I have not sent anybody to the physiatrist, no.

Q. Okay. If a patient arrived -- either your private patient or an inmate arrived with a suspected -- what you believed to be a suspected bowel blockage, which you indicated is a very painful conditions, would you at that -- at that point prescribe narcotics until they could get to the emergency room?

A. I will tell them in the emergency room and let them handle the situation.

Q. Okay. I'm getting a sense that you have a -- a hesitancy to never prescribe narcotics.

A. I have a hesitancy to -- not to prescribe, yes.

Q. Okay. And is that just the addiction issue or is there anything else that -- that I might know?

A. Side effects. If the person has bowel obstruction and if I prescribe narcotic, if his pain goes away, bowel obstruction won't go away with narcotic. He -- he can be in bigger trouble.

Q. And why is that?

A. The -- the colon can perforate. You know, bowel obstruction means there's a possibility of the colon perforating with dilation. Rupture. So narcotic will make the situation worse. So if -- if there's a suspicion of bowel obstruction, the person has to go to the emergency room and has to go to a surgeon if -- if the obstruction does not resolve.

Q. How does the -- the narcotic make it worse?

A. They -- number one, they relieve the pain so the patient feels comforted and does not pursue further --

Q. I see.

A. -- treatment or opinion or -- or the -- the -- as I said, as the time goes by, the -- the bowel obstruction will lead to perforation.

Q. Right. Okay. So if it's -- is there any chemical effect of the narcotics in terms of constipation, for example?

A. It does, yes.

Q. Okay.

A. See, you answered my question. That's good.

Q. What's that? I'm not supposed to be doing that.

A. Narcotics cause constipation, yes. Uh-huh.

Q. Any other side effects? Because you mentioned side effects with narcotics. Any other?

A. Well, respiratory depression especially if the patient has bad COPD. It can slow down their breathing a little bit more.

Q. Okay. I'm trying to think of anything else I could think of with the effects of narcotics.

Does it have interactions? Can narcotics have interactions with other drugs that the patient has to take?

A. If they are on psychotropic like Xanax and things of that nature.

Q. And I guess overdose is always a possibility too.

A. Possibility, yes.

Q. In your practice, either your -- your private practice or with the inmates, did you ever become familiar with the term "drug seeking"?

A. Drug seeking, yes. All the time. Yesterday I had a fight with a patient on the phone. He would not leave me alone. He wanted his Percocets.

Q. Okay.

A. He said, I can't live without it. I had to hang up on him. He kept calling and calling and calling.

Q. So you had experience with that kind of thing.

A. Recent experience. Yesterday, yeah.

Q. Prior to -- and we're not gonna identify the patient or anything like that. But prior to this phone call, had you prescribed any -- any amount of Percocet for him or other pain meds?

A. I have prescribed, yes.

Q. And at this point, you think it's becoming a problem for him.

A. Well, as I said, I try to limit it as much as possible.

Q. Okay.

A. Uh-huh.

Q. So you -- you do prescribe narcotics, but you're very careful about who you --

A. Yes.

Q. -- give it to.

Okay. Because you might have a phone call like that when they get addicted.

A. Yes.

Q. All right. In terms of drug seeking,

are there ways that the clinician could distinguish between someone who has a legitimate pain problem and a drug seeker? Are there certain steps that you could take to ensure that if you prescribe narcotics that's being done for the right reasons?

A. Drug seekers, they have their own characteristic. I'll give you an example.

Q. Sure.

A. A young -- young lady with a Princeton address came to my office in Trenton, New Jersey stating that I have lung cancer and I've been on narcotic because I can't tolerate the bone -- pain from the bone cancer. This is a classic example of a drug seeker.

Q. All right. Would you then prior to -- as -- as part of that interaction with the -- the client, would you want to see the medical records to establish that, in fact, she has bone cancer?

A. Well, I -- I did not have that much patience to do that. I told her I -- I was not able to prescribe you narcotics.

Q. And why was that in that case?

A. A person coming from Princeton to Trenton, City of Trenton, to look for a doctor who can prescribe Percocet. That's a drug-seeking --

drug-seeking personality.

Q. So geographically if the patient is coming away from their home address, that's something that tells you there's a little bit something wrong there.

A. Yup.

Q. All right.

A. You understand it.

Q. How about medical records? Would that be important to determine whether someone is a drug seeker? So, for example, if they did have treatment for bone cancer, would that be more likely, then, that they're not a drug seeker? Objective.

A. Still I -- even after looking at the record or a biopsy report, I will be very unlikely -- in my practice, would be unlikely that I would prescribe any narcotic.

Q. You just are against it, it looks like.

A. I'm against it, yes.

Q. Okay. Are there any non-narcotic pain medications that you do prescribe?

A. I routinely tell my patients that Tylenol is the best medicine.

Q. Okay.

A. Then they laugh at me. They say, You're

joking? I am not joking. It does nothing to us.

So Tylenol and ibuprofen are the alternative that I use for people who -- who want something for pain.

Q. Okay.

A. If that does not help, God help them.

Q. Meaning that -- that Tylenol should be sufficient in your -- your medical judgment?

A. In my judgment, yes.

Q. Okay. Any other types of pain medications like tramadol, for example?

A. I use tramadol in small dose for a short time, yes.

Q. And does that have any narcotic in it at all?

A. It has some -- some narcotic effect, but not as strong as Percocet.

Q. Anything else that you can -- you would prescribe for pain other than Tylenol or tramadol?

A. Tramadol is the only thing. I mean, I prescribe non-steroidal like Celebrex.

Q. Uh-huh. And that's pain relief without narcotics.

A. Right.

Q. Okay. Can physicians also -- and we're

talking about drug seekers. One way you can determine whether or not they're a legitimate pain patient is whether they have an objective medical history of their pain obviously. Would you agree with that?

A. Partially.

Q. Okay.

A. Because it's difficult to measure the pain, you see.

Q. Yeah. How do you -- how do you ask the patient? I'm familiar with the pain scale. Do you use that, the 1-through-10 pain scale?

A. Yes. They always go to 7 and more. They never say 3 over 10.

Q. Okay.

A. Yeah.

Q. So that's -- that's something that you would do.

Physical examination. Could that reveal --

A. That does not help in pain management or pain diagnosis, because person who has pain, he says he has pain everywhere. Every bone hurts, every back hurts, every leg hurts. It's the kind of symptoms for which there's no clinical correlation, you see.

Q. Right.

A. The person can't have pain in the back and pain in the knee together, you see. They -- they are not connected, you see.

Q. Okay.

A. So pain seekers always will complain of pain everywhere in the body, yeah.

Q. Even when you -- you press on the place that should be painful to them and they -- and they don't scream, right?

A. The other day I had somebody who won't let me touch his skin. He said (noise) don't touch me.

Q. Yeah.

A. You know what I did?

Q. What?

A. I said, Get out from here. Go to the emergency room.

Q. Right.

A. They can help you. I know they can't help him, and he didn't want to go to the emergency.

Q. Right.

A. His skin was sensitive to touch. I couldn't touch his skin. He screams. He jumps.

Q. Which could have been false.

A. It was false.
Q. Right.
A. So I -- I -- that's why I said good-bye to him.
Q. How about urine tests? If someone --
A. It's called drug screen. But it is done, yeah, in the rare situation. As I told you, you see, pain management is not my field. I do not prescribe narcotics that frequently. And the place where I'm working at presently, it's a City clinic owned by a physician where I spend my mornings. So I -- I get into this situation all the time.
Q. With the urine tests.
A. No. With the pain management.
Q. Oh. Pain management, right. A drug screen could show if the patient has elicit drugs in their --
A. Yes.
Q. -- their body, right?
A. Yes.
Q. Which increases the drug-seeking --
A. Behavior.
Q. -- score, I suppose. Right. Okay.
In your work with -- through the BOP through the contract, did you ever receive any type

of instruction or limitation by the BOP in terms of even recommending narcotic pain relievers?
A. No.
Q. All right. So that was your medical judgment.
A. Right.
Q. And you applied that same judgment as you described for us today in terms of drug seekers and things like that?
A. That's right.
Q. Okay. I'm just gonna jump ahead a little bit, Doctor.
Do you recall treating a patient by the name of Joshua Moses, the Plaintiff in this case, at some point?
A. I do.
Q. All right. Do you recall at any point in your treatment of Mr. Moses whether you concluded he was a drug seeker?
A. I had very brief contact with him.
Q. Okay.
A. Only on two occasions, I think, I saw him.
Q. Do you recall Mr. Moses ever asking for narcotics?

A. I don't remember, no.
Q. There's a term called "differential diagnosis." Can you define that for me as you see it. As you understand it.
A. Differential diagnosis is what causes the pain. Is it the kidney stone or it's the gallstone or it's a bowel obstruction or it's an -- it's an ulcer in the stomach. That's -- that's the differential diagnosis. You want to figure out what -- what the source of pain could be.
Similarly, person who has anemia, low hemoglobin, the differential diagnosis would be does the bone marrow make enough blood. Is it aplastic anemia or hemolytic anemia or -- or is it a GI bleed anemia. The person has colon cancer or stomach cancer and he's losing blood and becomes anemic. So that's -- anemia is only a symptom, I should say, and there is not a differential diagnosis. It is not a disease in itself.
Q. So it's -- it's a number of potential etiologies --
A. Right.
Q. -- for the condition.
A. That's -- that's all -- that's called a differential diagnosis.

Q. All right. We talked a little bit about adhesions before, but I want to talk a little more in-depth about it.
Adhesions are internal scar tissue?
A. That's right. Yeah.
Q. And that's generally caused by prior surgeries?
A. That's right. Yeah.
Q. Okay.
A. Or infection. Sometimes person has peritonitis due to one or more -- some other situation, and then you can get -- get adhesions.
Q. And adhesions can squeeze nerves, organs, joints to cause pain?
A. Yeah. They -- they can cause partial blockage of the intestines and cause pain. On GI track, right.
Q. Right. They can cause bowel obstructions. Is that what you're saying?
A. Right.
Q. Right. And bowel obstructions -- and I think you described this in connection with the drug seeking -- bowel obstructions can be very serious --
A. Yeah.
Q. -- and result in perforations, for

example?

A. Yeah.

Q. Do you know of any cause, other than prior surgery, for adhesions?

A. I told you, peritonitis.

Q. Oh. Peritonitis, right.

A. Like a ruptured appendix will cause inflammation in the abdomen, and later on, person can have adhesions.

Q. And adhesions can cause -- in -- in the GI tract, adhesions can cause diarrhea, bloating, constipation?

A. The can cause grade symptoms. Bloating mainly, or -- or if there's a partial bowel obstruction, vomiting, et cetera. Diarrhea is unusual with adhesions.

Q. Okay. How about painful bowel movements?

A. Again, unusual with adhesions.

Q. So it's primarily --

A. It could be constipation.

Q. Constipation. Right.

A. But not diarrhea.

Q. In terms of etiology for adhesions, would you agree that the far majority of patients

that have abdominal adhesions is from a prior abdominal surgery?

A. Yes.

Q. So in terms of adhesions, that should be considered by the clinician whenever a patient presents with severe abdominal pain and constipation?

A. Or vomiting.

Q. Or vomiting. Right. And has had previous abdominal surgery.

A. That's right.

Q. All right. With regard to the -- the diagnosis of adhesions, is it true that they can't be seen on -- on normal diagnostic tests like X-rays or MRIs?

A. Right.

Q. CT scans either, right?

A. No. They -- that might not show, yeah, no.

Q. And ultrasounds wouldn't show adhesions.

A. No.

Q. So when trying to get to the -- the diagnosis of adhesions, what is used?

A. There's a strong suspicion for adhesions causing bowel obstruction. Then we'll use barium -- use barium contrast with CAT scan.

Q. Okay. Is there a treatment known as "lysis of adhesions"? Are you familiar with that?

A. Yes. Surgeons do lysis of adhesions, yes.

Q. And that's at the point after it's been conclusively diagnosed. That's when you do the surgery, either exploratory and also the lysis?

A. Right. Yeah. It's not in my field, so I can't elaborate on it too much.

Q. Understood. Save it for the surgeons, right?

A. Leave it to the surgeon, right.

Q. Okay. And I know that this is not your area, but does lysis involve the cutting or burning of the adhesions?

A. Right.

Q. Okay. Is lysis surgery -- surgery accepted in your field?

MR. PATTANITE: Objection to form. You can answer.

Q. Is it --

A. Yeah.

Q. Is it an accepted medical procedure?

A. You asked is it accepted or not. I -- I can't answer that question.

Q. Let me ask you a question -- ask the question this way: Have you ever had a patient with adhesions that you recommended surgery?

A. I don't recollect, no.

Q. Are adhesions rare?

A. Pardon me?

Q. Are adhesions --

A. They are, yeah.

Q. They are.

A. Yes.

Q. But primarily would you agree that whenever a patient has had prior abdominal surgery, adhesions may be there?

A. Yes. Uh-huh.

Q. Okay. Prior to -- let me ask you this: Since we can't see adhesions on any of the normal tests, is the process for you, the clinician, to basically rule out other things through other tests before getting to the diagnosis of adhesions?

A. That's right, yeah.

Q. And you'd be using X-rays, CT scans, MRIs, endoscopies, for example. All of that would be exhausted prior to getting to the diagnosis of adhesions?

A. Right.

Q. Okay. Is there anything experimental that you know of now with -- with adhesions that -- you know, the technology changing or anything?
A. I -- I couldn't tell -- answer that question.
Q. Okay. So what would be your own process for ruling out conditions other than adhesions? How would you go about it with a patient?
A. CAT scan with barium contrast. And they call it follow-through GI series. They -- they let the barium go through the intestine -- from the stomach into the intestine and colon and keep taking multiple pictures, CAT scan pictures, from different -- at different times --
Q. Okay.
A. -- and see if there is a holdup of the barium at certain points; then that will suggest that there could be adhesions.
Q. Is that the same barium that I -- that I ingested as a child?
A. Yeah. Same -- same barium. It didn't change. They put -- they added flavor to it.
Q. Yeah. It wasn't very good back then, I can tell you that.
Okay. And MRIs we talked a little bit

about before. That would be more intensive, you know, a little bit more accurate than the CT scans, right?
A. Right.
Q. Okay. Ultrasound?
A. Ultrasound is -- is not very informative, let's say. But it is less expensive, so sometimes we order an ultrasound to see if some gallstones or kidney stone and things of that nature, yeah.
Q. And when you say it's less expensive, we order -- we use the ultrasounds, expensive to whom: The patient or the BOP or both?
A. To the insurance company.
Q. The insurance company. All right. Controls everything. And then the next one would be endoscopies. And how could endoscopies move you to a -- give you the information and move you to a diagnosis of adhesions?
A. I will -- endoscopy does not suggest adhesions. You cannot diagnose adhesions by endoscopy.
Q. What would you be trying to rule out?
A. You can rule out that the person does not have a tumor in the stomach or a -- or an ulcer

in the stomach or -- or -- or a tumor in the colon, yeah. Adhesions -- as a matter of fact, when one suspects adhesions, especially colonoscopy is less desirable because there's a risk of perforation.
Q. Because of the -- the -- the rigidness of the scars?
A. Scar. That's right, yeah.
Q. Okay. And with regard to CT scans, MRIs, X-rays, they're also trying to rule out things other than adhesions. You would do this battery of tests before the exploratory surgery for adhesions --
A. That's right.
Q. -- just to rule out other conditions.
A. That's right. Yeah.
Q. And that's because surgery is a pretty serious thing? Medical procedure?
A. Surgery is a serious medical procedure?
Q. Yeah.
A. Yes, it is. It has complications.
Q. I used the term earlier, Doctor, "enterography." It's a -- it's a capsulation of both CT scans and MR technology. Do you remember those questions?
A. I do.
Q. And you're not familiar with that

particular term, but it means the same thing basically. "Enterography" meaning the CT scans and the MRs.
A. Right. Okay.
Q. Okay.
A. I have never ordered enterography for any patient, so I can't tell you.
Q. Okay.
A. I'm a very old doctor. Old-fashioned doctor.
Q. CT scans or the MRs and endoscopies are slightly different because they look at different parts of the body -- of the abdomen?
A. CT scan can look outside the -- the lumen of the colon and the stomach while endoscopy can only look inside the lumen of the stomach and the colon. If there's something outside the lumen --
Q. Right.
A. You know, the -- the -- the colon or stomach are like -- like tubes, you see. So anything inside the tube you can see, but anything outside the tube, you cannot see.
Q. Okay. So, for example, I'm gathering what you're saying is endoscopy can give the clinician a very good view of the mucosal layer.

A. Right.
Q. While the imaging allows the clinician to see beyond the mucosa.
A. Beyond the mucosa, yes.
Q. Okay.
A. The -- the tube in the belly.
Q. You were saying it easier to me. You were explaining it before I went into these terms.
Okay. So seeing beyond the mucosa gives a more -- a full transmural view of the -- of the colon?
A. Right.
Q. And seeing beyond the mucosa would give the clinician the opportunity to determine whether the patient had complications like fistulas or abscesses or bowel obstruction.
A. Right.
Q. The CT scans and the MRs and the endoscopies, then, are -- are somewhat complementary. They both give you a good view of the -- the total abdomen area.
A. Yes.
Q. Okay. Now, if you have a patient with suspected bowel obstructions, for example, or fistulas or abscesses, performing both of those

batteries of tests -- both the CT, MR imaging and the endoscopies -- would be of good -- of great assistance.
A. It will be of great.... What did you say at the end?
Q. Oh. I'm sorry. It would be of good assistance or some....
A. Super assistance, okay. Okay. Yes.
Q. To the clinicians to -- to get a diagnosis.
A. Yeah.
Q. All right. All right. We just talked about your recollection of treating Josh Moses. You said maybe once or twice while he was an inmate at Fort Dix it was?
A. Right. At Fort Dix, yes.
Q. All right. And you recall maybe once or twice that you saw him?
A. Right.
Q. And Mr. Moses would have been then being treated under your flat-fee arrangement with the Bureau of Prisons?
A. Yes.
Q. Do you remember approximately when you first saw Mr. Moses? Even the year?

A. I went over the -- the papers, and it was some- -- sometime in April 2018.
Q. Okay. 2018. And do you remember approximately when you stopped treating him? That you never saw him again?
A. After November 2018 when I did the endoscopy and colonoscopy on him.
Q. That was the last time that you treated him?
A. The last time, yes.
Q. When you first evaluated Mr. Moses -- this is April of 2018 -- do you recall why he was seeing you? What was he complaining of?
A. He had abdominal pain mainly.
Q. Okay. And, Doctor, I've got some treatment notes that might be -- you know, that might refresh your recollection on the details, so why don't we make that the first exhibit so you have it and it would be fair to you.
A. Okay.
MR. INNAMORATO: Okay. We'll mark this as Chowdhury-1.
(Chowdhury-1, Handwritten treatment notes Bates-stamped US000407 and US000408, marked for identification.)

MR. INNAMORATO: Off the record.
(Off-the-record discussion.)
MR. INNAMORATO: Okay. We're back on the record.
Matt, you ready to go back on.
MR. MAILLOUX: Yes.
Q. Okay. Dr. Chowdhury, what we've just handed you is what purports to be a handwritten medical record regarding Joshua Moses. The institution is Fort Dix FCI. And while it doesn't have the particular date on it, we believe that it's sometime -- it is your first --
Well, you know what, let's turn to the second page. This will be 408. And we have the very last line, Doctor, you can see in the bolded type: "Reviewed with New Encounter Note by Sood, Ravi, MD on 04/24/2018?"
Does that refresh your recollection as approximately when you saw him -- first saw Mr. Moses?
A. Right.
Q. Okay.
MR. MAILLOUX: Can we get a clarification on page 407?
MR. INNAMORATO: Yes.

MR. MAILLOUX: On the bottom there's something that says "Generated." It appears to be a date. Do you know what that might refer to?

MR. INNAMORATO: I have no idea. I was gonna ask you that because it's inconsistent with -- with another five documents. What I can ask you is -- why don't I ask the witness this.

Q. Dr. Chowdhury, Exhibit 1 that was just handed to you, on the very bottom of the left-hand side, you see "Generated 03/15/2018"?

A. Right.

Q. Is -- is that possible that -- that you saw Mr. Moses as early as that?

A. No. That's -- that's the time when, in their system, they put a consult for me to see Mr. Moses. This was -- this was blank.

Q. Okay. So that -- so that would be opening a file for your later visit with him.

A. Right. Right. Right.

MR. INNAMORATO: Did you get that, Matt?

MR. MAILLOUX: Correct. So sometime between March 15, 2018 when this was, quote, unquote, generated as indicated on US407 and April 24th, 2018, the scan date as indicated on US408 is when you saw Mr. Moses?

THE WITNESS: That's right.

Q. Okay. Now, Doctor, what we've marked as Exhibit 1 is -- is what I believe to be your first treatment notes regarding Mr. Moses. Do you recognize this document?

A. I do.

Q. And is there handwriting on the document?

A. It is, yes.

Q. Is that your handwriting?

A. My handwriting, yes.

Q. And I see there's "B" on the bottom.

A. "B," yeah. Eleven letters pressed into one.

Q. Pressed into one. All right. So we're gonna ask -- I'm gonna ask you some questions. I'm gonna re-ask one question because I think it's fair to you to give you your actual treatment notes to refresh your recollection. It's been a while ago.

When you first evaluated Mr. Moses, do you recall why he was seeing you, what he was complaining of?

A. Abdominal pain, diarrhea, gas and GERD.

Q. What's GERD, Doctor?

A. The heartburn people have from acid

backing up into the food pipe.

Q. Okay.

A. Gastroesophageal reflux disease. That's the form of the GERD.

Q. And does that cause any pain?

A. It causes heartburn, yes.

Q. All right. Let's see. Do you recall Mr. -- at any time during this visit, do you recall Mr. Moses telling you that he suffered a -- a gunshot wound to the abdomen?

A. I don't recollect exactly what he said, but from -- from reviewing the notes, et cetera, there was a history of gunshot wounds and resection of the intestine.

Q. Connected somehow to the gunshot wound?

A. Right.

Q. Okay. Had he -- did he tell you that he had multiple abdominal surgeries at Temple as a result of that?

A. I don't recollect exactly what he said.

Q. Okay. Do you recall Mr. Moses or did you learn otherwise that he had a significant amount of his small bowel removed as part of this bowel resection?

A. Right.

Q. Okay. Did he tell you that he lost his transverse colon as a result of the surgeries?

A. I don't recall, no.

Q. Did he tell you that he had had multiple hernia operations?

A. I don't remember now.

Q. Do you remember anything about mesh in his abdomen?

A. No. The only information I have is what is written here.

Q. Okay. When you first saw Mr. Moses, did you have the digital record we were talking about, the file on him, during that first meeting with him?

A. I don't recollect.

Q. Did you know that Mr. Moses was rushed to the ER at Robert Wood in February of 2018?

A. I -- I learned that from Dr. Fares' notes.

Q. Okay. All right. But do you have an independent recollection as to whether -- when you were sitting down with Mr. Moses and doing his exam whether he discussed that earlier?

A. I don't recollect.

Q. You do recall, though, at some point -- well, let me ask you this: When you're -- when

you're saying -- when you stated a moment ago that you recall Dr. Fares treating Mr. Moses or examining him at some point, did you see that more recently, you know, within the last couple of weeks, or was it back then when you were treating Mr. Moses?

A. I -- I -- I saw his consultation a couple of weeks ago.

Q. Okay. Had you ever seen that before?

A. No.

Q. All right. Did Mr. Moses ever tell you that he was treated by Dr. Fares during that --

A. I don't recollect.

Q. All right. Do you recall Mr. Moses -- and this is at the time that you're sitting with Mr. Moses for the first time, okay. What's reflected on the notes there, Exhibit 1. Did you -- did you ever learn during that meeting or thereafter that Dr. Fares suspected that Mr. Moses might have had a small bowel obstruction?

A. I have no knowledge, no.

Q. Did you ever learn that Dr. Fares recommended that the upper and lower endoscopies be performed on Mr. Moses?

A. Only from -- by reading his consultation report.

Q. Okay. And is this something that you did within the last few weeks or at the time you -- you saw Mr. Moses?

A. Last few weeks.

Q. Okay. And you haven't seen that before?

A. No, I did not.

Q. In the normal course in -- in terms of the -- the digital file that you said would be open for the inmate patients that you would either have available to you at the time or at some point thereafter, do you recall Mr. Moses's file being open to you or available to you?

A. I don't remember now.

Q. All right.

A. How many years have gone by in-between? Can you calculate for me how many years have gone by?

Q. Since when?

A. Since I saw him on 4- -- what was that, 4/24/18?

Q. '18. Right.

MR. PATTANITE: Five years.

Q. We're talking five years.

A. Five years. Do you remember what breakfast you ate five years ago?

Q. I don't remember my breakfast from this

morning.

A. Another lawyer said, I'm not sworn, so I won't answer the question. I ask every time they ask me in -- in this kind of meeting, I ask them, What did you eat on that morning.

Q. Right. I'm just trying to know what you recall. All right?

A. How can you expect a person to recall five-year-old thing unless it was a murderer who came to murder me and my wife. I will recall that.

Q. Let's see. All right. So at the time that -- that you saw Mr. Moses for the first time as reflected in these notes, you were not aware of Dr. Fares' recommendation, if any, that he be given endoscopies?

A. No, I did not know. It's not written in here, so I cannot tell you that.

Q. All right. Is it possible that you were aware of it? Possibility?

MR. PATTANITE: Objection to form. You can answer.

A. I don't know.

Q. And I think you said that you can't recollect right now whether Mr. Moses told you he was in the ER a week before he saw you.

A. I don't recollect. That's all I can say.

Q. Okay.

A. This is -- all of the questions that you ask other than what is written here, the answer is going to be I cannot recollect --

Q. Okay.

A. -- because it's a five-year-old thing.

Q. And the notes are too sparse to refresh your recollection --

A. That's right.

Q. -- about that.

A. Yeah. You know, I see five, six patients in one afternoon and I write my notes and I handwrite the notes. So -- so there is only so much that I can write.

Q. Okay. So let's talk about the note. What we know you know about, right, or at least you think you do.

Going back to Exhibit 1, we have a section there, "Assessment." Do you see that, Doctor?

A. Yes.

Q. And in your handwriting you have "Abdominal pain, diarrhea, gas, GERD." We talked

about what GERD is.

Below that -- and these are things that Mr. Moses told you while you were there.

A. Right.

Q. Because he didn't have the digital record at that point, right?

Below that is "H/O." Is that history of?

A. History of.

Q. "Bowel resection."

A. Right.

Q. Okay. Have you treated -- prior to this point in time, have you treated people who had bowel resections in your practice?

A. I have.

Q. All right. Okay. And have you ever treated anyone other than Mr. Moses who had a gunshot wound?

A. I don't recollect.

Q. Okay. And what is the causes to -- for the necessity of a bowel resection? Potential causes. What types of things are most common?

A. Well, people who have cancer of the colon.

Q. Right.

A. Patients who have bone disease and they have, you know, complications from Crohn's disease, they have resection of the bowel.

Q. Okay.

A. Or any C. diff inflammation, bad colitis. You know, they -- they -- C. diff colitis. I know you heard about that condition, but sometimes it is incurable with medication; then they require colon resection.

Q. Okay. The next line that we have here is -- let's see. "Abdominal: Soft." Did I read that correctly?

A. Yes.

Q. What's the next two words?

A. Old scars.

Q. Old scars.

A. Old scars on the belly.

Q. On the belly. Externally, though, right?

A. That's right.

Q. The scars are external?

A. Right.

Q. Okay. Then I think it says, "No palpable masses."

A. Right.

Q. All right. Was that something based on your physical examination of Mr. Moses?

A. That's right.

Q. Okay. When you -- does this refresh your recollection as to whether or not Mr. Moses was complaining about abdominal pain when he saw you?

A. Yeah. It -- it says abdominal pain.

Q. Okay.

A. He said that to me.

Q. Okay.

A. Yeah.

Q. Do you recall telling Mr. Moses or giving Mr. Moses that 1-to-10 scale? Tell me how bad it is?

A. It wasn't done at the time, no. I did not do it.

Q. Okay.

A. Or -- or it is not mentioned here anyway.

Q. But you -- you feel it's kind of useless?

A. I don't want to -- I don't want to guess, you see.

Q. Yeah. And I don't want you to guess, but, you know, you told us before that that's kind of

a useless test anyway because it's so subjective.

A. It is. Uh-huh.

Q. Okay. Do you recall after -- after meeting with Mr. Moses in April 2018, which is reflected in your notes here, do you recall learning anything more about his history of bowel resection?

A. No.

Q. Would that be something you would look into?

A. No, I don't.

Q. And where you -- you mention here, "Abdomen: Soft, old scars. No palpable masses." What -- what are you looking for with palpable masses? What does that suggest?

A. Any -- any -- basically palpable mass means like a tumor kind of thing, you know.

Q. And that's just a -- sort of a tactile thing. You press on the --

A. You press on it and you feel it, yeah. Uh-huh.

Q. Okay. And is there any significance to no palpable masses? Meaning no tumors?

A. No tumors, yeah.

Q. All right.

A. At least not felt by the hand. I mean,

he could still have a tumor --
Q. Right.
A. -- but I can't feel with my hands. That's why the word "palpable."
Q. Okay.
A. Uh-huh.
Q. Are you aware -- strike that.
At -- at the time that you saw Mr. Moses, were you aware of whether he ever had any CT scans or MR imaging?
A. I don't remember now.
Q. Okay. Would you have noted it in your note there, Exhibit 1, if he did?
A. If it was done and if it was available to me, I would have wrote it, yeah.
Q. Okay. So based on that, is it suggested you -- you didn't know about any CT scans or MR images?
A. No, I did not. At least it's not mentioned here, so what can I tell you.
Q. Okay. Moving on in your notes, we have "Dx." Is that diagnosis?
A. Yes. Uh-huh.
Q. Is that differential diagnosis or -- or regular diagnosis?

A. It's a regular diagnosis.
Q. Okay. We have "adhesions," which we've talked about, and then we have "short bowel syndrome." Correct?
A. Right.
Q. Okay. So your first diagnosis of Mr. Moses is the adhesions. That's -- is that the same adhesions we've been discussing today?
A. That's right.
Q. All of the characteristics?
A. That's right.
Q. Okay. And what led you to that diagnosis, that he had adhesions, in April of 2018?
A. From the -- from the history of surgery. Prior surgery.
Q. Okay. So that's -- but we've already discussed that you -- you can't really tell adhesions from any testing other than the exploratory surgery?
A. One can suspect.
Q. Okay. So you were suspecting adhesions here. It doesn't say that, but that's really what it means, okay. And that wouldn't show up on a physical exam, though.
A. No.
Q. At any point during this evaluation or

afterwards in connection with it, did you ever review Mr. Moses' medical records suggesting that he had this exploratory surgery for the adhesions?
A. I don't recollect.
(Reporter requests clarification.)
MR. INNAMORATO: Had or -- he had or have exploratory surgery. Do you want to take a break?
THE WITNESS: I think we keep going. Can we finish it or no?
MR. INNAMORATO: Probably not today total. So do you want to take a break now or.... It's up to you.
THE WITNESS: I would want to continue. What is the time now?
MR. PATTANITE: It's ten after four.
THE WITNESS: Whatever your wish is.
MR. INNAMORATO: Well, you're the witness. I'm trying to accommodate you. You made time for me today, and I appreciate that. Do you want to take a break for five minutes? Does that help?
THE WITNESS: Sure. That's fine.
MR. INNAMORATO: Okay. Why don't we do that. Because usually when she starts getting like

that, then I know I've got to take a break, so....
(Break: 4:09 p.m.)
(Resume: 4:17 p.m.)
BY MR. INNAMORATO:
Q. All right, Doctor, we're back from our break. I had -- we were focusing on Exhibit 1, which are the notes from your visit with Mr. Moses, the first one, and the question for you there on "Diagnosis: Adhesions short bowel syndrome." Those were both suspected at that time?
A. Right.
Q. Okay. So if -- me, as a layman reading this, there should be "suspected" before those two phrases.
A. Right. Right.
Q. Okay. Now, do you recall recommending -- and I know you're limited to -- to recommending with the BO- -- with the Bureau of Prisons -- recommending any tests to rule out things other than adhesions as part of your normal care of Mr. Moses?
A. Well, I have recommended medication. That's all I can say at present.
Q. Meaning you don't recall, or....
A. I don't recall if I ordered any tests

for him, no.

Q. Okay. You did say something, I think, to the effect -- and -- and I think we'll get to this in a -- in a bit. You did perform endoscopies on Mr. Moses in November of 2018, right?

A. Right.

Q. Okay. Just independently here, do you recall recommending CT scans or MRIs of Mr. Moses or endoscopies at any time prior to that November?

A. No.

Q. Okay. Would there be any reason why you wouldn't? Based on what we have right here, what would be your normal practice?

A. I -- I didn't -- I didn't -- I don't see these -- these inmates after I see them in consultation.

Q. All right. When you say "consultation," what are you referring to?

A. This -- this page.

Q. Okay.

A. This -- this was my visit to the prison on that date.

Q. Right.

A. After that date, I do not see these -- the -- the inmates for any follow-up unless they --

another consult. Then the primary care physician requests.

Q. So you wouldn't see him at all.

A. No. I won't see him at all, no.

Q. If -- if this was a private patient of yours in your own practice and you have diagnosed suspected adhesions or short bowel syndrome, would you have ordered for the private patient the CT scans?

A. Depending upon how long the symptoms have been, I would have had some more information about -- about the surgery or the resection of the bowel. And depending upon that, the -- the tests would be ordered, yes.

Q. Okay. Would that be unusual for you to order the CT or MRIs in this situation?

A. Not unusual, no.

Q. Okay. But here you didn't have control over the follow-up is what you're saying.

A. Right. I did not have, no.

Q. Okay. Independently, do you recall any follow-up yourself other than the -- the November 2018 endoscopies?

A. No. I don't recall any, no.

Q. If this was -- if Mr. Moses was a

private patient, would you also consider endoscopies to rule out something other than adhesions?

MR. MAILLOUX: Object to the form.

A. Well, as a -- as a -- as a GI practice and GI symptoms, we first -- unless the patient is very acutely sick, we try medication and see what the effect of the medication is, and depending upon that, the follow-up is done. And if the symptoms do not resolve with medication, then we order the tests.

Q. Okay. With regard to the -- to the adhesions, would that -- would that be consistent with the abdominal pain that he told you about?

A. I think so, yes. Uh-huh.

Q. Okay. The -- the short bowel syndrome, that's something you suspected. Would that be something that would -- you would want to rule out at this point or you would normally rule out?

A. I think this was from the history given by the patient.

Q. Oral history.

A. Regarding prior surgery and what was done to him, yeah.

Q. Okay. Can short bowel syndrome cause pain?

A. It can cause pain, yeah. Uh-huh.

Q. All right. And, Doctor, at any point during your initial evaluation with Mr. Moses, what's reflected here on Exhibit 1, did you ever ask him for a urine or blood sample? Drug screen?

A. I don't recall now.

Q. Did you have -- can you recall today whether you had any concerns about him taking elicit drugs?

A. No. I can't recall.

Q. All right. Do you recall any -- seeing any evidence suggesting that Mr. Moses' complaints of extreme pain was somehow exaggerated?

A. It's difficult to say at this stage for me.

Q. Okay.

A. No -- I can say no recall. I can't recall.

Q. All right. Okay. Let's go back to Exhibit 1, and I want to focus your attention on the left there. It says "Plan." Do you see that?

A. Right.

Q. The first thing I see next to "Plan" is you have four items located there, right?

A. Right.

Q. And is that all in your handwriting?

A. This is my handwriting, yes.
Q. Okay. And it looks like the -- the first three are -- are those medications?
A. They are. Uh-huh.
Q. All right. The first one is -- is called -- is it Bentyl?
A. Bentyl, yeah. Uh-huh.
Q. All right. Ten milligrams. And --
A. Every six hours as necessary.
Q. And what was that for?
A. It's an antispasmodic. If the abdominal pain is caused by spasm in the intestines then the Bentyl will relieve the spasm and give him comfort with abdominal pain.
Q. All right. So -- so Bentyl is otherwise a gut antispasmodic?
A. It is.
Q. Okay. And it can be used to treat irritable bowel syndrome --
A. Yes.
Q. -- and conditions by reducing the intestinal cramping? That type of thing?
A. That's right.
Q. And you prescribed that for Mr. Moses after your first meeting with him. Is that right?

A. Right.
Q. Bentyl is not a controlled substance.
A. No, it's not.
Q. Okay. And it's not considered a -- a painkiller, right?
A. No.
Q. It has no opioid effects?
A. No. No opioid effect, no.
Q. All right. It's a -- I guess it's a painkiller in the sense that it indirectly reduces pain by --
A. Reducing the spasm in the intestines.
Q. Right. Okay. The next one we have is -- is Imodium. You see that?
A. Right.
Q. And that's also an over-the-counter treatment?
A. It is, yeah. Uh-huh.
Q. Used to treat diarrhea and gas?
A. Right, it is.
Q. And Imodium is also not considered a painkiller or pain reducer?
A. No, it's not.
Q. The next one -- I'm not even gonna try and pronounce it.

A. Omeprazole.
Q. Okay. Thank you.
MR. PATTANITE: O-M-E-P-R-A-Z -- Y-L-E?
THE WITNESS: O-L-E.
Q. Okay. So you also gave Mr. Moses something called Omeprazole?
A. Right.
Q. And that's an acid reducer commonly used to treat indigestion, heartburn. That kind of thing?
A. Heartburn mainly.
Q. Treat acid reflux as well?
A. Heartburn and acid reflux are synonymous.
Q. Okay. That's -- that's an over the counter, right? That's not a controlled substance?
A. It's -- it's -- believe or not, it's prescription strength, but it's not controlled.
Q. Okay. And again, it doesn't have any pain-relieving properties like narcotics?
A. No, it does not.
Q. Okay. And we saw when you -- when Mr. Moses -- on the top there when he first met with you in April of 2018, he complained to you about abdominal pain, right?
A. Right.

Q. Do you remember him -- the -- the degree? And I know I asked you a little bit about the 1 to 10, but do you remember him, like the other individual you talked about, Don't touch my skin. I mean, was it that kind of pain; do you remember?
A. I don't.
Q. All right. And he did have, though, at least orally from you an objective history of abdominal trauma, the bowel resection?
A. Right.
Q. Okay. Do you recall whether you had any doubts as to whether or not Mr. Moses was truly experiencing pain then?
A. There would be no way to know.
Q. All right. There are -- there are lower level narcotics. If there -- if we have sort of a scale and you have the -- the top level, oxycodone, things of that nature -- we talked about tramadol, right, which is a lower prescription with a lower composition of -- of narcotics -- do you have something in the Tylenol family as well? Tylenol 3, or something like that?
A. Tylenol 3 has -- has codeine in it.
Q. Right. Codeine in it, okay. When you were visiting with Mr. Moses in April of 2018, I

don't even see that you've prescribed Tylenol for him. Any form of Tylenol. Even the nonnarcotic. Do you know why?

A. The -- the pain caused by -- by spasm of the intestines is helped by Bentyl.

Q. Okay. But -- but you have adhesions there too suspected?

A. Same thing: Adhesions is cause by blockage of the intestines. Adhesions by itself do not cause pain, you see. They -- they -- they intertwine the intestine --

Q. Right.

A. -- and they -- and cause -- cause partial blockage of the intestines, and that causes the pain and discomfort.

Q. But the antispasmodic -- if -- if indeed -- strike that.

If indeed Mr. Moses did have adhesions, the antispasmodic would not alleviate the adhesions, the pain from that.

A. No, they will not. Yeah. The only way it will alleviate discomfort is if adhesions are causing partial blockage of the intestine.

Q. Because of the antispasmodic qualities of Bentyl.

A. Bentyl, yeah.

Q. Okay. All right. But you didn't know that at the time. You were just suspecting adhesions.

A. Suspecting, yeah. Uh-huh.

Q. All right. Were there any other consideration at the time or that you learned thereafter that would case you not to prescribe any type of narcotic pain relief for Mr. Moses?

A. Well, whatever is written here we went over it, and that's the only information that I have. I -- I don't have a separate recollection of conversation with him about the use of narcotics or pain-seeking behavior or any other issue that he had.

Q. We talked earlier about your general view, you know, which has been in your practice, I guess, from -- from the inception about narcotics. That you don't like to prescribe them and in a very limited fashion.

A. Right.

Q. Okay. Would that apply to the time that you saw Mr. Moses?

A. Yes.

Q. So you've been consistent is what I'm asking.

A. Right.

Q. All right. When you first saw Mr. Moses that's reflected here in Exhibit 1, did you consider having him go for endoscopies?

A. Considered doing endoscopy?

Q. Yeah.

A. Yeah. I -- I -- as we discussed earlier, whenever I see a patient with symptoms -- GI symptoms, unless the person shows signs of bowel obstruction or acute -- acute abdominal we call it. When the belly is tense, very painful, he won't let me even touch it, he might be running a fever, et cetera, that's called acute abdomen. Unless he has an acute abdomen, we prescribe medications first and see the effect of medication. And very small percentage of patients, the medications will relieve the symptoms and they won't need any further test.

Q. All right. So you're saying in a very small percentage you won't have to do the endoscopies.

A. Right.

Q. Okay.

A. Or -- or maybe you don't have to do endoscopy if the symptoms go away with medication.

(Reporter requests repeat.)

A. If the symptoms go away with medication, endoscopy is not necessary.

Q. And -- and that's the -- the minority of cases, though.

A. If the symptoms don't go away.

Q. No. If they go away is that the minority of the symptoms (sic)?

MR. PATTANITE: Objection to the form. You can answer.

Q. You can answer? Let me start over.

Doctor, when -- we were talking about when you would recommend an endoscopy for a patient that's presenting these types of symptoms.

A. If they last for a long enough time. That is -- there's no -- no hard and fast rule it should be three weeks or six weeks or 12 weeks or eight weeks.

Q. Right.

A. But if the symptoms last only for four days and person feels better and he's -- he's normal functioning, then no, I will not order any tests. If the symptoms last longer -- months, two months, he comes again and again with belly pains -- then I might consider doing some -- some procedure.

As a matter of fact, if there's a --

symptoms are mostly due to short bowel syndrome, which this -- this patient probably had short bowel syndrome, the endoscopy and colonoscopy do not add to the diagnosis. The colonoscopy can be risky. It can cause perforation of the bowel because of the presence of adhesions and the short bowel situation.

Q. Okay.

A. It's very risky, so....

Q. But in terms -- in terms of the patients that resolve after four days being treated with Bentyl or the other medications that you prescribed here, is that a larger group or those that do not?

A. I have no statistics on them.

Q. Okay. What's been your experience? That it usually works out or it doesn't work out?

MR. PATTANITE: Object to form. You can answer.

A. Yeah. It's difficult to say.

Q. Okay. How about with Mr. Moses here, based on what we see in front of us?

A. Looks like it did not work out with him.

Q. Okay.

A. He continued to have symptoms. That's why he was sent back -- sent -- referred again for -- for endoscopy procedure.

Q. And you actually performed those.

A. I did.

Q. And that was November of 2018?

A. Right.

Q. Okay. During your -- your first visit with Mr. Moses in April 2018, did you ever tell him anything to the effect of stay away from surgeons and you'll live longer.

A. I read in his deposition --

Q. Right.

A. -- that I told him to -- if you want to live longer, stay away from surgeons. Something along those lines.

Q. Did you ever say that to him?

A. I must have said it, yes.

Q. Okay. And that was because of the invasive nature of surgery, you know, complications, things like that?

A. Multiple surgeries that he had.

Q. Right. And opening it up again just creates a risk, I take it.

A. Right.

Q. Okay. Of infection?

A. It's not much -- not so much the infection, but more -- more surgeries, more

adhesions, more problems.

Q. Is -- is it true that -- that the problem with adhesions is that when you go in to fix them, you're leaving more scar?

A. That's right.

MR. INNAMORATO: Okay. Let's mark another exhibit. Mark this as Chowdhury-2.

(Chowdhury-2, Surgical Consultation Bates-stamped US000470 and US000471, marked for identification.)

Q. Now, Doctor, there's some text on there, so I want you to take your time and read it, okay?

A. (Witness reviewing exhibit.)

MR. MAILLOUX: Just off the record.

(Off-the-record discussion.)

MR. INNAMORATO: All right. We're back on the record.

Q. Doctor, have you had an opportunity to review what we've marked as Chowdhury-2?

A. Yes. Uh-huh.

Q. Okay. This appears to be a record prepared by a Dr. Fares, and it's dated 2/16/18 regarding Mr. Moses. A trip to the Robert Wood ER around that time. Do you see that?

A. Yes. Uh-huh.

Q. Have you ever seen this before?

A. I have.

Q. Was that at the time in 2018 or in preparation for this deposition?

A. In preparation for the deposition.

Q. All right. Had you ever seen it before that?

A. No.

Q. Okay. Would this normally be part of that digital record that we talked about with your work for the Bureau of Prisons?

A. It could be. I can't tell you 100 percent, you see.

Q. Okay. Is it that it's the type of record, maybe not this particular record, but this is the type of thing that would be in the digital file?

A. In the patient's file, yes. Uh-huh.

Q. Okay. What this reflects -- and I'm just gonna ask you whether you know -- not because this record says it, but your own independent recollection of certain facts, okay.

If we go to the bottom of the text and we go to the fourth line up beginning with "I believe." Do you see that?

A. Right. I do.

Q. Here it -- it suggests that Dr. Fares says, "I believe he needs upper and lower endoscopies to be performed since the last testing he had done was at least 5 years ago. If this patient does indeed have some kind of small gut syndrome, this needs to be investigated and followed medically." Do you see that?
A. Yes. Uh-huh.
Q. Do you have any disagreement with that --
A. No.
Q. -- approach?
A. No.
Q. Okay. Did you ever learn that -- that Dr. Fares, the surgeon -- well, let me ask you this: Why would Dr. Fares be having a surgical consult with Mr. Moses?
MR. PATTANITE: Objection to the form. You can answer.
Q. You can answer it.
A. Because of his -- his vomiting and prior history of abdominal surgery.
Q. All right. Could it be the adhesions?
A. Could be adhesions, yeah. Uh-huh.
Q. Okay. And that's what you suspected

when you saw Mr. Moses a couple of months later, right?
A. Right.
Q. Did you ever learn at any point other than preparing for this deposition that Dr. Fares in February of 2018 recommended endoscopies?
A. I don't recollect, no.
Q. All right. Just generally, what -- what was it that -- that led you in November of 2018 to actually perform the endoscopies on Mr. Moses?
A. I think because of the persistent symptoms and complaints that this patient had, so he was -- he was referred for endoscopic examination.
Q. All right. Is -- is the time of -- how many months was that -- nine months after you first saw him, is that a norm in your field?
A. No. There's not normal.
Q. There's not a normal. But it was -- who came up with the recommendation, is what I'm asking, that you actually perform endoscopies; do you know?
A. He was -- I mean, he was seen on a regular basis by the prison doctor.
Q. Dr. Sood for exam.
A. Dr. Sood, yeah. And they -- Dr. Sood is the one who must have referred him again to me

because of his persistent symptoms that something more should be done for him. He already had a CAT scan done, and so -- so the next step was to do an endoscopy examination.
Q. So you -- you recall Mr. Moses having a CAT scan done between the time you saw him in April, and then November, of 2018; do you remember that?
A. No. After reading this.
Q. Okay. I see. So based on the -- we're assuming that -- that the CAT scan was done here --
A. Right.
Q. -- based on this record.
Okay. Did you have any communication with Dr. Fares about Mr. Moses directly after you saw him in April?
A. I don't recollect.
Q. Okay. All right. Looking back at this record -- and I'm sorry, Doctor. Go up five lines. The line above where we were just referring. Five lines from the bottom.
A. Right.
Q. "I believe at this point in time, there's no evidence of obstruction and there's no surgical indication or surgical abdomen present." Do you understand what that meant?

A. Yeah.
Q. And what is that?
A. Surgical abdomen. Remember, I -- I was telling you about the acute abdomen.
Q. Right.
A. The distended abdomen. Very painful. Bowel sounds are diminished --
Q. Right.
A. -- or they could be absent. That is surgical abdomen. This happens when there's -- there's a perforation of a -- of an organ inside.
Q. Is that inflammation, then?
A. Inflammation and it causes peritonitis. That is surgical abdomen.
Q. Okay. And is Dr. -- based on this -- I know it's -- it's not your record, but is Dr. -- this text suggesting that Dr. Fares ruled out something in those notes?
A. He said it is not a surgical abdomen because his note -- he writes in his note the abdomen is soft. Nice and soft.
Q. Okay. Doctor, at any point in time since this lawsuit has been filed, had you -- have you talked to Dr. Sood or Dr. Fares?
A. No, I did not.

MR. INNAMORATO: Mark this Chowdhury-3.

(Chowdhury-3, Final Report Bates-stamped US000478 through US000480, marked for identification.)

A. (Witness reviewing exhibit.)

Q. Doctor, have you had an opportunity to review Exhibit 3?

A. Yes, I did.

Q. All right. This appears to be a report -- a radiology report concerning Mr. Moses dated 2/14/18 and prepared by a Dr. -- I'm gonna butcher this -- Khorashadi?

A. Difficult last name.

Q. It is. It is. Are you familiar with Dr. Khorashadi?

A. No, I'm not.

Q. Okay. Have you ever seen this document before?

A. No.

Q. Is this the type of document that would be in that digital file that we talked about before?

A. Yes.

Q. Okay. And it looks like the referring physician is Sood. I'm assuming that's the same Dr. Sood.

A. Yeah. Uh-huh.

Q. The one thing I wanted to -- is -- was there anything that -- when you went through this that surprised you with regard to Mr. Moses' condition?

A. No. It did not surprise me, no.

Q. Okay. On the first page, the paragraph up from the bottom where it says "Multiple differential." Do you see that under "Impression"?

A. Right. Right.

Q. "Multiple differential air-fluid levels with dilated small bowel." What does that mean.

A. It's an indication for -- well, suspected obstruction.

Q. Okay. And -- and how is that suspected? What -- what is it about the dilated small bowel that suggests --

A. That the air is not going through or the liquid is not going through.

Q. Okay. So something -- there's an obstruction in there preventing that normal flow.

A. Right.

Q. Okay. "Findings are concerning for partial or early small bowel obstruction. Follow-up along clinical correlation advised." Do you see

that?

A. Right. Right.

Q. Is that -- do you agree with that? That the follow-up is important?

A. Right. Right.

Q. Okay. And this appears to be at the same time or around the same time that we saw in the earlier exhibit, Mr. Moses met with Dr. Fares: February of 2018.

A. (Witness reviewing exhibit.)

So this was same -- same day, as a matter of fact.

Q. It looks like that.

A. 2/15 and 2/14.

Q. Right.

A. So the patient must have been in the -- in the emergency room waiting for -- I think they were placing an NG tube, right? So -- so he was there for a while in the emergency room.

Q. Okay.

A. That's when he had this X-ray done.

Q. And then the -- does that comment, I mean, to do all the tests while the patient's in the ER particularly when they're inmates?

A. They don't have to be an inmate.

Regular citizen will also get the X-rays done --

Q. Okay.

A. -- and will be treated same way.

Q. Do you recall any difference in the way that -- that the inmates were -- because of security concerns, obviously, but even when they're in the ER, but where they would be kept for a shorter period of time than -- than, you know, non-inmate patients?

A. Not really. I don't think so.

Q. When -- when you evaluate inmates, do you have a security guard there?

A. Yes.

Q. Okay.

A. Actually, St. Francis Hospital had a security unit. Whole unit for the inmates.

Q. Did the prison send anyone along with the inmates?

I'm trying to figure out who's in the room, and you said that St. Francis has its own security force, but --

A. No. Floor. Floor, not force. There's a floor only for prisoners.

Q. Oh. I see. All right. So they had the normal complement of security.

A. Doors, yeah. Steel doors everywhere.

Q. Okay. And has it always been that way?

A. Yes.

MR. INNAMORATO: All right. This is probably a good time to break. Is that okay with you, Doctor? And then we'll -- we'll figure out a time that's -- you know, I'll -- I'll --

THE WITNESS: Finish it.

MR. INNAMORATO: -- accommodate you to finish.

THE WITNESS: Thank you very much. I appreciate that.

MR. INNAMORATO: Okay.

(Proceedings concluded at 4:54 p.m.)

CERTIFICATE OF DEPONENT

I have read the foregoing transcript of my deposition and except for any corrections or changes noted on the errata sheet, I hereby subscribe to the transcript as an accurate record of the statements made by me.

__________________________

BHANWARLAL CHOWDHURY, M.D.

SUBSCRIBED AND SWORN before and to me this ____ day of ________________, 20___.

__________________________

NOTARY PUBLIC

My Commission expires:

C E R T I F I C A T E

I, LYDIA F. McDONNELL, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, do hereby certify that prior to the commencement of the examination, BHANWARLAL CHOWDHURY, M.D., was duly sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Notary Public of the State of New Jersey
License No. 30XI00155900
My Commission expires June 30, 2024
Dated: June 16, 2023

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Moses, Joshua v. Sood, Dr., Ravi, Et Al
DATE OF DEPOSITION: 6/7/2023
WITNESSES' NAME: Ranwarlal Chowdhury , MD

| PAGE | LINE (S) | CHANGE | REASON |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

__________________________

Ranwarlal Chowdhury , MD

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF ______________, 20__.

____________________ ____________________

(NOTARY PUBLIC) MY COMMISSION EXPIRES:

**&**
**&** 2:7 3:7
**0**
**03/15/2018** 81:10
**04/24/2018** 80:17
**07102** 3:14
**08540** 3:3
**08648** 3:8
**1**
**1** 4:10 63:12 79:22,23 81:8 82:3 85:16 88:20 91:13 93:13 96:6 100:3,19 104:3 107:3
**1-10** 1:8
**10** 19:10,12 63:12,14 91:13 104:3
**100** 112:12
**1025** 1:4
**111** 4:13
**117** 4:14
**12** 108:16
**136** 2:7 3:8
**15** 81:22
**16** 123:24
**18** 86:20
**1920** 9:24 10:11
**1964** 8:6
**1978** 8:19 9:22 11:23 12:10
**2**
**2** 4:12 111:7,8 111:19
**2/14** 119:14
**2/14/18** 117:11
**2/15** 119:14
**2/16/18** 111:22
**20** 1:4 14:21 15:18 122:13 124:22
**2015** 12:10 17:19 18:1,25 19:2 28:14
**2018** 79:2,3,6 79:12 81:22,23 84:16 92:4 94:13 97:5 98:23 103:23 104:25 110:3,6 112:3 114:6,9 115:7 119:9
**2020** 10:1,2,12 10:13,13,15 11:10 13:12 17:19 18:2 19:2
**2023** 2:9 123:24
**2024** 123:23
**24th** 81:23
**2:09** 2:10
**2:53** 42:13
**3**
**3** 4:14 63:14 104:21,23 117:1,2,7
**30** 123:23
**300** 3:3
**30xi00155900** 123:22
**35** 23:15 35:23
**3:02** 42:14
**4**
**4** 86:18
**4/24/18** 86:19
**407** 80:24
**408** 80:14
**4:09** 96:2
**4:17** 96:3
**4:54** 121:13
**5**
**5** 4:5 19:10,12 113:4
**500** 3:3
**6**
**6/7/2023** 124:3
**609-896-2000** 3:9
**609-987-0054** 3:4
**7**
**7** 2:9 63:13
**700** 3:13
**76** 8:19
**79** 4:11
**9**
**9441** 123:20
**970** 3:13
**973-645-2937** 3:14
**99.9** 51:16
**a**
**abdomen** 45:1 45:3,6 69:8 76:13 77:21 83:10 84:8 92:12 107:13 107:14 115:24 116:3,4,6,10,14 116:19,20
**abdominal** 70:1,2,6,9 72:12 79:14 82:23 83:18 88:25 90:11 91:6,7 99:12 101:11,14 103:24 104:9 107:10 113:22
**ability** 6:21 47:19
**able** 60:20
**abnormality** 44:20
**above** 2:3 115:19

**abscesses** 77:16 77:25
**absent** 116:9
**acceptable** 52:8
**accepted** 71:18 71:23,24
**accommodate** 95:19 121:8
**accurate** 74:2 122:6 123:10
**acid** 82:25 103:8,11,12
**action** 123:15 123:18
**actual** 82:18
**actually** 20:11 28:2 30:17 31:15 32:24 35:12 41:20 46:22 110:1 114:10,20 120:14
**acute** 51:15 107:10,10,13 107:14 116:4
**acutely** 99:6
**add** 109:3
**added** 73:22
**addicted** 54:21 59:23
**addiction** 53:6 53:8 54:19,22 56:18
**additional** 40:22
**address** 60:10 61:3
**adhesions** 51:19,20,23 52:1,4 68:2,4 68:12,13 69:4 69:9,10,11,16 69:19,24 70:1 70:4,12,19,22 70:23 71:2,3 71:15 72:3,5,7 72:13,16,19,24 73:2,7,18 74:19,21,22 75:2,3,10,11 94:2,7,8,13,17 94:20 95:3 96:9,20 98:7 99:2,11 105:6 105:8,9,18,19 105:22 106:4 109:6 111:1,3 113:23,24
**admits** 29:20
**admitted** 29:11
**advised** 118:25
**afternoon** 5:5 88:14
**age** 6:23 11:6 11:17,19 12:24
**agencies** 17:11
**agency** 9:10
**ago** 14:13,17,18 14:21 15:17,18 16:3 28:10 82:19 85:1,7 86:24 113:4
**agree** 63:4 69:25 72:11 119:3
**ahead** 11:18 24:16 66:11
**ailments** 40:9
**air** 118:11,18
**al** 124:2
**alleged** 13:25
**alleviate** 105:19,22
**allowed** 10:20
**allows** 77:2
**alternative** 49:1 62:3
**america** 1:7 3:16
**amount** 21:14 59:9 83:22
**amounts** 21:25
**anemia** 67:11 67:14,14,15,17
**anemic** 67:16
**answer** 33:25 39:12 44:8 56:1 71:20,25 73:4 87:3,21 88:5 108:9,10 109:17 113:19 113:20
**answered** 57:22
**answers** 5:23
**antispasmodic** 101:11,16 105:16,19,24
**anybody** 16:19 55:12 56:3
**anymore** 13:1 53:21
**anyway** 91:19 92:1
**aplastic** 67:13
**apologize** 30:25
**appears** 81:2 111:21 117:9 119:6
**appendix** 69:7
**applied** 66:7
**apply** 106:21
**appreciate** 95:20 121:11
**approach** 113:12
**appropriate** 24:6
**approval** 25:8 46:25 47:12,13 49:20
**approvals** 47:11
**approve** 46:20 46:22,23 48:23 49:21
**approved** 29:1 29:3 47:3

**approximate** 12:19
**approximately** 14:12 16:2 78:24 79:4 80:19
**april** 79:2,12 81:23 92:4 94:13 103:23 104:25 110:6 115:6,15
**area** 8:8 34:23 51:1 71:14 77:21
**arrangement** 21:3,22 25:4 26:2 27:8,23 35:20,21 78:21
**arrived** 56:5,6
**article** 7:23
**asked** 30:25 71:24 104:2
**asking** 45:22 66:24 106:25 114:19
**assess** 34:5
**assessment** 88:21
**assist** 39:18
**assistance** 78:3 78:7,8
**assume** 37:20
**assuming** 115:10 117:24
**ate** 86:24
**attached** 4:15
**attempt** 52:6,8
**attend** 8:1
**attended** 16:25
**attention** 100:19
**attorney** 123:14,16
**attorneys** 3:5 3:10,12,15
**audio** 19:4
**available** 38:22 39:6,7,10 86:10,12 93:14
**average** 19:13 20:3,4
**await** 25:14
**aware** 21:2 87:13,19 93:7 93:9
**azz** 8:24
**b**
**b** 1:6 3:10 4:7 5:1 82:12,13
**b2** 2:8 3:8
**back** 7:25 14:4 18:25 19:3 63:23 64:2 73:23 80:3,5 85:5 88:20 96:5 100:18 109:24 111:16 115:17
**background** 7:25
**backing** 83:1
**bad** 58:6 90:5 91:13
**barium** 44:5 70:24,25 73:9 73:11,17,19,21
**base** 37:4
**based** 33:20 42:21 91:1 93:16 97:12 109:20 115:9 115:12 116:15
**basically** 18:21 24:7 37:14 54:22 72:18 76:2 92:15
**basis** 26:9 27:4 27:5 29:14 31:22,23 34:4 55:15 114:22
**bates** 4:10,12 4:14 79:24 111:9 117:2
**batteries** 78:1
**battery** 75:10
**becoming** 59:13
**beds** 10:19,19 10:24,25
**beginning** 49:10 112:23
**behalf** 47:20
**behavior** 65:22 106:14
**believe** 5:7 16:19 25:5 26:2,3,21 48:21 80:11 82:3 103:16 112:24 113:2 115:22
**believed** 56:7
**belly** 40:16,18 77:6 90:17,18 107:11 108:23
**bentyl** 101:6,7 101:13,15 102:2 105:5,25 106:1 109:11
**best** 46:5,6 61:23
**better** 45:11 49:8 108:20
**beyond** 77:3,4 77:9,13
**bhanwarlal** 1:15 4:3 6:18 122:10 123:6
**bigger** 56:24
**biopsy** 61:15
**bit** 7:24 38:6 58:7 61:4 66:12 68:1 73:25 74:2 97:4 104:2
**blame** 44:2

**blank** 81:16
**bleed** 67:14
**bleeding** 15:1
**bloating** 69:11 69:13
**blockage** 51:15 56:8 68:16 105:9,14,23
**blockages** 51:13
**blood** 67:13,16 100:4
**bo** 96:18
**board** 8:10,12 8:15,18 9:10 32:12 34:20 37:23
**body** 44:16,16 44:25 64:7 65:19 76:13
**bolded** 80:15
**bone** 60:12,13 60:18 61:12 63:23 67:13 90:1
**bono** 20:21
**bop** 26:3 46:10 65:24 66:1 74:13
**bottom** 81:1,9 82:12 112:22 115:20 118:8
**bowel** 51:13,15 56:8,21,23 57:2,5,16 67:7 68:18,21,23 69:14,17 70:24 77:16,24 83:23 83:23 85:19 89:10,13,21 90:3 92:6 94:3 96:9 98:7,13 99:14,23 101:19 104:9 107:9 109:1,2 109:5,6 116:7 118:12,16,24
**break** 6:14 42:7 42:10,13 95:8 95:12,21 96:1 96:2,6 121:4
**breakfast** 86:24,25
**breathing** 58:7
**brief** 12:20 66:20
**briefly** 12:16
**brings** 16:10,11
**broached** 42:18
**broad** 3:13 34:1 51:3
**broke** 22:12
**brought** 14:7 16:12
**budget** 22:17
**bureau** 1:7 3:16 21:3 22:1 22:1,16 24:3,4 24:17 25:7,14 26:10,14,24 27:13,22 28:3 29:3 31:15 32:9 33:15 34:17 35:11,13 35:15 47:20 49:21 55:4,22 78:22 96:18 112:11
**burning** 71:14
**business** 16:22 36:24
**butcher** 117:12
**bye** 65:3
**c**
**c** 3:1 5:1 90:5,6 123:1,1
**calculate** 86:16
**calculated** 22:10
**call** 30:19,21 47:13 59:9,23 73:10 107:10
**called** 30:13,15 51:18 65:6 67:2,24 101:6 103:6 107:13
**calling** 59:2,2,3
**calls** 53:20
**cancer** 25:14 60:11,13,18 61:12 67:15,16 89:23
**capable** 36:20 37:19 52:19,23 52:24
**capacity** 11:1
**capital** 16:20
**capsulation** 75:21
**care** 17:14,21 17:23 18:4,11 18:14 19:7 24:5 26:3 27:12 29:18,19 29:21 30:8 31:12,25,25 33:3 96:20 98:1
**careful** 59:19
**carnegie** 3:3
**carrigg** 2:7 3:7
**case** 1:4 5:7 13:25 14:8 15:4 54:9 60:22 66:14 106:8 124:2
**cases** 15:5,11 15:15,19 16:4 108:4
**casey** 2:7 3:7
**cat** 41:4 70:25 73:9,13 115:2 115:6,10
**cause** 43:21 58:1 68:14,15 68:16,18 69:3 69:7,10,11,13 83:5 99:23,25 105:8,10,13,13 109:5

**caused** 68:6 101:12 105:4
**causes** 67:5 83:6 89:20,22 105:14 116:13
**causing** 70:24 105:23
**celebrex** 62:21
**center** 3:3 10:5 12:16 13:9
**certain** 51:2 55:22 60:3 73:17 112:21
**certificate** 122:1
**certification** 32:12
**certified** 2:4 8:10,12,18 34:20 37:23 123:3
**certify** 123:5,9 123:13
**cetera** 39:21 40:17 45:1 69:15 83:12 107:13
**chances** 45:7
**change** 73:22 124:5
**changes** 122:5
**changing** 73:3
**characteristic** 60:7
**characteristics** 94:10
**charge** 22:3 24:20
**check** 40:16
**checking** 40:18
**chemical** 57:18
**chest** 44:25
**child** 73:20
**chowdhury** 1:6 1:15 3:10 4:3 4:10,12,14 5:5 6:18 79:22,23 80:7 81:8 111:7,8,19 117:1,2 122:10 123:7 124:3,21
**chronic** 54:25
**citizen** 120:1
**city** 60:24 65:10
**clarification** 80:24 95:5
**classic** 60:13
**client** 60:17
**clinic** 8:24,25 18:18 20:7,8 20:14 21:4,7,8 21:10,13,23 22:2,23 24:9 24:21 25:22 26:20 27:13 28:19 30:1,6 30:12,13,22 38:24 39:4,17 46:2 65:10
**clinical** 33:21 38:17 42:22 63:25 118:25
**clinician** 60:1 70:5 72:17 76:25 77:2,14
**clinicians** 45:12 78:9
**clinics** 18:12
**close** 11:7 13:10
**closed** 10:8,10 11:5,8 13:9
**codeine** 104:23 104:24
**colitis** 90:6,6
**collaborations** 33:20
**college** 8:2
**colon** 57:1,3 67:15 73:12 75:1 76:15,17 76:19 77:11 84:2 89:24 90:9
**colonography** 41:12
**colonoscopies** 10:18
**colonoscopy** 15:1 75:3 79:7 109:3,4
**come** 25:9 53:23
**comes** 24:12 26:20 47:13 108:23
**comfort** 101:13
**comforted** 57:11
**coming** 6:25 20:7 60:23 61:3
**commencem...** 123:6
**commencing** 2:9
**comment** 119:22
**commission** 122:20 123:23 124:25
**committee** 47:4
**common** 89:22
**commonly** 103:8
**communicate** 24:17 50:12,15
**communication** 115:13
**companies** 49:3
**company** 48:22 74:14,15
**compared** 37:2
**compensated** 20:25
**compensation** 20:22

**complain** 64:6
**complained** 103:23
**complaining** 42:19 79:13 82:22 91:6
**complaints** 38:18 40:14 100:11 114:12
**complement** 120:24
**complementary** 77:19
**complications** 15:3 75:19 77:15 90:2 110:17
**composition** 104:20
**computer** 39:15 44:21
**computerized** 39:2 44:14
**concerning** 117:10 118:23
**concerns** 100:7 120:6
**concluded** 66:18 121:13
**conclusively** 71:6
**condition** 14:3 67:23 90:7 118:5
**conditions** 51:2 52:14,15 56:9 73:7 75:13 101:21
**conducted** 21:8
**conference** 16:25
**confirm** 51:11
**connected** 64:4 83:15
**connection** 5:12 68:22 95:1
**connections** 37:1
**consider** 40:21 99:1 107:3 108:24
**consideration** 106:7
**considered** 70:5 102:4,21 107:5
**consistent** 43:16 99:11 106:24
**constipation** 57:19 58:1 69:12,21,22 70:6
**consult** 29:22 81:15 98:1 113:16
**consultant** 29:24 35:15 49:4 55:15
**consultation** 4:12 18:8,16 85:6,24 97:16 97:17 111:8
**contact** 11:8 37:3,5 66:20
**continue** 27:11 95:14
**continued** 109:23
**continuous** 8:13,15 18:1
**contract** 27:21 27:25 28:2 30:18,20 32:8 34:16 35:12 46:10 49:22 65:25
**contractual** 21:3
**contrast** 70:25 73:9
**contribute** 43:21
**control** 98:18
**controlled** 102:2 103:15 103:17
**controls** 74:16
**conversation** 106:13
**coordinate** 25:18
**copd** 58:6
**copy** 28:5,9
**corner** 2:8 3:8
**correct** 20:9 24:14 28:14 32:10 47:18 81:21 94:4
**corrections** 122:4
**correctly** 90:12
**correlation** 63:25 118:25
**costs** 49:1
**counsel** 123:14 123:16
**counseled** 55:4
**counter** 43:9 102:16 103:15
**couple** 42:4,16 85:4,7 114:1
**course** 32:4 86:7
**court** 1:1
**covid** 10:16,18 10:20,25 11:14
**cramping** 101:22
**creates** 110:21
**crohn's** 90:2
**cross** 4:4
**ct** 41:11,14,15 44:12,15,21,24 45:2,7,11,13,20 45:23,25 46:4 47:9 48:13

70:16 72:21 74:2 75:8,22 76:2,11,14 77:18 78:1 93:10,17 97:8 98:8,16
**cucumber** 44:17
**currently** 8:21 8:21
**cutting** 71:14
**cv** 1:4

**d**

**d** 4:1 5:1
**daily** 34:4
**date** 17:18 80:11 81:3,24 97:22,24 123:12 124:3
**dated** 111:22 117:11 123:24
**dates** 14:16
**david** 1:6 3:16
**day** 29:14 55:18,18 64:11 119:11 122:13 124:22
**day's** 21:13
**days** 14:3 43:5 44:21 54:12,14 54:14 108:20 109:10
**decide** 47:6
**decided** 12:25
**declined** 14:4
**defendant** 3:10 13:15 16:5
**defendants** 1:9 3:15
**define** 67:3
**deformity** 44:6
**degree** 104:2
**denied** 26:15 31:3
**depending** 19:16 98:10,13 99:7
**deponent** 122:1
**deposed** 5:9
**deposition** 1:13 5:17 6:8 7:1,22 110:9 112:4,5 114:5 122:4 124:3
**depression** 58:5
**depth** 68:3
**described** 30:11 66:8 68:22
**description** 4:9 13:18
**desirable** 75:4
**detail** 14:15
**details** 45:16 79:17
**determine** 61:10 63:2 77:14
**devoted** 19:9
**diagnose** 74:21
**diagnosed** 71:6 98:6
**diagnosis** 34:10 36:17 63:22 67:3,5,9,12,18 67:25 70:12,22 72:19,23 74:19 78:10 93:22,24 93:25 94:1,6 94:13 96:9 109:4
**diagnostic** 70:13
**diarrhea** 69:11 69:15,23 82:23 88:25 102:19
**diff** 90:5,6
**difference** 120:4
**different** 20:17 20:17 38:10 44:25 73:14,14 76:12,12
**differential** 67:2,5,9,12,18 67:25 93:24 118:9,11
**difficult** 33:23 34:4 63:8 100:13 109:18 117:13
**digital** 84:12 86:8 89:5 112:10,16 117:21
**dilated** 118:12 118:16
**dilation** 57:3
**diminished** 116:7
**dinnamorato** 3:4
**direct** 4:4 5:4
**direction** 45:23
**directly** 21:9 33:15 115:14
**director** 33:10
**disagree** 34:9 47:20
**disagreed** 36:16 38:3
**disagreement** 113:9
**disciplined** 9:10
**discomfort** 105:15,22
**discussed** 49:20 55:7 84:22 94:17 107:7
**discussing** 22:23 48:13 94:8
**discussion** 80:2 111:15
**disease** 67:19 83:3 90:1,2

**disinclined** 54:19
**dispute** 34:13
**distended** 116:6
**distill** 22:7 23:22
**distinguish** 60:1
**distress** 42:20
**district** 1:1,1 3:12
**diverticulitis** 51:7,8
**dix** 18:19 20:8 20:11,12 21:23 23:15 32:23 33:4 38:24 39:4 78:15,16 80:10
**doctor** 6:19,23 13:13 17:3,14 20:16,20 30:16 33:8 38:16 42:9,16 49:3,4 49:18 50:7,13 50:18 52:22 55:17 60:24 66:12 75:20 76:9,10 79:15 80:15 82:2,24 88:22 96:5 100:1 108:11 111:11,18 114:22 115:18 116:22 117:6 121:5
**doctor's** 11:6,6 24:23
**doctors** 24:24 27:7 40:1 55:9
**document** 6:10 82:5,8 117:17 117:20
**documents** 6:7 81:6
**doing** 10:23 21:23 52:23 57:25 84:21 107:5 108:24
**don** 3:2 5:6
**doors** 120:25 120:25
**dose** 62:12
**doubts** 104:12
**dr** 1:5,5,6 3:10 3:16 5:5 31:6,9 31:11,12,18,20 32:3,4,11,19 33:6,11,18,21 34:13,18,18,20 34:25 35:2,7 35:10,20,21,24 36:15,20 37:2 37:2,3,3,5,12 37:22 38:2 50:16,17,19 80:7 81:8 84:17 85:2,11 85:18,21 87:14 111:22 113:1 113:15,16 114:5,23,24,24 115:14 116:15 116:16,17,24 116:24 117:11 117:15,25 119:8 124:2
**drawn** 43:1
**drug** 58:20,21 59:25 60:3,6 60:14,25 61:1 61:10,13 63:1 65:6,15,21 66:8,19 68:22 100:4
**drugs** 58:11 65:16 100:8
**due** 68:11 109:1
**duly** 5:2 123:7
**dx** 93:22

**e**

**e** 3:1,1 4:1,7 33:6 103:3,3,4 123:1,1
**earlier** 75:20 84:22 106:15 107:8 119:8
**early** 81:13 118:24
**easier** 77:7
**easy** 51:21
**eat** 87:5
**effect** 57:18 62:16 97:3 99:7 102:8 107:15 110:7
**effectively** 30:21
**effects** 56:21 58:3,4,9 102:7
**eight** 108:17
**eighty** 6:24
**either** 15:5 17:8 20:23 39:13,13 53:10 56:5 58:18 70:16 71:7 86:9
**elaborate** 71:9
**elective** 53:15
**eleven** 82:13
**elicit** 65:16 100:7
**eliminating** 52:4
**emergency** 26:9 51:16 53:18,22 56:11 56:12 57:6 64:18,21 119:17,19
**employed** 35:12,15
**employee** 31:16 33:16 123:14 123:16
**encounter** 80:16

**encountered** 26:12 53:9,11
**ended** 12:22
**endoscopic** 25:10 44:8 47:16 114:13
**endoscopies** 10:17,23 42:2 47:19 48:14 72:22 74:17,17 76:11 77:19 78:2 85:22 87:15 97:4,9 98:23 99:1 107:4,20 113:2 114:6,10,20
**endoscopy** 10:21 19:21 24:13 25:5 26:14,19,22 29:2,6 43:14 47:24 48:21 74:20,22 76:15 76:24 79:7 107:5,24 108:2 108:12 109:3 109:25 115:4
**engage** 55:5
**ensure** 60:4
**enterography** 75:21 76:2,6
**enterology** 41:6 41:9,10,11,13
**entitled** 2:3
**equipment** 54:3
**er** 25:23 84:16 87:25 111:23 119:24 120:6
**errata** 122:5 124:1
**especially** 39:21 58:5 75:3
**esq** 3:2,7,13,19
**establish** 60:18
**et** 39:21 40:17 45:1 69:15 83:12 107:13 124:2
**etiologies** 67:21
**etiology** 43:23 69:24
**evaluate** 26:21 32:5 120:10
**evaluated** 79:11 82:20
**evaluation** 31:21 94:25 100:2
**evidence** 100:11 115:23
**exact** 17:18
**exactly** 36:25 45:24 83:11,20
**exaggerated** 100:12
**exam** 40:11 50:8 84:22
94:23 114:23
**examination** 5:4 40:15 42:22 44:9 63:19 91:2 114:13 115:4 123:6
**examine** 49:25
**examining** 85:2
**example** 20:9 24:11 25:5,23 26:13 29:2 41:2 45:3 48:22 50:15,19 57:19 60:7,13 61:11 62:11 69:1 72:22 76:23 77:24
**except** 122:4
**exhausted** 72:23
**exhibit** 79:18 81:8 82:3 85:16 88:20 93:13 96:6 100:3,19 107:3 111:7,13 117:5 117:7 119:8,10
**exhibits** 4:15
**expect** 87:8
**expensive** 74:7 74:11,12
**experience** 51:10 59:4,6 109:14
**experiencing** 104:13
**experimental** 73:1
**expertise** 33:22
**expires** 122:20 123:23 124:25
**explaining** 77:8
**explains** 27:9
**exploratory** 51:24 52:2 71:7 75:11 94:18 95:3,7
**external** 90:21
**externally** 90:18
**extreme** 53:12 100:12

**f**

**f** 2:4 123:1,3
**facility** 10:25
**fact** 26:1,22 60:18 75:2 108:25 119:12
**facts** 112:21
**fair** 79:19 82:17
**false** 64:25 65:1
**familiar** 31:5,8 41:5,8,12 58:20 63:11 71:2 75:25 117:14
**family** 14:7 36:24 104:21

**far** 69:25
**fares** 1:6 34:25 35:2,7,10,20,21 35:24 36:6,8 36:15,20 37:2 37:3,5,12,22 38:2 84:17 85:2,11,18,21 87:14 111:22 113:1,15,16 114:5 115:14 116:17,24 119:8
**fashion** 55:16 106:19
**fashioned** 76:9
**fast** 108:15
**father** 35:25 36:22,23
**fci** 80:10
**february** 84:16 114:6 119:9
**federal** 17:11
**fee** 21:15,18,19 22:1,12,15,18 22:25 23:7,10 23:19,25 24:3 50:5 78:21
**feeding** 15:24 15:25
**feel** 19:11 36:19 37:19 91:20 92:19 93:3
**feels** 57:11 108:20
**felt** 24:6 92:25
**fever** 107:12
**field** 65:8 71:8 71:18 114:16
**fields** 20:17
**fight** 58:22
**figure** 22:10 67:9 120:18 121:5
**file** 38:24 81:18 84:13 86:8,11 112:16,17 117:21
**filed** 116:23
**final** 4:14 117:2
**financially** 123:17
**find** 38:18 44:2 44:20
**findings** 118:23
**fine** 95:23
**finish** 95:10 121:7,9
**first** 8:17 17:17 38:8,9 42:22 50:8 78:25 79:11,18 80:12 80:19 82:3,20 84:11,13 85:15 87:12 94:6 96:8 99:5 100:22 101:3,5 101:25 103:22 107:2,14 110:5 114:15 118:7
**fistulas** 77:15 77:25
**five** 19:7 20:1,1 23:12 42:10 54:12,14 81:6 86:21,22,23,24 87:9 88:8,13 95:21 115:18 115:19
**fix** 111:3
**fixed** 23:4
**flat** 21:13,15,18 21:19 22:1,12 22:15,18,25 23:6,10,19,25 24:3 50:5 78:21
**flavor** 73:22
**floor** 120:21,21 120:22
**flow** 118:21
**fluid** 118:11
**focus** 100:19
**focusing** 45:2 96:6
**follow** 24:22 25:6 27:1,2,11 29:13 31:22 38:7,9 48:14 49:23 73:10 97:25 98:19,22 99:8 118:24 119:4
**followed** 113:6
**following** 27:14 29:8,10
**follows** 5:3
**food** 83:1
**foot** 20:16
**force** 120:20,21
**foregoing** 122:3 123:9
**forgot** 55:25
**form** 40:10 71:19 83:4 87:20 99:3 105:2 108:8 109:16 113:18
**former** 5:7
**formidoni** 2:7 3:6
**fort** 18:19 20:8 20:11,12 21:23 23:15 32:23 33:4 38:24 39:4 78:15,16 80:10
**forth** 123:12
**foster** 1:6 3:16 33:11,12,18,19
**found** 45:20 51:24
**four** 6:24 14:2 95:16 100:23 108:19 109:10
**fourth** 112:23
**francis** 10:5,10 11:22,24 13:8 17:9,24 18:7

20:23 21:4,5 23:16 35:22,24 35:25 37:6,17 120:14,19
**franklin** 2:8 3:8
**fraud** 17:11
**free** 20:22
**frequently** 65:9
**front** 109:20
**fuld** 12:16
**fulfilled** 26:10
**full** 77:10
**functioning** 108:21
**further** 43:7 57:12 107:17 123:9,13

**g**

**g** 1:5
**gallbladder** 43:25
**gallstone** 67:7
**gallstones** 43:25 44:2 51:5 74:9
**gas** 82:23 88:25 102:19
**gastro** 49:4
**gastroenterol...** 8:9 9:19
**gastroenterol...** 8:18 18:8
**gastroesopha...** 83:3
**gathering** 54:4 76:23
**general** 38:7 106:15
**generally** 19:13 36:19 68:6 114:8
**generated** 81:2 81:10,23
**geographically** 61:2
**gerd** 82:23,24 83:4 88:25 89:1
**getting** 19:11 21:25 43:8 56:14 72:19,23 95:25
**gi** 19:19 29:13 29:13,21,23 30:16 31:21 36:12 42:19,20 44:4 49:4 51:19 52:14,22 67:14 68:16 69:11 73:10 99:4,5 107:8
**giordano** 2:7 3:6
**give** 5:17,23 13:18,24 22:9 24:4,20 27:1 31:23 43:5 44:7 54:16 59:21 60:7
74:18 76:24 77:13,20 82:18 101:13
**given** 20:23 22:17,25 87:14 99:18
**gives** 45:16 46:1 77:9
**giving** 25:3 91:13
**go** 11:18 13:1 15:6 18:14,21 20:11,12,18 23:3,14,15 24:10,16 25:22 26:5 27:5 29:23 30:6 34:5 43:2 46:17 47:6 53:22 56:23 57:6,6 63:13 64:17,21 73:8 73:11 80:5 100:18 107:4 107:24 108:1,5 108:6 111:3 112:22,23 115:18
**god** 62:6
**goes** 43:6,6 56:23 57:15
**going** 7:25 13:1 20:8 42:10 43:3 88:6,20 95:9 118:18,19
**gonna** 6:4 7:2 16:21 24:12 26:18 36:5 59:7 66:11 81:5 82:16,16 82:17 102:24 112:19 117:11
**good** 5:5 17:7 37:21 57:23 65:3 73:23 76:25 77:20 78:2,6 121:4
**governmental** 9:10
**grade** 69:13
**graduate** 8:4
**great** 78:2,4
**grounds** 32:25 33:1
**group** 47:5 109:12
**growth** 45:5
**guard** 120:11
**guess** 10:10 23:17 39:3 45:22 58:15 91:23,24 102:9 106:17
**guilty** 15:11
**gunshot** 83:9 83:13,15 89:17
**gut** 101:16 113:5

**h**

**h** 4:7 5:1,1,1 89:7
**habit** 46:3
**hallway** 37:13 37:16
**hamilton** 12:7 13:2,6
**hand** 81:9 92:25
**handed** 80:8 81:9
**handle** 56:13
**hands** 25:12 93:3
**handwrite** 88:15
**handwriting** 82:7,10,11 88:24 100:25 101:1
**handwritten** 4:10 79:23 80:8
**hang** 59:2
**happen** 6:4 25:24
**happened** 23:20
**happens** 6:5 49:7 116:10
**hard** 108:15
**head** 44:25
**hear** 5:19 6:21
**heard** 47:11 90:7
**heart** 40:16
**heartburn** 82:25 83:6 103:9,10,12
**heavens** 46:12 46:13,15,16
**held** 2:6 12:2 15:11
**helene** 12:16
**help** 43:10 54:1 62:6,6 63:21 64:20,21 95:22
**helped** 105:5
**hemoglobin** 67:12
**hemolytic** 67:14
**hereinbefore** 123:12
**hernia** 84:5
**hesitancy** 56:15 56:16
**higher** 11:12,13 11:19 22:2
**history** 38:13 42:23 63:4 83:13 89:7,9 92:6 94:14 99:18,20 104:8 113:22
**hit** 10:16
**hmo** 49:10
**hold** 9:1 10:3
**holdup** 73:16
**home** 14:2,3,11 15:23 61:3
**hooked** 55:1
**hope** 6:3
**hospital** 10:4,8 12:3,6 13:2 14:2,4,5 16:1 17:10 18:7 19:16 23:16 25:9 29:5,11 29:12,18 30:14 35:22 36:13 37:6 53:18 120:14
**hospitalist** 29:20
**hospitals** 12:14 12:25
**hourly** 22:5,7,8 23:22
**hours** 101:9
**huh** 18:3 19:5 20:12 28:15,24 33:1,13 35:9 36:23 37:15,21 38:22 39:8,19 42:3 44:11 45:18 46:8,21 48:19 50:25 51:25 55:2 58:2 59:17 62:22 72:14 92:2,20 93:6
93:23 99:13,25 101:4,7 102:18 106:5 111:20 111:25 112:17 113:8,24 118:1
**hurts** 63:23,24 63:24
**hypothetical** 24:11 25:3 43:17

**i**

**ibuprofen** 62:2
**idea** 40:14 81:4
**identification** 79:25 111:10 117:4
**identify** 59:7
**images** 93:18
**imaging** 77:2 78:1 93:10
**immediate** 26:3
**imodium** 102:14,21
**important** 38:16 40:4,13 50:11 61:10 119:4
**impression** 118:9
**inception** 106:17
**incident** 31:1
**incidents** 26:8
**inclined** 54:5

**include** 41:1 43:13
**included** 50:4
**inconsistent** 81:5
**increases** 65:21
**incurable** 90:8
**independent** 84:20 112:20
**independently** 97:7 98:21
**india** 8:3
**indicated** 56:8 81:23,24
**indication** 115:24 118:13
**indigestion** 103:9
**indirectly** 102:10
**individual** 46:3 104:4
**individually** 21:20
**infection** 68:10 110:23,25
**inflammation** 69:8 90:5 116:12,13
**information** 40:8 46:2 47:2 74:18 84:9 98:11 106:11
**informative** 74:7
**ingested** 73:20
**initial** 34:9 100:2
**inmate** 13:22 19:24 20:23,25 21:11,12,20 28:18 30:12 34:14 35:5 37:4,7,8 38:1,3 39:4 49:24 50:15,21 53:11 55:3 56:6 78:14 86:9 119:25 120:8
**inmates** 17:15 17:21 18:5 19:8,12 25:22 28:17,17 35:8 35:9 38:10 48:15 58:19 97:15,25 119:24 120:5 120:10,15,17
**innamorato** 3:2 4:5 5:4,6 16:21 17:1 36:25 42:8,12,15 79:21 80:1,3 80:25 81:4,20 95:6,11,18,24 96:4 111:6,16 117:1 121:3,8 121:12
**inpatient** 29:12 36:13
**inside** 44:9 76:16,21 116:11
**institution** 80:10
**instruction** 66:1
**insurance** 48:22,25 49:3 74:14,15
**intensive** 74:1
**interaction** 60:16
**interactions** 58:10,11
**interchangea...** 45:21
**interested** 123:17
**interfere** 6:20
**internal** 68:4
**internist** 8:23 9:18 32:15,17 33:4
**intertwine** 105:11
**intervention** 38:3
**intestinal** 101:22
**intestine** 73:11 73:12 83:14 105:11,23
**intestines** 68:16 101:12 102:12
105:5,9,14
**invasive** 110:17
**investigated** 17:10 113:6
**involve** 13:22 71:14
**involved** 15:20
**irritable** 101:19
**issue** 11:3 30:7 53:25 54:20,23 56:19 106:14
**issues** 29:21
**items** 100:23

**j**

**j** 3:13
**jaipal** 8:2
**jane** 1:8
**jersey** 1:1 2:6,9 3:3,8,12,14 9:2 10:6 12:17 60:10 123:5,21
**john** 1:8
**johnson** 12:6 12:12 13:2
**joint** 35:21
**joints** 68:14
**joking** 62:1,1
**josh** 78:13
**joshua** 1:2 5:7 66:14 80:9 124:2
**jr** 3:7
**judgment** 33:22 62:8,9

66:5,7
**jump** 46:5,6 66:11
**jumps** 64:24
**june** 2:9 123:23 123:24
**jury** 15:13

**k**

**keep** 28:8 42:10 73:12 95:9
**kept** 59:2 120:7
**khorashadi** 117:12,15
**kidney** 67:6 74:9
**kind** 21:3 25:1 42:18 47:4 59:4 63:24 87:4 91:20,25 92:16 103:9 104:5 113:5
**knee** 64:3
**knew** 33:17 35:25
**know** 5:20,25 6:10,14 10:23 18:10 21:5 22:22 23:22 26:16,19,25 27:24 28:12 30:8 32:11,13 32:18 34:24 35:1 37:22,24 41:2 42:20 43:2,24 44:4,4 44:23 45:21 47:2,10,25 49:5 51:3 56:20 57:2 64:15,20 69:3 71:13 73:2,3 74:2 76:19 79:16 80:13 81:3 84:15 85:4 87:6,16 87:22 88:13,18 88:18 90:2,6,7 91:25 92:16 93:17 96:1,17 104:2,14 105:3 106:2,16 110:17 112:19 114:20 116:16 120:8 121:6
**knowledge** 20:20 21:6 31:14 85:20
**known** 10:3 71:1

**l**

**l** 5:1,1 33:6 103:3,4
**lab** 39:21
**labs** 43:1,2,2
**lady** 33:8 60:9
**lang** 2:7 3:6
**larger** 109:12
**lately** 49:14
**laugh** 61:25
**laughter** 16:23 17:5
**lawrenceville** 2:8 3:8
**lawsuit** 13:14 13:16,21 14:13 14:23 16:5,6,8 16:11,12 116:23
**lawsuits** 16:19
**lawyer** 7:3,6,8 7:10 17:4 87:2
**layer** 76:25
**layman** 44:13 96:12
**layman's** 44:13
**lead** 57:16
**learn** 83:22 85:17,21 113:14 114:4
**learned** 31:2 84:17 106:7
**learning** 92:5
**leave** 58:23 71:12
**leaving** 111:4
**led** 94:12 114:9
**left** 27:6 81:9 100:20
**leg** 63:24
**legitimate** 60:2 63:2
**lenox** 2:6 3:6
**lenoxlaw.com** 3:9
**letters** 16:20 82:13
**level** 104:16,17
**levels** 118:11
**license** 9:1 52:20 123:22
**licensed** 8:21 52:24
**licenses** 9:6
**likely** 61:12
**limit** 6:6 46:11 46:16,18 59:14
**limitation** 66:1
**limited** 13:8 38:1 46:9 96:17 106:19
**limits** 24:5
**line** 17:4 80:15 90:10 112:23 115:19 124:5
**lines** 110:13 115:18,20
**liquid** 118:19
**listen** 40:15,16
**little** 7:24 38:6 58:7 61:4 66:12 68:1,2 73:25 74:2 104:2
**live** 59:1 110:8 110:12
**llc** 2:7 3:7 124:1
**llp** 3:2,19

**located** 100:23
**location** 32:21
**long** 9:13,20 10:9 11:21 13:5,7 28:10 35:19 36:2,3 42:25 98:10 108:14
**longer** 108:22 110:8,12
**look** 39:5 44:9 44:19,19 48:2 54:3 60:24 76:12,14,16 92:8
**looking** 43:15 44:24 61:14 92:13 115:17
**looks** 61:18 101:2 109:21 117:23 119:13
**losing** 67:16
**lost** 84:1
**lot** 53:21
**louis** 1:5 34:25 35:2 36:6,7
**low** 67:11
**lower** 22:3 48:3 48:5 85:22 104:15,19,19 113:2
**lumen** 76:15,16 76:17
**lung** 60:11
**lungs** 40:16
**lydia** 2:4 123:3
**lysis** 71:2,3,7 71:14,17

**m**

**m** 103:3
**m.d.** 1:15 4:3 5:1 122:10 123:7
**made** 26:9 38:2 55:8 95:19 122:7
**magnetic** 41:18 45:9
**mailloux** 3:13 42:6,11 80:6 80:23 81:1,21 99:3 111:14
**majority** 69:25
**make** 6:9 25:12 39:7 40:24 50:9 57:4,8 67:13 79:18
**makes** 30:24
**malignant** 25:6
**malpractice** 5:14 13:16 14:7,22,23 15:20 16:4,25
**management** 52:20,21 55:5 63:21 65:8,14 65:15
**march** 81:22
**mark** 79:21 111:6,7 117:1
**marked** 79:24 82:2 111:9,19 117:3
**marrow** 67:13
**mass** 92:15
**masses** 90:24 92:12,14,22
**matt** 42:10 80:5 81:20
**matter** 2:3 75:2 108:25 119:12
**matthew** 3:13
**matthew.mail...** 3:15
**maximum** 54:15
**mcdonnell** 2:4 123:3
**md** 80:16 124:3 124:21
**mean** 16:12 18:23 22:5 46:18 49:25 55:10 62:20 92:25 104:5 114:21 118:12 119:23
**meaning** 20:22 62:7 76:2 92:22 96:24
**means** 42:8 57:2 76:1 92:16 94:22
**meant** 115:25
**measure** 63:8
**medical** 8:1,2 8:24 10:5 12:16 13:9,15 16:4 33:9 38:20 39:5 40:4,22 42:5 49:19 60:17 61:9 62:8 63:3 66:4 71:23 75:16,17 80:9 95:2
**medically** 113:6
**medicare** 17:11
**medication** 43:5 52:23,25 55:21,22 90:8 96:22 99:6,7,9 107:15,24 108:1
**medications** 6:20 43:9 53:3 61:21 62:11 101:3 107:14 107:16 109:11
**medicine** 8:8 8:22 9:2,13 51:1 61:23
**meds** 59:10
**meet** 7:6,8,9,10
**meeting** 84:13 85:17 87:4 92:4 101:25

**mention** 92:11
**mentioned** 27:25 34:18 44:12 58:4 91:18 93:20
**mesh** 84:7
**met** 103:22 119:8
**michael** 3:7
**mike** 16:21
**miles** 23:16
**milligrams** 101:8
**minority** 108:3 108:7
**minute** 42:7,10
**minutes** 95:21
**moment** 5:15 85:1
**money** 49:2
**month** 18:13 19:12,15 23:6 23:18 27:5 30:7 43:8 55:17,18
**monthly** 23:1,2 23:3 31:23
**months** 18:14 108:22,22 114:1,15,15
**morning** 87:1,5
**mornings** 65:11
**moses** 1:2 5:7 7:22 66:14,18 66:24 78:13,20 78:25 79:11 80:9,20 81:13 81:16,25 82:4 82:20 83:9,21 84:11,15,21 85:2,5,10,13,15 85:18,23 86:3 87:12,24 89:3 89:17 91:2,5 91:12,13 92:4 93:9 94:7 95:2 96:7,21 97:5,8 98:25 100:2,11 101:24 103:5 103:22 104:12 104:25 105:18 106:9,22 107:2 109:19 110:6 111:23 113:17 114:1,10 115:5 115:14 117:10 118:4 119:8 124:2
**moses's** 13:14 86:11
**move** 12:25 74:17,18
**movements** 69:18
**moving** 93:21
**mpattanite** 3:9
**mri** 45:10,11 45:12,20,23,25 45:25 46:4
47:9 48:13
**mris** 41:17 70:14 72:22 73:25 75:9 97:8 98:16
**mucosa** 77:3,4 77:9,13
**mucosal** 76:25
**multiple** 15:3 73:13 83:18 84:4 110:19 118:8,11
**murder** 87:10
**murderer** 87:9

**n**

**n** 3:1 4:1 5:1
**name** 5:5 6:16 8:24 19:22 33:9 66:14 117:13 124:2,3
**named** 31:8
**narcotic** 53:25 54:6 56:22,24 57:4,8 60:12 61:17,20 62:14 62:16 66:2 106:9
**narcotics** 53:17 55:1,6 56:10 56:15 57:18 58:1,4,9,11 59:18 60:4,21 62:23 65:9 66:25 103:19 104:16,20
106:13,17
**nature** 58:14 74:9 104:18 110:17
**necessary** 48:22 101:9 108:2
**necessity** 89:21
**need** 6:8 107:17
**needed** 26:3,22 32:5 37:11,11
**needs** 25:5 52:2 113:2,6
**neither** 123:13 123:15
**nerves** 68:13
**never** 7:15 22:8 23:20 26:16 52:17 55:7 56:15 63:14 76:6 79:5
**new** 1:1 2:6,9 3:3,8,12,14 9:2 10:6 12:17 60:10 80:16 123:5,21 124:1
**newark** 3:14
**ng** 119:18
**nice** 116:21
**nicoletta** 1:6 3:16
**nine** 114:15
**noise** 64:12
**non** 29:15,15 61:20 62:21

120:8
**nonnarcotic** 105:2
**norm** 114:16
**normal** 22:13 32:4 49:23 50:8 70:13 72:16 86:7 96:20 97:13 108:20 114:17 114:18 118:21 120:24
**normally** 22:3 99:17 112:9
**notary** 2:5 5:2 122:17 123:4 123:21 124:25
**note** 24:20 80:16 88:17 93:13 116:20 116:20
**noted** 93:12 122:5
**notes** 2:2 4:10 34:5 50:9 79:16,24 82:4 82:18 83:12 84:18 85:16 87:13 88:9,14 88:15 92:5 93:21 96:7 116:18
**nothing's** 45:20
**november** 79:6 97:5,9 98:22 110:3 114:9 115:7
**nsaid** 53:3
**number** 4:9 19:24 23:9,13 57:10 67:20
**numbers** 19:14
**nurse** 24:20
**nurses** 39:25 40:2,3
**nursing** 14:2,3 14:10 15:23

**o**

**o** 5:1 89:7 103:3,4
**object** 99:3 109:16
**objection** 71:19 87:20 108:8 113:18
**objective** 61:13 63:3 104:8
**obligation** 27:18
**obstruction** 56:22,23 57:2 57:5,7,16 67:7 69:15 70:24 77:16 85:19 107:10 115:23 118:14,21,24
**obstructions** 68:19,21,23 77:24
**obviously** 53:6 63:4 120:6
**occasions** 66:22
**office** 2:6 3:12 13:8 25:18 27:3 29:16 37:11 47:13 53:15,23 54:1 60:10
**oh** 16:10 21:15 65:15 69:6 78:6 120:23
**okay** 5:12,15 5:18,21,22 6:13,16,23 7:6 7:12,14,24 8:13,20 9:1,6 9:25 10:7,22 11:11,16 12:11 12:18,22 13:3 13:13,18,21 14:6,12,17,19 15:8,12,14 16:15 17:20 18:1,15,25 19:6,20 20:6 20:13,20 21:18 21:22 22:11 23:5,9,21 25:6 25:11,17 27:9 28:5 29:17 30:20,24 31:5 32:2,11,24 34:20,25 35:24 36:14,19 37:13 38:6 39:3,20 40:3,10,21 41:17,20 42:1 43:12 44:1,10 46:9 48:3,12 49:9,18 50:4,7 50:14,21,24 51:12,18 52:13 52:19,22 53:19 54:8,15,18,24 55:3,25 56:5 56:14,18 57:17 57:21 58:8,25 59:16,22 61:20 61:24 62:5,10 62:25 63:7,15 64:5 65:23 66:11,21 68:9 69:17 71:1,13 71:17 72:15 73:1,6,15,25 74:5 75:8 76:4 76:5,8,23 77:5 77:9,23 78:8,8 79:3,15,20,21 80:3,7,22 81:17 82:2 83:2,17,21 84:1,11,19 85:8,15 86:1,5 88:3,7,17 89:12,16,20 90:4,10,23 91:4,8,10,17 92:3,21 93:5

93:12,16,21 94:2,6,12,16,20 94:22 95:24 96:12,16 97:2 97:7,11,20 98:15,18,21 99:10,14,23 100:15,18 101:2,18 102:4 102:13 103:2,5 103:14,18,21 104:11,24 105:6 106:2,21 107:22 109:7 109:14,19,22 110:5,16,23 111:6,12,21 112:9,14,18,21 113:14,25 115:9,13,17 116:15,22 117:17,23 118:7,15,20,23 119:6,20 120:2 120:13 121:1,4 121:12
**old** 76:9,9 87:9 88:8 90:15,16 90:17 92:12
**omeprazole** 103:1,6
**once** 14:10 18:13,13 27:1 27:5 28:18 29:14 30:6 31:23 78:14,17
**onwards** 24:21
**open** 86:8,11
**opening** 81:18 110:20
**operate** 35:10
**operations** 84:5
**opinion** 57:14
**opioid** 53:13 102:7,8
**opioids** 53:4
**opportunity** 77:14 111:18 117:6
**opposed** 27:10 30:16 48:15 53:3
**option** 28:25
**oral** 38:13 99:20
**orally** 104:8
**order** 45:12 46:4 74:8,12 98:16 99:9 108:21
**ordered** 24:6 76:6 96:25 98:8,14
**organ** 116:11
**organization** 22:9
**organs** 68:14
**originally** 8:14
**ortiz** 1:7 3:16
**outpatient** 19:21
**outside** 35:11 49:18,19 76:14 76:17,21
**overdose** 58:15
**own** 9:19,21 11:6 20:19,19 24:24 27:14 35:18 52:20 60:6 73:6 98:6 112:20 120:19
**owned** 65:11
**oxycodone** 104:17

**p**

**p** 3:1,1 33:6 103:3
**p.m.** 2:10 42:13 42:14 96:2,3 121:13
**page** 4:9 80:14 80:24 97:19 118:7 124:5
**paid** 21:9,9,18 21:20 22:2 23:6,8,19
**pain** 43:8 52:15 52:19,21,23,25 53:2,12,13,16 53:21,24 54:6 54:25 55:5,9 56:22 57:11 59:10 60:2,12 61:20 62:4,10 62:19,22 63:2 63:4,9,11,12,21 63:22,22,23 64:2,3,6,7 65:8 65:14,15 66:2 67:6,10 68:14 68:16 70:6 79:14 82:23 83:5 88:25 91:6,7 99:12 99:24,25 100:12 101:12 101:14 102:11 102:22 103:19 103:24 104:5 104:13 105:4 105:10,15,20 106:9,14
**painful** 51:2,5 51:8,14,19,20 52:14 56:8 64:9 69:17 107:11 116:6
**painkiller** 102:5,10,22
**pains** 108:23
**palpable** 90:24 92:12,13,15,22 93:4
**papers** 79:1
**paragraph** 118:7
**pardon** 7:7 20:10 31:7 35:6 41:7 72:6

**parentheses** 17:3
**part** 17:15 18:10,10 20:14 44:23 50:7 60:16 83:23 96:20 112:9
**partial** 68:15 69:14 105:14 105:23 118:24
**partially** 63:6
**particular** 18:17 27:14 31:2 32:12 38:2,24 40:19 54:9 76:1 80:11 112:15
**particularly** 119:24
**parties** 123:15
**parts** 44:16,25 76:13
**passed** 14:5
**past** 31:19 33:20 38:20 41:21 53:2
**patel** 33:6 34:18,20 50:19
**patience** 60:20
**patient** 5:8 14:1,25 15:23 22:4,13 23:14 23:18,23,25 24:1,8,12,25 25:2,4,19 26:14,20 27:1 27:3,15 29:8 29:10,15,23,23 30:4,11,12 31:19,20 32:5 34:14 36:10,16 37:4,11,11 38:8,14,18 39:4,10 40:4 40:11,22 42:19 43:17 44:8 47:14,21 50:9 50:15 51:3,16 56:2,5,6 57:11 58:6,12,22 59:8 61:2 63:3 63:11 65:16 66:13 70:5 72:2,12 73:8 74:13 76:7 77:15,23 98:5 98:8 99:1,5,19 107:8 108:12 109:2 113:4 114:12 119:16
**patient's** 44:3 112:17 119:23
**patients** 10:20 10:25 11:8 19:24 20:2 22:13 23:5,10 23:12 27:3,10 30:1 31:19 33:4,10,21 34:3,3,8,8 35:3 35:4,5,7 36:10 37:7,8,10 38:1 38:11,25 48:20 53:10,12 54:6 54:20 55:4,9 61:22 69:25 86:9 88:14 90:1 107:16 109:9 120:8
**pattanite** 3:7 7:15 17:7 36:24 71:19 86:21 87:20 95:16 103:3 108:8 109:16 113:18
**pay** 21:13
**pelvis** 45:1
**people** 47:5 54:25 62:3 82:25 89:13,23
**percent** 19:10 19:12 51:16 112:13
**percentage** 19:8 107:16,19
**percocet** 59:10 60:25 62:17
**percocets** 58:24
**perforate** 57:1
**perforating** 57:3
**perforation** 57:16 75:4 109:5 116:11
**perforations** 68:25
**perform** 24:13 26:19 29:2 30:13 40:10 41:23,25 46:18 48:8 97:4 114:10,20
**performed** 18:9 18:9 24:13 31:2 85:23 110:1 113:3
**performing** 77:25
**period** 12:9,19 19:6,7 120:7
**peritonitis** 68:11 69:5,6 116:13
**persistent** 114:11 115:1
**person** 16:16 16:18 43:4,7 47:6 49:7 56:21 57:5 60:23 63:22 64:2 67:11,15 68:10 69:8 74:24 87:8 107:9 108:20
**personal** 51:10
**personality** 61:1
**phone** 19:4 49:5 58:22

59:9,22
**phrases** 96:14
**physiatrist** 52:16 56:2,4
**physiatrists** 55:9 56:1
**physical** 40:11 40:15 63:19 91:2 94:22
**physically** 32:18
**physician** 29:20 31:8,12 65:11 98:1 117:24
**physicians** 20:13,15 31:25 62:25
**pick** 45:21
**pictures** 44:5 73:13,13
**pipe** 83:1
**place** 9:14 64:8 65:9 123:12
**placing** 119:18
**plain** 45:6
**plaintiff** 1:3 3:5 5:6 16:8,9 66:14
**plan** 100:20,22
**please** 6:17
**plus** 35:23
**point** 24:21 45:22 56:9 59:12 66:15,17 71:5 84:24 85:3 86:10 89:6,13 94:25 99:17 100:1 114:4 115:22 116:22
**points** 73:17
**polyp** 15:1
**possibility** 25:25 57:2 58:16,17 87:19
**possible** 59:15 81:12 87:18
**potential** 25:13 48:13 67:20 89:21
**practice** 8:22 9:2,16,17,19,21 11:5,8,21 13:9 13:11 17:8,15 19:8 27:11 35:18 38:12,17 46:3 52:17 53:10,15 54:2 58:18,19 61:16 89:14 97:13 98:6 99:4 106:16
**practiced** 9:18 10:10
**practicing** 9:13
**preauthorizat...** 25:1
**prep** 7:18
**preparation** 7:1,4 112:4,5
**prepared** 111:22 117:11
**preparing** 114:5
**prescribe** 52:22 52:25 53:12 54:6 55:24 56:10,15,17,22 59:18 60:4,21 60:25 61:17,21 62:19,21 65:9 106:8,18 107:14
**prescribed** 55:21 59:9,11 101:24 105:1 109:11
**prescription** 54:13,16 103:17 104:19
**presence** 109:6
**present** 3:19 8:23 96:23 115:24
**presenting** 108:13
**presently** 65:10
**presents** 70:6
**press** 64:8 92:18,19
**pressed** 82:13 82:15
**pretty** 75:15
**preventing** 118:21
**previous** 70:9
**primarily** 69:20 72:11
**primary** 29:19 31:12,25 33:3 98:1
**princeton** 3:3 60:9,23
**print** 39:15,23
**prior** 59:7,8 60:15 68:6 69:4 70:1 72:12,15,23 89:12 94:15 97:9 99:21 113:21 123:5
**prison** 17:15 18:5,12,18,19 19:7 21:1,9 24:23 25:19 26:5,6,7 27:6 30:8 31:3,13 32:1 49:22 50:13 55:10 97:21 114:22 120:16
**prisoner** 29:15 29:15 49:25 50:22
**prisoners** 27:4 30:18,21 46:12 120:22

**prisons** 1:7 3:17 18:14,20 21:4 22:1,16 24:4,4,18 25:7 25:15 26:10,14 26:24 27:13,22 29:4 31:15 32:9 33:16 34:17 35:11,13 35:16 47:20 49:21 55:5,22 78:22 96:19 112:11
**private** 9:19,21 17:8 27:10 35:18 38:11 48:16,20 53:10 56:6 58:19 98:5,8 99:1
**privilege** 12:23
**privileges** 10:4 11:24 12:2,3 12:11,15
**pro** 20:21
**probably** 95:11 109:2 121:4
**problem** 42:12 44:7 59:13 60:2 111:3
**problems** 38:19 111:1
**procedure** 10:17 25:2,10 25:20 31:2 37:12 45:19 47:3,14,17 49:8 71:23 75:16,17 108:24 109:25
**procedures** 18:8,9 19:22 38:7,10 47:10 48:12 49:14,23
**proceedings** 2:3 121:13
**process** 49:20 72:17 73:6
**progression** 48:15
**pronounce** 102:25
**properties** 103:19
**provide** 18:4,14 55:22
**provided** 17:14 17:23 19:7
**psychiatry** 20:16
**psychotropic** 58:13
**public** 2:5 5:2 122:17 123:4 123:21 124:25
**purports** 80:8
**purposes** 53:7
**pursue** 43:7 57:12
**put** 16:20,21 29:22 44:21 55:19 73:22 81:15

**q**

**qualified** 48:8
**qualities** 105:24
**question** 5:20 5:25 22:19 33:25 34:1 39:3,12 51:3 57:22 71:25 72:1,2 73:5 82:17 87:3 96:8
**questions** 6:21 42:5,17 75:23 82:16 88:4
**quickly** 42:7
**quite** 10:14
**quote** 81:22

**r**

**r** 3:1 5:1,1 103:3 123:1
**radiologist** 41:24,25 44:22
**radiology** 117:10
**ranwarlal** 124:3,21
**rare** 65:7 72:5
**rate** 22:2,3,5,7 22:8 23:22
**ravi** 1:5 3:16 31:6,9 80:16 124:2
**ray** 42:21 43:15 43:16,20 45:4 45:6,6,20 119:21
**rays** 39:21 41:2 41:4 43:13 48:14 54:2 70:13 72:21 75:9 120:1
**read** 90:11 110:9 111:12 122:3
**reading** 85:24 96:12 115:8
**ready** 80:5
**really** 22:11 47:22 51:24 94:17,21 120:9
**reason** 9:7 12:22 13:1 30:10 54:18 55:13 97:11 124:5
**reasons** 60:5
**recall** 31:1,4 36:15 66:13,17 66:24 78:17 79:12 82:21 83:7,8,21 84:3 84:24 85:2,13 86:11 87:7,8 87:10 91:12 92:3,5 96:16 96:24,25 97:8

98:21,24 100:5 100:6,9,10,16 100:17 104:11 115:5 120:4
**receive** 65:25
**recent** 43:2 59:6
**recently** 85:3
**recognize** 82:5
**recollect** 36:18 47:22 53:14 72:4 83:11,20 84:14,23 85:12 87:24 88:1,6 89:19 95:4 114:7 115:16
**recollection** 78:13 79:17 80:18 82:19 84:20 88:10 91:5 106:12 112:21
**recommend** 24:12,19 26:6 27:5 41:3 42:1 46:12,15,18 49:1 55:23 108:12
**recommendat...** 11:7 24:7,19 25:12 26:9 27:2 31:23 36:17 38:2 46:11 87:14 114:19
**recommendat...** 31:24 40:24
**recommended** 25:22 26:13 31:1 41:20 72:3 85:22 96:22 114:6
**recommending** 46:10 66:2 96:17,18,19 97:8
**record** 6:17 39:14 50:22 61:15 80:1,2,4 80:9 84:12 89:6 111:14,15 111:17,21 112:10,15,15 112:20 115:12 115:18 116:16 122:6
**records** 7:17 38:21 39:5 40:4 50:1,2,9 60:17 61:9 95:2
**recross** 4:4
**redirect** 4:4
**reducer** 102:22 103:8
**reduces** 102:10
**reducing** 52:3 101:21 102:12
**reedsmith** 3:2 3:19
**reedsmith.com** 3:4
**refer** 31:20 32:5 37:12 52:15 56:1 81:3
**referrals** 33:5 55:8
**referred** 34:8 55:12 109:24 114:13,25
**referring** 97:18 115:19 117:23
**refers** 34:8
**reflected** 85:15 87:13 92:5 100:3 107:3
**reflects** 112:18
**reflux** 83:3 103:11,12
**refresh** 79:17 80:18 82:19 88:9 91:4
**regard** 29:25 37:4 40:3 55:3 70:11 75:8 99:10 118:4
**regarding** 34:13 80:9 82:4 99:21 111:23
**regardless** 5:16
**regular** 27:2,4 27:4 31:22 55:14,17 93:25 94:1 114:22 120:1
**rejected** 26:23 26:24
**related** 11:19 42:17
**relative** 123:14 123:16
**relief** 62:22 106:9
**relieve** 57:10 101:13 107:16
**reliever** 53:13
**relievers** 54:6 66:2
**relieving** 103:19
**religious** 16:16 16:18
**remember** 7:20 12:18 14:12 23:24 26:8,11 28:10 30:4 33:9 34:12 37:25 38:5 67:1 75:22 78:24 79:3 84:6,7 86:13 86:23,25 93:11 104:1,3,5 115:7 116:3
**remove** 52:11 52:12
**removed** 15:2 83:23

**repeat** 16:17 46:14 107:25
**replaced** 15:24
**report** 4:14 39:23 61:15 85:25 117:2,10 117:10
**reporter** 2:5 16:17 46:14 95:5 107:25 123:4
**reporting** 124:1
**represent** 5:6
**request** 26:15 29:1,3 39:11 42:7
**requested** 55:21
**requests** 4:16 4:17 16:17 46:14 95:5 98:2 107:25
**require** 29:12 43:11 53:17 90:8
**required** 15:2 18:7 25:1
**resection** 83:13 83:24 89:10,21 90:3,9 92:6 98:12 104:9
**resections** 89:14
**resolve** 57:7 99:9 109:10
**resonance** 41:18
**respiratory** 58:5
**responsibility** 24:22
**rest** 27:6 31:24
**restrict** 49:13
**restricted** 49:22
**restriction** 50:3
**result** 15:10 68:25 83:19 84:2
**resume** 42:14 96:3
**reveal** 43:16,20 45:4,4 63:20
**review** 6:7,9 7:17 38:20 40:5 50:1,2 95:1 111:19 117:7
**reviewed** 80:16
**reviewing** 83:12 111:13 117:5 119:10
**revoked** 9:7 12:12
**right** 5:24 6:1,2 6:2,5,11,12,15 7:3,12,14,20 8:4,10,17 9:20 10:2,13,14 11:21 13:5,13 13:24 14:9,22 15:16,19 16:7 17:1,22,25 18:24 19:3,11 19:18,23 20:5 21:2,17 22:15 22:24,24 23:17 24:2,15 25:16 26:1,12 27:17 27:21 28:10,16 28:17,23 29:7 29:25 30:5,23 31:5,18 32:7 33:2,7,12,12,12 33:12,19 34:12 34:18,19,19 35:4,10,17 36:4,5,9 37:9 37:14,18,22,25 38:8,13,23 39:9,22,25 40:19,20 41:1 41:15,16,19 42:4,16,24 44:18 46:7,24 47:18,24 48:6 48:11,17 49:12 49:12 50:1,6,7 50:11,17,20,20 50:23 51:6,25 52:12 53:1,6,7 53:9 54:17 55:25 57:17 59:25 60:5,15 61:7 62:24 64:1,10,19,22 65:2,15,19,23 66:4,6,10,17 67:22 68:1,5,8 68:17,18,20,21 69:6,22 70:8 70:10,11,15,16 71:8,11,12,16 72:20,25 74:3 74:4,15 75:7 75:12,14 76:4 76:18 77:1,12 77:17 78:12,12 78:16,17,19 80:21 81:11,19 81:19,19 82:1 82:15 83:7,16 83:25 84:19 85:10,13 86:14 86:20 87:6,7 87:11,18,24 88:11,18 89:4 89:6,11,16,25 90:19,20,22,25 91:1,3 92:24 93:2 94:5,9,11 96:5,11,15,15 97:5,6,12,17,23 98:20 100:1,10 100:18,21,23 100:24 101:5,8 101:15,23,25 102:1,5,9,13,15

102:20 103:7 103:15,24,25 104:7,10,15,19 104:24 105:12 106:2,6,20 107:1,2,18,21 108:18 110:4 110:10,20,22 111:5,16 112:6 112:25 113:23 114:2,3,8,14 115:11,17,21 116:5,8 117:9 118:10,10,22 119:2,2,5,5,15 119:18 120:23 121:3
**rigidness** 75:5
**risk** 11:12,13 11:19 75:4 110:21
**risky** 109:4,8
**road** 2:8 3:8
**robert** 12:6,12 13:2 17:9 84:16 111:23
**room** 51:17 53:18,22 56:11 56:12 57:6 64:18 119:17 119:19 120:19
**routinely** 61:22
**rule** 72:18 74:23,24 75:9 75:13 96:19 99:2,16,17 108:15
**ruled** 116:17
**rules** 5:17
**ruling** 73:7
**running** 107:12
**rupture** 57:3
**ruptured** 69:7
**rushed** 84:15

**s**

**s** 3:1 4:7 124:5
**sad** 55:1
**sample** 100:4
**saranne** 3:19
**save** 71:10
**saw** 14:10 21:19 23:5,18 23:19,25 27:7 39:10 66:22 78:18,25 79:5 80:19,19 81:13 81:24 84:11 85:6 86:3,18 87:12,25 91:6 93:8 103:21 106:22 107:2 114:1,16 115:6 115:14 119:7
**saying** 25:11 53:2 54:5 68:19 76:24 77:7 85:1 98:19 107:18
**says** 63:22 81:2 90:23 91:7 100:20 112:20 113:2 118:8
**scale** 63:11,12 91:13 104:17
**scan** 41:15 44:12,15,15,21 45:2,7,11,13,20 45:23,25 46:4 47:9 48:13 70:25 73:9,13 76:14 81:24 115:3,6,10
**scans** 41:4 70:16 72:21 74:2 75:8,22 76:2,11 77:18 93:10,17 97:8 98:9
**scar** 52:11,12 68:4 75:7 111:4
**scars** 75:6 90:15,16,17,21 92:12
**scenario** 26:13 30:11 48:21
**schedule** 20:19 24:8,16,25 25:2 47:14
**scheduled** 19:22 25:20
**scheduler** 25:19 27:7
**scheduling** 25:18
**school** 8:1
**scope** 44:9 48:2
**scopes** 48:7
**score** 65:23
**scream** 64:10
**screams** 64:24
**screen** 65:6,16 100:4
**scrolling** 44:22
**second** 80:14
**secretary** 47:2
**section** 88:21
**security** 120:5 120:11,15,20 120:24
**see** 11:1,1 24:1 27:3,4 29:1,2,5 29:13,16,16,22 29:23 30:18 33:10 39:13 43:3,25 44:6 44:17,20,22 45:7,17 46:13 47:5 49:6,11 50:21 53:14 55:14,15,16,20 57:13,22 60:17 63:9,25 64:3,4 65:8 67:3 72:16 73:16 74:8 76:20,21 76:22 77:3 80:15 81:10,15 82:12 83:7 85:3 87:11

88:13,21 90:11 91:23 97:14,15 97:24 98:3,4 99:6 100:20,22 102:14 105:1 105:10 107:8 107:15 109:20 111:24 112:13 112:24 113:7 115:9 118:9,25 120:23
**seeing** 19:13 29:9 30:4 34:3 77:9,13 79:13 82:21 100:10
**seeker** 60:3,14 61:11,13 66:19
**seekers** 60:6 63:1 64:6 66:8
**seeking** 58:20 58:21 59:25 60:25 61:1 65:21 68:23 106:14
**seen** 28:16,18 30:1,12,22 36:12 49:14,15 70:13 85:8 86:5 112:1,6 114:21 117:17
**sees** 34:3 35:3,7
**send** 16:1 42:20 44:8 120:16
**sense** 19:24 29:8 30:24
56:14 102:10
**sensitive** 64:23
**sent** 14:4 56:3 109:24,24
**separate** 48:7 106:12
**series** 44:4 73:10
**serious** 43:1 53:16 68:23 75:16,17
**service** 30:14
**services** 18:16
**session** 7:18
**set** 123:12
**seven** 54:14
**severe** 70:6
**shared** 33:4 36:10
**sharing** 10:19 10:19
**sheet** 122:5 124:1
**short** 54:10 62:12 94:3 96:9 98:7 99:14,23 109:1 109:2,6
**shorter** 120:7
**shorthand** 2:5 123:4
**shoulders** 6:1
**show** 39:14 45:6,7,8 65:16 70:17,19 94:22
**shows** 107:9
**shrug** 6:1
**sic** 9:24 10:11 108:7
**sick** 99:6
**sickness** 19:17
**side** 24:8 53:11 56:21 58:3,4 81:10
**sign** 28:2
**signature** 123:20
**signed** 27:22 28:11
**significance** 92:21
**significant** 83:22
**signs** 107:9
**similarly** 67:11
**sit** 47:5
**sites** 18:22
**sitting** 84:21 85:14
**situation** 25:13 26:11,23 29:13 30:7 31:4 36:11,12,18 38:5 43:10 47:23 48:24 51:15 54:3 55:2,19 56:13 57:4 65:7,12 68:12 98:16 109:6
**six** 88:13 101:9 108:16
**sketch** 13:25
**skin** 64:12,23 64:24 104:4
**slice** 44:16,20 44:22,23,23
**sliced** 44:16
**slightly** 76:12
**slow** 58:6
**small** 54:11 62:12 83:23 85:19 107:15 107:19 113:5 118:12,16,24
**sms** 8:2
**socey** 2:6 3:6
**soft** 90:11 92:12 116:21 116:21
**solution** 51:21
**somebody** 16:13 64:11
**somewhat** 77:19
**sood** 1:5 3:16 31:6,9,11,12,18 31:20 32:3,4 32:11,19 33:21 34:13 37:2,3 50:16,17 80:16 114:23,24,24 116:24 117:24 117:25 124:2

**sophisticated** 46:1
**sorry** 10:1,13 11:18 13:11 16:10,11 18:17 22:20 42:6 78:6 115:18
**sort** 19:11 92:17 104:16
**sounds** 116:7
**source** 67:10
**sparse** 88:9
**spasm** 101:12 101:13 102:12 105:4
**speaking** 36:19
**special** 4:16,17
**specialist** 52:16
**specialties** 8:8 20:16
**specialty** 32:12 40:19
**specifically** 53:22
**spend** 65:11
**sporadic** 55:16 55:16
**squeeze** 68:13
**st** 10:5,10 11:22 11:24 13:8 17:9,24 18:7 20:23 21:4,5 23:16 35:22,24 35:25 37:6,17 120:14,19
**staff** 32:24 39:17
**stage** 30:9 100:13
**stamped** 4:10 4:12,14 79:24 111:9 117:2
**start** 17:17 108:10
**starts** 95:25
**state** 2:5 6:16 17:11 18:20 123:4,21
**stated** 85:1
**statements** 122:7
**states** 1:1,7 3:12,16 6:10 9:4
**stating** 60:11
**statistics** 109:13
**stay** 14:3 22:17 110:7,12
**steel** 120:25
**stenographic** 2:2
**stenographic...** 123:11
**step** 26:4 115:3
**steps** 60:3
**steroidal** 62:21
**sticker** 16:24 17:2
**stomach** 43:4,5 43:8 44:6,9 48:2,4 67:8,15 73:12 74:25 75:1 76:15,16 76:20
**stone** 67:6 74:9
**stop** 42:9
**stopped** 10:16 10:23 79:4
**street** 3:13
**strength** 103:17
**strike** 93:7 105:17
**strong** 62:17 70:23
**stronger** 53:13
**strongly** 31:1
**subjective** 92:1
**submitted** 28:7
**subscribe** 122:6
**subscribed** 122:12 124:22
**subspecialty** 52:13
**substance** 102:2 103:15
**sued** 14:23 16:13
**suffered** 83:9
**sufficient** 62:8
**suggest** 49:6 73:17 74:20 92:14
**suggested** 93:16
**suggesting** 95:2 100:11 116:17
**suggests** 113:1 118:17
**suite** 3:3,13 29:6
**super** 78:8
**supervise** 27:12
**support** 17:4
**suppose** 65:23
**supposed** 11:7 57:24
**sure** 6:9 42:8 60:8 95:23
**surgeon** 35:2 35:22 36:20,22 36:23 37:19,21 57:7 71:12 113:15
**surgeons** 71:3 71:10 110:7,12
**surgeries** 52:6 52:8 68:7 83:18 84:2 110:19,25
**surgery** 15:2 20:16 37:23 51:24 52:2 69:4 70:2,9 71:7,17,17 72:3,12 75:11 75:15,17 94:14

94:15,18 95:3 95:7 98:12 99:21 110:17 113:22
**surgical** 4:12 36:11 37:10,11 38:3 111:8 113:16 115:24 115:24 116:3 116:10,14,19
**surprise** 118:6
**surprised** 118:4
**suspect** 94:19
**suspected** 25:6 56:7,7 77:24 85:18 96:10,13 98:7 99:15 105:7 113:25 118:14,15
**suspecting** 94:20 106:3,5
**suspects** 75:3
**suspended** 9:7 11:25 12:12
**suspicion** 57:5 70:23
**swallow** 44:5
**sworn** 1:13 5:2 87:2 122:12 123:7 124:22
**symptom** 67:17
**symptoms** 42:25 43:1,23 44:3 63:24 69:13 98:10 99:5,8 107:8,9 107:17,24 108:1,5,7,13,19 108:22 109:1 109:23 114:12 115:1
**syndrome** 94:4 96:9 98:7 99:14,23 101:19 109:1,3 113:5
**synonymous** 103:13
**system** 18:12 21:1,6,9 24:3 24:23 26:7 27:6 30:8 31:13 32:1 38:25 39:2 44:24 46:25 55:10 81:15

**t**

**t** 4:7 33:6 123:1 123:1
**tactile** 92:17
**take** 6:8,14 26:4 38:13 40:19 42:10 44:5 58:12 60:4 95:7,12 95:21 96:1 110:21 111:12
**taken** 2:4 6:19 31:25 123:11
**takes** 29:21 30:8
**talk** 6:3,4 38:6 49:5 68:2 88:17
**talked** 68:1 73:25 78:12 88:25 94:3 104:4,18 106:15 112:10 116:24 117:21
**talking** 22:22 28:17 43:17 47:16,25 52:14 63:1 84:12 86:22 108:11
**technology** 73:3 75:22
**teleconference** 3:17
**telemed** 18:21
**telemedicine** 18:23 19:3
**tell** 7:2 14:14 15:10 19:14 22:11 23:13 28:1 45:24 53:21,22 56:12 61:22 73:4,24 76:7 83:17 84:1,4 85:10 87:17 91:13 93:20 94:17 110:6 112:12
**telling** 83:9 91:12 116:4
**tells** 61:4
**temple** 83:18
**ten** 14:17,18 15:17 23:12,19 49:15 95:16 101:8
**tense** 107:11
**term** 41:6,8 44:12 47:25 58:20 67:2 75:20 76:1
**terms** 10:22 19:23 37:1 44:13 57:18 59:25 66:1,8 69:24 70:4 77:8 86:7 109:9,9
**test** 47:6,8 49:1 92:1 107:17
**testified** 5:3,16
**testify** 15:8 123:7
**testimony** 1:13 123:10
**testing** 40:22 40:22 42:5,17 43:11 49:19,19 94:18 113:3
**tests** 24:5 41:23 46:10 65:5,13 70:13 72:17,18 75:11 78:1

96:19,25 98:13 99:9 108:21 119:23
**text** 111:11 112:22 116:17
**thank** 103:2 121:10
**thanks** 42:11
**thing** 17:12 25:1 39:18 59:5 62:20 75:16 76:1 87:9 88:8 92:16,18 100:22 101:22 103:9 105:8 112:16 118:2
**things** 39:2 45:3 58:14 66:9 72:18 74:9 75:9 89:2 89:22 96:19 104:18 110:18
**think** 12:10 23:11 24:25 27:9,20 39:1 50:3 58:8,9 59:12 66:22 68:22 82:17 87:23 88:19 90:23 95:9 97:2,3 99:13 99:18 114:11 119:17 120:9
**thought** 32:16
**three** 12:25 14:2 20:1 43:5 101:3 108:16
**thumbnail** 13:25
**tied** 25:12 30:14
**time** 6:5,8,13 7:13 10:18 11:4 12:8,21 14:24 16:24 17:20 19:9 21:23 23:14,24 28:15 29:7 34:12 36:2,3 36:14 37:25 38:8 39:10 40:23,23 41:3 41:3 50:14,21 54:10 57:15 58:21 62:13 65:12 79:8,10 81:14 83:8 85:14,15 86:2 86:10 87:3,11 87:12 89:13 91:15 93:8 95:15,20 96:10 97:9 106:3,7 106:21 108:14 111:12,24 112:3 114:14 115:6,22 116:22 119:7,7 120:8 121:4,6 123:11
**times** 5:16 7:12 29:10 73:14
**tissue** 52:11,12 68:4
**today** 5:18 6:20 6:25 13:15 66:8 94:8 95:11,20 100:6
**together** 20:18 36:13 47:5 64:3
**told** 7:3 9:12 30:3 31:21 60:20 65:7 69:5 87:24 89:3 91:25 99:12 110:11
**tolerate** 53:21 60:12
**tomographic** 44:14
**top** 103:22 104:17
**topic** 42:17
**total** 19:8 77:20 95:12
**touch** 64:12,12 64:23,24 104:4 107:12
**track** 68:17
**tract** 19:19 51:19 69:11
**tramadol** 62:11 62:12,19,20 104:18
**transcript** 2:2 4:15 122:3,6 123:10
**transferred** 14:1
**transmural** 77:10
**transverse** 84:2
**trauma** 104:9
**treat** 30:21 101:18 102:19 103:9,11
**treated** 31:19 36:10 48:18 78:21 79:8 85:11 89:12,13 89:17 109:10 120:3
**treating** 25:22 36:16 38:8,10 39:4 66:13 78:13 79:4 85:2,5
**treatment** 4:10 52:1 57:14 61:11 66:18 71:1 79:16,23 82:4,18 102:17
**trenton** 10:6,7 12:17 60:10,24 60:24

**trial** 15:6,8,13
**tried** 43:9
**trigger** 23:10
**trip** 13:5,7 111:23
**trouble** 56:24
**true** 51:23 54:7 70:12 111:2 123:10
**truly** 25:5 104:12
**trust** 33:21
**truth** 123:8,8,8
**try** 6:5 49:6 52:8 53:5 59:14 99:6 102:24
**trying** 19:23 21:16 23:17 58:8 70:21 74:23 75:9 87:6 95:19 120:18
**tube** 15:24,25 76:21,22 77:6 119:18
**tubes** 76:20
**tumor** 25:6 74:25 75:1 92:16 93:1
**tumors** 92:22 92:23
**turn** 80:13
**turner** 1:6 3:16 33:18,19
**twenty** 10:13 16:3
**twice** 29:9 78:14,18
**two** 15:5,19 18:6,13 36:9 42:7 48:7 49:6 49:8 66:22 90:14 96:13 108:22
**tylenol** 53:3 61:23 62:2,7 62:19 104:21 104:21,23 105:1,2
**type** 9:17 17:12 18:4 20:22 22:17 23:9 24:5 39:18 53:13 65:25 80:15 101:22 106:9 112:14 112:16 117:20
**types** 18:6 45:3 62:10 89:22 108:13

**u**

**u** 5:1
**uh** 18:3 19:5 20:12 28:15,24 33:1,13 35:9 36:23 37:21 38:22 39:8,19 42:3 44:11 45:18 46:8 48:19 50:25 51:25 55:2 58:2 59:17 62:22 72:14 92:2,20 93:6 93:23 99:13,25 101:4,7 102:18 106:5 111:20 111:25 112:17 113:8,24 118:1
**ulcer** 44:6 67:8 74:25
**ultrasound** 41:4,5 43:24 74:5,6,8
**ultrasounds** 70:19 74:12
**under** 19:22 26:2 29:18 78:21 118:9
**understand** 5:19 6:10,21 22:19 25:4 32:14 43:18 61:8 67:4 115:25
**understanding** 31:14 33:14
**understood** 71:10
**unfortunately** 14:5 15:25 51:21
**unit** 2:8 3:8 120:15,15
**united** 1:1,7 3:12,16
**university** 12:6
**unquote** 81:22
**unusual** 28:20 28:21 48:24 69:16,19 98:15 98:17
**upper** 44:4 48:3,5 85:22 113:2
**upset** 43:4,6
**urine** 65:5,13 100:4
**us000407** 4:10 79:24
**us000408** 4:11 79:24
**us000470** 4:12 111:9
**us000471** 4:13 111:9
**us000478** 4:14 117:3
**us000480** 4:14 117:3
**us407** 81:23
**us408** 81:24
**usdoj.gov** 3:15
**use** 5:17 36:5 45:9 62:3,12 63:12 70:24,25 74:12 106:13
**used** 10:17,24 47:1 49:13

70:22 75:20 101:18 102:19 103:8
**useless** 91:21 92:1
**using** 72:21
**usually** 18:13 23:11,13 30:6 31:22 53:17 95:25 109:15

**v**

**v** 124:2
**verbal** 5:23
**veritext** 124:1
**versus** 38:11 45:23
**view** 76:25 77:10,20 106:16
**visit** 21:10,11 39:11 42:21 50:8,22 53:15 81:18 83:8 96:7 97:21 110:5
**visited** 18:18
**visiting** 104:25
**visits** 22:4 42:19
**visual** 19:4,5
**volume** 1:12
**vomiting** 69:15 70:7,8 113:21
**vs** 1:4

**w**

**w** 5:1,1
**wait** 25:7,9 47:12,12
**waiting** 119:17
**want** 5:16 6:8 6:13 7:24 12:24 38:6 39:5 54:20 60:17 62:3 64:21 67:9 68:2 91:22,22 91:24 95:7,12 95:14,21 99:16 100:19 110:11 111:12
**wanted** 25:17 58:23 118:2
**warn** 7:2
**way** 7:25 14:24 15:25 25:11 30:15 39:13 48:19 52:3 55:19 63:1 72:2 104:14 105:21 120:3,4 121:1
**ways** 60:1
**we've** 47:25 80:7 82:2 94:2 94:8,16 111:19
**wednesday** 2:9
**week** 20:2 55:18,18 87:25
**weeks** 49:6,8 85:4,7 86:2,4 108:16,16,16 108:17
**weimer** 3:19
**went** 15:25 77:8 79:1 106:10 118:3
**wife** 87:10
**wikipedia** 7:23
**wish** 14:14 95:17
**withdrawn** 11:25
**witness** 4:3 16:20,24 17:2 81:7 82:1 95:9 95:14,17,19,23 103:4 111:13 117:5 119:10 121:7,10
**witnesses'** 124:3
**wood** 12:6,12 13:2 17:9 84:16 111:23
**word** 93:4
**words** 90:14
**work** 6:1 20:21 20:24,25 22:16 27:12 32:20,21 32:22 34:16 65:24 109:15 109:21 112:11
**worked** 22:8 32:19 33:15 38:23
**working** 8:23 34:2 35:19 65:10
**works** 31:15 32:23 109:15
**worse** 43:8 57:4,9
**wound** 83:10 83:15 89:18
**wounds** 83:13
**write** 10:15 13:20 88:14,16
**writes** 116:20
**writing** 27:18 27:19
**written** 84:10 87:16 88:5 106:10
**wrong** 15:25 61:4
**wrote** 93:15

**x**

**x** 4:1,7 39:21 41:2,4 42:21 43:13,15,16,20 45:4,6,6,20 48:14 54:2 70:13 72:21 75:9 119:21 120:1
**xanax** 58:13

**y**

**y** 5:1 103:3
**yeah** 6:2 8:16 10:16 11:13,15 13:7 14:20 22:6 23:23 32:17 33:17,17 35:9 36:3,4,8 36:23,25 37:8 37:21 39:7,16 41:11,22 43:19 45:8 46:6,23 48:5,10 50:18 50:23 51:22,25 59:6 63:10,16 64:7,14 65:7 68:5,8,15,24 69:2 70:17 71:8,22 72:8 72:20 73:21,23 74:10 75:2,7 75:14,18 78:11 82:13 88:13 91:7,11,24 92:19,23 93:15 99:22,25 101:7 102:18 105:21 106:1,5 107:6 107:7 109:18 113:24 114:24 116:1 118:1 120:25
**year** 9:15 13:10 19:7 78:25 87:9 88:8
**yearly** 23:1
**years** 14:13,17 14:18,21 15:17 15:18 16:3 35:23 49:15 86:15,16,21,22 86:23,24 113:4
**yesterday** 58:22 59:6
**york** 124:1
**young** 60:9,9
**younger** 36:6,7
**yup** 61:6

**z**

**z** 103:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 20-cv-1025

-------------------------*

JOSHUA MOSES,
Plaintiff,

DEPOSITION OF:

-vs-

BHANWARLAL CHOWDHURY, M.D.

DR. RAVI SOOD, ET AL.,
Defendants.

VOLUME II

-------------------------*

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before MICHELLE GALLO, a Certified Court Reporter and Notary Public of the State of New Jersey, held at the Law Offices of the Lenox Law Firm, 136 Franklin Corner Road, Unit B2, Lawrenceville, New Jersey, on Thursday, July 27, 2023, commencing at 2:07 p.m.

Job No. NJ6027534

A P P E A R A N C E S :

REED SMITH, LLP
BY: DON A. INNAMORATO, ESQ.
599 Lexington Avenue
New York, New York 10022
(212) 521-5400
Representing Plaintiff

LENOX LAW FIRM
BY: MICHAEL A. PATTANITE, JR., ESQ.
136 Franklin Corner Road, Unit B2
Lawrenceville, New Jersey 08648
(609) 896-2000
Representing Dr. Chowdhury

UNITED STATES ATTORNEY'S OFFICE
DISTRICT OF NEW JERSEY
BY: MATTHEW MAILLOUX, ESQ. (Via Zoom)
970 Broad Street, Room 806
Newark, New Jersey 07102
(973) 645-2700
Representing Dr. Ravi Sood, Nicoletta Turner-Foster, David Ortiz, United States of America and Bureau of Prisons

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BHANWARLAL CHOWDHURY, M.D. | | | | |
| BY MR. INNAMORATO | 125 | | -- | |
| BY MR. MAILLOUX | | 183 | | -- |
| BY MR. PATTANITE | | 193 | | -- |

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Chowdhury-4 | Surgical Consultation | 135 |
| Chowdhury-5 | Contract | 146 |
| Chowdhury-6 | Internal Records Request | 148 |
| Chowdhury-7 | Bureau of Prisons Health Services Consultation Request | 173 |
| Chowdhury-8 | Bureau of Prisons Health Services Consultation Request | 174 |
| Chowdhury-9 | LMA LifeCare Physicians of Hamilton Clinic Notes | 177 |
| Chowdhury-10 | Bureau of Prisons Health Services Consultation Request | 179 |

(Exhibits attached.)

BHANWARLAL CHOWDHURY, M.D.,

having been duly sworn by the Notary Public, testified as follows:

DIRECT EXAMINATION

BY MR. INNAMORATO:

Q. Good afternoon, Doctor. Welcome back.

A. Thank you, sir.

Q. Same rules for today. If you don't hear or understand a question I ask you, I want you to stop me and I'll clarify. And I will try not to talk over you and ask you to do the same.

Since the last time that we met, have you reviewed any of your testimony from before, the last session?

A. Not really.

Q. Do you recall today anything that you want to change from your earlier testimony?

A. You mean the testimony we had here?

Q. Yes.

A. I did not get any copy of that testimony.

Q. Okay. But independent of the actual transcript itself, anything that you remember that you might have said, you know, is not accurate?

A. I did not get any transcript.

Q. Okay. All right.

THE WITNESS: Was I supposed to get it?

MR. PATTANITE: No. You were not. I didn't send you the transcript.

Q. Since we last met, have you reviewed any additional documents?

A. Not really.

Q. I had a couple of questions about one of the exhibits that we used the last time. And that's Exhibit 1, Chowdhury-1, and I'll give that to you. Those are your notes?

A. Right. This is my notes, yes.

Q. And I think you identified that that is your notes, consultation notes from the first meeting you had with the plaintiff in this case Joshua Moses?

A. That's right.

Q. Question for you, couple of questions, actually. At the time that you met with Mr. Moses, you described for me last time certain procedures that you follow with regard to new patients. Do you recall that testimony?

A. Yes.

Q. And one of those I think you described as an oral history from the patient; is that correct?

A. That's correct.

Q. And would the oral history at times include

asking about any hospitalizations that the patient had?

A. Yes.

Q. And would that include recent hospitalizations?

A. Yes.

Q. So that would be your normal procedure then?

A. Yes.

Q. Did you follow that with Mr. Moses?

A. Yes.

Q. Do you recall him telling you about any hospitalizations?

A. I don't recall it now.

Q. And this particular session with Mr. Moses, you had diagnosed him with suspected adhesions; is that right?

A. That's right.

Q. At any time during or after this meeting with Mr. Moses, did you ever consider recommending to the BOP a CT scan to rule out conditions?

A. How can I answer that question, because I do not remember. All I can say is what is written here. Even if you ask me a hundred questions, the answer will be same. Whatever is written here, I can answer that. Beyond this, I cannot remember anything, sir.

Q. If you were to make -- you made recommendations in the past to the BOP regarding inmate patients?

A. I do.

Q. And how would you make that request or that recommendation? Would it be in your notes?

A. In my notes, yes.

Q. And do you see there in your notes, Exhibit 1, whether or not you made a recommendation to have Mr. Moses undertake a CT scan?

A. I did. No recommendation for CT scan.

Q. Was there a reason why you didn't make a recommendation?

A. I don't recollect.

Q. How about ultrasound, would that be something that would be pertinent to what you saw in Mr. Moses?

A. As I said, I do not recollect. You are asking my opinion whether he should have an ultrasound or not ultrasound?

Q. Yes.

A. Looking at this information that I have, I don't think it was necessary to order an ultrasound.

Q. Okay. How about X-rays?

A. Not necessary.

Q. And why wouldn't it be necessary?

A. Because patient has history of bowel obstruction in the past and history of multiple surgeries leading to adhesions.
Q. Right.
A. And his symptoms have been chronic in nature.
Q. In fact, he also had chronic pain?
A. Right.
Q. Is that supportive of adhesions?
A. Yes.
Q. I think you described it as something like it tightens around, the adhesions themselves tighten around the organs and cause pain?
A. Right.
Q. Do you recall whether or not you considered or recommended MRIs for Mr. Moses?
A. I don't recall, no.
Q. You could have, but didn't do it -- let me rephrase that.
Would that be a test, given what he's presented to you, would that be a test that could rule out other conditions?
A. That could be done, but with the information that I have on this paper, I think my suspicion was adhesions causing his abdominal pain.
Q. Okay. Just a general medicine question for

you. With bowel resections, you've seen those in the past in your practice?
A. I have.
Q. And I think you told us that a bowel resection could be involved with colon cancer, for example?
A. Right.
Q. And it could also be because of complications from Crohn's disease?
A. Yes.
Q. And it also can be because C. diff, a condition known as C. diff, colitis?
A. Rare, but, yes, it's possible.
Q. All right. Now, with regard to those particular diseases or illnesses, if you have a bowel resection, is that always 100 percent curative?
A. Not necessarily.
Q. And the colon cancer or the Crohn's disease or the C. diff, colitis, could come back?
A. Yes.
Q. I think you said earlier in your testimony that Mr. Moses himself had a history of bowel resection?
A. Yes.
Q. You described the endoscopies. You know what

they do, they actually look at the lumen of the abdomen internally, is an endoscopy?
A. That's right.
Q. These other tests, CT scans, MRIs, ultrasounds, they look at it from the vantage point of outside the lumen?
A. And they can look inside the lumen also because we use the CAT scan with auto contrast which outlines the inner lining of the stomach, colon.
Q. That would be with the barium?
A. Barium, yes.
Q. It still tastes bad?
A. It tastes bad; is that right? I never had one. Thank God.
Q. With regard to Mr. Moses in that first session that you had with him, you did not consider ruling out other conditions because my understanding of your testimony is you didn't rule out other conditions because you were fairly certain that it was the adhesions?
A. Well, that was the clinical suspicion.
Q. Okay. And as I think you said before, the only way you could really know whether it's adhesions is exploratory surgery?
A. That's right.

Q. Which is to be avoided if you could do it?
A. Right.
Q. Okay. If you had recommended CT scans, MRIs, ultrasound, X-rays for Mr. Moses, would that be reflected in writing?
A. I would have mentioned here to do a CT scan of the abdomen, yes.
Q. You feel confident that you did not recommend those tests?
A. Yeah. It's not recommended in this note, no.
Q. All right. One of the things that you told me last time was one way to determine whether there's a serious condition is to try medication first, and if the medication is successful, you could rule out certain conditions. If the medication is not successful, then you might consider these other tests?
A. That is the way we practice medicine in gastroenterology.
Q. Was there a possibility that Mr. Moses had colon cancer? Can you tell that from your notes?
A. From these notes, I cannot tell if he had colon cancer, no.
Q. Do you recall at any point after this visit with Mr. Moses that he did, in fact, have colon cancer?

A. You mean --

Q. Have you learned at any point in time after this visit that Mr. Moses might have had colon cancer?

A. After this visit, I did a colonoscopy on him after a while in November, there was no colon cancer.

Q. Okay. One thing about endoscopies, and correct me if I'm wrong, I'm just remembering your testimony, the colon cancer can escape detection in some cases even though you do an endoscopy?

A. Not really. If it is in the colon, it will be visible through the scope, yes.

Q. There are other forms of cancer in the abdominal area that would not be picked up by an endoscopy, though; correct? That's why we have CT scans?

A. Right. Cancer of the pancreas, cancer of the liver, cancer of the small intestine will not be detected by endoscopy.

Q. The case of Mr. Moses, based on the notes you have there, Exhibit 1, you prescribe for him Bentyl?

A. Right.

Q. And also Imodium?

A. Yes.

Q. And I'm not going to try to --

A. Omeprazole.

Q. Do you recall whether or not his symptoms did, in fact, improve after the prescription of those medications?

A. I did not see him after. I think until endoscopy, in between I did not see him, no.

Q. Okay. Would you have had access to his medical records, that digital file we've talked about before?

A. No. I did not have any access to medical records.

Q. Let me ask you something about your procedure with the BOP. Do you have an account, sort of a computer account with the BOP where you can access the database?

A. I don't.

Q. Do you have any kind of hard copy file of the patients?

A. No. I don't keep any records in my office, no.

Q. If you needed records to prepare a formal diagnosis for a patient or just their overall care, would you have to request that from the BOP?

A. If there is a follow-up, yes.

Q. Do you recall ever doing that with Mr. Moses?

A. No. I don't remember any follow-up with him.

Q. One of the things I think you told me the last time, too, when we were looking at this particular progress note that you have, is I think you told me that diarrhea is not supportive of a diagnosis of adhesions?

A. No, I didn't say that.

Q. Okay. All right. Can someone have diarrhea, and is that --

A. And have adhesions, yes.

Q. Okay. So it's not necessarily a yes or no? I mean, you could have adhesions and also see diarrhea at that point?

A. Right.

Q. One moment, Doctor. I'm going to mark another document. This would be Chowdhury-4.

(Surgical Consultation is received and marked as Exhibit Chowdhury-4 for Identification.)

Q. Doctor, what we've handed you what purports to be -- Doctor, what Exhibit 4 purports to be is a surgical consultation. Fort Dix is on the top. It's dated 6/26/18. The patient is Joshua Moses, and it appears to have been prepared by Dr. Louis Fares. Do you see that?

A. Right.

MR. MAILLOUX: Do you have a Bates type?

MR. INNAMORATO: Bates No. Is 359, Matt.

MR. MAILLOUX: Thank you.

Q. Dr. Fares, we've mentioned him earlier in your testimony during this deposition. Was his first name Louis?

A. Louis Fares, yes.

Q. This report purports to be a follow-up that Dr. Fares had with Mr. Moses. Have you ever seen this document before?

A. I don't recollect.

Q. Is it possible that you saw it?

A. I just can't recollect.

Q. There is a cover memo, and this is the first page, this is 359. If you would turn to the second page, this appears to be Bureau of Prisons Health Services Consultation Request. Have you ever seen this type of document, not necessarily this one, but this type of document?

A. You mean from other patients?

Q. Other patients, but inmate patients for the BOP, this kind of document.

A. There's a possibility that I might have seen.

Q. Do you recall ever seeing this particular document? And I want you to make sure that you go through the four pages of the document before you

answer, just to be sure.
A. I don't recollect.
Q. I want you to, if you could, focus on the second full paragraph on page 2. This is 360 where it says, "He was sent to ER."
A. Right. "He was sent to ER."
Q. When you first saw Mr. Moses, were you aware that he had been hospitalized in the ER at Robert Wood Johnson Hospital?
A. I cannot recollect.
Q. If we could skip down two paragraphs, and I'm still on 360, and I'm looking at the paragraph beginning with, "In the interim." Do you see that?
A. Yes.
Q. Can you read that paragraph to yourself?
A. "In the interim: He was seen by the GI consultant on 4/24/2018. Post surgery adhesions, short bowel syndrome, Omeprazole, Bentyl and Imodium PRN. Diet as tolerated. He did not recommend upper GI endoscopy or colonoscopy. He continues to have intermittent abdominal pain. Overall pattern of abdomen pain has been same with no new symptoms. He tolerates meals, though he has nausea. No distention of abdomen or vomiting."
Q. Independent of this particular document, does

that describe accurately your visit with Mr. Moses in April of 2018?
A. It describes what?
Q. It does not identify you as the GI consultant, but what you've just read in that paragraph, is that consistent with what --
A. I would, yes, it is.
Q. That's what I wanted to get at. There appears to be handwriting on this. Do you see that?
A. Right.
Q. Do you know whose handwriting that is?
A. I do not, no.
Q. It's not yours?
A. Not mine.
Q. Okay. This particular report appears to be by Ravi Sood. We've discussed Dr. Sood before. Did you know him to be with the BOP?
A. Dr. Sood was a doctor with BOP, yes.
Q. Okay. In the same paragraph that you've read, it says he did not recommend UGI, endoscopy or colonoscopy. That's consistent with what you viewed or how you interacted with Mr. Moses, you did not recommend those?
A. Yes. It is not written in my consult, no.
Q. Okay. Generally speaking, not pinning it

down to any particular document, but if it's not in your progress notes, the recommendation wasn't made?
A. If it was not in the progress note, what conversation happened or what was done, I do not recollect at this moment.
Q. Do you recall this document being in the digital file for the BOP?
A. This one?
Q. Yes.
A. No. I do not have access to any digital files, no.
Q. Did that ever become a problem that you didn't have access to the -- in terms of your treatment of patients, was that ever a difficulty that you had to -- challenge that you had to deal with?
A. Well, there are physicians at the prison system, and they communicate with us from time to time; verbally sometimes, sometimes in writing.
Q. Would it be E-mail, perhaps?
A. Pardon me?
Q. E-mail.
A. No E-mail. I don't get any E-mail from the prison system, no.
Q. Is that because you don't like E-mail generally or --

A. Well, that's not the way they communicate, I guess. They have their own privacy system and their own recordkeeping system.
Q. It's all HIPAA-related, I guess; right?
A. I guess so. I do have an E-mail address where I get E-mail. But I never got any E-mail from the prison doctors, no.
Q. How would you communicate with them then?
A. Usually, telephone.
Q. Telephone?
A. Yeah.
Q. Do you remember any phone calls that you had with Dr. Sood or Dr. Fares regarding Mr. Moses?
A. I don't recollect, no.
MR. PATTANITE: Mr. Innamorato, while we're still on the document, would you mind going over what appears to be a fax number at the top, just to try and get an understanding of how this was generated and the relationship with NaphCare.
Q. Dr. Chowdhury, have you ever heard the term NaphCare?
A. NaphCare, yes.
Q. And who is NaphCare?
A. I think it's just the company that takes care of prison system -- I think it's the management

company who takes care of the federal prisoners.

Q. Is this a healthcare company?

A. Healthcare company, yes.

Q. Is this then an intermediary between you and the Bureau of Prisons?

A. Yes.

Q. Okay. So you're not directly communicating with the BOP, but it comes through NaphCare?

A. Right.

Q. This might be a good time to --

A. I want to tell you a little story.

Q. Sure.

A. You have heard of Rama, the Hindu epic poetry Lord Rama story?

Q. Right.

A. In Rama, Lord Rama goes for 12 years of living in the jungles, and in the end he conquers Shree Ram, Lanka, and kills Ravana, the evil king of Lanka. And they're about 1,300 or 1,500 pages written in the poetic form about this epic story. So the other guy who was very simple like me, he said he stole his wife, he killed him and brought his wife back. There was only two sentences. And the author, the person who wrote the poetry has written 1,350 on this simple story.

So in this simple story, we are creating a Ramayana that in the morning Mr. Moses -- how did he wash his face, how did he pee, how did he move his bowels. We cannot recollect the total story based on a single five-minute or 25-minute interview with the patient.

Q. Okay.

A. All these questions, when I say I do not recollect, I really do not recollect. Because if I asked you what breakfast did you eat that morning, do you recollect? After you eating your breakfast, you recollect; you don't.

Q. Understood.

A. So asking me do you recollect what you told him, do I recollect did I get a phone call from him or from Dr. Sood? How do you expect a physician or forget about a physician, a dumb ignorant person to remember a phone conversation between one person to the other after 25 years or 30 years or five years, I don't know how many years, 2018.

Q. And you understand that you're under oath, so you're being honest. You don't remember; right?

A. So the thing is, if you ask me 100 percent, I am going to tell you 100 times the same answer, which does not get us anywhere other than what is written

here and what is written here.

Q. Right.

A. Beyond this, I have no recollection.

Q. Okay. So it's possible then that Mr. Moses may have said something to you or you might have said something to him, but you just don't recall it?

A. Right. Do you expect me to recall it?

Q. I don't know. I'm asking.

A. You are a lawyer, but you are a human being, too.

Q. I forget things all the time. Probably my next question I'm going to get.

A. Don't blame me if I forget or if I don't recollect.

Q. You're being honest, Doctor. And that's all I can ask from you. It's probably a good time, since we've mentioned NaphCare --

MR. MAILLOUX: Could I ask a quick question?

MR. INNAMORATO: Go ahead.

MR. MAILLOUX: Doctor, this is Matt Mailloux of the U.S. Attorney's Office on behalf of the federal defendants.

THE WITNESS: Yes, sir.

MR. MAILLOUX: With respect to the second

page of the document you've been shown, there's phone number at the top that appears to be (205) 731-1205. Do you recognize that phone number? It's right below where it says admin documents, looks like a fax setting.

THE WITNESS: Yeah. I see the number, yes, sir.

MR. MAILLOUX: Do you recognize that number?

THE WITNESS: No, I don't.

MR. MAILLOUX: Is that your office's fax number?

THE WITNESS: No, it's not.

MR. MAILLOUX: Is it a number from which you've received faxes before?

THE WITNESS: No.

MR. MAILLOUX: Thank you.

CONTINUED DIRECT EXAMINATION

BY MR. INNAMORATO:

Q. Doctor, with regard to this NaphCare, is there any particular individual that you interacted with in that company?

A. I never called them, no.

Q. But they are an intermediary between you and the Bureau of Prisons?

A. That's right, yes.
Q. Did you ever receive any type of communications from NaphCare?
A. Only thing I could recollect is that when I see the prisoners, the prison system, we bill for the services to send -- my billing company send them to NaphCare to be paid for the procedures that I do.
Q. Do you get a check from NaphCare itself?
A. I do not recollect.
Q. In terms of you said billing department, is this at St. Francis Hospital at the time or was it your own?
A. No. I had my own private practice.
Q. Do you remember the name of the person that does your billing or did your billing, because you're not in practice now?
A. I don't offhand recollect that, but there is a billing company that I sent my papers to them and they billed it.
Q. It's not someone that's located in your office, but rather --
A. In my office, no. Remote.
Q. Outside accounting or something like that?
A. Right. Actually, their office is in India.
Q. Since we're mentioning NaphCare, earlier we

talked about the contract or contracts that you signed with the Bureau of Prisons. You think the last one was probably signed in 2015. Do you recall that testimony?
A. I filled up the papers, yes. But I do not know whether I wrote any written contract from them or not. I don't recollect what I got.
Q. Do you remember signing anything like that, a contract?
A. I filled an application, yes.
MR. INNAMORATO: Let's make this Chowdhury-5.
(Contract is received and marked Chowdhury-5 for Identification.)
Q. There's a number of pages to this document. Doctor, take all the time that you need, but I may have some questions for you. Just general questions.
A. Is there any place where you see my handwriting or my signature on this?
Q. I could not identify it.
A. Pardon me?
Q. I couldn't see it myself. I normally look at a contract at the back, but this is a form contract it seems.
A. If I don't have any of my signatures or

filled in my handwriting, I won't be able to answer any questions about it. So you can take my answer no for all of them.
Q. All of the questions on this. I have one that you might be able to answer. Do you recall the contract, the last contract that you signed with the BOP, was that a contract where you would actually sign it? Do you remember signing the contract?
A. If you show it to me, I will say yes.
Q. Do you recall the contract that you may have signed looking like this sort of form contract like this?
A. Yeah. I remember filling an application, but I don't know whether that was the contract or the application. But I did fill the application.
Q. Do you remember whether the application was with this NaphCare, the intermediary or the Bureau of Prisons?
A. I think it was about Bureau of Prison.
Q. Directly?
A. Directly, yes. Is my name anywhere on this paper?
Q. I couldn't find it, but there's some what's called redactions, the deletion out, if you look through there, they'll be some for privacy reasons, I

assume.
A. I don't even know what this document is about.
Q. And the last one you signed, if at all, was 2015, I think you said.
A. I don't recollect the exact month, no. I remember filling an application before I started work seeing patients there.
Q. I think earlier you said that between the first time that you saw Mr. Moses and in April 2018 and the time that you actually performed the endoscopies in, I think it was, November of 2018, I'll show you your report, that you had really no involvement with Mr. Moses during that period?
A. No.
Q. Do you know if Dr. Fares continued to treat Mr. Moses?
A. I do not know.
Q. How about Dr. Sood?
A. I do not know that either.
Q. All right.
MR. INNAMORATO: Mark this one 6.
(Internal Records Request is received and marked as Exhibit Chow-6 for Identification.)
Q. Doctor, what we're marking as Exhibit 6

appears to be, at least the first page says internal records request. I think this has to do with the litigation itself, but it says in the note section on the first page, "A complete copy of the outpatient endoscopy records on file for Joshua Moses requested by Trinity Health and an attorney representing SFMC in legal matter." Do you see that?

MR. MAILLOUX: What's the Bates No.?

MR. INNAMORATO: Bates No. Is 00005 through 36.

MR. PATTANITE: It's pre-marked Chowdhury.

Q. You could take your time to go through it. Have you had an opportunity to review the document?

A. I did.

Q. Dr. Chowdhury, on the second page, that's Bates 00006, we look at the -- apparently, it's attending physician on the upper left-hand corner. Do you see that?

A. Right.

Q. And is that you listed as the attending physician?

A. Yes, sir.

Q. And that's for purposes of the endoscopies you recall performing on Mr. Moses?

A. Right.

Q. Prior to or between the time of this document which is dated 11/30/18 and your earlier first visit with Mr. Moses in April of 2018, did you have any contact with Mr. Moses whatsoever?

A. No.

Q. Did you have any consultations with any of the doctors regarding Mr. Moses' healthcare?

A. If there was a phone conversation, I do not recollect.

Q. And do you know why you were selected to perform these endoscopies on Mr. Moses?

A. I guess a gastroenterologist with prison system at that time.

Q. Do you recall whether or not you would be contacted directly by, let's say, Dr. Sood or would it be through this intermediary company?

A. Usually, it was the Dr. Sood or the director. They would contact me on phone sometimes about patients or about the procedures.

Q. This is while you were at St. Francis?

A. While I was at St. Francis, yes, sir.

Q. Did you have the capability of performing endoscopies at Fort Dix itself, at the clinic?

A. No.

Q. And did you perform an upper and lower

endoscopy on Mr. Moses around this time, November 2018?

A. Yes.

Q. Do you know why you were performing them?

A. Why I performed the endoscopy?

Q. Yes. Why were you doing it? What were you trying to rule out at that point or determine?

A. To rule out any gastric pathology or colon pathology.

Q. Did you recall Mr. Moses at the time?

A. If I see him now in front of me?

Q. Yes.

A. I won't recall him, no.

Q. Did you in preparation for the endoscopies themselves, Doctor, did you go through your notes that we marked as Exhibit 1?

A. You mean my consultation note?

Q. Yes.

A. No, I did not.

Q. Okay. Was there a reason why?

A. Well, the prison papers are scheduled from the prison to my office. My office secretary communicates with the scheduler in the prison. And then depending upon availability in the hospital, if there's an opening, and a patient needs or patient

needs to be scheduled for endoscopy, then the scheduling is done.

Q. Okay. But were you given a reason why Mr. Moses was having these endoscopies?

A. I don't recollect at present now.

Q. Can you turn to page 12 of this document.

Take a look at that. There's some handwriting on that. Is that your handwriting?

A. It is my handwriting, yes, sir.

Q. Why don't you take a look through that just so that you're prepared to answer my questions. You don't have to memorize it.

A. I could look at it.

Q. And forget it in a second?

A. And forget it in a second. My handwriting, easy to read one's own handwriting.

Q. Have you had an opportunity to review it?

A. I did, yeah. It's in front of me so I could look at it.

Q. What I should probably do is if you could turn to page 10, I just have a question for you about that. And it's titled St. Francis Medical Center at the top, and it says post anesthesia care unit admissions orders. Can you recognize the signature at the very bottom where it says physician signatures?

A. No, I can't.
Q. Could that be you?
A. It's not me. I know my signature, sir.
Q. At the very -- at the left upper section, it says IV. Do you see that?
A. IV, yes.
Q. Was that -- does that discuss or represent what medications Mr. Moses was given during the endoscopy, based on your experience with this?
A. Well, this is by anesthesia. So what anesthesia does, they don't tell me what they do.
Q. Just out of curiosity, sodium chloride 100 milligrams?
A. This is normal saline, they give it intravenous.
Q. It's not a sedative in any fashion?
A. No.
Q. So we're now on page 12, and I want to look at chief complaint. Do you see that on the top there, upper left-hand corner? This is your handwriting.
A. Right.
Q. Can you read that to me just so that I know what you meant?
A. It says, screening colonoscopy. Pain, epigastrium. Gastroesophageal reflux disease. That's

GERD.
Q. And that's what you defined for us earlier, GERD is esophageal --
A. Yeah. Inflammation, yes.
Q. And at the time that you saw Mr. Moses here in November 2018, there was pain?
A. There was pain in epigastrium, yes.
Q. Do you meet with the patients normally for the colonoscopy or they're just on the table when you come out and they're already sedated?
A. We usually meet the patient, yeah.
Q. Do you recall independently of this meeting with Mr. Moses? Let me ask you this --
A. It doesn't say my handwriting. It says Mr. Moses, but there's a stamp there, his name is there on top, so it has to be his record.
Q. Right. I guess what I'm asking is was he giving you the chief complaint orally and that you're writing this down?
A. Right.
Q. Okay. All right. And below that is history of present illness. It says for colon cancer screening?
A. Right.
Q. I know that I've had endoscopies, but just as

a normal screening every ten years or whatever it may be. Was this in your mind or can you tell from this whether it was just a normal screening or was it in response to some symptomatology that he had?
A. Well, it is written here normal screening.
Q. Okay. So this wasn't connected to the conditions that you saw on him, the adhesions, earlier in the year?
A. It doesn't mention here, no.
Q. Can you turn to page 19 now. That's 00019.
MR. PATTANITE: Can you identify the top of the page?
MR. MAILLOUX: Can you identify what's at the top of the page?
MR. INNAMORATO: Top of the page, I see SMFC Moses, Joshua. ENC #4018007O5694. It says eSurgical pathology report. Do you have that, Matt?
MR. MAILLOUX: Yes. Just so we're clear, before we go to this, there are a number of pages that have signatures before, you know, the last page that we went to. But does the doctor say that none of those signatures are his? Because they do appear to say B. and the doctor's last name.
MR. PATTANITE: I don't know if he was asked if any of the other signatures were his.

MR. INNAMORATO: Matt, you're talking about other pages of the same document?
MR. MAILLOUX: Correct. Like, for example, the St. Francis Medical Center, Trenton, New Jersey, the short stay history and physical which is like eight pages in, and then there are what appear to be a B and a C signature at the bottom of the pages on the colonoscopy orders.
MR. PATTANITE: If you go to the bottom of page, Doc, correct me if I'm wrong, bottom of page 8 right above his team, B. Chowdhury. That's his signature the B with the C.
THE WITNESS: That's correct.
MR. PATTANITE: It's pretty distinct.
Q. The doctor is identifying 00008, and there is a symbol signature. And that's your own signature, Doctor?
A. Yeah. This is mine, yes, sir.
Q. All right.
MR. MAILLOUX: Thank you. We'll append the exhibits on the deposition transcripts?
MR. INNAMORATO: Yes.
MR. MAILLOUX: Great. Thanks.
Q. Dr. Chowdhury, do you know if we're looking at page 8 and that's your signature there, do you know

who the first signature -- is there someone there that would be in the room with you?

A. I do not know. Nurse's signature, yeah.

Q. I can't tell, but is it Cesar?

A. No.

Q. Do you know who it is at all?

A. I do not.

Q. It could be a staff nurse, for example, or something like that?

A. It has to be a nurse who signed him off, yes.

Q. That's the practice that you have two medical professionals sign documents like this?

A. Yes. There is the recording nurse after the procedure. When the person is recovered and he is discharged and the person signs the discharge papers along with me.

Q. All right.

MR. INNAMORATO: Matt, are there any other signatures that you see that we didn't cover?

MR. MAILLOUX: No. It was just about two or three pages behind where the Cesar nurse signature is on the bottom of the short stay history and physical.

MR. INNAMORATO: Short stay history and physical, right, that's 12.

MR. MAILLOUX: Yeah. There appears to be a B., and then the doctor's last name written out on the physician signature line. That's different than the CB symbol we've seen previously. Is that the doctor's signature?

Q. This would be on 12. Would that be your signature, Doctor?

A. That's my signature, yes, sir.

Q. With regard to this page, Doctor, this is page 12, on the right-hand column, we see report of operation or procedure. Do you see that?

A. Right.

Q. And what is listed there, what did you list there on the postop diagnosis?

A. Normal EGD, there is normal gastroscopy and normal colonoscopy.

Q. Doctor, with regard to the -- how do I describe this? Colonoscopies, endoscopies focus on one particular area. We were talking about the other tests being complementary because they look at different things. Do you recall that?

A. Right.

Q. What would you be ruling out by use of the endoscopies here in November of 2018, what types of things, conditions?

A. Gastritis, gastric ulcer, gastric cancer, esophagitis, ulcers of the esophagus, polyps in the colon, colitis, cancer of the colon, all those things can be detected by the endoscopy and colonoscopy.

Q. And what would CT scan or the MRI reveal, if there's some condition there?

A. CT scan will detect cancer of the liver, cancer of the pancreas, any lymph nodes enlarged in the abdomen. They will be detected by CAT scan or MRI. They cannot be detected by endoscopy or colonoscopy.

Q. Let me turn to --

A. We turned this story into Rama, Lord Rama, the story of 1,350 pages.

Q. There you go. Let's go to page 19 that's titled St. Francis Medical Center Surgical Pathology Report. And I see that you're listed there as the attending physician?

A. Right.

Q. We have a preop diagnosis below that, and we have the GERD, which is consistent with the earlier statements in this. Postop, you have GERD; right?

A. Right.

Q. And then final diagnosis, is it self-explanatory what the preop versus the postop, the

final diagnosis?

A. This is actually biopsy from the stoma, so it had no direct relationship with GERD.

Q. And we have listed there gastric antrum biopsy?

A. Right.

Q. Is that a condition or a test?

A. That is part of the stomach, is called antrum, which is biopsied. We usually do that to rule out any bacterial infection or any pathology which we do not perceive or see through our eye.

Q. Okay. Below that, we have, "Slight chronic inflammation in benign gastric antral mucosa." Can you describe what that is?

A. That's what the pathologists described as slight inflammation in the lining, yes.

Q. This is really --

A. This is not visible to my naked eyes.

Q. So this is actually prepared by, it sounds like --

A. Pathologist.

Q. Leslie Mechanic, M.D.?

A. Right. She's the pathologist, yeah.

Q. Have you worked with her before?

A. I did.

Q. And then to the next page, 20, page 20, we're going to get through this poem, this looks to be a consent form, essentially?

A. Right. That's right.

Q. Mr. Moses consenting to the endoscopies?

A. Right.

Q. The slight chronic inflammation that we saw on the earlier page, are there any symptoms associated with that?

A. Some people have pain in the epigastrium, the pit of the stomach, because of the inflammation.

Q. Can the inflammation cause severe pain?

A. Usually not.

Q. Is it a chronic condition or does it resolve itself normally?

A. It can resolve itself normally. We give proton pump inhibitors like Omeprazole or Lansoprazole to cut down on the acidity in the stomach. Acidity causes inflammation. We're teaching you gastroenterology today.

Q. Doctor, can you turn to page 25? It's 00025.

MR. MAILLOUX: What's at the top of this page?

MR. INNAMORATO: Pre-anesthetic evaluation.

Q. Do you recognize any of the handwriting on this?

A. No, I don't.

Q. All right. So this is probably a technician?

A. No. It's an anesthesiologist, most likely. I think it was Dr. Losberd, but don't quote me for that, because I can't tell from his handwriting, from the signature, I can't tell you. He was anesthesiologist who used to work with us there. But don't quote me on that. Because from signature, how can you tell.

Q. Can you now turn to page 31.

MR. INNAMORATO: Matt, the top of the page is St. Francis Medical Center, and I believe there's --

MR. MAILLOUX: Sedation record?

MR. INNAMORATO: This one should be endoscopy department on the very bottom of the page. On the top, it's St. Francis Medical Center.

Q. Doctor, we have attending MD on the top. Is that yourself?

A. Yes, sir.

Q. And this procedure date is 11/30/2018; is that correct?

A. Yes, sir.

Q. We have, "Procedure, upper GI endoscopy. Indication, suspected peptic ulcer." Do you recall that?

A. It's written here. I can read it, yeah. I can't recall, but I can read.

Q. Right. Do you have any reason to doubt that that was a suspicion of yours, the peptic ulcer?

A. Yeah. It is written there. Make note that it is written there, so I'm reading it. Suspected peptic ulcer.

Q. Okay. And I'm looking at findings now. Do you see that?

A. Pardon me?

Q. Findings in the middle of the page.

A. Findings, yes, sir.

Q. The examined esophagus was normal?

A. Yes.

Q. Any reason to doubt that that was your conclusion?

A. No doubt about it.

Q. Okay. The entire exam on stomach was normal?

A. That's also my impression, yes.

Q. And then biopsies were taken with cold forceps for Helicobacter pylori testing. What is that?

A. It's a bacterial infection in the stomach which ultimately leads to stomach cancer. If you find it, we treat it.

Q. It's associated with stomach cancer?

A. That's what I'm saying, that if it continues, it causes gastric cancer, yes.

Q. The bacteria itself?

A. Bacteria itself, yes. So we do a biopsy to make sure that the person has or does not have bacterial infection. It does not show on naked examination. When I look inside the stomach, I don't see anything different. It looks normal.

Q. It looks normal, but the testing itself would determine whether or not --

A. That's why I said the entire exam of the stomach was normal.

Q. Okay. And this is, I guess, your electronic signature there?

A. Yes, sir.

Q. Do you use an electric signature in your practice?

A. In my practice, I had no computers, no electronics.

Q. None?

A. It is in the hospital that they have their

system, their computerized system which prints for me.

Q. Let me ask you this, Doctor. Overall with regard to -- if we could turn to page 33 -- actually, if you would, one more page.

A. Okay.

Q. With regard to the procedures that you performed on Mr. Moses in November of 2018, were you able to rule out conditions other than adhesions causing his pain?

A. Colonoscopy cannot rule out adhesions as a cause of pain.

Q. I mean, ruling out conditions other than the adhesions you originally suspected?

A. I'm saying the colonoscopy cannot rule out adhesions. Colonoscopy can only rule out colon cancer or colon polyps or colitis.

Q. That's my question. Was this test able to rule out the colon cancer and the polyps?

A. Yes, it did.

Q. And that left then what your original suspicion was was adhesions?

A. Yeah. It's an indirect conclusion, yes.

Q. After coming to these conclusions, did you recommend exploratory surgery for Mr. Moses with regard to the adhesions?

A. I don't recollect.

Q. Would there be any reason why you would not recommend exploratory surgery?

A. My procedures were normal. Patient was sent back to prison system. That was the end of it.

Q. Do you recall him, at any connection with this procedure, that he was still in pain, did you learn?

A. I don't remember, no.

MR. MAILLOUX: Mr. Innamorato, can I ask a quick question?

MR. INNAMORATO: Sure.

MR. MAILLOUX: These notes that you've been shown, Doctor, are typewritten; correct?

THE WITNESS: They were computer generated, sir.

MR. MAILLOUX: How do you go about preparing the notes to put them into the computer?

THE WITNESS: Pardon me?

MR. MAILLOUX: How do you know about preparing the notes to put them into the computer?

THE WITNESS: Because I sit in front of the computer and I type a few things on the screen and other things are already created in there, so it's a combination of what you print, what you type, and what

is already there. You know, modern computers, it is AI, artificial intelligence. So few things are already preprinted, few things we add to the preprinted things.

MR. PATTANITE: I think what he's asking is do you type it yourself?

THE WITNESS: I type it myself, yes. I know how to type, yes.

MR. MAILLOUX: With respect to the November 30, 2018 procedure on Mr. Moses, when did you enter the information into the computer?

THE WITNESS: It is entered same time, sir. When the procedure is done. Otherwise, patient --

MR. MAILLOUX: From the operating room?

THE WITNESS: Yeah. We have a small dictation area, we call it. Either we dictate it on the dictation system, then later on the transcribers will print it, or I will type it into the computer and it will be generated with the printed form right after the procedure, yes, sir. There is a small dictation area, they call it. All documentation area, we call it documentation area. How about that? Sounds better word.

MR. MAILLOUX: And for Mr. Moses'

procedure, how did you enter that information?

THE WITNESS: After I did the procedure, I went to the dictation area or documentation area, and I documented what I saw on endoscopic examination. I typed it.

MR. MAILLOUX: Did you dictate any notes?

THE WITNESS: I do not recollect, sir.

MR. MAILLOUX: If you dictated any notes, where would those notes be?

THE WITNESS: In the endoscopy report and colonoscopy report.

MR. MAILLOUX: Is it the EHR or the electronic health records program that converts your speaking into text by dictation or something else?

THE WITNESS: There is transcribers who type the notes that I dictate. We don't have -- when I dictate, they don't type it right away, no. There's a transcriber that transcribe the notes. They are remotely situated. They are not in the hospital. So if I dictated something, I did not have the information right in front of me. If I typed it, then it was there in front of me.

CONTINUED DIRECT EXAMINATION

BY MR. INNAMORATO:

Q. Doctor, do you keep the tapes, do you use the

little tapes for your dictation or is it digital?

A. No. It's digital. There's no dictation.

Q. Okay. Do you delete the digital files after you use it or do you continue to maintain them?

A. I just dictate it to their system. I do not know what happens to them afterwards.

Q. Okay.

MR. INNAMORATO: Matt, do you have any follow-up on it?

MR. MAILLOUX: No. I'm just trying to get an understanding.

Doctor, are there any other notes that you have with respect to the procedure you performed on Mr. Moses that are not reflected in this electronic health record?

THE WITNESS: This is the only thing we have. No additional notes are there.

MR. MAILLOUX: And you previously testified that you have no independent knowledge in addition to your notes; correct?

THE WITNESS: Yeah. I have no knowledge in addition to my notes that you see in front of you and in front of me, yes.

MR. MAILLOUX: With respect to what you would have provided to the Bureau of Prisons, there

would have been no additional information aside from what's reflected here in the EHR; correct?

THE WITNESS: Exactly, that's what they had, yes. This information went with the patient to the prison system.

MR. MAILLOUX: How is it sent to BOP?

THE WITNESS: How is it sent to the BOP?

MR. MAILLOUX: The BOP, yes.

THE WITNESS: Patient comes with prison guards and the prison guards carry the documents with them to the prison system, and deliver it, I guess, to the prison system. I hope they don't take them home.

MR. MAILLOUX: The medical documents you delivered in paper to the prison --

THE WITNESS: They're put in an envelope, and the envelope is handed over to the security guard who comes with the prisoner. All prisoners always come with security guards. Sometimes two, sometimes six, by the way. Those who are high criminals, they have six security guards with them. They have special uniform and special guns and everything, even though they are paralyzed and they have feeding tubes. I had a patient with a feeding tube, and he came with six guards all the time. Best use of our tax money.

CONTINUED DIRECT EXAMINATION

BY MR. INNAMORATO:

Q. After performing these endoscopies in November of 2018, you determined that those tests showed normal results; is that right?

A. Yes, sir.

Q. And what were you able to rule out definitively then regarding his condition?

A. That he does not have colon cancer, he does not have colitis, he does not have polyps in his colon, he does not have gastric cancer or gastric ulcer or esophogeal ulcer.

Q. Would that include conditions like fistula or abdominal abscesses or bowel obstructions?

A. Abdominal abscesses cannot be seen through endoscopy, and fistula also cannot be seen through endoscopy.

Q. How about any form of abdominal cancer beyond the mucosal layer?

A. Cannot be seen through the endoscopy, sir. That needs CAT scan or MRI, or cut him open and look inside him.

Q. Did you, after these endoscopies, recommend to the BOP any CAT scans or MRIs?

A. I don't recollect.

Q. If you did make the recommendation, would it

be in writing?

A. It could be on phone conversation, also. Because sometimes I would communicate with Dr. Sood or the other lady doctor, Dr. Patel, from time to time.

Q. That would happen at times?

A. That would happen at times, yes.

Q. Would that be reflected then in Dr. Sood's notes, to your knowledge?

A. That, I do not know.

Q. Do you recall anything like that with regard to Mr. Moses?

A. I don't.

Q. All right. Would you agree that things like fistulas, abdominal abscesses and bowel obstructions are serious health conditions?

A. They are, yes.

Q. And they could be very painful; is that right?

A. Yes.

Q. And they could be life-threatening?

A. Not necessarily. But they can be painful. Only cancer is life-threatening, perforation of the bowel is life-threatening.

Q. Even an abscess, if untreated?

A. Abscess is life-threatening, you are right.

Q. And bowel obstructions can be life-threatening?
A. Life-threatening, yes.
Q. Both of which are also painful?
A. They are painful, yes, sir.
Q. All right. I think you're tiring me out, Doctor.
A. You tired me out. I have to create a Rama. He stole his wife and he killed his kingdom. A short story became a very long story.
Q. All right. We're going to move quickly now.
MR. INNAMORATO: Let's make this 7.
(Bureau of Prisons Health Services Consultation Request is received and marked as Exhibit Chowdhury-7 for Identification.)
Q. Doctor, what we're handing you now marked as Exhibit 7 what purports to be a Bureau of Prisons Health Services Consultation Request. And I believe this one is dated at the very bottom 6/19/2019.
A. Yes, sir.
Q. Do you recognize the handwriting on this document?
A. No, I don't.
Q. And I think your earlier testimony was that after the endoscopies in November 2018, you no longer

interacted with Mr. Moses?
A. I don't recollect, no.
MR. INNAMORATO: All right. Let's mark this one 8.
(Bureau of Prisons Health Services Consultation Request is received and marked as Exhibit Chowdhury-8 for Identification.)
Q. All right. Doctor, what we're marking as Exhibit 8 is what purports to be another one of these Bureau of Prisons Health Services Consultation Requests. Do you see handwriting on that document?
A. I see the document, yes, sir.
MR. INNAMORATO: For Matthew's benefit, it's 001614.
A. Yes, sir.
Q. Now, did you see Mr. Moses on 8/21/19?
A. Yes, sir.
Q. So that would have been almost a year after the endoscopies?
A. Right.
Q. Can you read for me in the assessment area what your handwriting represents?
A. Chronic constipation, diarrhea, short bowel.
Q. Anything else?
A. That's the assessment. You want me to read

recommendation?
Q. The assessment I see is GI consult done; is that right?
A. Oh, you want me to read from the top?
Q. Yes. So I know your handwriting.
A. "GI consult: History of short bowel syndrome, chronic diarrhea, abdominal pain on and off, occasional vomiting and weight loss.
"On examination: Abdomen soft. Midline scar of prior surgery. No palpable masses. Bowel sounds normal. CT abdomen. Stools in colon.
"Assessment: Chronic constipation. Diarrhea. Short bowel. Recommend Colace 200 milligrams PO daily. Fiber, two tablespoons PO daily. Bentyl, 10 milligrams PRN for abdominal cramps. Dr. Sood, thanks." And my signature.
Q. Do you recall, does this refresh your recollection as to whether you met with Mr. Moses again in 2019?
A. I have my notes here, so I must have seen him, yes.
Q. Okay. Can you tell from your notes whether or not he complained of significant pain at this time?
A. It says abdominal pain, yes.
Q. All right. Do you remember whether or not

you gave him that pain scale, albeit being subjective, do you remember doing that?
A. I don't recollect.
Q. At this point, you've recommended Colace. What is that?
A. Stool softener for constipation.
Q. How about the fiber?
A. Fiber also helps aid the constipation.
Q. How about the Bentyl?
A. It relieves pain caused by spasm in the intestines. It's like an antispasmodic.
Q. None of those medications have any type of opiate or narcotic pain relief; correct?
A. No. None of them, no, sir.
Q. Was there a reason why you did not prescribe any type of stronger pain reliever to Mr. Moses at this time?
A. I think that was my impression that he needs Bentyl. That's all.
Q. This is the same Bentyl that you prescribed for him in 2018?
A. That's right.
Q. All right. Do you recall any further visits with Mr. Moses after this in 2019?
A. I don't recall.

MR. INNAMORATO: Let's do this one 9.
(LMA LifeCare Physicians of Hamilton Clinic Notes are received and marked as Exhibit Chowdhury-9 for Identification.)
MR. MAILLOUX: Just so we're clear, what was the date again?
MR. PATTANITE: August 21, 2019.
Q. What we're presenting to you now, Doctor, is a document Bates 001616 through 1617.
A. Yes, sir.
Q. And it's titled LMA LifeCare Physicians of Hamilton.
A. Yes, sir.
Q. Are you familiar with that practice?
A. I am.
Q. And how are you familiar with it?
A. I know Dr. Rajiv Shah personally.
Q. Okay. Did you share care of Mr. Moses with Dr. Shah?
A. That, I don't recollect.
Q. Do you know whether or not Dr. Rajiv Shah has ever examined Mr. Moses?
A. I do not know.
Q. Have you ever seen this document before?
A. No, I have not.

Q. What's the connection between, if any, that you're aware of between Dr. Shah and LMA LifeCare and the Bureau of Prisons?
A. Dr. Shah is a surgeon in practice. He's employed by LifeCare organization.
Q. Is that connected in any way to the intermediary that we're talking about earlier?
A. You mean NaphCare?
Q. NaphCare, yes.
A. I don't know.
MR. MAILLOUX: For the record, can we spell the names of those two organizations?
MR. INNAMORATO: LMA LifeCare Physicians of Hamilton. Was there another one?
Q. Dr. Shah is with LMA, as far as you know?
A. Yes. He was, yes.
Q. And you haven't seen this document before?
A. No, I have not.
Q. Just for the record, this is dated 8/27/19. And I believe your visit with Mr. Moses was 8/15/2019.
A. 8/21.
Q. 8/21. I'm sorry.
A. So one week later, yes.
Q. Do you know whether or not you would refer patients to Dr. Shah?

A. I do refer patients to Dr. Shah even today.
Q. Okay. And do you recall whether or not, given the connection there, between the temporal connection there, whether or not you may have referred Mr. Moses to Dr. Shah?
A. I don't recollect.
Q. If you wanted to do that or if that was your desire, would you have to go through NaphCare and Dr. Sood to get approval recommending a referral as opposed to --
A. I would just write in my recommendations.
Q. We didn't see on the prior exhibit any referral.
A. So obviously I did not refer him at that time.
Q. All right. One more. Almost done, Doctor, at least for me.
MR. INNAMORATO: This will be 10.
(Bureau of Prisons Health Services Consultation Request is received and marked as Exhibit Chowdhury-10 for Identification.)
Q. Doctor, what we're handing you now we're marking as Exhibit 10. It purports to be another one of these Bureau of Prisons Health Services Consultation Request. It appears to be dated

10/31/19.
A. Yes, sir.
Q. And do you recognize the handwriting and the signature on this?
A. Yes, sir.
Q. Is that your handwriting?
A. It is my handwriting, yes.
Q. Does this refresh your recollection as to whether you were still treating Mr. Moses as late as 10/31/19?
A. I saw him at that time, yes.
Q. All right. And can you read into the record your handwriting?
A. "History of bowel resection. Short bowel syndrome. Adhesions causing GI symptoms. Has lost weight. On examination: Abdominal soft. Long midline scar. No palpable masses. Liver and spleen not palpable. Recommend Ensure, one can twice daily. Multivitamins, one tablet daily. Low lactose diet. Dr. Sood, thanks."
MR. MAILLOUX: I have a quick question.
Doctor, before you got to the recommendations one, two, three, what does it say on the line above that?
THE WITNESS: No palpable masses. I

couldn't feel any lumps in his belly.

MR. MAILLOUX: After no palpable masses, is there anything written?

THE WITNESS: This is abbreviation for liver and spleen we use many times. Liver and spleen not palpable.

Q. And, Doctor, what does that represent, meaning, not palpable?

A. That he does not have an enlarged liver or enlarged spleen. Sometimes people with Leukemia or cirrhosis of the liver, they have enlargement of the liver or the spleen. Or cancer patients have enlarged liver and spleen.

Q. You noted in the assessment section, short bowel syndrome, adhesions causing GI symptoms, has lost weight. Did he describe pain to you?

A. I do not remember that conversation.

Q. Short bowel syndrome, could that cause pain?

A. Yes, it can.

Q. And can it cause severe pain?

A. It can cause severe pain.

Q. And I think we've covered adhesions, they cause severe pain?

A. Severe pain, yes.

Q. Is there a reason why you did not prescribe

any type of pain medication for Mr. Moses at this time?

A. I do not know.

Q. I think you told me earlier that you had a philosophy of not using narcotics. Could that explain why there was no pain medication?

MR. PATTANITE: Objection to form. You could answer.

A. Actually, in these notes, I do not see any mention about pain. So maybe at this visit he did not complain of pain. But that's only a guess, and I'm not supposed to guess.

Q. Okay. But you're saying maybe, it's possible. You don't know one way or the other?

A. No, I don't.

Q. All right. Ensure is not a pain medication; right?

A. No. It's a supplement. You know, Ensure.

Q. Right. It's the common over-the-counter drink, basically?

A. Yes.

Q. And multivitamins, that's not pain relieving; right?

A. No.

Q. And a lactose diet is not pain relieving?

A. No.

Q. But offhand right now, can you describe -- I think what you've told us is that he may not have been complaining of pain?

A. Maybe. Maybe he was not complaining, yes.

Q. You were consistent with the Bentyl prior to that, though?

A. Yes.

Q. The antispasmodic?

A. Yes, I was.

Q. All right. Why don't we take a break, and I think we may be done. Five-minute break?

A. I want to continue.

Q. I need to look at my notes. That's the thing. There's a reason for me asking for the break.

(A short break is taken.)

MR. INNAMORATO: Doctor, I want to thank you for your time. Mr. Mailloux may have some questions for you, but I'm complete. Thank you.

CROSS-EXAMINATION

BY MR. MAILLOUX:

Q. Good afternoon, Doctor.

A. Good afternoon, sir.

Q. Can you hear me okay?

A. Fine. Thank you.

Q. Were there any questions that Mr. Innamorato asked you that you didn't understand?

A. No. I understood all the questions. Only thing I did not have -- unfortunately, did not have answer to all the questions. But I had only brief encounter with Mr. Moses on three occasions.

Q. And in speaking with Mr. Innamorato, both the last time and today, any of your answers change during that time?

A. How can I remember what answers I gave last time and how they have changed from this time? I would say they should not have changed because the situation has not changed.

Q. Have you ever personally spoken with Dr. Sood about Mr. Moses?

A. I don't recollect, sir.

Q. Is that no, you don't think you have, or is that something else?

A. I told you I do not recollect if I ever spoke with Dr. Sood about Mr. Moses.

Q. Did you typically speak with Dr. Sood about any of the patients?

A. On rare occasions, yes.

Q. Did you ever speak with Dr. Nicoletta Turner-Foster?

A. I have spoken with her from time to time. But I do not remember if I spoke with her about Mr. Moses.
Q. Did you ever speak with Warden David Ortiz?
A. No, I did not. I don't know who they are.
Q. Was there anyone else from the Bureau of Prisons with whom you spoke about -- I'm sorry, was there anyone at the Bureau of Prisons with whom you spoke about Mr. Moses?
A. I do not recollect.
Q. Is there anyone in addition to Drs. Rajiv Sood and Turner-Foster with whom you would speak about inmate patients?
A. I occasionally will speak with Dr. Patel.
Q. Who is that?
A. I don't remember his first name, but he's also one of the prison doctors.
Q. What is that doctor's last name?
A. Patel, P-a-t-e-l.
Q. With respect to the recommendations that you had for Mr. Moses' care, do you know what the Bureau of Prisons did with respect to those recommendations?
A. I do not know.
Q. Did you ever follow up to make sure that that care was being provided or those recommendations were

being followed?
A. I did not follow up, no.
Q. Do you have any experience providing care in an institutional setting such as a federal correction institution?
A. State prisons, yes. I did provide care to the patients in state prisons in State of New Jersey.
Q. And were you physically stationed at those state prisons?
A. No. I did telemed, sir. I did not go to any of the state prisons.
Q. Was that providing care the same way you were providing care to inmates at Fort Dix?
A. That's right.
Q. So you were not on staff of the state prisons?
A. I was not on staff, but I was a consulting gastroenterologist with the state prisons.
Q. Were you ever on staff of a correctional institution?
A. No, I was not.
Q. Have you ever worked in a correctional institution?
A. None other than Fort Dix.
Q. And that's on a consulting basis where

patients are referred to you for care?
A. Right. As a consultant, yes. But I have physically gone to Fort Dix to conduct the clinics. That's where I see the patients there.
Q. Where did you see Mr. Moses?
A. At Fort Dix Federal Prison.
Q. And where did you perform the procedure?
A. At St. Francis Medical Center in Trenton, New Jersey.
Q. So you saw him both at Fort Dix and at St. Francis then?
A. Pardon me?
Q. You saw him both at Fort Dix and at St. Francis?
A. That's right. St. Francis, I performed the procedures; and at Fort Dix, I did the consultation.
Q. After a request was made for you to do a consultation on an inmate, when were you available to do it?
A. Pardon me?
Q. How soon after a consult was made would you be available to make that consult at Fort Dix?
A. That depends upon scheduling. The scheduler at Fort Dix and the office secretary in my office, Kim is her name, she used to talk to them or they would

call her with the name of the inmates who has to be seen, and that's how they were scheduled.
Q. And your schedule is pretty busy?
A. Pardon me?
Q. Your schedule was pretty busy?
A. It was pretty busy.
Q. 2018 and 2019 time frame?
A. Pretty busy. There were six state prisons, and Fort Dix is the federal prison. So I used to provide GI consultation to all these institutions, sir.
Q. And you maintained a practice of your own, as well?
A. I did.
Q. Was one institution given the priority over others?
A. I don't think so. I treat all people equal. All institutions are equal to me. No priority given to any one of them.
Q. And the Bureau of Prisons couldn't say, for example, you need to see this person sooner than later or you need to cancel this appointment to see someone on an expedited basis?
A. That, I don't know what they do.
Q. I'm sorry?

A. I said I cannot answer that question because I do not know how their internal functioning works or scheduling works. I have no idea. If the situation Dr. Sood or Dr. Patel or the lady doctor, what's her name, Nicoletta, I forget her name now, they would call me about a particular patient they want me to see right away.

Q. Then it would be up to your schedule to determine when you are able to see that patient?

A. Right. It was once in a month clinic I used to do. It was not like random that I go there every day. It is quite far from Trenton, by the way. It is almost 35 miles a way. So I won't go randomly. It will be scheduled once a month clinic visit.

Q. Were there any recommendations that you had that the BOP didn't follow with respect to Mr. Moses' care?

A. I don't recollect.

Q. Were there any instances where you reached out to BOP and requested that certain things be done with respect to Mr. Moses' care that were not otherwise being done?

A. I don't recollect.

Q. Is there anything that we've discussed between the last deposition session and today where

any communications were made or any recommendations were made with respect to Mr. Moses' care to the BOP that were not discussed?

A. I don't understand your question. But I have already mentioned that other than those three visits where I saw Mr. Moses in prison and my notes, I do not have any recollection about any other aspects of his care.

Q. So aside from everything we've discussed, the notes that you --

A. That's 100 percent.

Q. That's the entire universe of what you remember with respect to Mr. Moses' care?

A. It's more than universe.

Q. Do you have a separate contract with NaphCare?

A. No, I don't. Actually, now I have no contact with NaphCare.

Q. How does NaphCare pay you?

A. By dollar bills.

Q. How do you invoice NaphCare?

A. My insurance -- my billing company will bill NaphCare, and they will pay me depending upon, you know, nature of procedures and the standard fee that, you know, Medicare allows or whatever their system is.

Q. How do you become affiliated with NaphCare as a physician?

A. I have nothing to do with NaphCare. It was the prison system, federal prison. I was consultant with federal prison. And federal prison's policy is that NaphCare is subcontracted, I think. I do not know all the business logistics. But NaphCare provides the money part, and I think the federal government contracts to NaphCare to take care of the prisoners. You should know better than me.

Q. Do you have a contract with the Bureau of Prisons?

A. Yes, I do.

MR. MAILLOUX: We'd like to formally request a copy of that contract.

A. I have no copy now. It's all done with now. I'm no more with federal prisons, I'm no more with NaphCare. It is already almost two years. Ever since COVID-19 hit. I stopped seeing NaphCare -- I stopped seeing inmates.

Q. How can we get a copy of the contracts that you say you have between yourself and the Bureau of Prisons?

A. Fort Dix might have the copy.

Q. I understood that Fort Dix did not contract

directly with physicians, and instead they contracted with NaphCare, who then provided subspecialists such as yourself.

A. I do not recollect contracting NaphCare or communicating with them or sending an application to NaphCare. My application was sent to Fort Dix and they processed it. They might have sent it to NaphCare, sir, but I have no recollection about all this. I remember seeing the application.

Q. You may have contracted with NaphCare, but during your time at Fort Dix it was NaphCare who provided the opportunity for you to work with inmates at Fort Dix?

A. It could be. I do not know.

MR. PATTANITE: I think those are all the questions that I have. I appreciate your time, Doctor.

Mr. Innamorato, do you have anything else.

MR. INNAMORATO: No follow-up. Thank you, Doctor.

THE WITNESS: Sorry if I was abrupt, because I have no knowledge about these things. I'm a practicing physician. I spend most of my time seeing my patients.

MR. PATTANITE: I just have a couple

follow-up.

CROSS-EXAMINATION

BY MR. PATTANITE:

Q. Doctor, if I show you what was marked as Exhibit 1, this is your consultation report from the first consultation with the patient; correct?

A. Right.

Q. And did you write that the patient had abdominal pain there?

A. I did, yes.

Q. And is that something that the patient reported to you?

A. He must have mentioned it to me.

Q. For you to write it down, he must have said it; correct?

A. Yes.

Q. When you saw the patient again in consultation in August 2019, Chowdhury Exhibit 8, did you have any mention of abdominal pain by the patient?

A. I did. It states abdominal pain on and off.

Q. And where would you have gotten that information from?

A. From the patient.

Q. On and off, is that the same as intermittent, to your knowledge?

A. Intermittent, yeah.

Q. I'm going to show you Chowdhury-9, and I'm going to ask you the type of pain that is described by the doctor who wrote this note.

A. The same thing, intermittent abdominal pain. I wrote on and off abdominal pain. Very similar, yeah.

Q. So then when you saw the patient on October 31, 2019, there's no mention of pain in this note; right?

A. No. I don't see any, no.

Q. And is it fair to say that the patient didn't complain of pain, and that's why you did not write it down?

A. Most likely.

Q. And is that consistent with your practice over the other notes that we've discussed, that you would have written down the complaints that the patient made?

A. Right. I do, yes.

Q. In terms of opiate pain medicine, is there an effect of opiate pain medicine on constipation?

A. It does. They all cause constipation.

Q. Causes constipation. And had the patient complained of constipation previously?

A. I think he did at one time. I have to go over my notes.

Q. Would you prescribe in a general patient, not this patient, but a general patient, would you prescribe opiate pain medicine to a patient who has complaints of constipation?

A. No. Probably not.

Q. And why not?

A. Because it can worsen the constipation.

MR. PATTANITE: Those are all the questions that I have. Thanks, Doctor.

MR. MAILLOUX: All the exhibits will be attached?

MR. INNAMORATO: Yes.

THE COURT REPORTER: Did you need a copy of the transcript?

MR. INNAMORATO: I'll take an expedited copy.

MR. MAILLOUX: Yes. I'll take a copy.

MR. PATTANITE: I'll take a copy of both today and day one.

(Time noted: 4:00 p.m.)

A C K N O W L E D G E M E N T

I, BHANWARLAL CHOWDHURY, certify that I have read the transcript of my testimony taken under oath on July 27, 2023, and that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

____________________

BHANWARLAL CHOWDHURY

Signed and subscribed to before me, this day of , 20 .

____________________

Notary Public

C E R T I F I C A T I O N

I, MICHELLE GALLO, a Certified Court Reporter and Notary Public of the State of New Jersey, do hereby certify that the foregoing witness, BHANWARLAL CHOWDHURY, M.D., was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

Michelle Gallo

MICHELLE GALLO, CCR

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Moses, Joshua v. Sood, Dr., Ravi, Et Al
DATE OF DEPOSITION: 7/27/2023
WITNESSES' NAME: Bhanwarlal Chowdhury - Vol 2

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| | | | |

______________________
Bhanwarlal Chowdhury

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF ____________, 20__.

______________________
(NOTARY PUBLIC)

______________________
MY COMMISSION EXPIRES:

**0**
**00005** 149:9
**00006** 149:16
**00008** 156:15
**00019** 155:10
**00025** 161:21
**001614** 174:14
**001616** 177:9
**07102** 123:13
**08648** 123:8

**1**
**1** 126:9,9 128:9 133:20 151:16 193:5
**1,300** 141:19
**1,350** 141:24 159:14
**1,500** 141:19
**10** 124:19 152:21 175:15 179:18,21,23
**10/31/19** 180:1 180:10
**100** 130:16 142:23,24 153:12 190:11
**10022** 123:4
**1025** 122:2
**11/30/18** 150:2
**11/30/2018** 162:23
**12** 141:16 152:6 153:18 157:25 158:6 158:10
**12360** 197:18
**125** 124:4
**135** 124:11
**136** 122:14 123:8
**146** 124:12
**148** 124:13
**1617** 177:9
**173** 124:14
**174** 124:16
**177** 124:17
**179** 124:19
**183** 124:4
**19** 155:10 159:15 191:19
**193** 124:5

**2**
**2** 137:4 198:3
**20** 122:2 161:1 161:1 196:20 198:22
**200** 175:13
**2015** 146:3 148:5
**2018** 138:2 142:20 148:10 148:12 150:3 151:2 154:6 158:24 165:7 167:10 171:3 173:25 176:21 188:7
**2019** 175:19 176:24 177:7 188:7 193:18 194:9
**2023** 122:16 196:8
**205** 144:2
**21** 177:7
**212** 123:4
**25** 142:5,19 161:21
**27** 122:16 196:7

**3**
**30** 142:19 167:10
**31** 162:12 194:9
**33** 165:3
**35** 189:13
**359** 136:1,14
**36** 149:10
**360** 137:4,12

**4**
**4** 124:11 135:15,17,19
**4/24/2018** 137:17
**401800705694** 155:16
**4:00** 195:22

**5**
**5** 124:12 146:12,14
**521-5400** 123:4
**599** 123:3

**6**
**6** 124:13 148:22,24,25
**6/19/2019** 173:19
**6/26/18** 135:21
**609** 123:9
**645-2700** 123:14

**7**
**7** 124:14 173:12,15,17
**7/27/2023** 198:3
**731-1205** 144:2

**8**
**8** 124:16 156:10,25 174:4,7,9 193:18
**8/15/2019** 178:20
**8/21** 178:21,22
**8/21/19** 174:16
**8/27/19** 178:19
**806** 123:13
**896-2000** 123:9

**9**
**9** 124:17 177:1 177:4 194:2
**970** 123:13
**973** 123:14

**a**
**abbreviation** 181:4
**abdomen** 131:2 132:7 137:22 137:24 159:9 175:9,11
**abdominal** 129:24 133:13 137:21 171:13 171:14,17 172:14 175:7 175:15,24 180:16 193:9 193:19,20 194:5,6
**able** 147:1,5 165:8,17 171:6 189:9
**above** 122:11 156:11 180:24
**abrupt** 192:21
**abscess** 172:24 172:25
**abscesses** 171:13,14 172:14
**access** 134:6,9 134:13 139:10 139:13
**account** 134:12 134:13
**accounting** 145:23
**accurate** 125:23 197:13
**accurately** 138:1
**acidity** 161:18 161:18
**action** 122:2 197:15
**actual** 125:21
**actually** 126:17 131:1 145:24 147:7 148:11 160:2,19 165:3 182:9 190:17
**add** 167:3
**addition** 169:20,22 185:11
**additional** 126:5 169:17 170:1
**address** 140:5
**adhesions** 127:15 129:3,8 129:11,24 131:20,23 135:5,9,11 137:17 155:7 165:8,10,13,15 165:21,25 180:15 181:15 181:22
**admin** 144:4
**admissions** 152:24
**affiliated** 191:1
**afternoon** 125:6 183:22 183:23
**agree** 172:13
**ahead** 143:20
**ai** 167:2
**aid** 176:8
**al** 122:6 198:2
**albeit** 176:1
**allows** 190:25
**america** 123:15
**anesthesia** 152:23 153:10 153:11
**anesthesiolog...** 162:5,9
**anesthetic** 161:24
**answer** 127:21 127:23,24 137:1 142:24 147:1,2,5 152:11 182:8 184:5 189:1
**answered** 196:10
**answers** 184:8 184:10 196:12
**antispasmodic** 176:11 183:9
**antral** 160:13
**antrum** 160:4,9
**apparently** 149:16
**appear** 155:22 156:6
**appears** 135:22 136:15 138:9 138:15 140:17 144:2 149:1 158:1 179:25
**append** 156:20
**application** 146:10 147:13 147:15,15,16 148:7 192:5,6 192:9
**appointment** 188:22
**appreciate** 192:16
**approval** 179:9
**april** 138:2 148:10 150:3
**area** 133:13 158:19 167:17 167:22,22,23 168:3,3 174:21
**artificial** 167:2
**aside** 170:1 190:9
**asked** 142:10 155:25 184:2 196:10
**asking** 127:1 128:18 142:14 143:8 154:17 167:5 183:15

**aspects** 190:7
**assessment** 174:21,25 175:2,12 181:14
**associated** 161:8 164:4
**assume** 148:1
**attached** 124:21 195:13
**attending** 149:17,20 159:18 162:20
**attorney** 149:6
**attorney's** 123:11 143:22
**august** 177:7 193:18
**author** 141:23
**auto** 131:8
**availability** 151:24
**available** 187:18,22
**avenue** 123:3
**avoided** 132:1
**aware** 137:7 178:2

**b**

**b** 124:9 155:23 156:7,11,12 158:2
**b2** 122:15 123:8
**back** 125:6 130:19 141:23 146:23 166:5
**bacteria** 164:7 164:8
**bacterial** 160:10 164:1 164:10
**bad** 131:12,13
**barium** 131:10 131:11
**based** 133:19 142:4 153:9
**basically** 182:20
**basis** 186:25 188:23
**bates** 135:25 136:1 149:8,9 149:16 177:9
**beginning** 137:13
**behalf** 143:22
**believe** 162:14 173:18 178:20
**belly** 181:1
**benefit** 174:13
**benign** 160:13
**bentyl** 133:20 137:18 175:15 176:9,19,20 183:6
**best** 170:24
**better** 167:23 191:10
**beyond** 127:25 143:3 171:17
**bhanwarlal** 122:5 124:3 125:1 196:5,16 197:11 198:3 198:21
**bill** 145:5 190:22
**billed** 145:19
**billing** 145:6,10 145:15,15,18 190:22
**bills** 190:20
**biopsied** 160:9
**biopsies** 163:23
**biopsy** 160:2,5 164:8
**blame** 143:13
**bop** 127:20 128:2 134:12 134:13,22 136:21 138:17 138:18 139:7 141:8 147:7 170:6,7,8 171:23 189:16 189:20 190:2
**bottom** 152:25 156:7,9,10 157:22 162:18 173:19
**bowel** 129:1 130:1,4,15,22 137:18 171:13 172:14,23 173:1 174:23 175:6,10,13 180:14,14 181:15,18
**bowels** 142:4
**break** 183:11 183:12,15,16
**breakfast** 142:10,11
**brief** 184:5
**broad** 123:13
**brought** 141:22
**bureau** 123:15 124:14,16,19 136:15 141:5 144:25 146:2 147:17,19 169:25 173:13 173:17 174:5 174:10 178:3 179:19,24 185:6,8,21 188:20 191:11 191:22
**business** 191:7
**busy** 188:3,5,6 188:8

**c**

**c** 123:1 130:11 130:12,19 156:7,12 196:2 197:3,3
**call** 142:15 167:17,22,22

188:1 189:6
**called** 144:23 147:24 160:8
**calls** 140:12
**cancel** 188:22
**cancer** 130:5 130:18 132:20 132:22,25 133:3,5,8,12,16 133:16,17 154:22 159:1,3 159:7,8 164:2 164:4,6 165:15 165:18 171:8 171:10,17 172:22 181:12
**capability** 150:22
**care** 134:21 140:24 141:1 152:23 177:18 185:21,25 186:3,6,12,13 187:1 189:17 189:21 190:2,8 190:13 191:9
**carry** 170:10
**case** 126:14 133:19 198:2
**cases** 133:9
**cat** 131:8 159:9 171:20,23
**cause** 129:12 161:12 165:11 181:18,20,21 181:23 194:23
**caused** 176:10
**causes** 161:19 164:6 194:24
**causing** 129:24 165:9 180:15 181:15
**cb** 158:4
**ccr** 197:19
**center** 152:22 156:4 159:16 162:14,19 187:8
**certain** 126:18 131:19 132:15 189:20
**certified** 122:12 197:8
**certify** 196:5 197:10,14
**cesar** 157:4,21
**challenge** 139:15
**change** 125:17 184:8 198:5
**changed** 184:11,12,13
**check** 145:8
**chief** 153:19 154:18
**chloride** 153:12
**chow** 148:24
**chowdhury** 122:5 123:9 124:3,11,12,13 124:14,16,17 124:19 125:1 126:9 135:15 135:17 140:20 146:12,14 149:11,15 156:11,24 173:15 174:7 177:4 179:21 193:18 194:2 196:5,16 197:11 198:3 198:21
**chronic** 129:5,6 160:12 161:7 161:14 174:23 175:7,12
**cirrhosis** 181:11
**civil** 122:2
**clarify** 125:10
**clear** 155:18 177:5
**clinic** 124:18 150:23 177:3 189:10,14
**clinical** 131:21
**clinics** 187:3
**colace** 175:13 176:4
**cold** 163:23
**colitis** 130:12 130:19 159:3 165:16 171:9
**colon** 130:5,18 131:9 132:20 132:22,24 133:3,5,8,10 151:8 154:22 159:3,3 165:15 165:16,18 171:8,10 175:11
**colonoscopies** 158:18
**colonoscopy** 133:4 137:20 138:21 153:24 154:9 156:8 158:16 159:4 159:11 165:10 165:14,15 168:11
**column** 158:10
**combination** 166:25
**come** 130:19 154:10 170:18
**comes** 141:8 170:9,17
**coming** 165:23
**commencing** 122:16
**commission** 198:25
**common** 182:19
**communicate** 139:17 140:1,8

172:3
**communicates** 151:23
**communicating** 141:7 192:5
**communicati...** 145:3 190:1
**company** 140:24 141:1,2 141:3 144:22 145:6,18 150:16 190:22
**complain** 182:11 194:13
**complained** 175:23 194:25
**complaining** 183:4,5
**complaint** 153:19 154:18
**complaints** 194:18 195:6
**complementary** 158:20
**complete** 149:4 183:19 196:9
**complications** 130:8
**computer** 134:13 166:15 166:18,21,23 167:11,19
**computerized** 165:1
**computers** 164:22 167:1
**conclusion** 163:19 165:22
**conclusions** 165:23
**condition** 130:12 132:13 159:6 160:7 161:14 171:7
**conditions** 127:20 129:21 131:17,19 132:15 155:7 158:25 165:8 165:12 171:12 172:15
**conduct** 187:3
**confident** 132:8
**connected** 155:6 178:6
**connection** 166:6 178:1 179:3,4
**conquers** 141:17
**consent** 161:3
**consenting** 161:5
**consider** 127:19 131:16 132:16
**considered** 129:14
**consistent** 138:6,21 159:21 183:6 194:16
**constipation** 174:23 175:12 176:6,8 194:22 194:23,24,25 195:6,9
**consult** 138:24 175:2,6 187:21 187:22
**consultant** 137:17 138:5 187:2 191:4
**consultation** 124:11,15,16 124:19 126:13 135:16,20 136:16 151:17 173:14,18 174:6,10 179:20,25 187:16,18 188:10 193:5,6 193:18
**consultations** 150:6
**consulting** 186:17,25
**contact** 150:4 150:18 190:17
**contacted** 150:15
**continue** 169:4 183:13
**continued** 144:18 148:16 168:23 170:25
**continues** 137:20 164:5
**contract** 124:12 146:1,6 146:9,13,23,23 147:6,6,7,8,10 147:11,14 190:15 191:11 191:15,25
**contracted** 192:1,10
**contracting** 192:4
**contracts** 146:1 191:9,21
**contrast** 131:8
**conversation** 139:4 142:18 150:8 172:2 181:17
**converts** 168:13
**copy** 125:20 134:16 149:4 191:15,16,21 191:24 195:15 195:18,19,20
**corner** 122:15 123:8 149:17 153:20

**correct** 126:23 126:24 133:7 133:14 156:3 156:10,13 162:24 166:14 169:20 170:2 176:13 193:6 193:15 196:9 196:13
**correction** 186:4
**correctional** 186:19,22
**counter** 182:19
**couple** 126:7,16 192:25
**court** 122:1,12 195:15 197:8
**cover** 136:13 157:19
**covered** 181:22
**covid** 191:19
**cramps** 175:15
**create** 173:8
**created** 166:24
**creating** 142:1
**criminals** 170:19
**crohn's** 130:9 130:18
**cross** 124:2 183:20 193:2
**ct** 127:20 128:10,11 131:4 132:3,6 133:14 159:5,7 175:11
**curative** 130:16
**curiosity** 153:12
**cut** 161:18 171:20
**cv** 122:2

**d**

**d** 124:1 196:2
**daily** 175:14,14 180:18,19
**database** 134:14
**date** 162:23 177:6 197:11 198:3
**dated** 135:21 150:2 173:19 178:19 179:25
**david** 123:15 185:4
**day** 189:12 195:21 196:19 198:22
**deal** 139:15
**defendants** 122:6 143:23
**defined** 154:2
**definitively** 171:7
**delete** 169:3
**deletion** 147:24
**deliver** 170:11
**delivered** 170:14
**department** 145:10 162:18
**depending** 151:24 190:23
**depends** 187:23
**deposition** 122:4 136:4 156:21 189:25 196:11 198:3
**describe** 138:1 158:18 160:14 181:16 183:2
**described** 126:18,22 129:10 130:25 160:15 194:3
**describes** 138:3
**description** 124:10
**desire** 179:8
**detect** 159:7
**detected** 133:18 159:4,9 159:10
**detection** 133:8
**determine** 132:12 151:7 164:14 189:9
**determined** 171:3
**diagnosed** 127:15
**diagnosis** 134:21 135:4 158:14 159:20 159:24 160:1
**diarrhea** 135:4 135:7,11 174:23 175:7 175:13
**dictate** 167:17 168:6,16,17 169:5
**dictated** 168:8 168:20
**dictation** 167:17,18,21 168:3,14 169:1 169:2
**diet** 137:19 180:19 182:25
**diff** 130:11,12 130:19
**different** 158:3 158:21 164:12
**difficulty** 139:14
**digital** 134:7 139:7,10 169:1 169:2,3
**direct** 124:2 125:4 144:18 160:3 168:23 170:25
**directly** 141:7 147:20,21 150:15 192:1

director 150:17
discharge 157:15
discharged 157:15
discuss 153:7
discussed 138:16 189:24 190:3,9 194:17
disease 130:9 130:18 153:25
diseases 130:15
distention 137:23
distinct 156:14
district 122:1,1 123:12
dix 135:20 150:23 186:13 186:24 187:3,6 187:10,13,16 187:22,24 188:9 191:24 191:25 192:6 192:11,13
doc 156:10
doctor 125:6 135:14,18,19 138:18 143:15 143:21 144:20 146:16 148:25 151:15 155:21 156:15,17 158:7,9,17 161:21 162:20 165:2 166:14 168:25 169:12 172:4 173:7,16 174:8 177:8 179:16,22 180:22 181:7 183:17,22 189:4 192:17 192:20 193:4 194:4 195:11
doctor's 155:23 158:2,5 185:18
doctors 140:7 150:7 185:17
document 135:15 136:9 136:17,18,21 136:24,25 137:25 139:1,6 140:16 144:1 146:15 148:2 149:13 150:1 152:6 156:2 173:22 174:11 174:12 177:9 177:24 178:17
documentation 167:22,23 168:3
documented 168:4
documents 126:5 144:4 157:12 170:10 170:13
doing 134:24 151:6 176:2
dollar 190:20
don 123:3
doubt 163:6,18 163:20
dr 122:6 123:9 123:14 135:22 136:3,8 138:16 138:18 140:13 140:13,20 142:16 148:16 148:19 149:15 150:15,17 156:24 162:6 172:3,4,7 175:16 177:17 177:19,21 178:2,4,15,25 179:1,5,9 180:20 184:14 184:20,21,24 185:14 189:4,4 198:2
drink 182:20
drs 185:11
duly 125:2 197:11
dumb 142:17

e

e 123:1,1 124:1 124:9 139:19 139:21,22,22 139:24 140:5,6 140:6 185:19 196:2,2,2 197:3
earlier 125:17 130:21 136:3 145:25 148:9 150:2 154:2 155:7 159:21 161:8 173:24 178:7 182:4
easy 152:16
eat 142:10
eating 142:11
effect 194:22
egd 158:15
ehr 168:12 170:2
eight 156:6
either 148:20 167:17
electric 164:20
electronic 164:17 168:13 169:14
electronics 164:23
employed 178:5 197:14
enc 155:16
encounter 184:6
endoscopic 168:4
endoscopies 130:25 133:6 148:12 149:23

150:11,23 151:14 152:4 154:25 158:18 158:24 161:5 171:2,22 173:25 174:19
endoscopy 131:2 133:9,14 133:18 134:5 137:20 138:20 149:5 151:1,5 152:1 153:9 159:4,10 162:18 163:1 168:10 171:15 171:16,19
enlarged 159:8 181:9,10,12
enlargement 181:11
ensure 180:18 182:16,18
enter 167:11 168:1
entered 167:12
entire 163:21 164:15 190:12
entitled 122:11
envelope 170:15,16
epic 141:13,20
epigastrium 153:25 154:7 161:10
equal 188:17 188:18
er 137:5,6,8
errata 198:1
escape 133:8
esophageal 154:3
esophagitis 159:2
esophagus 159:2 163:16
esophogeal 171:11
esq 123:3,7,12
essentially 161:3
esurgical 155:17
et 122:6 198:2
evaluation 161:25
evil 141:18
exact 148:6
exactly 170:3
exam 163:21 164:15
examination 125:4 144:18 164:11 168:4 168:23 170:25 175:9 180:16 183:20 193:2
examined 163:16 177:22
example 130:6 156:4 157:8 188:21
exhibit 124:10 126:9 128:8 133:20 135:17 135:19 148:24 148:25 151:16 173:14,17 174:6,9 177:3 179:12,20,23 193:5,18
exhibits 124:21 126:8 156:21 195:12
expect 142:16 143:7
expedited 188:23 195:17
experience 153:9 186:3
expires 198:25
explain 182:5
explanatory 159:25
exploratory 131:24 165:24 166:3
eye 160:11
eyes 160:18

f

f 197:3
face 142:3
fact 129:6 132:24 134:2
fair 194:12
fairly 131:19
familiar 177:14 177:16
far 178:15 189:12
fares 135:22 136:3,6,8 140:13 148:16
fashion 153:16
fax 140:17 144:4,11
faxes 144:15
federal 141:1 143:23 186:4 187:6 188:9 191:4,5,5,8,17
fee 190:24
feeding 170:22 170:23
feel 132:8 181:1
fiber 175:14 176:7,8
file 134:7,16 139:7 149:5
files 139:11 169:3
fill 147:15
filled 146:5,10 147:1
filling 147:13 148:7
final 159:24 160:1

find 147:23 164:2
findings 163:11 163:14,15
fine 183:25
firm 122:14 123:7
first 126:13 131:15 132:13 136:4,13 137:7 148:10 149:1,4 150:2 157:1 185:16 193:6
fistula 171:12 171:15
fistulas 172:14
five 142:5,19 183:12
focus 137:3 158:18
follow 126:19 127:9 134:23 134:25 136:7 169:9 185:24 186:2 189:16 192:19 193:1
followed 186:1
follows 125:3
forceps 163:24
foregoing 197:10,12
forget 142:17 143:11,13 152:14,15 189:5
form 141:20 146:23 147:11 161:3 167:20 171:17 182:7
formal 134:20
formally 191:14
forms 133:12
fort 135:20 150:23 186:13 186:24 187:3,6 187:10,13,16 187:22,24 188:9 191:24 191:25 192:6 192:11,13
foster 123:14 184:25 185:12
four 136:25
frame 188:7
francis 145:11 150:20,21 152:22 156:4 159:16 162:14 162:19 187:8 187:11,14,15
franklin 122:15 123:8
front 151:11 152:18 166:22 168:21,22 169:22,23
full 137:4
functioning 189:2
further 176:23 197:14

g

g 196:2
gallo 122:12 197:8,19
gastric 151:8 159:1,1 160:4 160:13 164:6 171:10,10
gastritis 159:1
gastroenterol... 150:12 186:18
gastroenterol... 132:18 161:20
gastroesopha... 153:25
gastroscopy 158:15
general 129:25 146:17 195:3,4
generally 138:25 139:25
generated 140:18 166:16 167:20
gerd 154:1,3 159:21,22 160:3
gi 137:16,20 138:4 163:1 175:2,6 180:15 181:15 188:10
give 126:9 153:14 161:16
given 129:19 152:3 153:8 179:3 188:15 188:18 196:12
giving 154:18
go 136:24 143:20 149:12 151:15 155:19 156:9 159:15 159:15 166:17 179:8 186:10 189:11,13 195:1
god 131:14
goes 141:16
going 133:24 135:14 140:16 142:24 143:12 161:2 173:11 194:2,3
good 125:6 141:10 143:16 183:22,23
gotten 193:21
government 191:9
great 156:23
guard 170:16
guards 170:10 170:10,18,20 170:24
guess 140:2,4,5 150:12 154:17 164:17 170:11 182:11,12

guns 170:21
guy 141:21

h

h 124:9
hamilton 124:18 177:2 177:12 178:14
hand 149:17 153:20 158:10
handed 135:18 170:16
handing 173:16 179:22
handwriting 138:9,11 146:19 147:1 152:8,8,9,15,16 153:20 154:14 162:1,7 173:21 174:11,22 175:5 180:3,6 180:7,13
happen 172:5,6
happened 139:4
happens 169:6
hard 134:16
health 124:14 124:16,19 136:15 149:6 168:13 169:15 172:15 173:13 173:18 174:5 174:10 179:19 179:24
healthcare 141:2,3 150:7
hear 125:8 183:24
heard 140:20 141:13
held 122:14
helicobacter 163:24
helps 176:8
high 170:19
hindu 141:13
hipaa 140:4
history 126:23 126:25 129:1,2 130:22 154:21 156:5 157:22 157:24 175:6 180:14
hit 191:19
home 170:12
honest 142:22 143:15
hope 170:12
hospital 137:9 145:11 151:24 164:25 168:19
hospitalizatio... 127:1,5,12
hospitalized 137:8
human 143:9
hundred 127:23

i

idea 189:3
identification 135:17 146:14 148:24 173:15 174:7 177:4 179:21
identified 126:12
identify 138:4 146:20 155:11 155:13
identifying 156:15
ignorant 142:17
ii 122:6
illness 154:22
illnesses 130:15
imodium 133:22 137:18
impression 163:22 176:18
improve 134:2
include 126:25 127:4 171:12
independent 125:21 137:25 169:19
independently 154:12
india 145:24
indicated 197:12
indication 163:2
indirect 165:22
individual 144:21
infection 160:10 164:1 164:10
inflammation 154:4 160:13 160:16 161:7 161:11,12,19
information 128:21 129:22 167:11 168:1 168:21 170:1,4 193:22
inhibitors 161:17
inmate 128:3 136:20 185:13 187:18
inmates 186:13 188:1 191:20 192:12
innamorato 123:3 124:4 125:5 136:1 140:15 143:20 144:19 146:11 148:22 149:9 155:15 156:1 156:22 157:18 157:24 161:24 162:13,17

166:10,12 168:24 169:8 171:1 173:12 174:3,13 177:1 178:13 179:18 183:17 184:1,7 192:18,19 195:14,17
**inner** 131:9
**inside** 131:7 164:11 171:21
**instances** 189:19
**institution** 186:5,20,23 188:15
**institutional** 186:4
**institutions** 188:10,18
**insurance** 190:22
**intelligence** 167:2
**interacted** 138:22 144:21 174:1
**interim** 137:13 137:16
**intermediary** 141:4 144:24 147:17 150:16 178:7
**intermittent** 137:21 193:24
194:1,5
**internal** 124:13 148:23 149:1 189:2
**internally** 131:2
**interview** 142:5
**intestine** 133:17
**intestines** 176:11
**intravenous** 153:15
**invoice** 190:21
**involved** 130:5
**involvement** 148:14
**iv** 153:5,6

**j**

**jersey** 122:1,13 122:16 123:8 123:12,13 156:5 186:7 187:9 197:9
**job** 122:24
**johnson** 137:9
**joshua** 122:3 126:14 135:21 149:5 155:16 198:2
**jr** 123:7
**july** 122:16 196:7
**jungles** 141:17

**k**

**k** 196:2
**keep** 134:18 168:25
**killed** 141:22 173:9
**kills** 141:18
**kim** 187:24
**kind** 134:16 136:21
**king** 141:18
**kingdom** 173:9
**know** 125:23 130:25 131:23 138:11,17 142:20 143:8 146:6 147:14 148:2,16,18,20 150:10 151:4 153:3,22 154:25 155:20 155:24 156:24 156:25 157:3,6 166:20 167:1,8 169:6 172:9 175:5 177:17 177:21,23 178:10,15,24 182:3,14,18 185:5,21,23 188:24 189:2 190:24,25 191:7,10 192:14
**knowledge** 169:19,21 172:8 192:22 193:25
**known** 130:12

**l**

**l** 185:19 196:2
**lactose** 180:19 182:25
**lady** 172:4 189:4
**lanka** 141:18 141:19
**lansoprazole** 161:17
**late** 180:9
**law** 122:14,14 123:7
**lawrenceville** 122:15 123:8
**lawyer** 143:9
**layer** 171:18
**leading** 129:3
**leads** 164:2
**learn** 166:8
**learned** 133:2
**left** 149:17 153:4,20 165:20
**legal** 149:7
**lenox** 122:14 123:7
**leslie** 160:22
**leukemia** 181:10

**lexington** 123:3
**life** 172:20,22 172:23,25 173:2,3
**lifecare** 124:17 177:2,11 178:2 178:5,13
**likely** 162:5 194:15
**line** 158:3 180:24 198:5
**lining** 131:9 160:16
**list** 158:13
**listed** 149:20 158:13 159:17 160:4
**litigation** 149:3
**little** 141:11 169:1
**liver** 133:17 159:7 180:17 181:5,5,9,11,12 181:13
**living** 141:17
**llc** 198:1
**llp** 123:2
**lma** 124:17 177:2,11 178:2 178:13,15
**located** 145:20
**logistics** 191:7
**long** 173:10 180:16
**longer** 173:25
**look** 131:1,5,7 146:22 147:24 149:16 152:7 152:10,13,19 153:18 158:20 164:11 171:20 183:14
**looking** 128:21 135:2 137:12 147:11 156:24 163:11
**looks** 144:4 161:2 164:12 164:13
**lord** 141:14,16 159:13
**losberd** 162:6
**loss** 175:8
**lost** 180:15 181:16
**louis** 135:22 136:5,6
**low** 180:19
**lower** 150:25
**lumen** 131:1,6 131:7
**lumps** 181:1
**lymph** 159:8

**m**

**m** 196:2
**m.d.** 122:5 124:3 125:1 160:22 197:11
**made** 128:1,9 139:2 187:17 187:21 190:1,2 194:19
**mail** 139:19,21 139:22,22,24 140:5,6,6
**mailloux** 123:12 124:4 135:25 136:2 143:18,21,22 143:25 144:8 144:11,14,17 149:8 155:13 155:18 156:3 156:20,23 157:20 158:1 161:22 162:16 166:10,13,17 166:20 167:9 167:15,25 168:6,8,12 169:10,18,24 170:6,8,13 177:5 178:11 180:21 181:2 183:18,21 191:14 195:12 195:19
**maintain** 169:4
**maintained** 188:12
**make** 128:1,5 128:12 136:24 146:11 163:8
164:9 171:25 173:12 185:24 187:22
**management** 140:25
**mark** 135:14 148:22 174:3
**marked** 135:17 146:13 148:24 149:11 151:16 173:14,16 174:6 177:3 179:20 193:4
**marking** 148:25 174:8 179:23
**masses** 175:10 180:17,25 181:2
**matt** 136:1 143:21 155:17 156:1 157:18 162:13 169:8
**matter** 122:11 149:7
**matthew** 123:12
**matthew's** 174:13
**md** 162:20
**meals** 137:23
**mean** 125:18 133:1 135:11 136:19 151:17 165:12 178:8

**meaning** 181:8
**meant** 153:23
**mechanic** 160:22
**medical** 134:7 134:9 152:22 156:4 157:11 159:16 162:14 162:19 170:13 187:8
**medicare** 190:25
**medication** 132:13,14,15 182:1,6,16
**medications** 134:3 153:8 176:12
**medicine** 129:25 132:17 194:21,22 195:5
**meet** 154:8,11
**meeting** 126:13 127:18 154:12
**memo** 136:13
**memorize** 152:12
**mention** 155:9 182:10 193:19 194:9
**mentioned** 132:6 136:3 143:17 190:5 193:13
**mentioning** 145:25
**met** 125:12 126:4,17 175:18
**michael** 123:7
**michelle** 122:12 197:8,19
**middle** 163:14
**midline** 175:9 180:17
**miles** 189:13
**milligrams** 153:13 175:14 175:15
**mind** 140:16 155:2
**mine** 138:14 156:18
**minute** 142:5,5 183:12
**modern** 167:1
**moment** 135:14 139:5
**money** 170:24 191:8
**month** 148:6 189:10,14
**morning** 142:2 142:10
**moses** 122:3 126:14,17 127:9,14,19 128:10,16 129:15 130:22
131:15 132:4 132:19,24 133:3,19 134:24 135:21 136:8 137:7 138:1,22 140:13 142:2 143:4 148:10 148:14,17 149:5,24 150:3 150:4,7,11 151:1,10 152:4 153:8 154:5,13 154:15 155:16 161:5 165:7,24 167:10,25 169:14 172:11 174:1,16 175:18 176:16 176:24 177:18 177:22 178:20 179:5 180:9 182:1 184:6,15 184:20 185:3,9 185:21 187:5 189:16,21 190:2,6,13 198:2
**move** 142:3 173:11
**mri** 159:5,10 171:20
**mris** 129:15 131:4 132:3 171:23
**mucosa** 160:13
**mucosal** 171:18
**multiple** 129:2
**multivitamins** 180:19 182:22

**n**

**n** 123:1 124:1 196:2,2 197:3
**naked** 160:18 164:10
**name** 136:5 145:14 147:21 154:15 155:23 158:2 185:16 185:18 187:25 188:1 189:5,5 198:2,3
**names** 178:12
**napheare** 140:19,21,22 140:23 141:8 143:17 144:20 145:3,7,8,25 147:17 178:8,9 179:8 190:16 190:18,19,21 190:23 191:1,3 191:6,7,9,18,19 192:2,4,6,8,10 192:11
**narcotic** 176:13
**narcotics** 182:5
**nature** 129:5 190:24

**nausea** 137:23
**necessarily** 130:17 135:10 136:17 172:21
**necessary** 128:22,24,25
**need** 146:16 183:14 188:21 188:22 195:15
**needed** 134:20
**needs** 151:25 152:1 171:20 176:18
**never** 131:13 140:6 144:23
**new** 122:1,13 122:15 123:4,4 123:8,12,13 126:19 137:22 156:4 186:7 187:8 197:9 198:1
**newark** 123:13
**nicoletta** 123:14 184:24 189:5
**nj6027534** 122:24
**nodes** 159:8
**normal** 127:7 153:14 155:1,3 155:5 158:15 158:15,16 163:16,21 164:12,13,16
166:4 171:4 175:11
**normally** 146:22 154:8 161:15,16
**notary** 122:13 125:2 196:22 197:9 198:25
**note** 132:10 135:3 139:3 149:3 151:17 163:8 194:4,9
**noted** 181:14 195:22
**notes** 122:10 124:18 126:10 126:11,13,13 128:6,7,8 132:20,21 133:19 139:2 151:15 166:13 166:18,21 168:6,8,9,16,18 169:12,17,20 169:22 172:8 175:20,22 177:3 182:9 183:14 190:6 190:10 194:17 195:2 197:13
**november** 133:5 148:12 151:1 154:6 158:24 165:7 167:10 171:3
173:25
**number** 140:17 144:2,3,6,9,12 144:14 146:15 155:19
**nurse** 157:8,10 157:13,21
**nurse's** 157:3

**o**

**o** 196:2 197:3
**oath** 142:21 196:7
**objection** 182:7
**obstruction** 129:2
**obstructions** 171:13 172:14 173:1
**obviously** 179:14
**occasional** 175:8
**occasionally** 185:14
**occasions** 184:6 184:23
**october** 194:8
**offhand** 145:17 183:2
**office** 123:11 134:18 143:22 145:21,22,24 151:22,22 187:24,24
**office's** 144:11
**offices** 122:14
**oh** 175:4
**okay** 125:21,25 128:23 129:25 131:22 132:3 133:6 134:6 135:7,10 138:15,19,25 141:7 142:7 143:4 151:20 152:3 154:21 155:6 160:12 163:11,21 164:17 165:5 169:3,7 175:22 177:18 179:2 182:13 183:24
**omeprazole** 133:25 137:18 161:17
**once** 189:10,14
**one's** 152:16
**open** 171:20
**opening** 151:25
**operating** 167:15
**operation** 158:11
**opiate** 176:13 194:21,22 195:5
**opinion** 128:18
**opportunity** 149:13 152:17

192:12
**opposed** 179:10
**oral** 126:23,25
**orally** 154:18
**order** 128:22
**orders** 152:24 156:8
**organization** 178:5
**organizations** 178:12
**organs** 129:12
**original** 165:20
**originally** 165:13
**ortiz** 123:15 185:4
**outlines** 131:9
**outpatient** 149:4
**outside** 131:6 145:23
**overall** 134:21 137:21 165:2
**own** 140:2,3 145:12,13 152:16 156:16 188:12

**p**

**p** 123:1,1 185:19
**p.m.** 122:17 195:22
**page** 124:10 136:14,15 137:4 144:1 149:1,4,15 152:6,21 153:18 155:10 155:12,14,15 155:20 156:10 156:10,25 158:9,10 159:15 161:1,1 161:8,21,23 162:12,13,18 163:14 165:3,4 198:5
**pages** 136:25 141:19 146:15 155:19 156:2,6 156:7 157:21 159:14
**paid** 145:7
**pain** 129:6,12 129:24 137:21 137:22 153:24 154:6,7 161:10 161:12 165:9 165:11 166:7 175:7,23,24 176:1,10,13,16 181:16,18,20 181:21,23,24 182:1,6,10,11 182:16,22,25 183:4 193:9,19 193:20 194:3,5 194:6,9,13,21 194:22 195:5
**painful** 172:17 172:21 173:4,5
**palpable** 175:10 180:17 180:18,25 181:2,6,8
**pancreas** 133:16 159:8
**paper** 129:23 147:22 170:14
**papers** 145:18 146:5 151:21 157:15
**paragraph** 137:4,12,15 138:6,19
**paragraphs** 137:11
**paralyzed** 170:22
**pardon** 139:20 146:21 163:13 166:19 187:12 187:20 188:4
**part** 160:8 191:8
**particular** 127:14 130:15 135:3 136:23 137:25 138:15 139:1 144:21 158:19 189:6
**party** 197:15
**past** 128:2 129:2 130:2
**patel** 172:4 185:14,19 189:4
**pathologist** 160:21,23
**pathologists** 160:15
**pathology** 151:8,9 155:17 159:16 160:10
**patient** 126:23 127:1 129:1 134:21 135:21 142:6 151:25 151:25 154:11 166:4 167:13 170:4,9,23 189:6,9 193:6 193:8,11,17,19 193:23 194:8 194:12,19,24 195:3,4,4,5
**patients** 126:19 128:3 134:17 136:19,20,20 139:14 148:8 150:19 154:8 178:25 179:1 181:12 184:22 185:13 186:7 187:1,4 192:24
**pattanite** 123:7 124:5 126:2 140:15 149:11 155:11,24

156:9,14 167:5 177:7 182:7 192:15,25 193:3 195:10 195:20
**pattern** 137:21
**pay** 190:19,23
**pee** 142:3
**people** 161:10 181:10 188:17
**peptic** 163:2,7 163:10
**perceive** 160:11
**percent** 130:16 142:23 190:11
**perforation** 172:22
**perform** 150:11 150:25 187:7
**performed** 148:11 151:5 165:7 169:13 187:15
**performing** 149:24 150:22 151:4 171:2
**period** 148:14
**person** 141:24 142:17,18 145:14 157:14 157:15 164:9 188:21
**personally** 177:17 184:14
**pertinent** 128:16
**philosophy** 182:5
**phone** 140:12 142:15,18 144:1,3 150:8 150:18 172:2
**physical** 156:5 157:23,25
**physically** 186:8 187:3
**physician** 142:16,17 149:17,21 152:25 158:3 159:18 191:2 192:23
**physicians** 124:17 139:16 177:2,11 178:13 192:1
**picked** 133:13
**pinning** 138:25
**pit** 161:11
**place** 146:18
**plaintiff** 122:4 123:5 126:14
**po** 175:14,14
**poem** 161:2
**poetic** 141:20
**poetry** 141:13 141:24
**point** 131:5 132:23 133:2 135:12 151:7 176:4
**policy** 191:5
**polyps** 159:2 165:16,18 171:9
**possibility** 132:19 136:22
**possible** 130:13 136:11 143:4 182:14
**post** 137:17 152:23
**postop** 158:14 159:22,25
**practice** 130:2 132:17 145:13 145:16 157:11 164:21,22 177:14 178:4 188:12 194:16
**practicing** 192:23
**pre** 149:11 161:24
**preop** 159:20 159:25
**preparation** 151:14
**prepare** 134:20
**prepared** 135:22 152:11 160:19
**preparing** 166:18,21
**preprinted** 167:3,4
**prescribe** 133:20 176:15 181:25 195:3,5
**prescribed** 176:20
**prescription** 134:2
**present** 152:5 154:22
**presented** 129:20
**presenting** 177:8
**pretty** 156:14 188:3,5,6,8
**previously** 158:4 169:18 194:25
**print** 166:25 167:19
**printed** 167:20
**prints** 165:1
**prior** 150:1 175:10 179:12 183:6
**priority** 188:15 188:18
**prison** 139:16 139:23 140:7 140:25 145:5 147:19 150:12 151:21,22,23 166:5 170:5,9

170:10,11,12 170:14 185:17 187:6 188:9 190:6 191:4,4 191:5
**prison's** 191:5
**prisoner** 170:17
**prisoners** 141:1 145:5 170:17 191:10
**prisons** 123:15 124:14,16,19 136:15 141:5 144:25 146:2 147:18 169:25 173:13,17 174:5,10 178:3 179:19,24 185:7,8,22 186:6,7,9,11,16 186:18 188:8 188:20 191:12 191:17,23
**privacy** 140:2 147:25
**private** 145:13
**prn** 137:19 175:15
**probably** 143:11,16 146:3 152:20 162:4 195:7
**problem** 139:12
**procedure** 127:7 134:11 157:14 158:11 162:23 163:1 166:7 167:10 167:13,21 168:1,2 169:13 187:7
**procedures** 126:18 145:7 150:19 165:6 166:4 187:16 190:24
**proceedings** 122:11
**processed** 192:7
**professionals** 157:12
**program** 168:13
**progress** 135:3 139:2,3
**proton** 161:17
**provide** 186:6 188:10
**provided** 169:25 185:25 192:2,12
**provides** 191:8
**providing** 186:3,12,13
**public** 122:13 125:2 196:22 197:9 198:25
**pump** 161:17
**purports** 135:18,19 136:7 173:17 174:9 179:23
**purposes** 149:23
**put** 166:18,21 170:15
**pylori** 163:24

**q**

**question** 125:9 126:16 127:21 129:25 143:12 143:19 152:21 165:17 166:11 180:21 189:1 190:4
**questions** 126:7 126:16 127:23 142:8 146:17 146:17 147:2,4 152:11 183:19 184:1,3,5 192:16 195:11
**quick** 143:18 166:11 180:21
**quickly** 173:11
**quite** 189:12
**quote** 162:6,10

**r**

**r** 123:1 197:3
**rajiv** 177:17,21 185:11
**ram** 141:18
**rama** 141:13,14 141:16,16 159:13,13 173:8
**ramayana** 142:2
**random** 189:11
**randomly** 189:13
**rare** 130:13 184:23
**rather** 145:21
**ravana** 141:18
**ravi** 122:6 123:14 138:16 198:2
**rays** 128:23 132:4
**reached** 189:19
**read** 137:15 138:5,20 152:16 153:22 163:4,5 174:21 174:25 175:4 180:12 196:6
**reading** 163:9
**really** 125:15 126:6 131:23 133:10 142:9 148:13 160:17
**reason** 128:12 151:20 152:3 163:6,18 166:2 176:15 181:25

183:15 198:5
**reasons** 147:25
**recall** 125:16 126:19 127:11 127:13 129:14 129:16 132:23 134:1,24 136:23 139:6 143:6,7 146:3 147:5,10 149:24 150:14 151:10,13 154:12 158:21 163:2,5 166:6 172:10 175:17 176:23,25 179:2
**receive** 145:2
**received** 135:16 144:15 146:13 148:23 173:14 174:6 177:3 179:20
**recent** 127:4
**recognize** 144:3,8 152:24 162:1 173:21 180:3
**recollect** 128:14,17 136:10,12 137:2,10 139:5 140:14 142:4,9 142:9,11,12,14 142:15 143:14 145:4,9,17 146:7 148:6 150:9 152:5 166:1 168:7 171:24 174:2 176:3 177:20 179:6 184:16 184:19 185:10 189:18,23 192:4
**recollection** 143:3 175:18 180:8 190:7 192:8
**recommend** 132:8 137:19 138:20,23 165:24 166:3 171:22 175:13 180:18
**recommendat...** 128:6,9,11,13 139:2 171:25 175:1
**recommendat...** 128:2 179:11 180:23 185:20 185:22,25 189:15 190:1
**recommended** 129:15 132:3 132:10 176:4
**recommending** 127:19 179:9
**record** 154:16 162:16 169:15 178:11,19 180:12 196:9 196:12
**recording** 157:13
**recordkeeping** 140:3
**records** 124:13 134:7,10,18,20 148:23 149:2,5 168:13
**recovered** 157:14
**recross** 124:2
**redactions** 147:24
**redirect** 124:2
**reed** 123:2
**refer** 178:24 179:1,14
**referral** 179:9 179:13
**referred** 179:4 187:1
**reflected** 132:5 169:14 170:2 172:7
**reflux** 153:25
**refresh** 175:17 180:8
**regard** 126:19 130:14 131:15 144:20 158:9 158:17 165:3,6 165:25 172:10
**regarding** 128:2 140:13 150:7 171:7
**related** 140:4 197:15
**relationship** 140:19 160:3
**relief** 176:13
**reliever** 176:16
**relieves** 176:10
**relieving** 182:22,25
**remember** 125:22 127:22 127:25 134:25 140:12 142:18 142:22 145:14 146:8 147:8,13 147:16 148:7 166:9 175:25 176:2 181:17 184:10 185:2 185:16 190:13 192:9
**remembering** 133:7
**remote** 145:22
**remotely** 168:19
**rephrase** 129:18
**report** 136:7 138:15 148:13

155:17 158:10 159:17 168:10 168:11 193:5
**reported** 193:12
**reporter** 122:13 195:15 197:9
**reporting** 198:1
**represent** 153:7 181:7
**representing** 123:5,9,14 149:6
**represents** 174:22
**request** 124:13 124:15,16,19 128:5 134:22 136:16 148:23 149:2 173:14 173:18 174:6 179:20,25 187:17 191:15
**requested** 149:5 189:20
**requests** 174:11
**resection** 130:5 130:16,23 180:14
**resections** 130:1
**resolve** 161:14 161:16
**respect** 143:25 167:9 169:13 169:24 185:20 185:22 189:16 189:21 190:2 190:13
**response** 155:4
**results** 171:4
**reveal** 159:5
**review** 149:13 152:17
**reviewed** 125:13 126:4
**right** 125:25 126:11,15 127:16,17 129:4,7,13 130:7,14 131:3 131:13,25 132:2,11 133:16,21 135:7,13,24 137:6 138:10 140:4 141:9,15 142:22 143:2,7 144:3 145:1,24 148:21 149:19 149:25 153:21 154:17,20,21 154:24 156:11 156:19 157:17 157:25 158:10 158:12,22 159:19,22,23 160:6,23 161:4 161:4,6 162:4 163:6 167:20 168:17,21 171:4 172:13 172:18,25 173:6,11 174:3 174:8,20 175:3 175:25 176:22 176:23 179:16 180:12 182:16 182:17,19,23 183:2,11 186:14 187:2 187:15 189:7 189:10 193:7 194:10,20
**road** 122:15 123:8
**robert** 137:8
**room** 123:13 157:2 167:15
**rule** 127:20 129:20 131:18 132:14 151:7,8 160:9 165:8,10 165:14,15,18 171:6
**rules** 125:8
**ruling** 131:17 158:23 165:12

**s**

**s** 123:1 124:9 198:5
**saline** 153:14
**saw** 128:16 136:11 137:7 148:10 154:5 155:7 161:7 168:4 180:11 187:10,13 190:6 193:17 194:8
**saying** 164:5 165:14 182:13
**says** 137:5 138:20 144:4 149:1,3 152:23 152:25 153:5 153:24 154:14 154:22 155:16 175:24
**scale** 176:1
**scan** 127:20 128:10,11 131:8 132:6 159:5,7,9 171:20
**scans** 131:4 132:3 133:15 171:23
**scar** 175:10 180:17
**schedule** 188:3 188:5 189:8

**scheduled** 151:21 152:1 188:2 189:14
**scheduler** 151:23 187:23
**scheduling** 152:2 187:23 189:3
**scope** 133:11
**screen** 166:23
**screening** 153:24 154:23 155:1,3,5
**second** 136:14 137:4 143:25 149:15 152:14 152:15
**secretary** 151:22 187:24
**section** 149:3 153:4 181:14
**security** 170:16 170:18,20
**sedated** 154:10
**sedation** 162:16
**sedative** 153:16
**see** 128:8 134:4 134:5 135:11 135:23 137:13 138:9 144:6 145:5 146:18 146:22 149:7 149:18 151:11 153:5,19 155:15 157:19 158:10,11 159:17 160:11 163:12 164:12 169:22 174:11 174:12,16 175:2 179:12 182:9 187:4,5 188:21,22 189:6,9 194:11
**seeing** 136:23 148:8 191:19 191:20 192:9 192:23
**seems** 146:24
**seen** 130:1 136:8,16,22 137:16 158:4 171:14,15,19 175:20 177:24 178:17 188:2
**selected** 150:10
**self** 159:25
**send** 126:3 145:6,6
**sending** 192:5
**sent** 137:5,6 145:18 166:4 170:6,7 192:6 192:7
**sentences** 141:23
**separate** 190:15
**serious** 132:13 172:15
**services** 124:14 124:16,19 136:16 145:6 173:13,18 174:5,10 179:19,24
**session** 125:14 127:14 131:16 189:25
**setting** 144:5 186:4
**severe** 161:12 181:20,21,23 181:24
**sfmc** 149:6
**shah** 177:17,19 177:21 178:2,4 178:15,25 179:1,5
**share** 177:18
**sheet** 198:1
**short** 137:18 156:5 157:22 157:24 173:9 174:23 175:6 175:13 180:14 181:14,18 183:16
**show** 147:9 148:13 164:10 193:4 194:2
**showed** 171:4
**shown** 144:1 166:14
**shree** 141:18
**sign** 147:7 157:12
**signature** 146:19 152:24 153:3 156:7,12 156:16,16,25 157:1,3,21 158:3,5,7,8 162:8,10 164:18,20 175:16 180:4 197:18
**signatures** 146:25 152:25 155:20,22,25 157:19
**signed** 146:1,3 147:6,11 148:4 157:10 196:18
**significant** 175:23
**signing** 146:8 147:8
**signs** 157:15
**similar** 194:6
**simple** 141:21 141:25 142:1
**single** 142:5
**sir** 125:7 127:25 143:24 144:7 149:22 150:21 152:9

153:3 156:18 158:8 162:22 162:25 163:15 164:19 166:16 167:13,21 168:7 171:5,19 173:5,20 174:12,15,17 176:14 177:10 177:13 180:2,5 183:23 184:16 186:10 188:11 192:8
**sit** 166:22
**situated** 168:19
**situation** 184:13 189:3
**six** 170:19,20 170:23 188:8
**skip** 137:11
**slight** 160:12 160:16 161:7
**small** 133:17 167:16,21
**smfc** 155:16
**smith** 123:2
**sodium** 153:12
**soft** 175:9 180:16
**softener** 176:6
**sood** 122:6 123:14 138:16 138:16,18 140:13 142:16 148:19 150:15 150:17 172:3 175:16 179:9 180:20 184:14 184:20,21 185:12 189:4 198:2
**sood's** 172:7
**soon** 187:21
**sooner** 188:21
**sorry** 178:22 185:7 188:25 192:21
**sort** 134:12 147:11
**sounds** 160:19 167:23 175:11
**spasm** 176:10
**speak** 184:21 184:24 185:4 185:12,14
**speaking** 138:25 168:14 184:7
**special** 170:20 170:21
**spell** 178:12
**spend** 192:23
**spleen** 180:17 181:5,5,10,12 181:13
**spoke** 184:19 185:2,7,9
**spoken** 184:14 185:1
**st** 145:11 150:20,21 152:22 156:4 159:16 162:14 162:19 187:8 187:11,14,15
**staff** 157:8 186:15,17,19
**stamp** 154:15
**standard** 190:24
**started** 148:7
**state** 122:13 186:6,7,7,9,11 186:15,18 188:8 197:9
**statements** 159:22
**states** 122:1 123:11,15 193:20
**stationed** 186:8
**stay** 156:5 157:22,24
**stenographic** 122:10 197:13
**stole** 141:22 173:9
**stoma** 160:2
**stomach** 131:9 160:8 161:11 161:18 163:21 164:1,2,4,11,16
**stool** 176:6
**stools** 175:11
**stop** 125:9
**stopped** 191:19 191:19
**story** 141:11,14 141:20,25 142:1,4 159:13 159:14 173:10 173:10
**street** 123:13
**stronger** 176:16
**subcontracted** 191:6
**subjective** 176:1
**subscribed** 196:18 198:22
**subspecialists** 192:2
**successful** 132:14,16
**supplement** 182:18
**supportive** 129:8 135:4
**supposed** 126:1 182:12
**sure** 136:24 137:1 141:12 164:9 166:12 185:24
**surgeon** 178:4
**surgeries** 129:3

**surgery** 131:24 137:17 165:24 166:3 175:10
**surgical** 124:11 135:16,20 159:16
**suspected** 127:15 163:2,9 165:13
**suspicion** 129:23 131:21 163:7 165:21
**sworn** 125:2 197:11 198:22
**symbol** 156:16 158:4
**symptomatol...** 155:4
**symptoms** 129:5 134:1 137:22 161:8 180:15 181:15
**syndrome** 137:18 175:7 180:15 181:15 181:18
**system** 139:17 139:23 140:2,3 140:25 145:5 150:13 165:1,1 166:5 167:18 169:5 170:5,11 170:12 190:25 191:4

**t**

**t** 124:9 185:19 196:2 197:3,3
**table** 154:9
**tablespoons** 175:14
**tablet** 180:19
**take** 146:16 147:2 149:12 152:7,10 170:12 183:11 191:9 195:17 195:19,20
**taken** 122:11 163:23 183:16 196:7
**takes** 140:24 141:1
**talk** 125:10 187:25
**talked** 134:7 146:1
**talking** 156:1 158:19 178:7
**tapes** 168:25 169:1
**tastes** 131:12 131:13
**tax** 170:24
**teaching** 161:19
**team** 156:11
**technician** 162:4
**telemed** 186:10
**telephone** 140:9,10
**tell** 132:20,21 141:11 142:24 153:11 155:2 157:4 162:7,8 162:11 175:22
**telling** 127:11
**temporal** 179:3
**ten** 155:1
**term** 140:20
**terms** 139:13 145:10 194:21
**test** 129:19,20 160:7 165:17
**testified** 125:2 169:19
**testimony** 125:13,17,18 125:20 126:20 130:21 131:18 133:8 136:4 146:4 173:24 196:7
**testing** 163:24 164:13
**tests** 131:4 132:9,16 158:20 171:3
**text** 168:14
**thank** 125:7 131:14 136:2 144:17 156:20 183:17,19,25 192:19
**thanks** 156:23 175:16 180:20 195:11
**thing** 133:6 142:23 145:4 169:16 183:15 184:4 194:5
**things** 132:11 135:1 143:11 158:21,25 159:3 166:23 166:24 167:2,3 167:4 172:13 189:20 192:22
**think** 126:12,22 128:22 129:10 129:23 130:4 130:21 131:22 134:4 135:1,3 140:24,25 146:2 147:19 148:5,9,12 149:2 162:6 167:5 173:6,24 176:18 181:22 182:4 183:3,12 184:17 188:17 191:6,8 192:15 195:1
**threatening** 172:20,22,23 172:25 173:2,3
**three** 157:21 180:23 184:6

190:5
**thursday** 122:16
**tighten** 129:11
**tightens** 129:11
**time** 125:12 126:8,17,18 127:18 132:12 133:2 135:2 139:17,18 141:10 143:11 143:16 145:11 146:16 148:10 148:11 149:12 150:1,13 151:1 151:10 154:5 167:12 170:24 172:4,4 175:23 176:17 179:15 180:11 182:2 183:18 184:8,9 184:11,11 185:1,1 188:7 192:11,16,23 195:1,22
**times** 126:25 142:24 172:5,6 181:5
**tired** 173:8
**tiring** 173:6
**titled** 152:22 159:16 177:11
**today** 125:8,16 161:20 179:1 184:8 189:25
195:21
**told** 130:4 132:11 135:1,4 142:14 182:4 183:3 184:19
**tolerated** 137:19
**tolerates** 137:23
**top** 135:20 140:17 144:2 152:23 153:19 154:16 155:11 155:14,15 161:22 162:13 162:19,20 175:4
**total** 142:4
**transcribe** 168:18
**transcriber** 168:18
**transcribers** 167:18 168:15
**transcript** 122:10 125:22 125:24 126:3 195:16 196:6,8
**transcription** 197:13
**transcripts** 156:21
**treat** 148:16 164:3 188:17
**treating** 180:9
**treatment** 139:14
**trenton** 156:4 187:8 189:12
**trinity** 149:6
**true** 196:9,13 197:12
**try** 125:10 132:13 133:24 140:18
**trying** 151:7 169:10
**tube** 170:23
**tubes** 170:22
**turn** 136:14 152:6,21 155:10 159:12 161:21 162:12 165:3
**turned** 159:13
**turner** 123:14 184:25 185:12
**twice** 180:18
**two** 137:11 141:23 157:11 157:20 170:18 175:14 178:12 180:23 191:18
**type** 135:25 136:17,18 145:2 166:23 166:25 167:6,7 167:8,19 168:16,17
176:12,16 182:1 194:3
**typed** 168:5,21
**types** 158:24
**typewritten** 166:14
**typically** 184:21

**u**

**u.s.** 143:22
**ugi** 138:20
**ulcer** 159:1 163:2,7,10 171:11,11
**ulcers** 159:2
**ultimately** 164:2
**ultrasound** 128:15,18,19 128:22 132:4
**ultrasounds** 131:5
**under** 142:21 196:7
**understand** 125:9 142:21 184:2 190:4
**understanding** 131:17 140:18 169:11
**understood** 142:13 184:3 191:25
**undertake** 128:10

**unfortunately** 184:4
**uniform** 170:21
**unit** 122:15 123:8 152:23
**united** 122:1 123:11,15
**universe** 190:12,14
**untreated** 172:24
**upper** 137:19 149:17 150:25 153:4,20 163:1
**use** 131:8 158:23 164:20 168:25 169:4 170:24 181:5
**used** 126:8 162:9 187:25 188:9 189:10
**using** 182:5
**usually** 140:9 150:17 154:11 160:9 161:13

**v**

**v** 198:2
**vantage** 131:5
**verbally** 139:18
**veritext** 198:1
**versus** 159:25
**viewed** 138:21
**visible** 133:11 160:18
**visit** 132:23 133:3,4 138:1 150:2 178:20 182:10 189:14
**visits** 176:23 190:5
**vol** 198:3
**volume** 122:6
**vomiting** 137:24 175:8
**vs** 122:5

**w**

**w** 196:2
**want** 125:9,16 136:24 137:3 141:11 153:18 174:25 175:4 183:13,17 189:6
**wanted** 138:8 179:7
**warden** 185:4
**wash** 142:3
**way** 131:23 132:12,17 140:1 170:19 178:6 182:14 186:12 189:12 189:13
**we've** 134:7 135:18 136:3 138:16 143:17 158:4 181:22 189:24 190:9 194:17
**week** 178:23
**weight** 175:8 180:16 181:16
**welcome** 125:6
**went** 155:21 168:3 170:4
**whatsoever** 150:4
**wife** 141:22,22 173:9
**witness** 124:2 126:1 143:24 144:6,10,13,16 156:13 166:15 166:19,22 167:7,12,16 168:2,7,10,15 169:16,21 170:3,7,9,15 180:25 181:4 192:21 197:10
**witnesses'** 198:3
**wood** 137:8
**word** 167:24
**work** 148:7 162:9 192:12
**worked** 160:24 186:22
**works** 189:2,3
**worsen** 195:9
**write** 179:11 193:8,14 194:13
**writing** 132:5 139:18 154:19 172:1
**written** 127:22 127:24 138:24 141:19,24 142:25 143:1 146:6 155:5 158:2 163:4,8 163:9 181:3 194:18
**wrong** 133:7 156:10
**wrote** 141:24 146:6 194:4,6

**x**

**x** 124:1,9 128:23 132:4

**y**

**yeah** 132:10 140:11 144:6 147:13 152:18 154:4,11 156:18 157:3 158:1 160:23 163:4,8 165:22 167:16 169:21 194:1,7
**year** 155:8 174:18
**years** 141:16 142:19,19,19 142:20 155:1 191:18

**york** 123:4,4 198:1

**z**

**zoom** 123:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**Bureau of Prisons**
**Health Services**
**Consultation Request**

Inmate Name: MOSES, JOSHUA — Reg #: 55716-066 — Complex: FTD
Date of Birth: 05/11/1981 — Sex: M

Report of Consultation: Gastroenterology — Subtype: Initial Evaluation

Inmate Name: MOSES, JOSHUA — Reg #: 55716-066
Date of Birth: 05/11/1981 — Sex: M
Institution: FORT DIX FCI
5756 HARTFORD & POINTVILLE RD
FORT DIX,New Jersey 08640
6097231100

Assessment: S: Abdominal pain, diarrhea, gas, GERD.
H/o bowel resection.
Abd: soft, old scars,
no palpable masses.

Dx: Adhesions
short bowel syndrome

Plan:
1. Bentyl 10 mg q 6h prn
2. Imodium 4 mg q 6h prn.
3. omeprazole 40 mg P.O. QD
4. Diet as tolerated.

Signature
Date

Thanks

Completed By:

Report may be hand-written or (preferably) typed on this form. If dictated on office or hospital letterhead to follow, please indicate essential findings or recommendations to be acted upon pending final report.

Follow-up services and primary responsibility for inmate health care remains with Bureau of Prisons staff. While discussion of diagnostic/treatment options with the inmate may be appropriate, they are subject to review by the inmate's primary care provider, the institution utilization review committee and/or the BOP National Formulary.

Please notify institution prior to scheduling surgery dates or follow-up appointments.

Inmate not to be informed of appointment dates.

EXHIBIT
Chow-1
7/27/23

**Bureau of Prisons**
**Health Services**
**Cosign/Review**

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | MOSES, JOSHUA | | | Reg #: | 55716-066 |
| Date of Birth: | 05/11/1981 | Sex: | M | Race: | BLACK |
| Scanned Date: | 04/24/2018 11:34 EST | | | Facility: | FTD |

**Reviewed with New Encounter Note by Sood, Ravi MD on 04/24/2018 11:57.**

RWJ Hamilton

| MOSES, JOSHUA | | | Gender: M |
|---|---|---|---|
| MR#: 60-07-74 | DOB 05/11/81 | LOCATION: | HMOP Emergency |
| Visit# 072969494 | | ADMITTED | 02/15/2018 11:34 AM |
| DR: Fellman, Katherine | | DISCHARGED: | 02/15/2018 21:43 PM (LOS =0 days) |

**Physician Consult Report** 02/15/2018 21:13 PM Fares II, Louis G.(MD)

02/16/2018 13:45 Fares II, Louis G. (MD)

DATE OF CONSULTATION: 02/15/2018

SURGICAL CONSULTATION

HISTORY OF PRESENT ILLNESS: This 36-year-old male Federal inmate sustained a gunshot wound to the abdomen greater than 10 years ago. He has had multiple surgeries over that time, according to the patient, and they were all done at Temple University. Apparently, he did lose a significant amount of small bowel and he says he only has 105 cm left. He also lost his transverse colon. He has also had multiple hernia operations as well using mesh and having mesh removed a number of times. The reason he was presently brought to the emergency department at Robert Wood Johnson, Hamilton, was because he had some bright red blood per rectum and some "undigested food particles" per rectum. However, when I discussed this with him, he has had the same symptoms for at least 10 years now. We placed the nasogastric tube expecting to see a lot of drainage and essentially minimal came out, maybe at the most 50 mL. He said the tube was making him nauseous and I have ordered that the tube be removed since I do not think there is anything that is going on there. I examined his abdomen. Although he has a long midline and multiple scars in his abdomen, he is soft and he has no evidence of hernias at this time. He has no tenderness. He has good bowel sounds. I have also reviewed the CT scan that was done as well as his labs. CT scan did show some dilated small bowel and the stomach, but I think the stomach was dilated because of the dye that he had ingested. The small bowel itself, there is no evidence of obstruction and no transition point. It looks like this is probably all related to the previous surgeries he has had. His laboratories also were essentially unremarkable with no evidence of white count, fever, or abnormalities. His albumin level was 4.4. I believe at this point in time, there is no evidence of obstruction and there is no surgical indication or surgical abdomen present. I believe he needs upper and lower endoscopies to be performed since the last testing he had done was at least 5 years ago. If this patient does indeed have some kind of small gut syndrome, this needs to be investigated and followed medically. I will be going to the Fort Dix Surgical Clinic next Tuesday, which is 02/20/2018 and I will request that they have him present so I can see him there. Meanwhile, I believe he can be discharged back safely to the institution and we will go from there.

IMPRESSION:

RECOMMENDATIONS:

Dictated by: Louis Fares II, MD
Signed by: Louis G. Fares, II, MD
DD: 02/15/2018 21:13:02
DT: 02/16/2018 13:45:00
TB: hh
J: 380495

CC:

EXHIBIT

Requested by: Selby, Stephanie (Remote Chart Reviewer) — Printed from: RWJ Hamilton
3/5/2018 3:07:00 PM — Page: 1 of 2

US000470

RWJ Hamilton

MOSES, JOSHUA Gender: M
MR#: 60-07-74 DOB 05/11/81 LOCATION: HMOP Emergency
Visit# 072969494 ADMITTED 02/15/2018 11:34 AM
DR: Fellman, Katherine DISCHARGED: 02/15/2018 21:43 PM (LOS =0 days)

Physician Consult Report 02/15/2018 21:13 PM Fares II, Louis G.(MD)
02/16/2018 13:45 Fares II, Louis G. (MD)

Requested by: Selby, Stephanie (Remote Chart Reviewer) — Printed from: RWJ Hamilton
3/5/2018 3:07:00 PM — End of Report — Page: 2 of 2

US000471

StatRad Exam Requisition — Page 1 of 2

statrad

EXHIBIT

**FCI Fort Dix FTD**

| | | | |
|---|---|---|---|
| Patient: | MOSES, JOSHUA (Male) | DOB: | 05/11/81 |
| Register#: | 55716-066 | Age: | 36 |
| Date: | 02/14/18 10:15 | Status: | OP |
| Slicecount: | 3 | | |
| History: | PAIN HX RESECTION | | |
| Priors: | 6/10/15;;3/11/15 READ AS NEG | | |
| Exams: | FILM ACUTE ABDOMEN SERIES W/ CXR | | |
| Referring Phy: | SOOD | | |
| Ordering Phy: | SOOD | | |
| Ordering Phy #: | 609 723 1100 X6787 | | |
| Accession Numbers: | 202#BOP171512818 | | |

**Final Report**

Exam: FILM ACUTE ABDOMEN SERIES W/ CXR

INDICATION: Pain history resection

COMPARISON: Abdominal exam 6/10/15

FINDINGS:

Single frontal view of the chest and 2 frontal views of the abdomen obtained.

Multifocal air-fluid levels within dilated loops of small bowel and also in the stomach.

There is bowel gas and fecal matter throughout the colon and into the rectum.

No free air under diaphragm.

Lungs are clear. No pleural effusion.

Cardiomediastinal silhouette is within normal limits.

No radiopaque renal calculi identified.

Osseous structures intact.

IMPRESSION:

Multiple differential air-fluid levels with dilated small bowel. Findings are concerning for partial or early small bowel obstruction. Follow-up along clinical correlation advised.

No free air under diaphragm.

US000478

https://clients.statrad.com/Report/ViewReport?message=Mrn7n3nHA S=0Y W7SbHKA1I 2/14/2018

StatRad Exam Requisition — Page 2 of 2

No radiopaque renal calculi identified.

Lungs are clear. No acute cardiopulmonary process.

Radiologist: Farhad Khorashadi, MD

Study ready at 10:16 and initial results transmitted at 13:13

Critical Value Communications

| Clear Time | Type | Notes |
|---|---|---|
| | Verify Receipt | |

US000479

https://clients.statrad.com/Report/ViewReport?message=Mrn7n3nHA S=0Y W7SbHKA1I 2/14/2018

**Bureau of Prisons**
**Health Services**
**Cosign/Review**

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | MOSES, JOSHUA | | | Reg #: | 55716-066 |
| Date of Birth: | 05/11/1981 | Sex: | M | Race: | BLACK |
| Scanned Date: | 02/14/2018 13:30 EST | | | Facility: | FTD |

**Reviewed by Sood, Ravi MD on 02/15/2018 11:46.**

07/03/2018 11:20 (FAX) P.006/018

## SURGICAL CONSULTATION

### Fort Dix

**Date:** 6/26/2018

**Patient:** Joshua Moses

**ID #:** 55716-066

**CC:** Multiple visits to ER, RWJ-H for abdominal pain.

**HPI:** 36 y/o male s/p exploratory laparotomy at Temple d/t GSW in 2009. Small bowel removed and appendix. Possible short gut syndrome.

**Findings:** He has changed his diet to a soy-based "religious diet." He did vomit that morning but he is doing much better now. Last endoscopy in 2012. Had bleeding ulcers "cauterized" in 2010.

**Plan:** I had asked for the records from his Temple admissions to be obtained. I am still waiting for them. He still needs an Upper and Lower Endoscopies to evaluate his intestinal tract. Surgically, I do not think there is anything to do but this other information is needed to be sure.

*Louis G. Fares II, M.D., F.A.C.S.*

EXHIBIT
Chow-4
7/27/23

Unknown

06/18/18 13:20:16 RaphCare-12857311286 -> +Athena Raphcare Inc Page 836

**Bureau of Prisons**
**Health Services**
**Consultation Request**

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | MOSES, JOSHUA | Reg #: | 55716-066 | Complex: | FTD |
| Date of Birth: | 05/11/1981 | Sex: | M | | |

**Consultation/Procedure Requested:** General Surgery
**Subtype:** Initial Evaluation
**Priority:** Routine
**Target Date:** 06/22/2018
**Reason for Request:**
36 years old male.

S/P exploratory laparotomy for abdomen GSW injury in 2009 - resection of most his small bowel and appendix; he denies removal of spleen; 105 cms of small bowel was left; he had several surgery to close his non healing abdominal wall - last surgery was in 09/2010 when abdominal wall was closed with biosynthetic mesh; in 2014 wires of mesh pouted out, and started having drainage; in 02/15/2017 he had surgery - wires were removed; post surgery wound has closed; no local drainage, he has intermittent abdominal pain, and increased frequency of watery and semisolid bowel movements

He was sent to ER, RWJH, Hamilton on 02/15/2018; he had CT scan of abdomen, and was seen by surgeon in the ER - Dr. fares, who recommended UGI endoscopy and colonoscopy.

Again, he was sent to ER, RWJH, Hamilton on 04/11/2018 for abdominal pain- ER discharge papers are reviewed- CT scan of abdomen and pelvis with IV contrast on 04/11/2018- mild fullness of renal pelvis, bilaterally with no ureteral obstruction, no gross bowel ischemia or perforation, colonic distension as was seen on prior study - secondary to chronic partial small bowel obstruction.

In the interim; he was seen by the GI consultant ON 04/04/2018- post surgery adhesions, short bowel syndrome - omeprazole, bentyl and imodium PRN, diet as tolerated; he did not recommend UGI endoscopy or colonoscopy; he continues to have intermittent abdomen pain; overall pattern of abdomen pain has been same with no new symptoms; he tolerates the meals, though he has nausea; no distention of abdomen or vomiting

**Provisional Diagnosis:**
Chronic intermittent abdominal pain- S/P exploratory laparotomy for abdomen GSW injury in 2009 - resection of most his small bowel and appendix, short bowel syndrome

**Medications (As of 06/18/2018)**
Acetaminophen 325 MG Tab Exp: 11/07/2018 SIG: Take two tablets (650 MG) by mouth three times daily AS NEEDED
Capsaicin 0.1% Ext Cream 56.6 GM Exp: 11/10/2018 SIG: Apply a small amount topically to the affected area(s) twice daily
Omeprazole 40 MG Cap Exp: 11/07/2018 SIG: Take one capsule (40 MG) by mouth each morning "Chronic Care Verified"

**Allergies (As of 06/18/2018)**
Cymbalta

**Health Problems (As of 06/18/2018)**
Esophageal reflux, Extremity, Pain in limb, Oth symp involving skin and integumentary tissue, Other general symptoms, Diarrhea, functional, Nausea with vomiting, Astigmatism, unspecified, Dermatitis, unspecified, Body mass index (BMI) 27.0-27.9, adult, Body mass index (BMI) 28.0-28.9, adult, Vitamin D deficiency, Unspecified abdominal pain, Pain in unspecified joint

**Inmate Requires Translation:** No **Language:**
**Additional Records Required:**
**Comments:**
**Requested By:** Sood, Ravi MD
**Ordered Date:** 05/09/2018 12:06
**Scheduled Target Date:** 07/13/2018 00:00

Generated 06/18/2018 13:01 by Walls, Kymberly HIT Bureau of Prisons - FTD Page 1 of 2

Unknown

06/18/18 13:20:36 RaphCare-12857311286 -> +Athena Raphcare Inc Page 837

**Bureau of Prisons**
**Health Services**
**Consultation Request**

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | MOSES, JOSHUA | Reg #: | 55716-066 | Complex: | FTD |
| Date of Birth: | 05/11/1981 | Sex: | M | | |

**Level of Care:** Medically Necessary - Non-Emergent

**Report of Consultation:** General Surgery **Subtype:** Initial Evaluation
**Inmate Name:** MOSES, JOSHUA **Reg #:** 55716-066
**Date of Birth:** 05/11/1981 **Sex:** M
**Institution:** FORT DIX FCI
5756 HARTFORD & POINTVILLE RD
FORT DIX,New Jersey 08640
6097231100

**Assessment:**

**Plan:**

**Signature**
**Date**

Completed By:

Report may be hand-written or (preferably) typed on this form. If dictated on office or hospital letterhead to follow, please indicate essential findings or recommendations to be acted upon pending final report.

Follow-up services and primary responsibility for inmate health care remains with Bureau of Prisons staff. While discussion of diagnostic/treatment options with the inmate may be appropriate, they are subject to review by the inmate's primary care provider, the institution utilization review committee and/or the BOP National Formulary.

Please notify institution prior to scheduling surgery dates or follow-up appointments.

Inmate not to be informed of appointment dates.

Generated 06/18/2018 13:01 by Walls, Kymberly HIT Bureau of Prisons - FTD Page 2 of 2

**Bureau of Prisons**
**Health Services**
**Cosign/Review**

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | MOSES, JOSHUA | | | Reg #: | 55716-066 |
| Date of Birth: | 05/11/1981 | Sex: | M | Race: | BLACK |
| Scanned Date: | 07/05/2018 12:47 EST | | | Facility: | FTD |

Reviewed with New Encounter Note by Sood, Ravi MD on 07/05/2018 15:36.

**SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS**
*OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30*

1. REQUISITION NUMBER: 1610-12
PAGE 1 OF 5
2. CONTRACT NO.: DJBP0206000000029
3. AWARD/EFFECTIVE DATE: see 31c
4. ORDER NUMBER
5. SOLICITATION NUMBER
6. SOLICITATION ISSUE DATE
7. FOR SOLICITATION INFORMATION CALL: a. NAME: [redacted] Contract Specialist
b. TELEPHONE NUMBER (No collect calls)
8. OFFER DUE DATE/LOCAL TIME
9. ISSUED BY: CODE
Federal Bureau of Prisons
Field Acquisition Office
US Armed Forces Reserve Complex
346 Marine Forces Drive
Grand Prairie, TX 75051
10. THIS ACQUISITION IS [X] UNRESTRICTED OR [ ] SET ASIDE: ___ % FOR: [ ] SMALL BUSINESS [ ] HUBZONE SMALL BUSINESS [ ] SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS [ ] WOMEN-OWNED SMALL BUSINESS (WOSB) ELIGIBLE UNDER THE WOMEN-OWNED SMALL BUSINESS PROGRAM [ ] EDWOSB [ ] 8(A)
NAICS: 622110
SIZE STANDARD: $35.5 Million
11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED [ ] SEE SCHEDULE
12. DISCOUNT TERMS: 0.5%/10, Net 30
13a. [ ] THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700)
13b. RATING
14. METHOD OF SOLICITATION: [ ] RFQ [ ] IFB [X] RFP
15. DELIVER TO: CODE
Federal Correctional Institution (FCI) Ft. Dix
5756 Hartford Rd., Ft. Dix, NJ 08640
16. ADMINISTERED BY: CODE
FCI Ft. Dix
5756 Hartford Rd., Ft. Dix, NJ 08640
17a. CONTRACTOR/OFFEROR: CODE 581823464 — FACILITY CODE 004677399
NaphCare, Inc.
2090 Columbiana Rd.
Birmingham, AL 35216-2158
TELEPHONE NO. [redacted]
17b. [ ] CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER
18a. PAYMENT WILL BE MADE BY: CODE
FCI Ft. Dix
P.O. Box 38
Fort Dix, New Jersey, 08640
18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED [ ] SEE ADDENDUM

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | Comprehensive Medical Services for FCI Fort Dix<br>Contract DJBP0206000000029/Award Information<br>(Use Reverse and/or Attach Additional Sheets as Necessary) | | | | |

EXHIBIT Chow-5 7/27/23

25. ACCOUNTING AND APPROPRIATION DATA: Funds will be obligated by individual task orders. Est. Base Year
26. TOTAL AWARD AMOUNT (For Govt. Use Only): [redacted]
27a. [ ] SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA [ ] ARE [ ] ARE NOT ATTACHED
27b. [X] CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED. ADDENDA [ ] ARE [X] ARE NOT ATTACHED
28. [X] CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN 1 COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED
29. [ ] AWARD OF CONTRACT: REF. ___ OFFER DATED ___. YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS:
30a. SIGNATURE OF OFFEROR/CONTRACTOR
31a. UNITED STATES OF AMERICA (SIGNATURE OF CONTRACTING OFFICER)
30b. NAME AND TITLE OF SIGNER (Type or print): [redacted] V. P. Off-Site Operations
30c. DATE SIGNED
31b. NAME OF CONTRACTING OFFICER (Type or print): [redacted] FAO Contracting Officer
31c. DATE SIGNED

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION IS NOT USABLE
STANDARD FORM 1449 (REV. 2/2012) Prescribed by GSA - FAR (48 CFR) 53.212

**SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS**
*OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30*

1. REQUISITION NUMBER: 1610-12 — PAGE 1 OF 5
2. CONTRACT NO.: DJBP0206000000029 — 3. AWARD/EFFECTIVE DATE: see 31c
7. FOR SOLICITATION INFORMATION CALL: [redacted] Contract Specialist
9. ISSUED BY: Federal Bureau of Prisons, Field Acquisition Office, US Armed Forces Reserve Complex, 346 Marine Forces Drive, Grand Prairie, TX 75051
10. THIS ACQUISITION IS [X] UNRESTRICTED OR [ ] SET ASIDE — NAICS: 622110 — SIZE STANDARD: [redacted]
11. [ ] SEE SCHEDULE
12. DISCOUNT TERMS: 0.5%/10, Net 30
14. METHOD OF SOLICITATION: [ ] RFQ [ ] IFB [X] RFP
15. DELIVER TO: Federal Correctional Institution (FCI) Ft. Dix, 5756 Hartford Rd., Ft. Dix, NJ 08640
16. ADMINISTERED BY: FCI Ft. Dix, 5756 Hartford Rd., Ft. Dix, NJ 08640
17a. CONTRACTOR/OFFEROR: CODE 581823464 — FACILITY CODE 004677399
NaphCare, Inc., 2090 Columbiana Rd., Birmingham, AL 35216-2158
TELEPHONE NO. [redacted]
18a. PAYMENT WILL BE MADE BY: FCI Ft. Dix, P.O. Box 38, Fort Dix, New Jersey, 08640

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | Comprehensive Medical Services for FCI Fort Dix<br>Contract DJBP0206000000029/Award Information | | | | |

25. Funds will be obligated by individual task orders. Est. Base Year — 26. TOTAL AWARD AMOUNT: [redacted]
27b. [X] ... ADDENDA [X] ARE NOT ATTACHED
28. [X] CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN 1 COPIES TO ISSUING OFFICE.
30a. SIGNATURE OF OFFEROR/CONTRACTOR: [signature] Katherine Tarice
31a. UNITED STATES OF AMERICA: [signature]
30b. Katherine Tarice, V. P. Off-Site Operations — 30c. DATE SIGNED: 7-1-14
31b. Raymond Kelemencky, FAO Contracting Officer — 31c. DATE SIGNED: 7/1/14

AUTHORIZED FOR LOCAL REPRODUCTION — PREVIOUS EDITION IS NOT USABLE
STANDARD FORM 1449 (REV. 2/2012) Prescribed by GSA - FAR (48 CFR) 53.212

DJBP0206000000029/0002 — Page 1 of 26

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

1. CONTRACT ID CODE
2. AMENDMENT/MODIFICATION NO.: 0002
3. EFFECTIVE DATE: 11/23/2014
4. REQUISITION/PURCHASE REQ. NO.
5. PROJECT NO. (If applicable)
6. ISSUED BY: CODE BNEF
Federal Bureau of Prisons
NE Finance Center- FCI Fort Dix
NE FINANCE CENTER
BLDG 5756 HARTFORD ROAD
FORT DIX, NJ 08640
[redacted] (O) 609-723-1100
7. ADMINISTERED BY (If other than Item 6): CODE BFTD
Federal Bureau of Prisons
FCI Fort Dix
5756 Hartford Street
FORT DIX, NJ 08640
8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code):
NAPHCARE, INC.
2090 COLUMBIANA RD, SUITE 4000
BIRMINGHAM, AL 35216-2158
9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (SEE ITEM 11)
10A. MODIFICATION OF CONTRACT/ORDER NO.: X DJBP0206000000029
10B. DATED (SEE ITEM 13): 07/01/2014
CODE 581823464 — FACILITY CODE 004677399

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS
[ ] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [ ] is extended, [ ] is not extended.
[illegible]

12. ACCOUNTING AND APPROPRIATION DATA (If required): See Line Item Detail

13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.
X A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.
FAR 52.243-1 CHANGES IN FIXED PRICE CONTRACTS
B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).
C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor [ ] is not, [X] is required to sign this document and return ___ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Contract DJBP0206000000029 is hereby modified to incorporate ambulance services. The rate of Mansfield Township Ambulance is +11% Medicare and non- MCR covered service rate of 80% billed charges.

All other items remain in effect.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.
15A. NAME AND TITLE OF SIGNER (Type or print): Katherine Tarice, Executive Vice President
16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print): [illegible]
15B. CONTRACTOR/OFFEROR: [signature] (Signature of person authorized to sign) — 15C. DATE SIGNED: 6-2-15
16B. UNITED STATES OF AMERICA: By [signature] (Signature of Contracting Officer) — 16C. DATE SIGNED: 6/2/15

NSN 7540-01-152-8070
Previous edition unusable
STANDARD FORM 30 (REV. 10-83) Prescribed by GSA FAR (48 CFR) 53.243



Table of Contents

| Section | Description | Page Number |
|---|---|---|
| 1 | Solicitation/Contract Form | 1 |
| 2 | Commodity or Services Schedule | 3 |
| | 2-1 Contract Pricing/SDB Participation | 3 |
| | 2-2 Performance Work Statement | 8 |
| 3 | Contract Clauses | 14 |
| | 52.24-403-70 Notice of Contractor Personnel Security Requirements (OCT 2005) | 14 |
| | 52.37-103-72 DOJ CONTRACTOR RESIDENCY REQUIREMENT BUREAU OF PRISONS (JUNE 2004) | 16 |
| | 52.209-8 (Deviation) Updates of Information Regarding Responsibility Matters (OCT 2010) (DEVIATION) | 16 |
| | 52.216-18 Ordering (Oct 1995) | 16 |
| | 52.216-19 Order Limitations (Oct 1995) | 16 |
| | 52.216-21 Requirements (Oct 1995) | 17 |
| | 52.217-8 Option to Extend Services (Nov 1999) | 17 |
| | 52.217-9 Option to Extend the Term of the Contract (Mar 2000) | 17 |
| | 52.218-000 CONTINUING CONTRACT PERFORMANCE DURING A PANDEMIC INFLUENZA OR OTHER NATIONAL EMERGENCY (May 2008) | 17 |
| | 52.252-6 Authorized Deviations in Clauses (Apr 1984) | 18 |
| | 52.212-5 Contract Terms and Conditions Required to Implement Statutes or Executive Orders—Commercial Items (July 2010) | |
| | 52.232-19 Availability Of Funds For The Next Fiscal Year (Apr 1984) | 18 |
| | 52.237-7 Indemnification and Medical Liability Insurance (Jan 1997) | 19 |
| | 2852.201-70 Contracting Officer's Technical Representative (COTR) (JAN 1985) | 19 |
| | 2852.223-70 Unsafe Conditions Due to the Presence of Hazardous Material (June 1996) | 19 |
| 4 | List of Attachments | 22 |
| | 4-1 Special Contract Conditions | 23 |

Section 2 - Commodity or Services Schedule

SCHEDULE OF SUPPLIES/SERVICES

CONTINUATION SHEET

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | Comprehensive Medical Services for the Federal Correctional Institution located in FT. Dix, New Jersey. See Section 2-1 Schedule of Items and Section 2-2 Performance Work Statement. Base Year: Date of Award (DOA) through twelve months | Previous: 12.000000 Change: 0.000000 Current: 12.000000 | | Previous: [redacted] | Previous: [redacted] |
| 0002 | Comprehensive Medical Services for the Federal Correctional Institution in FT Dix, New Jersey. See Section 2-1 Schedule of Items and Section 2-2 performance Work Statement. Option Year 1: 13 months through 24 months from DOA. | Previous: 12.000000 Change: 0.000000 Current: 12.000000 | | [redacted] | [redacted] |
| 0003 | Comprehensive Medical Services for the Federal Correctional Institution located in FT Dix, New Jersey. See Section 2-1 Schedule of Items and Section 2-2 performance Work Statement. Option Year 2: 25 months through 36 months from DOA | Previous: 12.000000 Change: 0.000000 Current: 12.000000 | | [redacted] | [redacted] |
| 0004 | Comprehensive Medical Services for the Federal Correctional Institution located in FT Dix, New Jersey. See Section 2-1 Schedule of Items and Section 2-2 performance Work Statement. Option Year 3: 37 months through 48 months from DOA | Previous: 12.000000 Change: 0.000000 Current: 12.000000 | | [redacted] | [redacted] |
| 0005 | Comprehensive Medical Services for the Federal Correctional Institution located in Ft Dix, New Jersey. See Section 2-1 Schedule of Items and Section 2-2 Performance Work Statement. Option Year 4: 49 months through 60 months from DOA | Previous: 12.000000 Change: 0.000000 Current: 12.000000 | | [redacted] | [redacted] |
| | | | | PREVIOUS TOTAL CHANGE CURRENT TOTAL | [redacted] |

2-1 Contract Pricing/SDB Participation

**BLOCKS 19 THROUGH 24 - CONTRACT PRICING/SDB PARTICIPATION**
**Overview**

Services are required to be provided in accordance with the Performance Work Statement included in this solicitation/contract. Offerors are required to submit, as a part of their business proposal, a completed copy of the Schedule of Items and the Target for Participation of Small Disadvantaged Business Concerns (page 7-9).

**Pricing Methodology**

Except for services based on session rates, price proposals will be calculated from benchmarks utilizing Medicare reimbursement methodologies. For each category of service to be provided, offerors will be allowed to propose a variance from the benchmark Medicare rate in the form of a discount from or a premium to Medicare rates established by the Centers for Medicare and Medicaid Services. The rates established in the resulting contract shall not be construed as participation in the Medicare program; contract rates will merely be equated to Medicare rates of reimbursement without reductions for deductibles, copayments, or coinsurance. **When appropriate, outlier payments calculated in accordance with Medicare reimbursement methodologies shall be made in recognition of extremely costly stays.** The outlier payment shall be calculated based upon the defined benchmark and will consist of the operating portion only. This structuring of the pricing methodology is not intended to be restrictive of any offeror; offerors need only to propose that percentage discount from or premium to the Medicare benchmark rate which will reflect the desired level of payment for the category of services rendered. If during contract performance, it is determined that a necessary contract deliverable is not covered by Medicare reimbursement methodologies, a separate rate shall be negotiated for such deliverable(s).

**Medicare Part A.** The Medicare benchmark to be utilized for all services covered by Medicare Part A shall be the most current Basic DRG payment (i.e., Operating Federal Rate) established for CBSA 48700, Williamsport, PA. The Basic DRG calculation shall not include any provider-specific adjustments allowed under actual Medicare participation. Offerors may propose a discount from or a premium to Basic DRG rates. (Refer to Attachment I of this solicitation)

**Medicare Part B Physician and Non-Physician Services.** The Medicare benchmark to be utilized for all physician services and non-physician services covered by Medicare Part B shall be those rates established in the most current Medicare Part B Fee Schedule for Payment Locality 99 for the Commonwealth of Pennsylvania. The benchmark charges shall be those established for participating providers. Offerors may propose a discount from or a premium to the benchmark charges.

**Medicare Part B Facility Services (including hospital outpatient services and ambulatory surgical centers).** The Medicare benchmark to be utilized for all facility services covered by Medicare Part B shall be the most current APC and ASC rates calculated for CBSA 48700, Williamsport, PA. Offerors may propose a discount from or a premium to the benchmark charges.

**Estimated Quantities**

Estimated quantities for the base year and all option periods are detailed below. The estimated quantities provided are not a representation to the offeror/contractor that the estimated quantities will be required or ordered or that conditions affecting requirements will be stable or normal.

<u>Inpatient and Outpatient Facility and Physician Services</u>

Base Year - Date of Award (DOA) through 12 months from DOA

Inpatient Days: Estimated 120 Days
Outpatient Visits: Estimated 720 Visits

Option Year 1 - 13 through 24 months from DOA

Inpatient Days: Estimated 120 Days
Outpatient Visits: Estimated 720 Visits

Option Year 2 - 25 through 36 months from DOA

Inpatient Days: Estimated 120 Days
Outpatient Visits: Estimated 720 Visits

Option Year 3 - 37 through 48 months from DOA

Inpatient Days: Estimated 120 Days
Outpatient Visits: Estimated 720 Visits

Option Year 4 - 49 through 60 months from DOA

Inpatient Days: Estimated 120 Days
Outpatient Visits: Estimated 720 Visits

**Outpatient Institution Services**

Estimated quantities shall remain constant for the base year and all option years. For Medicare-based services, duration of visits is listed for informational purposes only, as contracted rates will be based upon the Medicare allowable per procedure performed. Oral Surgeon services shall be paid based upon the provision of defined sessions. The estimated quantities are not a representation to an offeror or contractor that the estimated quantities will be required or ordered or that conditions affecting requirements will be stable or normal.

General Surgeon: Visit Duration – 4 hours (Approximate)
Visit Quantity – 12 per contract year

Optometrist: Session Duration – 4 hours (Approximate)
Session Quantity – 24 per contract year

Orthopedic Surgeon: Visit Duration – 6 hours (Approximate)
Visit Quantity – 12 per contract year

Physical Therapy: Visit Duration – 3 hours (Approximate)
Visit Quantity – 192 per contract year

Podiatrist: Visit Duration – 4 hours (Approximate)
Visit Quantity – 36 per contract year

Note: Session priced items which exceed the established session or are less than a full session shall be prorated to the nearest quarter hour. Session prices for optometrist shall be for evaluations only. Contract rates for procedures covered by Medicare reimbursement methodologies shall be covered by line items 2c1, Other Physicians. Optometry procedures not covered by Medicare reimbursement methodologies shall be negotiated on a case-by-case basis.

**Schedule of Items/Target for Participation of Small Disadvantaged Business Concerns**

Offerors shall complete the following Schedule of Items and Target for Participation of Small Disadvantaged Business Concerns. All proposed pricing and participation targets will be evaluated in accordance with FAR 52.212-2, "Evaluation—Commercial Items" and "Evaluation of Proposals" (Section 5-2) of this solicitation.

**Schedule of Items**
**BASE YEAR**
************************************************************************************************
**Date of Award through 12 months from DOA**

1a. Inpatient Facility Services: -_____ Discount or +_____ Premium to Medicare Part A

1b. Outpatient Facility Services: -_____ Discount or +_____ Premium to Medicare Part B

2a. Inpatient Physician Services: -_____ Discount or +_____ Premium to Medicare Part B

2b. Outpatient Physician Services: -_____ Discount or +_____ Premium to Medicare Part B

2c. Outpatient Institution Services:

1. Other Physicians: -_____ Discount or +_____ Premium to Medicare Part B

2. Optometrist: $_________ Session

**NOTE: IF OFFERING A VARIANCE FROM THE BENCHMARK MEDICARE RATE, INSERT APPLICABLE "-/+" PERCENTAGE. IF NO VARIANCE, ENTER "0".**

OPTION YEAR 1

**13 through 24 months from DOA**

1a. Inpatient Facility Services: -_____ Discount or +_____ Premium to Medicare Part A

1b. Outpatient Facility Services: -_____ Discount or +_____ Premium to Medicare Part B

2a. Inpatient Physician Services: -_____ Discount or +_____ Premium to Medicare Part B

2b. Outpatient Physician Services: -_____ Discount or +_____ Premium to Medicare Part B

2c. Outpatient Institution Services:

1. Other Physicians: -_____ Discount or +_____ Premium to Medicare Part B

2. Optometrist: $_________ Session

**NOTE: IF OFFERING A VARIANCE FROM THE BENCHMARK MEDICARE RATE, INSERT APPLICABLE "-/+" PERCENTAGE. IF NO VARIANCE, ENTER "0".**

OPTION YEAR 2

**25 through 36 months from DOA**

1a. Inpatient Facility Services: -_____ Discount or +_____ Premium to Medicare Part A

1b. Outpatient Facility Services: -_____ Discount or +_____ Premium to Medicare Part B

2a. Inpatient Physician Services: -_____ Discount or +_____ Premium to Medicare Part B

2b. Outpatient Physician Services: -_____ Discount or +_____ Premium to Medicare Part B

2c. Outpatient Institution Services:

1. Other Physicians: -_____ Discount or +_____ Premium to Medicare Part B

2. Optometrist: $_________ Session

**NOTE: IF OFFERING A VARIANCE FROM THE BENCHMARK MEDICARE RATE, INSERT APPLICABLE "-/+" PERCENTAGE. IF NO VARIANCE, ENTER "0".**

OPTION YEAR 3

**37 through 48 months from DOA**

1a. Inpatient Facility Services: -_____ Discount or +_____ Premium to Medicare Part A

1b. Outpatient Facility Services: -_____ Discount or +_____ Premium to Medicare Part B

2a. Inpatient Physician Services: -_____ Discount or +_____ Premium to Medicare Part B

2b. Outpatient Physician Services: -_____ Discount or +_____ Premium to Medicare Part B

2c. Outpatient Institution Services:

1. Other Physicians: -_____ Discount or +_____ Premium to Medicare Part B

2. Optometrist: $_________ Session

**NOTE: IF OFFERING A VARIANCE FROM THE BENCHMARK MEDICARE RATE, INSERT APPLICABLE "-/+" PERCENTAGE. IF NO VARIANCE, ENTER "0".**

OPTION YEAR 4

**49 through 60 months from DOA**

1a. Inpatient Facility Services: -_____ Discount or +_____ Premium to Medicare Part A

1b. Outpatient Facility Services: -_____ Discount or +_____ Premium to Medicare Part B

2a. Inpatient Physician Services: -_____ Discount or +_____ Premium to Medicare Part B

2b. Outpatient Physician Services: -_____ Discount or +_____ Premium to Medicare Part B

2c. Outpatient Institution Services:

1. Other Physicians: -_____ Discount or +_____ Premium to Medicare Part B

2. Optometrist: $_________ Session

**NOTE: IF OFFERING A VARIANCE FROM THE BENCHMARK MEDICARE RATE, INSERT APPLICABLE "-/+" PERCENTAGE. IF NO VARIANCE, ENTER "0".**

**Target for Participation of Small Disadvantaged Business (SDB) Concerns**

Offerors shall provide a participation target for utilization of small disadvantaged business (SDB) concerns (including joint ventures, teaming arrangements, and subcontracts) performing within North American Industry Classification System Sector 62, Health Care and Social Assistance. The SDB participation target identified by the offeror will be incorporated into any resulting contract.

**Participation Target** _____________ percent

The above participation target will be achieved through performance by:

[ ] the Contractor, including joint venture partners and team members (target: ________ percent)

[ ] subcontractors (target: ______ percent)

Offerors are advised that, in accordance with FAR clause 52.219-25 entitled Small Disadvantaged Business Participation Program--Disadvantaged Status and Reporting, in order to qualify for disadvantaged status under this clause, SDB concerns must be identified

as such in the database maintained by the Small Business Administration (Pro-Net) or by contacting the SBA's Office of Small Disadvantaged Business Certification and Eligibility.

2-2 Performance Work Statement

**BLOCK 20 # PERFORMANCE WORK STATEMENT**

**I. Background**

The Federal Bureau of Prisons (BOP) was established in 1930 to provide more progressive and humane care for Federal inmates, to professionalize the prison service, and to ensure consistent and centralized administration. Today, the BOP is responsible for the custody and care of approximately 217,000 Federal offenders. The Federal prison system is a nationwide system of prisons and detention facilities for the incarceration of inmates who have been sentenced to imprisonment for Federal crimes and the detention of individuals awaiting trial in Federal court. The defined mission of the BOP is as follows:

It is the mission of the Federal Bureau of Prisons to protect society by confining offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost-efficient, and appropriately secure, and that provide work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens.

As an agency under the Executive Branch of the United States Government, the BOP receives an annual appropriation of funds to accomplish its assigned mission. The public trust demands that this annual appropriation be prudently managed. Thus, dollars spent to maintain the health of the inmate population must reflect the agency's best efforts to obtain cost-effective health care consistent with community standards.

In meeting the health care needs of a growing inmate population, the BOP provides essential medical, dental, and mental health services to Federal inmates by BOP staff. When a medical need arises which cannot be provided within prison walls by BOP staff, referrals are then made to community-based providers. It is the goal of this solicitation to establish a contractual agreement that will provide necessary physician and facility services for both inpatient admissions and outpatient encounters.

The United States Penitentiary and Satellite Camp (hereinafter referred to as USP) located in Waymart, Pennsylvania, intends to make a single award to a responsible entity for the provision of Comprehensive Medical Services as set forth in this solicitation/contract. The USP currently houses male inmates. The USP is presently identified as a Care Level II BOP facility. Care Level II is an intermediate classification on the four-level scale where Care Level I represents the healthiest inmates and Care Level IV represents inmates with serious health issues. Criteria for categorizing an inmate in the Care Level II category is included as Attachment I. Despite this description of the general health of the inmate population, however, needs for inmate healthcare may arise at any time, in any specialty, and any level of complexity. Classification and designation of inmates is the sole responsibility of the BOP and may be changed at any time without consideration to the contractor.

In evaluating offers, the Government will evaluate the proximity of the proposed community-based providers, in addition to other factors, and give preference to those providers located nearest the USP. Although a mileage restriction has not been placed on this acquisition, the Government reserves the right to determine that the proposed driving distances/conditions to community-based providers pose an unacceptable cost or security risk and to find such offers unacceptable.

**II. Organizational Conflict of Interest**

The objective of this solicitation is to satisfy the BOP's requirement for the provision of health care to the inmates of the USP. A potential organizational conflict of interest may arise if the awardee is an entity which also holds or participates in a separate contract/agreement with the BOP as a medical claims adjudicator. A possible conflict of interest may exist if the awardee has dual responsibilities for the submission of proper invoices (i.e., medical claims) for services rendered under the resulting contract and for the adjudication of those invoices (i.e., medical claims) under a separate contract/agreement with the BOP.

Offers received from any firm which holds or participates in a separate contract/agreement for BOP medical claims adjudication services must address any potential organizational conflict of interest that may arise and must provide a detailed explanation of how such conflicts will be avoided. Offers received from any firm which holds or participates in a separate contract/agreement for BOP medical claims adjudication services which fail to adequately address/resolve potential conflicts of interest will be rejected without further consideration. This limitation on the eligibility of offerors has been imposed as authorized by Federal Acquisition Regulations (FAR) 9.506.

**III. Statement of Output**

Within this Performance Work Statement (PWS), necessary services are described in terms of output rather than specific task assignments. The BOP desires to make an award to the offeror who can provide the best value, considering the diversity of available services and price, among other criteria specified in Section 5-2. Therefore, the Government may award any or all line items, may withhold award of any or all line items, or may award to an offeror who proposes less than the full complement of services contained in this solicitation. Accordingly, output items 1 and 2 are optional deliverables while output items 3, 4, and 5 are applicable to all services provided. Offerors are encouraged to submit comprehensive proposals committing to provide all output listed in the solicitation. Offerors who propose less comprehensive approaches will be evaluated accordingly.

Output #1: Provide inpatient and outpatient facility services which conform to community standards and all local, state and Federal laws and regulations applicable to the delivery of health care to members of the general public. (Cross-reference pricing categories 1a and 1b.)

Output #2: Provide professional services which conform to community standards and all local, state and Federal laws and regulations applicable to the delivery of health care to members of the general public. (Cross-reference pricing categories 2a, 2b, and 2c.)

Output #3: Submit properly priced invoices for services rendered.

Output #4: Manage medical record information in a manner which promotes continuity of care while observing restrictions on the release of information.

Output #5: Maintain open avenues of communication, facilitating the exchange of information between the contract provider, contract facility, and the Government regarding the contract services.

**IV. Compliance with Contract Requirements**

The Contractor's efforts under this contract shall be monitored to ensure that the required output is achieved. The Government reserves the right to inspect and evaluate in a reasonable manner all services rendered during the performance of this contract. The contractor's performance will be measured by the Government utilizing the outcome measure indicators provided in Attachment III.

The Contractor is responsible for all management and quality control actions necessary to meet the quality standards set forth by this contract. Prior to commencing performance, the Contractor shall develop and submit a quality control plan (QCP) for the USP's approval. Once the QCP is approved by the USP, the contractor shall utilize the QCP to guide and rigorously document the implementation of the required management and quality control actions to achieve the specified output.

**V. Specific Requirements**

**Output #1: Provide inpatient and outpatient facility services which conform to community standards and all local, state and Federal laws and regulations applicable to the delivery of health care to members of the general public.**

Output #1 is an optional deliverable. However, if the offeror proposes to provide these services, the following minimum requirements apply:

If proposed, the contractor shall provide facility services on an as-needed basis in a manner which adheres to community standards of quality and costeffective medical care. The services required to satisfy Output #1 may include inpatient facility and outpatient facility, including emergency room services. Inpatient visits for nonemergency services shall require private room accommodations with available space for up to three armed or unarmed guards per inmate.

It is the USP's preference to obtain the services of facilities that are accredited by The Joint Commission. Offerors utilizing facilities which maintain accreditation by The Joint Commission shall submit a copy of the current accreditation certificate as part of the offeror's technical proposal. If an offeror intends to utilize a facility which is accredited or certified by any other recognized professional accrediting body, the offeror shall submit documentation validating this accreditation or certification as a part of its proposal.




The offeror's technical proposal shall discuss in detail the diversity of services, as well as the proximity of facility providers to the USP, that it is capable of providing to achieve Output #1.

**Output #2: Provide professional services which conform to community standards and all local, state, and Federal laws and regulations applicable to the delivery of health care to members of the general public.**

Output #2 is an optional deliverable. However, if the offeror proposes to provide these services, the following minimum requirements shall apply.

**Community-Based Services**

Professional services resulting from a BOP referral are necessary to be performed in a community-based setting (e.g., hospital facility, surgical center, physician's office, etc.). If proposed, the Contractor shall provide the services of professional medical staff who have appropriate educational qualification, experience, licensure, and board certification (where required) to achieve Output #2. This output specifically excludes the provision of radiological interpretations of BOP-provided films, images, or other media.

If requested by the Contracting Officer, the Contractor shall be required to document primary source verification of the credentials for each provider including: current license from the appropriate State Board of Medical Examiners, education from professional schools or universities, evidence of completion of internships and/or residences as appropriate.

Whenever possible, appointments for specialty care should be available within 14 calendar days from the date of referral to the specialty provider. This practice promotes the safety and security of the federal prisoner, the escorting correctional staff, and the general public. The medical urgency of any referral must receive consideration in the scheduling and delivery of professional services.

For prescriptions to be filled by the USP pharmacy, contract providers shall only prescribe pharmaceutical drugs that are listed in the approved BOP Formulary. The BOP Formulary can be accessed at www.bop.gov/news/PDFs/formulary.pdf. Requests for exemptions shall be submitted to the Contracting Officer's Technical Representative (COTR), who shall obtain the required approvals. As part of the Discharge Instructions, the issuance of sample medication to any Federal inmate shall be prohibited.

The offeror's technical proposal shall discuss in detail the diversity of services, as well as the proximity of physician providers to the USP, that it is capable of providing to achieve Output #2.

**Institution-Based Services**

As an additional tool to satisfy Output #2, specialty services may be performed within the confines of the USP. If the resulting contract does not provide for telemedicine consultation or all of the on-site clinics listed, the USP reserves the right to pursue such contracts. The USP also reserves the right to determine the manner of an inmate's referral, i.e., via on-site clinic, via community-based referral, via telemedicine consult, or any other method the USP determines to be reasonable and appropriate.

If the contractor performs on-site specialty clinics at the USP, the following minimum requirements shall apply. Contract services shall be provided on-site within the Health Services Unit of the USP. Consultations shall be limited to the chief complaint on the BOP consultation form. Services shall include diagnosis and treatment of medical conditions with appropriate referral, if necessary, to a specialist at the contract medical facility. Scheduling of clinics shall be subject to the mutual agreement of the USP and the contract provider. Scheduling of inmates for on-site clinics shall be performed by the USP.

Providers performing institution-based services shall be licensed to practice medicine in the State of Pennsylvania. Providers performing these services shall apply for clinical privileges at the USP. All clinical privileges shall be appropriate to the qualifications of the provider and the resources of the facility where care is provided. Any clinical privileges granted due to the award of this contract shall be contingent upon the continuation of this contract and upon the provider's continued affiliation with the Contractor or any subcontractor. Continuation of privileges at the USP shall be at the sole discretion of the USP. Non-physician providers shall maintain active licenses from the State of Pennsylvania, as applicable.

The following specialty clinics/sessions may be conducted at the USP contingent upon an acceptable offer. The BOP reserves the right to award some, all, or none of the following on-site clinics.

**General Surgeon**

**Optometry**

**Orthopedic Surgeon**

**Physical Therapy**

**Podiatry**

In the event it becomes necessary for the Government to cancel a scheduled visit, the USP will provide the contract provider with 48-hour written or verbal notice prior to canceling a visit. However, certain circumstances beyond the control of the USP (e.g., fog or other Acts of God, institution disturbances, etc.) may dictate the cancellation of a scheduled visit with less than 48 hours written or verbal notice. In the event it becomes necessary for the contract provider to cancel a scheduled visit, the Contractor may provide qualified replacement professional staff or may reschedule a mutually agreed-upon replacement session. Prior to utilizing replacement staff, the Contractor must obtain preliminary clearance from the Contracting Officer or COTR, in accordance with the security and privileging requirements of this contract.

All contract personnel providing services within the confines of the USP shall have a complete background investigation conducted in accordance with BOP Program Statement 3000.03, "Human Resource Management Manual." See also "Contract Security/Investigative Requirements" contained within Section 4-1 of this solicitation/contract. All contract providers and other applicable staff who will enter the USP to perform services on a recurring basis shall be required to attend a four-hour institution orientation course held at the USP or a mutually acceptable site. A "refresher" orientation must be completed annually. The Contractor's costs for contract staff to attend this training shall be the responsibility of the Contractor. The Contracting Officer or COTR will be responsible for scheduling training for all applicable contract staff.

**Output #3: Submit properly priced invoices for services rendered.**

**Overview.** Upon completion of a treatment encounter, the contractor shall prepare and submit proper invoices for services rendered under this contract. For the purpose of this contract, a specific definition for what documentation constitutes an invoice is provided below. A proper invoice shall include the information specified in FAR clause 52.212-4, Contract Terms and Conditions - Commercial Items, paragraph (g). Services shall be invoiced in accordance with the terms and conditions of the contract, including the payment rate structures specified in the contract.

**Invoice/Medical Claims Adjudication.** The USP will employ a process of invoice/medical claims adjudication to ensure, at a minimum, that the services billed by the contractor were properly authorized and ordered by the USP, are appropriately coded in compliance with Medicare coding policies (where applicable), are properly priced in accordance with the terms and conditions of the contract, and do not represent duplicate billings for payments already made. In addition, the USP may utilize the services of a third-party medical claims adjudicator to review invoices submitted by the contractor under this contract. When requested by the USP, the contractor shall comply with all reasonable requests for additional invoice/medical claim/medical record documentation. All invoice payments shall be made by the USP and any disagreements regarding the paid amount of any invoice shall be resolved directly with the USP.

**Invoice Definitions.**

**Line Items 1a - Inpatient Facility Services, 1b - Outpatient Facility Services, 2a - Inpatient Physician Services, 2b - Outpatient Physician Services, and 2c1 - Outpatient Institution Services - Other Physicians.** At the outset of this contract, an invoice for services rendered under Line Items 1a, 1b, 2a, 2b, and 2c1 shall be a paper version of an invoice containing not more than 50 individual medical claims. Each invoice shall be supported with paper copies of Universal Billing (UB) 92 forms or Centers for Medicare and Medicaid Services (CMS) 1500 forms, as applicable, for each medical claim included in the invoice.

Following written notification to the contractor by the Contracting Officer that a third-party medical claims adjudication service will be utilized by the USP, an invoice for services rendered under Line Items 1a, 1b, 2a, 2b, and 2c1 shall be a paper invoice detailing not more than 50 individual medical claims which have been electronically transmitted to the BOP's medical claims adjudicator via American National Standards Institute (ANSI) 837 format that also conforms to Medicare and Health Insurance Portability and Accountability Act of 1996 (HIPAA) electronic billing standards. For each medical claim included on the invoice, the contractor shall reference, at a minimum, the following information: VREGDOC number, inmate name and register number, date of service, provider of service, billed code, and contract amount billed. Medical claims detailed in the invoice shall be listed first in descending order by the VREGDOC number, second in alphabetic order by the inmate's last name, and third by ascending date of service (i.e., earliest to latest) when more than one medical claim is present for the same inmate within the same invoice.

The Contractor shall not submit a medical claim for processing that the Contractor knows or has reason to believe contains inaccurate, incomplete, or misleading information. Medical claims which contain inaccurate, incomplete, or misleading information shall be held by the Contractor and not submitted until such time as all lines are deemed to be accurate and complete. At that time, the Contractor may proceed with submitting the medical claim for processing and invoicing the USP for all services represented by that medical claim.

**Line Item 2c2 - Outpatient Institution Services – Optometry:** An invoice for services rendered under Line Item 2c2 shall be a paper invoice detailing the date(s) sessions were provided, the number of sessions provided, the unit pricing applied, and the extended total amount due. The BOP will not use the services of a third party medical claims adjudicator for verification of these services.

**Provider Information.**

**Submission of Provider Data to the BOP's Medical Claims Adjudicator.** Within ten calendar days after notification that a third party medical claims adjudication service will be utilized by the USP, the contractor shall provide the BOP's medical claims adjudicator with a complete list of provider information, which will enable the claims adjudicator to accurately identify the correct payable amount for any provider performing services under the Contract. Specific informational requirements are provided in Attachment IV. Provider information supplied to the BOP's medical claims adjudicator should be appropriately marked to identify the data as proprietary information so that it may be adequately protected by the BOP and its contracted medical claims adjudicator. Provider information shall be submitted directly to the BOP's medical claims adjudicator. As individual providers are added to the contractor's network, the contractor shall provide the information listed in Attachment IV to the medical claims adjudicator no less than three business days prior to filing claims electronically for services rendered by such new providers.

**National Provider Identifier (NPI) Numbers.** The contractor shall only utilize providers who have a current National Provider Identifier (NPI) number.

**Electronic Trading Partner Agreement.** The BOP will execute the Electronic Trading Partner Agreement with the medical claims adjudicator (Attachment V). The contractor shall participate in the claims adjudication process described herein as a Business Associate of the BOP. As a Business Associate, the contractor agrees to abide by all terms of the Trading Partner Agreement as it pertains to Business Associates.

**Technical Data for Submission of Claims.** Prior to the submission of an invoice to the USP, the Contractor shall electronically transmit the information found on each individual invoiced claim via ANSI 837 format only, to the BOP's medical claims adjudicator. After the Contractor's electronic transmission to the BOP's medical claims adjudicator, the Contractor shall promptly submit a paper copy of the invoice to the USP. The Contractor will also post the ANSI 837 file in an FTP site set up and maintained by the BOP's medical claims adjudicator. The only exceptions to the electronic filing requirement shall be corrected claims for professional services. Address information for the submission of a paper medical claim to the BOP's medical claims adjudicator is provided in Attachment VI, along with other pertinent details.

**Procedures for Filing Corrected Medical Claims.**

**Facility Services.** If it becomes necessary to file a corrected medical claim for facility services, the Contractor shall electronically transmit the information found on each individual corrected medical claim via ANSI 837 format only, to the BOP's medical claims adjudicator. After the Contractor's electronic transmission to the BOP's medical claims adjudicator, the Contractor shall promptly submit a paper copy of the invoice or credit memo, as applicable, to the USP. Invoices for corrected medical claims shall be clearly marked as such and shall be separate from routine invoices. Invoices or credit memos for corrected medical claims shall detail information pertaining to the original claim submission, including any amount(s) previously paid, and shall bill only for the corrected medical claim submission or reflect the credit amount due for the corrected medical claim submission.

**Physician/Professional Services.** If it becomes necessary to file a corrected medical claim for physician/professional services, the Contractor shall submit the corrected medical claim in hard copy (i.e., paper) format to the BOP's medical claims adjudicator. The word "CORRECTED" shall be prominently displayed on the paper claim. After the Contractor's submission to the BOP's medical claims adjudicator, the contractor shall promptly submit a paper copy of the invoice or credit memo, as applicable, to the USP. Invoices for corrected medical claims shall be clearly marked as such and shall be separate from routine invoices. Invoices or credit memos for corrected medical claims shall detail information pertaining to the original claim submission, including any amount(s) previously paid, and shall bill only for the corrected medical claim submission or reflect the credit amount due for the corrected medical claim submission.

**Payment by the USP.** The USP will pay all invoices directly to the Contractor. If the invoiced amount of a medical claim exceeds the adjudicated amount of that medical claim, the USP will take an administrative deduction from the invoice. The USP will provide written notification to the Contractor when an administrative deduction is taken from an invoice payment.

If the Contractor is in disagreement with the paid amount of a medical claim, the contractor will provide written notification to the USP of the disagreement along with supporting documentation for why the Contractor believes the medical claim was paid incorrectly. The USP will interface between the Contractor and the medical claims adjudicator to bring resolution to any disagreements. If it is determined that a medical claim was paid incorrectly by the USP, interest on the underpayment will be paid when required by the Prompt Payment Act.

**Timeliness of Medical Claims.**

Medical Claims shall be submitted/invoiced within 90 calendar days after an inmate's discharge or outpatient encounter or other service provided under this contract. Medical Claims which are submitted beyond the 90-day requirement shall constitute a performance deficiency under this output and shall be documented in the contractor's performance evaluations. Medical Claims which are submitted within the acceptable time period, but are found to contain errors or require further justification, will be rejected and shall be resubmitted by the contractor within 30 calendar days from the date of rejection. Upon resubmission, invoices for corrected medical claims shall bear the new date of submission.

No later than November 1 of each year, the contractor shall stimulate the billing process by reviewing its records, including those of subcontracted providers, to determine an estimated amount of outstanding charges for services provided through September 30 of that year. Based upon information generated through this review process, the contractor shall provide a written estimate to the USP of outstanding fiscal year obligations, supported by adequate documentation. This estimate and supporting documentation shall be provided to the Contracting Officer no later than December 1 of each year. The contractor shall put forth its best efforts to ensure the accuracy of the annual estimate provided to the Government.

**Output #4: Manage medical record information in a manner which promotes continuity of care while observing restrictions on the release of information.**

Upon request, authorized BOP staff shall have access to and obtain copies of all inmate medical records and evaluation and treatment reports prepared and maintained by the contract facility and/or contract providers. Inmate medical records will be subject to review by the USP for validation of payment and verification of services rendered. Release of information shall only be made in accordance with community standards, Joint Commission regulations, and the Privacy Act of 1974. Any request(s) for copies of an inmate's medical records by the inmate or a third party shall be directed to the COTR for processing.

Notwithstanding the above restrictions on the release of information, medical record information shall be provided to the USP in order to enhance inmate recovery as well as continuity of care. At the completion of treatment, the Contractor shall provide the USP with documented discharge instructions, as provided by the attending physician. A written report by the attending physician which documents the circumstances of the inpatient treatment, outpatient procedure, or other consultation shall be provided to the COTR within ten business days of the inpatient discharge, outpatient procedure, or other consultation. All lab and consultations pending at time of discharge shall be faxed to the COTR upon receipt but not later than ten calendar days past discharge.

**Output #5: Maintain open avenues of communication, facilitating the exchange of information between the contract physician, contract facility, and the Government regarding the contract services.**

The Contractor shall provide a Point of Contact (POC) who shall be responsible for facilitating the Contractor's delivery of health services under this contract. The POC shall have sufficient clinical knowledge to enable preliminary technical consultation, with referral to a specialist if necessary. The Contractor shall designate this individual in writing to the Contracting Officer prior to the start date of the contract. Alternate POC's may be designated, however, the Contractor must identify those times when an alternate shall be the primary POC (i.e., after-hours and weekend referrals).

There shall be an open line of communication between the Contractor, its representatives, and the USP to ensure that only those services ordered by the institution are provided, unless required for intervention in a life-threatening emergency. In the event of a life-threatening emergency, the Contractor shall contact the COTR within a 24-hour time period or the next normal working day. All USP referrals shall be the sole responsibility and decision of the Government. No inmate may be transferred to another medical facility, with exception of emergency cases, without advanced approval by authorized USP medical staff.

**VI. Enhancements to the Basic Contract Requirements**

Offerors are encouraged to propose enhancements to the basic contract requirements which will facilitate the USP's ability to conform to the BOP's stated mission. Due to security concerns inherent in transporting an inmate into the community for medical care, it is the USP's preference to treat inmates within the confines of a secure perimeter whenever possible. Offerings which assist the USP in mitigating security concerns are considered beneficial to the Government and will be evaluated for merit. Enhancements are not additional line items. Pricing for offered enhancements must be absorbed in the line item structure established within Section 2-1. Offerings of enhancements that are separately-priced line items will not be considered or accepted. The Government reserves the right to reject any offered enhancements that are determined not to be in the best interest of the Government.

The offeror's technical proposal shall discuss in detail any such enhancements proposed, including relevant terms and a detailed discussion of the merits of offered enhancements.

**VII. Inmates Who Release from BOP Custody**

Offerors are advised that the BOP retains responsibility only for inmates in the custody of the BOP. The BOP's responsibilities, including fiscal responsibilities, end with the inmate's release from custody. Once released from custody, the former inmate will be




come personally liable for any further medical treatment received. When an inmate's term of commitment expires while the inmate is in inpatient status in a contracted facility, the BOP will use its best effort to notify the contractor in advance of the inmate's projected release date. In preparation of a pending release from BOP custody, the contractor shall provide planning assistance to an inmate who requires continuing or follow-up medical care that extends beyond his or her projected release date.

Should an inmate's release date come while in inpatient status in a contracted hospital, the inmate's place of conviction and/or legal residence is outside the local area, and there are no other entities assuming custodial responsibility for the inmate, the BOP will accept financial responsibility for the inmate's medical care until the BOP can satisfy its obligation provide release transportation for the inmate.

(End of Performance Work Statement)**********

**Section 3 - Contract Clauses**

**A.1 ADDENDUM TO FAR 52.212-4, Contract Terms and Conditions--Commercial Items (June 2010)**

The terms and conditions for the following clauses are hereby incorporated into this solicitation and resulting contract as an addendum to FAR clause 52.212-4.

Clauses By Reference

| Clause | Title |
|---|---|
| 52.203-12 | Limitation On Payments To Influence Certain Federal Transactions (Sept 2007) |
| 52.204-4 | Printed or Copied Double-Sided on Recycled Paper (Aug 2000) |
| 52.204-9 | Personal Identity Verification of Contractor Personnel. (Sept 2007) |
| 52.212-4 | Contract Terms and Conditions--Commercial Items (June 2010) |
| 52.223-5 | Pollution Prevention and Right-to-Know Information (Aug 2003) |
| 52.224-1 | Privacy Act Notification (Apr 1984) |
| 52.224-2 | Privacy Act (Apr 1984) |
| 52.228-5 | Insurance - Work on a Government Installation (Jan 1997) |
| 52.232-18 | Availability Of Funds (Apr 1984) |
| 52.237-2 | Protection Of Government Buildings, Equipment, And Vegetation (Apr 1984) |
| 52.253-1 | Computer Generated Forms (Jan 1991) |

Clauses By Full Text

52.24-403-70 Notice of Contractor Personnel Security Requirements (OCT 2005)

Compliance with Homeland Security Presidential Directive-12 (HSPD-12) and Federal Information Processing Standard Publication 201 (FIPS 201)[1] entitled "Personal Identification Verification (PIV) for Federal Employees and Contractors," Phase I.
1. Long-Term Contractor Personnel:
In order to be compliant with HSPD-12/PIV I, the following investigative requirements must be met for each new long-term [2] contractor employee whose background investigation (BI) process begins on or after October 27, 2005:
a. Contractor Personnel must present two forms of identification in original form prior to badge issuance (acceptable documents are listed in Form I-9, OMB No. 1615-0047, "Employment Eligibility Verification," and at least one document must be a valid State or Federal government-issued picture ID);
b. Contractor Personnel must appear in person at least once before a DOJ official who is responsible for checking the identification documents. This identity proofing must be completed sometime during the clearance process but prior to badge issuance and must be documented by the DOJ official;
c. Contractor Personnel must undergo a BI commensurate with the designated risk level associated with the duties of each position. Outlined below are the minimum BI requirements for each risk level:

- High Risk - Background Investigation (5 year scope)
- Moderate Risk - Limited Background Investigation (LBI) or Minimum Background Investigation (MBI)
- Low Risk - National Agency Check with Inquiries (NACI) investigation

d. The pre-appointment BI waiver requirements for all position sensitivity levels are a:
1) Favorable review of the security questionnaire form;
2) Favorable fingerprint results;
3) Favorable credit report, if required;[3]
4) Waiver request memorandum, including both the Office of Personnel Management schedule date and position sensitivity/risk level; and
5) Favorable review of the National Agency Check (NAC)[4] portion of the applicable BI that is determined by position sensitivity/risk level.
A badge may be issued following approval of the above waiver requirements.
If the NAC is not received within five days of OPM's scheduling date, the badge can be issued based on a favorable review of the Security Questionnaire and the Federal Bureau of Investigation Criminal History Check (i.e., fingerprint check results).
e. Badge re-validation will occur once the investigation is completed and favorably adjudicated. If the BI results so justify, badges issued under these procedures will be suspended or revoked.
2. Short-Term Contractor Personnel:
It is the policy of the DOJ that short-term contractors having access to DOJ information systems and/or DOJ facilities or space for six months or fewer are subject to the identity proofing requirements listed in items 1a. and 1b. above. The pre-appointment waiver requirements for short-term contractors are:
a. Favorable review of the security questionnaire form;
b. Favorable fingerprint results;
c. Favorable credit report, if required;[5] and
d. Waiver request memorandum indicating both the position sensitivity/risk level and the duration of the appointment. The commensurate BI does not need to be initiated.
A badge may be issued following approval of the above waiver requirements and the badge will expire six months from the date of issuance. This process can only be used once for a short-term contractor in a twelve month period. This will ensure that any consecutive short-term appointments are subject to the full PIV-I identity proofing process.
For example, if a contractor employee requires daily access for a three or four-week period, this contractor would be cleared according to the above short-term requirements. However, if a second request is submitted for the same contractor employee within a twelve-month period for the purpose of extending the initial contract or for employment under a totally different contract for another three or four-week period, this contractor would now be considered "long-term" and must be cleared according to the long-term requirements as stated in this interim policy.
3. Intermittent Contractors:
An exception to the above-mentioned short-term requirements would be intermittent contractors.
a. For purposes of this policy, "intermittent" is defined as those contractor employees needing access to DOJ information systems and/or DOJ facilities or space for a maximum of one day per week, regardless of the duration of the required intermittent access. For example, the water delivery contractor that delivers water one time each week and is working on a one-year contract.
b. Contractors requiring intermittent access should follow the Department's escort policy. Please reference the August 11, 2004, and January 29, 2001, Department Security Officer policy memoranda that conveys the requirements for contractor facility escorted access.
c. Due to extenuating circumstances, if a component requests unescorted access or DOJ IT system access for an intermittent contractor, the same pre-employment background investigation waiver requirements that apply to short-term contractors are required.
d. If an intermittent contractor is approved for unescorted access, the contractor will only be issued a daily badge. The daily badge will be issued upon entrance into a DOJ facility or space and must be returned upon exiting the same facility or space.
e. If an intermittent contractor is approved for unescorted access, the approval will not exceed one year. If the intermittent contractor requires unescorted access beyond one year, the contractor will need to be re-approved each year.
4. An individual transferring from another department or agency shall not be re-adjudicated provided the individual has a current

(within the last five years), favorably adjudicated BI meeting HSPD-12 and DOJ's BI requirements.
5. The DOJ's current escorted contractor policy remains unchanged by this acquisition notice.
**Notes:**
1. FIPS 201 is available at: www.csrc.nist.gov/publications/fips/fips201/FIPS-201-022505.pdf
2. Under HSPD-12, long-term contractors are contractors having access to DOJ information systems and/or DOJ facilities or space for six months or longer. The PIV-I identity proofing process, including initiation and adjudication of the required background investigation, is required for all new long-term contractors regardless of whether it is the current practice to issue a badge. The second phase of HSPD-12 implementation (PIV-II) requires badge issuance to all affected long-term contractors.
3. For contractors in position sensitivity/risk levels above level 1, a favorable review of a credit check is required as part of the pre-appointment waiver package.
4. In order to avoid a delay in the hiring process, components should request an Advance NAC Report when initiating investigations to OPM. Per OPM ' s instructions, to obtain an Advance NAC Report, a Code " 3 " must be placed in block " B " of the " Agency Use Only " section of the investigative form. This report is available for all case types.
5.For contractors in position sensitivity/risk levels above level 1, a favorable review of a credit check is required as part of the pre-appointment waiver package.

[End of Clause]

52.27-103-72 DOJ CONTRACTOR RESIDENCY REQUIREMENT BUREAU OF PRISONS (JUNE 2004)

For three of the five years immediately prior to submission of an offer/bid/quote, or prior to performance under a contract or commitment, individuals or contractor employees providing services must have:
1. Legally resided in the United States (U.S.);
2. worked for the U.S. overseas in a Federal or military capacity; or
3. been a dependent of a Federal or military employee serving overseas.
If the individual is not a U.S. citizen, they must be from a country allied with the U.S. The following website provides current information regarding allied countries: http://www.opm.gov/employ/html/citizen.htm
By signing this contract or commitment document, or by commencing performance, the contractor agrees to this restriction.
[End of Clause]

52.209-9 (Deviation) Updates of Information Regarding Responsibility Matters (OCT 2010) (DEVIATION)

(a) (1) The Contractor shall update the information in the Federal Awardee Performance and Integrity Information System (FAPIIS) on a semi-annual basis, throughout the life of the contract, by posting the required information in the Central contractor Registration database at http://www.ccr.gov (see 52.204-7).

(2) At the first semi-annual update on or after April 15, 2011, the Contractor shall post again any required information that the Contractor posted prior to April 15, 2011.

(b) (1) The Contractor will receive notification when the Government posts new information to the Contractor's record.

(2) The Contractor will have an opportunity to post comments regarding information that has been posted by the Government. The comments will be retained as long as the associated information is retained, i.e., for a total period of 6 years. Contractor comments will remain a part of the record unless the Contractor revises them.

(3) Public access to information in FAPIIS.
(i) Public requests for system information that was submitted prior to April 15, 2011, will be handled under Freedom of Information Act procedures, including, where appropriate, procedures promulgated under E.O. 12600.
(ii) As required by section 3010 of Public Law 111-212, all information posted in FAPIIS on or after April 15, 2011, except past performance reviews, will be publicly available.

(End of Clause)

52.216-18 Ordering (Oct 1995)

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued from the first day of the effective contract period through the last day of the effective contract period.
(b) All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.
(c) If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally, by facsimile, or by electronic commerce methods only if authorized in the Schedule.
(End of clause)

52.216-19 Order Limitations (Oct 1995)

(a) Minimum order. When the Government requires supplies or services covered by this contract in an amount of less than $50.00, the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.
(b) Maximum order. The Contractor is not obligated to honor--
(1) Any order for a single item in excess of the estimated quantities within the current performance period as identified in Section 2.1;
(2) Any order for a combination of items in excess of the estimated quantities within the current performance period as identified in Section 2.1; or
(3) A series of orders from the same ordering office within 30 days that together call for quantities exceeding the limitation in paragraph (b)(1) or (2) of this section.
(c) If this is a requirements contract (i.e., includes the Requirements clause at subsection 52.216-21 of the Federal Acquisition Regulation (FAR)), the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) of this section.
(d) Notwithstanding paragraphs (b) and (c) of this section, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b), unless that order (or orders) is returned to the ordering office within 7 days after issuance, with written notice stating the Contractor's intent not to ship the item (or items) called for and the reasons. Upon receiving this notice, the Government may acquire the supplies or services from another source.
(End of clause)

52.216-21 Requirements (Oct 1995)

(a) This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.
(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. Subject to any limitations in the Order Limitations clause or elsewhere in this contract, the Contractor shall furnish to the Government all supplies or services specified in the Schedule and called for by orders issued in accordance with the Ordering clause. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.
(c) Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.
(d) The Government is not required to purchase from the Contractor requirements in excess of any limit on total orders under this contract.
(e) If the Government urgently requires delivery of any quantity of an item before the earliest date that delivery may be specified under this contract, and if the Contractor will not accept an order providing for the accelerated delivery, the Government may acquire the urgently required goods or services from another source.
(f) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after the last day of the effective contract period.
(End of clause)

52.217-8 Option to Extend Services (Nov 1999)

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within the current performance period.
(End of clause)

52.217-9 Option to Extend the Term of the Contract (Mar 2000)

(a) The Government may extend the term of this contract by written notice to the Contractor within current performance period; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days *(60 days unless a different number of days is inserted)* before the contract expires. The preliminary notice does not commit the Government to an extension.
(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.
(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years, but excludes the exercise of any option under the clause 52.217-8, Option to Extend Services, which is incorporated into this contract in full text.
(End of clause)

52.218-000 CONTINUING CONTRACT PERFORMANCE DURING A PANDEMIC INFLUENZA OR OTHER NATIONAL EMERGENCY (May 2008)




During a Pandemic or other emergency we understand that our contractor workforce will experience the same high levels of absenteeism as our federal employees. Although the Excusable Delays and Termination for Default clauses used in Government contracts list epidemics and quarantine restrictions among the reasons to excuse delays in contract performance, we expect our contractors to make a reasonable effort to keep performance at an acceptable level during emergency periods.
The Office of Personnel Management (OPM) has provided guidance to federal managers and employees on the kinds of actions to be taken to ensure the continuity of operations during emergency periods. This guidance is also applicable to our contract workforce. Contractors are expected to have reasonable policies in place for continuing work performance, particularly those performing mission critical services, during a pandemic influenza or other emergency situation.
The types of actions a federal contractor should reasonably take to help ensure performance are:

- Encourage employees to get inoculations or follow other preventive measures as advised by the public health service.
- Cross-train workers as backup for all positions performing critical services. This is particularly important for work such as guard services where telework is not an option.
- Implement telework to the greatest extent possible in the workgroup so systems are in place to support successful remote work in an emergency.
- Communicate expectations to all employees regarding their roles and responsibilities in relation to remote work in the event of a pandemic health crisis or other emergency.
- Establish communication processes to notify employees of activation of this plan.
- Integrate pandemic health crisis response expectations into telework agreements.
- With the employee, assess requirements for working at home (supplies and equipment needed for an extended telework period). Security concerns should be considered in making equipment choices; agencies or contractors may wish to avoid use of employees' personal computers and provide them with PCs or laptops as appropriate.
- Determine how all employees who may telework will communicate with one another and with management to accomplish work.
- Practice telework regularly to ensure effectiveness.
- Make it clear that in emergency situations, employees must perform all duties assigned by management, even if they are outside usual or customary duties.
- Identify how time and attendance will be maintained.

It is the contractor's responsibility to advise the Government Contracting Officer if they anticipate not being able to perform and to work with the Department to fill gaps as necessary. This means direct communication with the Contracting Officer or in his/her absence, another responsible person in the contracting office via telephone or email messages acknowledging the contractor's notification. The incumbent contractor is responsible for assisting the Department in estimating the adverse impacts of nonperformance and to work diligently with the Department to develop a strategy for maintaining the continuity of operations.
The Department does reserve the right in such emergency situations to use Federal employees, employees of other agencies, contract support from other existing contractors, or to enter into new contracts for critical support services. Any new contracting efforts would be acquired following the guidance in the Office of Federal Procurement Policy issuance "Emergency Acquisitions", May, 2007 and Subpart 18.2, Emergency Acquisition Flexibilities, of the Federal Acquisition Regulations.
(End of Clause)

52.252-6 Authorized Deviations in Clauses (Apr 1984)

(a) The use in this solicitation or contract of any Federal Acquisition Regulation (48 CFR Chapter 1) clause with an authorized deviation is indicated by the addition of(DEVIATION)after the date of the clause.
(b) The use in this solicitation or contract of any Justice Acquisition Regulation. (48 CFR Chapter 28]) clause with an authorized deviation is indicated by the addition of(DEVIATION)after the name of the regulation.
(End of clause)

52.232-19 Availability Of Funds For The Next Fiscal Year (Apr 1984)

Funds are not presently available for performance under this contract beyond September 30 of the base year or any option year exercised. The Government's obligation for performance of this contract beyond that date is contingent upon the availability of appropriated funds from which payment for contract purposes can be made. No legal liability on the part of the Government for any payment may arise for performance under this contract beyond September 30 of the base year or any option year exercised, until funds are made available to the Contracting Officer for performance and until the Contractor receives notice of availability, to be confirmed in writing by the Contracting Officer.

(End of clause)

52.237-7 Indemnification and Medical Liability Insurance (Jan 1997)

(a) It is expressly agreed and understood that this is a nonpersonal services contract, as defined in Federal Acquisition Regulation (FAR) 37.101, under which the professional services rendered by the Contractor are rendered in its capacity as an independent contractor. The Government may evaluate the quality of professional and administrative services provided, but retains no control over professional aspects of the services rendered, including by example, the Contractor's professional medical judgment, diagnosis, or specific medical treatments. The Contractor shall be solely liable for and expressly agrees to indemnify the Government with respect to any liability producing acts or omissions by it or by its employees or agents. The Contractor shall maintain during the term of this contract liability insurance issued by a responsible insurance carrier of not less than the following amount(s) per specialty per occurrence: *as required by the Commonwealth of Pennsylvania.
(b) An apparently successful offeror, upon request by the Contracting Officer, shall furnish prior to contract award evidence of its insurability concerning the medical liability insurance required by paragraph (a) of this clause.
(c) Liability insurance may be on either an occurrence basis or on a claims-made basis. If the policy is on a claims-made basis, an extended reporting endorsement (tail) for a period of not less than 3 years after the end of the contract term must also be provided.
(d) Evidence of insurance documenting the required coverage for each health care provider who will perform under this contract shall be provided to the Contracting Officer prior to the commencement of services under this contract. If the insurance is on a claims-made basis and evidence of an extended reporting endorsement is not provided prior to the commencement of services, evidence of such endorsement shall be provided to the Contracting Officer prior to the expiration of this contract. Final payment under this contract shall be withheld until evidence of the extended reporting endorsement is provided to the Contracting Officer.
(e) The policies evidencing required insurance shall also contain an endorsement to the effect that any cancellation or material change adversely affecting the Government's interest shall not be effective until 30 days after the insurer or the Contractor gives written notice to the Contracting Officer. If, during the performance period of the contract the Contractor changes insurance providers, the Contractor must provide evidence that the Government will be indemnified to the limits specified in paragraph (a) of this clause, for the entire period of the contract, either under the new policy, or a combination of old and new policies.
(f) The Contractor shall insert the substance of this clause, including this paragraph (f), in all subcontracts under this contract for health care services and shall require such subcontractors to provide evidence of and maintain insurance in accordance with paragraph (a) of this clause. At least 5 days before the commencement of work by any subcontractor, the Contractor shall furnish to the Contracting Officer evidence of such insurance.
(End of clause)
* Contracting Officer insert the dollar value(s) of standard coverage(s) prevailing within the local community as to the specific medical specialty, or specialties, concerned, or such higher amount as the Contracting Officer deems necessary to protect the Government's interests.

2852.201-70 Contracting Officer's Technical Representative (COTR) (JAN 1985)

(a) Mr./Ms. Mr. Steve Brown of USP Lewisburg Health Services, 2400 Robert F. Miller Drive, Lewisburg, Pennsylvania 17837, 570-547-7950, is hereby designated to act as Contracting Officer's Technical Representative (COTR) under this contract.
(b) The COTR is responsible, as applicable, for: receiving all deliverables, inspecting and accepting the supplies or services provided hereunder in accordance with the terms and conditions of this contract; providing direction to the contractor which clarifies the contract effort, fills in details or otherwise serves to accomplish the contractual Scope of Work; evaluating performance; and certifying all invoices/vouchers for acceptance of the supplies or services furnished for payment.
(c) The COTR does not have the authority to alter the contractor's obligations under the contract, and/or modify any of the expressed terms, conditions, specifications, or cost of the agreement. If as a result of technical discussions it is desirable to alter/change contractual obligations or the Scope of Work, the Contracting Officer shall issue such changes.
(End of Clause)

2852.223-70 Unsafe Conditions Due to the Presence of Hazardous Material (June 1996)

(a) "Unsafe condition" as used in this clause means the actual or potential exposure of contractor or Government employees to a hazardous material as defined in Federal Standard No. 313, and any revisions thereto during the term of this contract, or any other material or working condition designated by the Contracting Officer's Technical Representative (COTR) as potentially hazardous and requiring safety controls.
(b) The Occupational Safety and Health Administration (OSHA) is responsible for issuing and administering regulations that require contractors to apprise its employees of all hazards to which they may be exposed in the course of their employment; proper conditions and precautions for safe use and exposure; and related symptoms and emergency treatment in the event of exposure.
(c) Prior to commencement of work, contractors are required to inspect for and report to the contracting officer or designee the presence of, or suspected presence of, any unsafe condition including asbestos or other hazardous materials or working conditions in areas in which they will be working.
(d) If during the performance of the work under this contract, the contractor or any of its employees, or subcontractor employees, discovers the existence of an unsafe condition, the contractor shall immediately notify the contracting officer, or designee, (with written notice provided not later than three (3) working days thereafter) of the existence of an unsafe condition. Such notice shall include the contractor's recommendations for the protection and the safety of Government, contractor and subcontractor personnel and property

that may be exposed to the unsafe condition.
(e) When the Government receives notice of an unsafe condition from the contractor, the parties will agree on a course of action to mitigate the effects of that condition and, if necessary, the contract will be amended. Failure to agree on a course of action will constitute a dispute under the Disputes clause of this contract.
(f) Nothing contained in this clause shall relieve the contractor or subcontractors from complying with applicable Federal, State, and local laws, codes, ordinances and regulations (including the obtaining of licenses and permits) in connection with hazardous material including but not limited to the use, disturbance, or disposal of such material.
(End of Clause)
**[END OF ADDENDUM TO FAR 52.212-4]**

52.212-5 Contract Terms and Conditions Required to Implement Statutes or Executive Orders—Commercial Items (July 2010)

(a) The Contractor shall comply with the following Federal Acquisition Regulation (FAR) clauses, which are incorporated in this contract by reference, to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

(1) 52.222-50, Combating Trafficking in Persons (Feb 2009) (22 U.S.C. 7104(g)).

__Alternate I (Aug 2007) of 52.222-50 (22 U.S.C.7104(g)).

(2) 52.233-3, Protest After Award (Aug 1996) (31 U.S.C. 3553).

(3) 52.233-4, Applicable Law for Breach of Contract Claim (Oct 2004) (Pub. L. 108-77, 108-78).

(b) The Contractor shall comply with the FAR clauses in this paragraph (b) that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

*[Contracting Officer check as appropriate.]*

xx (1) 52.203-6, Restrictions on Subcontractor Sales to the Government (Sept 2006), with Alternate I (Oct 1995) (41 U.S.C. 253g and 10 U.S.C. 2402).
xx(2) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr 2010) (Pub. L. 110-252, Title VI, Chapter 1 (41 U.S.C. 251 note)).
xx(3) 52.203-15, Whistleblower Protections under the American Recovery and Reinvestment Act of 2009 (June 2010) (Section 1553 of Pub. L. 111-5). (Applies to contracts funded by the American Recovery and Reinvestment Act of 2009.)
__(4) 52.204-11, American Recovery and Reinvestment Act – Reporting Requirements (Mar 2009) (Pub. L. 111-5).
__(5) 52.219-3, Notice of Total HUBZone Set-Aside (Jan 1999) (15 U.S.C. 657a).
xx (6) 52.219-4, Notice of Price Evaluation Preference for HUBZone Small Business Concerns (July 2005) (if the offeror elects to waive the preference, it shall so indicate in its offer) (15 U.S.C. 657a).
__ (7) [Reserved]
__ (8)(i)52.219-6, Notice of Total Small Business Set-Aside (June 2003) (15 U.S.C. 644).
__ (ii) Alternate I (Oct 1995) of 52.219-6.
__ (iii) Alternate II (Mar 2004) of 52.219-6.
__ (9)(i)52.219-7, Notice of Partial Small Business Set-Aside (June 2003) (15 U.S.C. 644).
__ (ii) Alternate I (Oct 1995) of 52.219-7.
__ (iii) Alternate II (Mar 2004) of 52.219-7.
xx (10) 52.219-8, Utilization of Small Business Concerns (May 2004) (15 U.S.C. 637(d)(2) and (3)).
xx (11)(i)52.219-9, Small Business Subcontracting Plan (July 2010) (15 U.S.C. 637(d)(4)).
__ (ii) Alternate I (Oct 2001) of 52.219-9.
__ (iii) Alternate II (Oct 2001) of 52.219-9.
__(iv) Alternate III (July 2010) of 52.219-9.
__ (12) 52.219-14, Limitations on Subcontracting (Dec 1996) (15 U.S.C. 637(a)(14)).
xx (13) 52.219-16, Liquidated Damages-Subcontracting Plan (Jan 1999) (15 U.S.C. 637(d)(4)(F)(i)).
__ (14)(i) 52.219-23, Notice of Price Evaluation Adjustment for Small Disadvantaged Business Concerns (Oct 2008) (10 U.S.C. 2323) (if the offeror elects to waive the adjustment, it shall so indicate in its offer).
__ (ii) Alternate I (June 2003) of 52.219-23.
xx (15) 52.219-25, Small Disadvantaged Business Participation Program – Disadvantaged Status and Reporting (Apr 2008) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).
__ (16) 52.219-26, Small Disadvantaged Business Participation Program – Incentive Subcontracting (Oct 2000) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).
__ (17) 52.219-27, Notice of Total Service-Disabled Veteran-Owned Small Business Set-Aside (May 2004) (15 U.S.C. 657 f).
xx(18) 52.219-28, Post Award Small Business Program Rerepresentation (Apr 2009) (15 U.S.C. 632(a)(2)).

xx (19) 52.222-3, Convict Labor (June 2003) (E.O. 11755).
__ (20) 52.222-19, Child Labor – Cooperation with Authorities and Remedies (Aug 2009) (E.O. 13126).
xx (21) 52.222-21, Prohibition of Segregated Facilities (Feb 1999).
xx (22) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).
xx (23) 52.222-35, Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (Sept 2006) (38 U.S.C. 4212).
xx (24) 52.222-36, Affirmative Action for Workers with Disabilities (Jun 1998) (29 U.S.C. 793).
xx (25) 52.222-37, Employment Reports on Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (Sept 2006) (38 U.S.C. 4212).
xx(26) 52.222-54, Employment Eligibility Verification (Jan 2009). (Executive Order 12989). (Not applicable to the acquisition of commercially available off-the-shelf items or certain other types of commercial items as prescribed in 22.1803.)
__(27)(i) 52.223-9, Estimate of Percentage of Recovered Material Content for EPA-Designated Items (May 2008) (42 U.S.C. 6962(c)(3)(A)(ii)). (Not applicable to the acquisition of commercially available off-the-shelf items.)
__ (ii) Alternate I (May 2008) of 52.223-9 (42 U.S.C. 6962(i)(2)(C)). (Not applicable to the acquisition of commercially available off-the-shelf items.)
__(28) 52.223-15, Energy Efficiency in Energy-Consuming Products (Dec 2007) (42 U.S.C. 8259b).
__(29)(i) 52.223-16, IEEE 1680 Standard for the Environmental Assessment of Personal Computer Products (Dec 2007) (E.O. 13423).
__(ii) Alternate I (Dec 2007) of 52.223-16.
__ (30) 52.225-1, Buy American Act – Supplies (Feb 2009) (41 U.S.C. 10a-10d).
__ (31)(i) 52.225-3, Buy American Act – Free Trade Agreements – Israeli Trade Act (June 2009) (41 U.S.C. 10a-10d, 19 U.S.C. 3301 note, 19 U.S.C. 2112 note, 19 U.S.C. 3805 note, Pub. L. 108-77, 108-78, 108-286, 108-302, 109-53, 109-169, 109-283, and 110-138).
__ (ii) Alternate I (Jan 2004) of 52.225-3.
__ (iii) Alternate II (Jan 2004) of 52.225-3.
__ (32) 52.225-5, Trade Agreements (Aug 2009) (19 U.S.C. 2501, *et seq.*, 19 U.S.C. 3301 note).
xx (33) 52.225-13, Restrictions on Certain Foreign Purchases (June 2008) (E.O.'s, proclamations, and statutes administered by the Office of Foreign Assets Control of the Department of the Treasury).
__ (34) 52.226-4, Notice of Disaster or Emergency Area Set-Aside (Nov 2007) (42 U.S.C. 5150).
__ (35) 52.226-5, Restrictions on Subcontracting Outside Disaster or Emergency Area (Nov 2007) (42 U.S.C. 5150).
__ (36) 52.232-29, Terms for Financing of Purchases of Commercial Items (Feb 2002) (41 U.S.C. 255(f), 10 U.S.C. 2307(f)).
__ (37) 52.232-30, Installment Payments for Commercial Items (Oct 1995) (41 U.S.C. 255(f), 10 U.S.C. 2307(f)).
xx (38) 52.232-33, Payment by Electronic Funds Transfer – Central Contractor Registration (Oct 2003) (31 U.S.C. 3332).
__ (39) 52.232-34, Payment by Electronic Funds Transfer – Other than Central Contractor Registration (May 1999) (31 U.S.C. 3332).
__ (40) 52.232-36, Payment by Third Party (Feb 2010) (31 U.S.C. 3332).
__ (41) 52.239-1, Privacy or Security Safeguards (Aug 1996) (5 U.S.C. 552a).
__ (42)(i)52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631).
__ (ii) Alternate I (Apr 2003) of 52.247-64.

(c) The Contractor shall comply with the FAR clauses in this paragraph (c), applicable to commercial services, that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

*[Contracting Officer check as appropriate.]*

xx (1) 52.222-41, Service Contract Act of 1965 (Nov 2007) (41 U.S.C. 351, *et seq.*).
xx (2) 52.222-42, Statement of Equivalent Rates for Federal Hires (May 1989) (29 U.S.C. 206 and 41 U.S.C. 351, *et seq.*).
__ (3) 52.222-43, Fair Labor Standards Act and Service Contract Act – Price Adjustment (Multiple Year and Option Contracts) (Sep 2009) (29 U.S.C. 206 and 41 U.S.C. 351, *et seq.*).
__ (4) 52.222-44, Fair Labor Standards Act and Service Contract Act – Price Adjustment (Sep 2009) (29 U.S.C. 206 and 41 U.S.C. 351, *et seq.*).
xx(5) 52.222-51, Exemption from Application of the Service Contract Act to Contracts for Maintenance, Calibration, or Repair of Certain Equipment – Requirements (Nov 2007) (41 U.S.C. 351, *et seq.*).
__(6) 52.222-53, Exemption from Application of the Service Contract Act to Contracts for Certain Services – Requirements (Feb 2009) *(41 U.S.C. 351, et seq.)*.
__ (7) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (Mar 2009) (Pub. L. 110-247).
__(8) 52.237-11, Accepting and Dispensing of $1 Coin (Sept 2008) (31 U.S.C. 5112(p)(1)).

(d)*Comptroller General Examination of Record.* The Contractor shall comply with the provisions of this paragraph (d) if this contract was awarded using other than sealed bid, is in excess of the simplified acquisition threshold, and does not contain the clause at 52.215-2, Audit and Records – Negotiation.

(1) The Comptroller General of the United States, or an authorized representative of the Comptroller General, shall have access to and right to examine any of the Contractor's directly pertinent records involving transactions related to this contract.

(2) The Contractor shall make available at its offices at all reasonable times the records, materials, and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in FAR Subpart 4.7, Contractor Records Retention, of the other clauses of this contract. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(3) As used in this clause, records include books, documents, accounting procedures and practices, and other data, regardless of type and regardless of form. This does not require the Contractor to create or maintain any record that the Contractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e)(1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), (c), and (d) of this clause, the Contractor is not required to flow down any FAR clause, other than those in this paragraph (e)(1) in a subcontract for commercial items. Unless otherwise indicated below, the extent of the flow down shall be as required by the clause–

(i) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr 2010) (Pub. L. 110-252, Title VI, Chapter 1 (41 U.S.C. 251 note)).

(ii) 52.219-8, Utilization of Small Business Concerns (May 2004) (15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $550,000 ($1,000,000 for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

(iii) [Reserved]

(iv) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

(v) 52.222-35, Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (Sept 2006) (38 U.S.C. 4212).

(vi) 52.222-36, Affirmative Action for Workers with Disabilities (June 1998) (29 U.S.C. 793).

(vii)[Reserved]

(viii) 52.222-41, Service Contract Act of 1965 (Nov 2007) (41 U.S.C. 351, *et seq.*).

(ix) 52.222-50, Combating Trafficking in Persons (Feb 2009) (22 U.S.C. 7104(g)).

__Alternate I (Aug 2007) of 52.222-50 (22 U.S.C.7104(g)).

(x) 52.222-51, Exemption from Application of the Service Contract Act to Contracts for Maintenance, Calibration, or Repair of Certain Equipment-Requirements (Nov 2007) (41 U.S.C. 351, *et seq.*).

(xi) 52.222-53, Exemption from Application of the Service Contract Act to Contracts for Certain Services-Requirements (Feb 2009)(41 U.S.C. 351, *et seq.*).

(xii) 52.222-54, Employment Eligibility Verification (Jan 2009).

(xiii) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (Mar 2009) (Pub. L. 110-247). Flow down required in accordance with paragraph (e) of FAR clause 52.226-6.

(xiv) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C.Appx. 1241(b) and 10 U.S.C. 2631). Flow down required in accordance with paragraph (d) of FAR clause 52.247-64.

(2) While not required, the contractor may include in its subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

(End of clause)

**Section 4 - List of Attachments**

| Identifier | Title | Number of Pages |
|---|---|---|
| 1 | Attachment I - Computation of Basic MS-DRG Payments - CBSA 48700 | 1 |
| 2 | Attachment II - Medical Classification - Levels of Care Criteria | 4 |
| 3 | Attachment III - Performance-Based Outpatient Measure Indicators | 2 |
| 4 | Attachment IV - List of Provider Information Requirements | 1 |
| 5 | Attachment V - Electronic Trading Partner Agreement | 15 |
| 6 | Attachment VI - Informational and Requirements for Medical Claims | 1 |
| 7 | Attachment VII - Technical Proposal Summary Sheets | 3 |
| 8 | Attachment VIII - Past Performance Questionnaire for Bureau of Prisons Medical Services Contract | 5 |

4-1 Special Contract Conditions

**SPECIAL CONTRACT CONDITIONS**

**Type of Contract:** The Government contemplates award of an indefinite delivery, requirements type contract with firm fixed unit prices resulting from this solicitation. It is anticipated that a contract award resulting from this solicitation will be made approximately October 1, 2012.

The resulting contract will include four 12-month option periods for renewal at the unilateral discretion of the Government. Pursuant to FAR 17.203(b), the Government's evaluation shall be inclusive of options. Pursuant to FAR 17.203(d), offerors may offer varying prices for options, depending on the quantities actually ordered and the dates when ordered. Offerors are advised that the Government has the unilateral right to exercise option periods in accordance with FAR 43.103(b) and 52.217-9, "Option to Extend the Term of the Contract" and 52.217-8, "Option to Extend Services", when conditions identified by FAR 37.111 exist.

**Non-Personal Services Status:** Award of this contract will result in a contractual arrangement only and shall not be construed as a personal appointment with the BOP. The services shall not constitute an employer/employee relationship. Payments to the Contractor shall be based on the provision of an end product or the accomplishment of a specific task. Results to be obtained are within the Contractor's own unsupervised determination. The Contractor will not be subject to Government supervision but its efforts will be monitored for quality assurance.

Pursuant to FAR 37.401, the resulting contract shall be a non-personal health care services contract, under which the Contractor is an independent contractor. The Government may evaluate the quality of professional and administrative services provided, but retains no control over the medical, professional aspects of services rendered (e.g., professional judgments, diagnosis for specific medical treatment). The Contractor shall indemnify the Government for any liability producing act or omission by the Contractor, its employees and agents occurring during contract performance. The Contractor shall maintain medical liability insurance as required by FAR 52.237-7 entitled "Indemnification and Medical Liability Insurance". The Contractor is required to ensure that its subcontracts for provision of health care services contain the requirements of the clause at FAR 52.237-7 including the maintenance of medical liability insurance.

**Reviews:** The Contracting Officer or designee is authorized to review by on-site survey, review of records, or by any other reasonable manner, the quality of services rendered under this contract. All records shall be subject to review by the Contracting Officer or other representative of the BOP.

Payments will be denied when such service does not support the charges or if the service is deemed not necessary or appropriate. Such determinations may be made by the Contracting Officer or COTR, whichever is appropriate. The provider shall furnish medical information including a narrative summary when requested by the Contracting Officer or designee. Adequate records shall be maintained to reflect accuracy with respect to claims submission as well as for quality and appropriateness of care. All records shall be subject to review by the Contracting Officer or other delegated representatives of the BOP.

**Performance:** The periods of performance of the resulting contract shall be as follows:

Base Year: Date of award (DOA) through 12 months from DOA
Option Year 1: 13 months through 24 months from DOA
Option Year 2: 25 months through 36 months from DOA
Option Year 3: 37 months through 48 months from DOA
Option Year 4: 49 months through 60 months from DOA

The Contractor shall commence full performance of Inpatient and Outpatient Facility/Physician Services under this contract within 30 calendar days from date of award of the contract and shall provide a complete security clearance investigation package for each institutional-based provider no later than 30 calendar days from date of award. In accordance with FAR 46.503 and 46.403(a)(6), the place of acceptance for services under this contract is at the destination, the United States Penitentiary Lewisburg, PA. The Contractor shall provide the contract services independent of Government supervision.

**Contract Administration:** Contracting Officer Responsibility: Authority to negotiate changes in the terms, conditions, or amounts cited in this contract is reserved to the Contracting Officer. This responsibility may be delegated to an Administrative Contracting Officer by the Contracting Officer.

Ordering Official: Task orders may be issued only by the Contracting Officer, Administrative Contracting Officer, or an ordering official for the USP with an appropriate certificate of appointment or a delegation of authority for purchase card acquisitions. Task orders issued under the resulting contract will take the form of a BOP purchase request, purchase order, or purchase card acquisition form.

Contracting Officer's Technical Representative: The Contracting Officer will designate in writing a COTR who shall be responsible for:

a) Monitoring technical progress, including surveillance and assessment of performance and issuing technical changes;

b) Interpreting the scope of work;

c) Technical evaluation as required;

d) Technical inspection and acceptance;

e) Assisting in the resolution of technical problems encountered by the service provider during contract performance;

f) Monitoring funds available for obligation;

g) Ensuring that task orders are issued in accordance with appropriate terms;

h) Ensuring that invoices and payments are processed in a timely manner;

i) Assisting in the resolution of administrative problems encountered by the service provider during the contract performance.

**Contract Security/Investigative Requirements:** The employees of the Contractor entering the institution shall meet certain security requirements to receive an institutional pass as required by Bureau of Prisons Program Statement 3000.03 dated December 19, 2007. Primary concerns are the amount of contact that may occur between the Contractor and his/her employees/subcontractors with the inmate population during the performance of the contract.

The program manager at the USP is responsible for conducting the appropriate vouchering, law enforcement checks, and ensuring that fingerprinting is completed on all Contractor staff that may need access inside the confines of the secure perimeter. The BOP personnel department will establish a security file that will be maintained on each of the contractor's employees/subcontractors from the beginning of the contract through its duration. The following investigative procedures will be performed:

National Crime Information Center (NCIC) check;
DOJ-99 (name check);
FD-258 (fingerprint check);
Law Enforcement Agency checks;
Vouchering of Employers;
Resume/Personal Qualifications;
OPM-329-A (Authority for Release of Information);
Complete Contractor Pre-employment form
National Agency Check and Inquiries (NACI) check (if applicable); and
Urinalysis Test (for the detection of marijuana and other drug usage)

By submitting a proposal, the Contractor and its employees/subcontractors agree to complete the required documents and undergo the listed procedures. An individual who does not pass the security clearances will be unable to perform services under the contract. The final determination and completion of the security investigation procedures will be made at the sole discretion of the USP. All persons are advised that a urinalysis test for the detection of marijuana and other drug

usage shall be performed. Any person(s) testing positive shall be disqualified from performing under the resulting contract. Any individual employed by the Contractor deemed not suitable by the Bureau of Prisons requirements will not be granted access to perform services under the contract. This is a condition of the contract. The Contractor must be in compliance with Department of Justice regulations at 8 CFR 274a regarding the employment of aliens. A copy of this directive is available upon the Contractor's request.

In addition, each contractor employee/subcontractor must attend an orientation program at the USP. The purpose of this program is to familiarize contractor employees/subcontractors with institution operations, the institution, and general rules of conduct and procedures inside the institution. Contractor employees/subcontractors shall adhere to all institution regulations regarding conduct and performance. Contractor employees/subcontractors will be allowed access to the institution at the sole discretion of the Chief Executive Officer (CEO). Any individual performing under this contract may be removed if it becomes apparent that his/her conduct does not reflect the conduct of that prescribed for those people performing under non-personal service contracts.

**Schedule of Required Insurance:** As required by FAR clauses 52.228-5 entitled "Insurance -Work on a Government Installation" and 52.237-7 entitled "Indemnification and Medical Liability Insurance," the contractor shall, at its own expense, provide and maintain during the entire performance of the resulting contract, at least the kinds and minimum amounts of insurance required as listed below:

Professional Medical Liability: See FAR Clause 52.237-7, of this solicitation/contract.

Workers Compensation and Employers Liability: Contractors are required to comply with applicable Federal and State worker's compensation and occupational disease statutes. If occupational diseases are not compensable under those statutes, they shall be covered under the employer's liability section of the insurance policy, except when contract operations are so commingled with a contractor's commercial operations that it would not be practical to require this coverage. Employer's liability coverage of at least $100,000 shall be required, except in States with the exclusive or monopolistic funds that do not permit workers' compensation to be written by private carriers. (FAR 28.307-2)

Comprehensive General Liability: $500,000 per accident or occurrence for bodily injury. The insurance shall include contractors protective and liability.

However, if the contractor and/or subcontractor is an entity or a subdivision of a state that either provides for self-insurance and/or is limited by law to the amount of liability insurance that may be purchased by State entities, then the insurance requirement of this contract shall be fulfilled by incorporating the provisions of the applicable State law.

Before commencing work under this contract, the contractor shall certify to the Contracting Officer in writing that the required insurance has been obtained. The policies evidencing required coverage shall contain an endorsement to the effect that any cancellation or any material change adversely affecting the Government's interest shall not be effective (1) for such period as the laws of the state in which this contract is to be performed, or (2) until 30 days after insurer or the contractor gives written notice to the Contracting Officer, whichever period is longer.

The Contractor shall insert the substance of this clause, including this paragraph, in subcontracts under this contract and shall require subcontractors to provide and maintain insurance required in the schedule or elsewhere in the contract. The Contractor shall maintain a copy of all subcontractor's proofs of required insurance, and shall make copies available to the Contracting Officer upon request.

**Medical Malpractice:** Except as provided elsewhere in this contract, the Contractor shall provide and maintain medical malpractice and such other insurance during the period of this contract. Refer to FAR 52.237-7, Indemnification and Medical Liability Insurance.

If the Contractor or provider who is providing services under this contract has pending litigation or administrative proceedings that may affect his/her license to practice medicine or standing as a fellow member in a professional organization, full disclosure shall be provided to the COTR and CO within five calendar days upon official notification.

If it is determined by the medical legal review that the standard of care has not been met or there is substantial evidence of negligence on the part of the Contractor or contract employee/subcontractor, regardless of the final judicial decision, the provider may be unable to perform under the contract.

**Contractor Training and Courtesy Privileges:** Contractor training and courtesy privileges may be extended to BOP medical staff and will be limited to care and treatment of Federal inmates to ensure continuity of care.

**Quality of Patient Care/Non-Discrimination:** The hospital and professional service providers will provide BOP patients under the terms of this contract the same or equal services to those provided to non-BOP patients. Professional service providers shall be provided within accepted professional standards.




The contractor agrees to make no distinction among patients under this contract on the basis of race, color, creed, national origin, or physical condition. For this contract, distinctions on the grounds of race, color, creed, national origin, or physical condition include but are not limited to the following: denying any service or benefit or availability of a facility; providing any service or benefit to a patient which is different; or if provided in a different manner or at a different time from that provided to other patients under this contract; subjecting a patient to segregation or separate treatment in any manner related to his receipt of any service; restricting a patient in any way in the enjoyment of an advantage or privilege enjoyed by others in determining whether he satisfies any admission, enrollment quota, eligibility, membership or other requirement or condition which an individual must meet in order to be provided any service or benefit; the assignment of time or places for the provision of services on the basis of race, color, creed, or national origin of the patients served.

**Third Party Liability:** Public Law 87-693 (42 U.S.C. 2651) provides that the United States shall be entitled to recover the reasonable value of hospital and medical care and treatment furnished or to be furnished to a person who suffers any injury or disease under circumstances indicating the Third Party's Liability involves the potential legal liability of another person for the injury or disease in question. This other person is commonly referred to as the "third party" since his/her negligent act or failure to act caused an injury or disease to the "first party" requiring medical treatment by or at the expense of the United States, the "second party".

**Privacy Act Notification:** This contract requires the Contractor, on behalf of the USP, to provide health care and report requested medical record and financial information to the BOP. The BOP will use the information for financial, legal, research, and health care procedures.

Disclosure of this information may be made by the BOP to: fiscal intermediaries; the Office of Workers' Compensation Programs, Department of Labor; the Department of Justice for their representation of the United States; and for Congressional inquiry; quality assessment; medical audit or utilization review; billing third parties for the payment of care; analytical and evaluation studies; to federal or state agencies as required by law; and research purposes supported by the BOP.

Disclosure of the appropriate medical record information without prior consent of the subject patient may be made by you to: another provider of health care treating the same patient; a federal or state agency as required by law such as the reporting of communicable diseases, births, deaths, or the commission of crimes (e.g., gunshot wounds, rape, child abuse or neglect, alcohol or drug abuse, etc.); designated fiscal intermediaries; and billing third parties for the payment of care not reimbursed by the USP. The Contractor must forward all other requests for information to the COTR.

**Authorized Users:** The USP reserves the right to grant permission allowing the United States Marshals Service and Bureau of Citizenship and Immigration Services to utilize this contract. The contractor shall receive written notification from the USP when permission is granted. If approved to utilize the contract, these agencies shall be considered "optional users" with the ability to issue task orders against this contract for Federal prisoners and detainees. The contractor shall "direct bill" the applicable agency for any services that are provided under this section.

**SDB Reporting Requirements:** In accordance with FAR 52.219-25, the Contractor shall report on the participation of SDB concerns. Reports may be on Optional Form 312, Small Disadvantaged Business Participation Report, or in the Contractor's own format providing the same information. This report is required upon completion of contracts containing SDB participation targets.

**Electronic Subcontracting Reporting System (eSRS):** In accordance with FAR 52.219-9, the offeror agrees to submit the Individual Subcontracting Report (ISR), formerly the SF-294, and Summary Subcontracting Report (SSR), formerly the SF-295, as applicable. Pursuant to FAR 19.704, the Federal Bureau of Prisons requires submission of these reports as follows:

The ISR is due semi-annually and at contract completion, always within 30 days after the close of each reporting period unless otherwise directed by the Contracting Officer. Normally, these deadlines are April 30th for the period ending March 31st and October 30th for the period ending September 30th. A separate report is also due within 30 days after contract completion. Reports are required when due, regardless of whether there has been any subcontracting activity since the inception of the contract or since the last reporting period.

The SSR must be submitted annually (for twelve months ending September 30th). Reports are due 30 days after the close of each reporting period.

Additional information concerning the Electronic Subcontracting Reporting System (eSRS) program can be located at http://www.acquisition.gov and https://esrs.gov/.

## Internal Records Request

From: St. Francis Integrity and Compliance
Requested by: Kathy Vaccaro
Date: 8/30/2021

Patient: Joshua Moses
MRN: 449637
Date of Birth: 5/11/1981
SSN: 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
PAN:
Date of Service: 11/30/2018
Request ID: 49593492

Notes: A complete copy of the Outpatient Endoscopy Records on file for Joshua Moses requested by Trinity Health and an attorney representing SFMC in a legal matter.

SFMC Moses, Joshua ENC# 4018007056** OPT GAS 11/30/2018 Coding Summary - scanned 12/11/2018

## St. Francis Medical Center
### Coding Summary
Print Date: 12/11/2018 11:43:33AM

Patient Name: Moses, Joshua | Billing Number: 401800705694 | MRN: 449637

| | | | |
|---|---|---|---|
| Date of Birth: | 05/11/1981 | Sex: | MALE |
| Age at Admit: | 37 years | Race: | BLACK - NON HISPAA |
| Admit Date/Time: | 11/30/2018 1008 | Disch Date/Time: | 11/30/2018 1008 |
| Attend Phys: | 00003387 Chowdhury, Bhawarlal | Financial Class: | Z PRISON - STATE OF NEW J |
| Patient Type: | O OUTPATIENT | Payor 1: | |
| Det Pt Type: | Y MINOR SURGERY | Payor 2: | |
| Disch Service: | GAS GASTOENTEROLOGY | Payor 3: | |
| Admit Dx: | Z12.11 Encounter for screening for malignant neoplasm of colon | Discharge Status: | ADC Trans/disch to Prison, Jail /law enforcement |

SSN: 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
LOS: 1
Total Charges:

| Coder ID | Coded Date | Final Date |
|---|---|---|
| ioriib | 12/11/2018 | 12/11/2018 |

| Seq | POA | CC | Diagnosis | Description |
|---|---|---|---|---|
| 1 | | | Z12.11 | Encounter for screening for malignant neoplasm of colon |
| 2 | | | K21.9 | Gastro-esophageal reflux disease without esophagitis |

| Seq | Ep | Procedure | | Modifiers 1 2 3 4 5 | Start | End | Provider | Role |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 0DJD8ZZ | Inspection of Lower Intestinal Tract, Via Natural or Artificial | | 11/30/2018 | | 00003387 Chowdhury, Bhawarlal | S |
| 2 | 2 | 0DB68ZX | Excision of Stomach, Via Natural or Artificial Opening | | 11/30/2018 | | 00003387 Chowdhury, Bhawarlal | S |
| 3 | 1 | 45378 | Colonoscopy flx dx w/coll) spec when pfrmd | | 11/30/2018 | | 00003387 Chowdhury, Bhawarlal | S |
| 4 | 2 | 43239 | Egd transoral biopsy single/multiple | | 11/30/2018 | | 00003387 Chowdhury, Bhawarlal | S |

Consult Performed By
<None>

* This diagnosis was determined to be a Hospital Acquired Condition (HAC) by the 3M Coding and Reimbursement System. This data is available if the interface option to include HAC data is enabled.

3M Prepared by: 3M Health Information Systems, ...\VECTOREPORTS\CA\STANDARD\Coding

Page 1 of 1
Printed by: ...

SFMC Moses, Joshua ENC# 4018007056** OPT GAS 11/30/2018 Demographics 11/30/2018

## St. Francis Medical Center

### PATIENT RECORD

Patient Number: 401800705694
Medical Record Number: 449637
Admit Date: 11/30/18 Admit Time: 10:08
Service: GAS

PATIENT INFORMATION

Patient Name: MOSES, JOSHUA
Address: PO BOX 5000 FORT DIX NJ 08640
Home Phone Number: 999 - 999-9999
Employer: INMATE
Employer Phone Number: 999 999-9999
Employer Address: NONE NONE NJ 99999
Date of Birth: 05/11/1981
Social Security #: XXX XX 9999
Language: ENG

Emergency Contact 1: FCI HEALTH SERVICES
Home Phone Number: 999 - 999-9999

GUARANTOR INFORMATION

Guarantor: FCI HEALTH SERVICES
Date of Birth: 01/01/1900
Social Security #: XXX XX 9999
Address: PO BOX 5000 FORT DIX NJ 08640
Employer: UNKNOWN
Address: NONE NJ 99999

INSURANCE INFORMATION

Insurance Name: BOP ... HEALTHCARE
Insurance Address: 2090 COLUMBIANA ROAD, SUITE 4000 BIRMINGHAM AL 35216
Insurance Phone: 205-536-4862
Subscriber's Name: FCI HEALTH SERVICES
Social Security #: XXX XX 9999
Date of Birth: 01/01/1900

MEDICAL INFORMATION

Admitting Doctor: CHOWDHURY, BHAWARLAL MD 003387
Attending Doctor: CHOWDHURY, BHAWARLAL MD 003387
Primary Care Doctor: PATEL, PRADIP MD

St. Francis Medical Center

681 Hamilton Ave Trenton, NJ 08629

## Upper GI endoscopy Discharge Instructions

Patient: Joshua Moses
MRN: 000000449637
Account Number: 401800705694
Procedure Date: Friday, November 30, 2018
Attending MD: Bhanwarlal Chowdhury, MD

You have undergone a Upper GI endoscopy procedure by Bhanwarlal Chowdhury, MD. The following reccomendations have been suggested:

- Await pathology results.

**Reports of your procedure and these reccomendations have been sent to: PRADIP PATEL, MD**

**We are waiting for your pathology results.**

Do not drive or operate any power tools for 24 hours
Do not make any important or business decisions, sign any legal papers or perform any activity that depends on your full concentrating powers or mental judgement.
Resume your normal diet.
Resume your current medications as prescribed.

**Go directly to the Emergency Room if you notice any of the following:**

Chills and fever over 101 occurring within 24 hours after the procedure.
Persistent vomiting or vomiting with blood.
Severe abdominal pain, other than gas cramps.
Black, tarry stools.
Any bleeding - exceeding one tablespoon.

**For patients that had an Endoscopy Procedure:**
Notify your physician or go to the Emergency Room if experiencing severe sore throat, difficulty swallowing or breathing with pain in chest, neck or abdomen.

**In case of emergency, please call your physician immediately or go to the Emergency Room.**

I have read and understand the above instructions.

Nurse Signature

Patient/Designated Responsible Party Signature

Bhanwarla Chowdhury, MD

Bhanwarlal Chowdhury, MD
Signed Date: 11/30/2018 12:52:46 PM
This report has been electronically signed by Bhanwarlal Chowdhury, MD

Page 1 of 1

CHOWDHURY 00008

St. Francis Medical Center

681 Hamilton Ave Trenton, NJ 08629

## Colonoscopy Discharge Instructions

Patient: Joshua Moses
MRN: 000000449637
Account Number: 401800705694
Procedure Date: Friday, November 30, 2018
Attending MD: Bhanwarlal Chowdhury, MD

You have undergone a Colonoscopy procedure by Bhanwarlal Chowdhury, MD. The following reccomendations have been suggested:

- Repeat colonoscopy in 10 years for screening purposes.

**Reports of your procedure and these reccomendations have been sent to: PRADIP PATEL, MD**

None

Do not drive or operate any power tools for 24 hours
Do not make any important or business decisions, sign any legal papers or perform any activity that depends on your full concentrating powers or mental judgement.
Resume your normal diet.
Resume your current medications as prescribed.

**Go directly to the Emergency Room if you notice any of the following:**

Chills and fever over 101 occurring within 24 hours after the procedure.
Persistent vomiting or vomiting with blood.
Severe abdominal pain, other than gas cramps.
Black, tarry stools.
Any bleeding - exceeding one tablespoon.

**For patients that had an Endoscopy Procedure:**
Notify your physician or go to the Emergency Room if experiencing severe sore throat, difficulty swallowing or breathing with pain in chest, neck or abdomen.

**In case of emergency, please call your physician immediately or go to the Emergency Room.**

I have read and understand the above instructions.

Nurse Signature

Patient/Designated Responsible Party Signature

Bhanwarla Chowdhury, MD

Bhanwarlal Chowdhury, MD
Signed Date: 11/30/2018 12:50:13 PM
This report has been electronically signed by Bhanwarlal Chowdhury, MD

Page 1 of 1

CHOWDHURY 00009

St. Francis Medical Center

**POST ANESTHESIA CARE UNIT ADMISSIONS ORDERS**

Patient I.D.

**UNACCEPTABLE ABBREVIATIONS**

[illegible]

**Physician's Orders: (Excluding Medication Orders)**

Admit to PACU

Vital Signs and Pulse Ox per unit Protocol

**Oxygen:**

[illegible]

☐ Discontinue above orders when patient leaves the PACU

☐ Discharge patient when discharge criteria is met.

**ANALGESIA:**

**MILD PAIN:** [illegible]

**MODERATE PAIN:** [illegible]

**SEVERE PAIN:** [illegible]

**NAUSEA & VOMITING:** [illegible]

**OTHER ORDERS:**

[illegible]

Date: 11/30/18 Time: 1247

Physician's Signature

Revision 10/1/2014

Date: 11/30/18 Time: 12:47

Physician's Signature

CHOWDHURY 00010

St. Francis Medical Center

Medication Orders Only
Specify Dosage, Frequency and Route
Formulary Rules apply

| Date/Time | ORDER (Please Sign Each) |
|---|---|
| 11/30/18 | |
| 11:30 | |
| | PRE-ENDOSCOPY ORDERS |
| | 1 Start Normal Saline Peripheral IV at 125 ml/hour |
| | MD |
| 11/30/18 | POST ENDOSCOPY ORDERS: |
| | Discontinue IV |
| | MD |
| | MD |

PHYSICIAN'S ORDERS (Excluding Medication orders)

| Date/Time | ORDER (Please Sign Each) |
|---|---|
| | PRE-ENDOSCOPY ORDERS |
| | 1 NPO |
| | 2 Obtain documentation |
| | Esophagogastroduodenoscopy and Biopsy |
| | Esophageal Dilatation |
| | Colonoscopy and Biopsy and Polypectomy |
| | Other |
| | 3 Transfer patient to PACU via stretcher |
| 11-30 12:47 | |
| | POST ENDOSCOPY ORDERS: |
| | Discharge patient when stable. |
| | Meets discharge criteria |

Physician's Orders

CHOWDHURY 00011

SFMC Moses, Joshua SHC# 401800705694 OPT OAS 11/30/2018 History and Physical - scanned 12/4/2018

ST. FRANCIS MEDICAL CENTER
TRENTON, NEW JERSEY 08629

SHORT STAY
History & Physical Colonoscopy/EGD

401800705694 MOSES JOSHUA
CHOWDHURY, BHANWAR MD 11/30/18 10:58 M 37 05/11/1981

- ☐ Ambulatory Care (ACC)
- ☐ Chemotherapy/Transfusion
- ☐ Cardiac Cath Lab
- ☐ 24 Hour Stay
- ☐ Minor Surgery
- ☑ Endoscopy/Bronchoscopy
- ☐ Other ______

**HISTORY**

Chf of Complaint: Screening colonoscopy, Pain epigastric, GERD

History Present Illness: Fm. Colon Cancer, Screening

Allergies: —

Medications & Dosage: SEE LIST

Past Medical History: DM, HTN —, MI —, CVA —

**PHYSICAL EXAMINATION**

Height: ______ Weight: ______

Vital Signs: STABLE

General Appearance: Healthy AA male

Mental Status: Alert, oriented x 3

Head, Eyes, Ears, Nose & Throat: normal

Neck: Supple, no [illegible]

Breast & Axilla: — NA

Heart: S1 + S2 normal, no [illegible], No CHF

Lungs: No rales / rhonchi

Abdomen: No masses, BS normal, No visceromegaly

Back: Normal

Genitalia: NA

Rectal: No mass, trace good blood

Pelvic: NA

Extremities: No edema

Impression: Screening for CA colon, GERD

Plan: Colonoscopy / EGD

Physician Signature: B. Chowdhury, MD
Date: 11-30-18

Pre-Procedure Note (If H&P completed prior to day of procedure) ______

Laboratory Data ______

**REPORT OF OPERATION OR PROCEDURE**

Pre-Op Diagnosis: Screening / GERD

Post-Op Diagnosis: Normal EGD, normal colonoscopy

Procedure: EGD, colonoscopy

Attending Physician: B. CHOWDHURY, MD

Assistant: NONE

Anesthesiologist: YES

Findings: SEE REPORT

EBL: NONE

Specimen: YES

Drains: NO Packing: NO

Complications: NONE

**DISCHARGE NOTE**

Final Diagnosis: AS ABOVE

Condition on Discharge: STABLE

Mental Status: ALERT

Discharge Instructions: SEE SEPARATE

Physician Signature: B. Chowdhury, MD
Date: 11-30-18

Page 1 of 1 Printed by: [illegible] on 9/17/2021 1:30:07 PM -04:00

CHOWDHURY 00012

SFMC Moses, Joshua SHC# 401800705694 OPT OAS 11/30/2018 eNursing Misc Assessments 11/30/2018

**Assessment Report**

| | | | |
|---|---|---|---|
| Pt Name: | MOSES, JOSHUA | MRN: | 000000449637 |
| Pt ID: | 2018034482 | Acct No: | 401800705694 |
| DOB: | 05/11/1981 | Age/Sex: | 37Y/M |
| Adm Date: | 11/30/2018 | Attn Dr: | CHOWDHURY, BHANWAR MD |
| Dsch Date: | | | |
| Entity: | ST Francis Medical Center | | |

**Patients Factors**

Assessment Sts: Complete — Collected DTime: 11/30/2018 10:58
Collected By: SUZANNE BRZEZYNSKI, RN

Patients Factors

| | |
|---|---|
| Height | 5/10 ft,in |
| Height. | 1.78 m |
| Ht Obtained Method | Stated |
| Weight | 88.904 kg |
| Weight. | 196/0 lbs,oz |
| How Wt Obtained | Stated |
| Body Mass Index | 28.12 |
| Mode of Transportation | Ambulate |

Clinical Note:

**PreOperative/Procedure Checklist**

Assessment Sts: In progress — Collected DTime: 11/30/2018 11:08
Collected By: SUZANNE BRZEZYNSKI, RN

PreOperative/Procedure Checklist

| | |
|---|---|
| Surgery / Procedure Date | 11/30/2018 |
| Proposed Surgery/Procedure #1 Name/Site | COLONOSCOPY AND EGD |
| Armband Apply | Yes |
| Patient showered before arrival | No |
| Patient received nasal screening prior to arrival to facility | Not Applicable |
| Patient received nasal screening upon arrival to facility | Not Applicable |
| NPO? | Yes |
| Medical Evaluation | Not Applicable |
| Cardiac Evaluation | Not Applicable |
| Cardiac Clearance | Not Applicable |
| ICD data available | Not Applicable |
| Type and Screen | Not Applicable |
| Type and Cross | Not Applicable |
| Autologous Blood available | Not Applicable |
| Chest X ray | Not Applicable |
| EKG Present | Not Applicable |
| Pulmonary Function Tests | Not Applicable |
| Lab reports within 30 days | Not Applicable |
| Urine reports within 30 days | Not Applicable |
| Urine BHCG | Not applicable |
| Current Medication List Verified | Yes |
| Hair removal completed | Not Applicable |
| Verify correct procedure and Site/Side with procedure schedule. | Yes |
| Verify correct procedure and site/side with patient or agent | Yes |
| Side | Not applicable |
| General Consent | Yes |

Pt Name: MOSES, JOSHUA MRN: 000000449637 Assessment Report
Entity: ST Francis Medical Center Page 1 of 3 ORE_TRH_0010_DSCH_EDR.rpt version v1.00
Adm Date: 11/30/2018 Generated By: EDR
Page 1 of 3 Printed by: [illegible] on 9/17/2021 1:30:07 PM -04:00

CHOWDHURY 00013

SFMC Moses, Joshua SHC# 401800705694 OPT OAS 11/30/2018 eNursing Misc Assessments 11/30/2018

**Assessment Report**

| | | | |
|---|---|---|---|
| Pt Name: | MOSES, JOSHUA | MRN: | 000000449637 |
| Pt ID: | 2018034482 | Acct No: | 401800705694 |
| DOB: | 05/11/1981 | Age/Sex: | 37Y/M |
| Adm Date: | 11/30/2018 | Attn Dr: | CHOWDHURY, BHANWAR MD |
| Dsch Date: | | | |
| Entity: | ST Francis Medical Center | | |

**PreOperative/Procedure Checklist**

Assessment Sts: In progress — Collected DTime: 11/30/2018 11:08
Collected By: SUZANNE BRZEZYNSKI, RN

PreOperative/Procedure Checklist

| | |
|---|---|
| Temperature | 35.4 Cel |
| BP #1 | 120/76 |
| Pulse | 82 |
| Respirations | 14 |
| Pulse Ox (%) | 100 |
| Height | 5/10 ft,in |
| Height. | 1.78 m |
| Weight | 88.9 kg |
| Weight. | 195/15.855 lbs,oz |
| Body Mass Index | 28.12 |
| Antibiotic Therapy prescribed and based on SCIP protocol? | Not Applicable |
| Patient on Beta Blocker | No |
| DVT Prophalxis Ordered | No |
| Belongings Comment | ON STRETCHER |
| Other item removed: | DENIES CONTACTS OR DENTURES |
| Disposition of Belongings/Valuables | PT HAS BULLETS IN RT KNEE AND 3 IN SACRAL AREA |
| Does Patient have DNR order? | No |

Clinical Note:

**Vaccines**

Assessment Sts: Complete — Collected DTime: 11/30/2018 11:00
Collected By: SUZANNE BRZEZYNSKI, RN

Vaccines

| | |
|---|---|
| Patient is 65 years or older? | No |
| Age 5 to 64 years old with High Risk condition? | None |
| Age 6 months and older? | Yes |
| Vaccinated this flu season? | No/ Unsure |
| Flu Contraindications | No Contraindications |
| Flu Date Info Given | 11/30/2018 |

Clinical Note:

**Vascular Access Devices**

Assessment Sts: Complete — Collected DTime: 11/30/2018 13:32
Collected By: CAROL A CHESONIS, RN

Vascular Access Devices

| | |
|---|---|
| Vascular Access Type 1 | Peripheral IV |
| Lumens 1 | 1 Lumen |
| Vascular Access Site 1 | Forearm - Right |
| Size 1 | 22G |
| Date Inserted 1 | 11/30/2018 |

Pt Name: MOSES, JOSHUA MRN: 000000449637 Assessment Report
Entity: ST Francis Medical Center Page 2 of 3 ORE_TRH_0010_DSCH_EDR.rpt version v1.00
Adm Date: 11/30/2018 Generated By: EDR
Page 2 of 3 Printed by: [illegible] on 9/17/2021 1:30:07 PM -04:00

CHOWDHURY 00014

SFMC Moses, Joshua SHC# 401800705694 OPT OAS 11/30/2018 eNursing Misc Assessments 11/30/2018

**Assessment Report**

| | | | |
|---|---|---|---|
| Pt Name: | MOSES, JOSHUA | MRN: | 000000449637 |
| Pt ID: | 2018034482 | Acct No: | 401800705694 |
| DOB: | 05/11/1981 | Age/Sex: | 37Y/M |
| Adm Date: | 11/30/2018 | Attn Dr: | CHOWDHURY, BHANWAR MD |
| Dsch Date: | | | |
| Entity: | ST Francis Medical Center | | |

**Vascular Access Devices**

Assessment Sts: Complete — Collected DTime: 11/30/2018 13:32
Collected By: CAROL A CHESONIS, RN

Vascular Access Devices

| | |
|---|---|
| Time Inserted 1 | 11:15 |
| Inserted by: 1 | GARY LUI, RN |
| D/T Discontinued 1 | 11/30/2018 |
| Time Discontinued 1 | 13:20 |
| Phlebitis Score 1 | 0 - Healthy |

Clinical Note:

**Vascular Access Devices**

Assessment Sts: Complete — Collected DTime: 11/30/2018 11:24
Collected By: SUZANNE BRZEZYNSKI, RN

Vascular Access Devices

| | |
|---|---|
| Vascular Access Type 1 | Peripheral IV |
| Lumens 1 | 1 Lumen |
| Vascular Access Site 1 | Forearm - Right |
| Size 1 | 22G |
| Date Inserted 1 | 11/30/2018 |
| Time Inserted 1 | 11:15 |
| Inserted by: 1 | GARY LUI, RN |

Clinical Note:

Pt Name: MOSES, JOSHUA MRN: 000000449637 Assessment Report
Entity: ST Francis Medical Center Page 3 of 3 ORE_TRH_0010_DSCH_EDR.rpt version v1.00
Adm Date: 11/30/2018 Generated By: EDR
Page 3 of 3 Printed by: [illegible] on 9/17/2021 1:30:07 PM -04:00

CHOWDHURY 00015

**Assessment Report**

| | | | |
|---|---|---|---|
| Pt Name: | MOSES, JOSHUA | MRN: | 000000449637 |
| Pt ID: | 2018034482 | Acct No: | 401800705694 |
| DOB: | 05/11/1981 | Age/Sex: | 37Y/M |
| Adm Date: | 11/30/2018 | Atn Dr: | CHOWDHURY, BHANWAR MD |
| Dsch Date: | | | |
| Entity: | ST Francis Medical Center | | |

**Outpatient Pre Procedure Assessment**

| | | | |
|---|---|---|---|
| Assessment Sts | Complete | Collected DTime | 11/30/2018 11:00 |
| Collected By | SUZANNE BRZEZYNSKI, RN | | |

**Outpatient Pre Procedure Assessment**

| | |
|---|---|
| Date of Pre-Procedure Assessment | 11/30/2018 |
| Source of Info | Self, Healthcare Provider |
| Is the patient able to give informed consent | Yes |
| Surgery / Procedure Date | 11/30/2018 |
| Proposed Surgery/Procedure #1 Name/Site | COLONOSCOPY AND EGD |
| Travel outside US less than 1 yr? | No |
| Height | 5/10 ft,in |
| Height. | 1.78 m |
| Ht Obtained Method | Stated |
| Weight | 88.9 kg |
| Weight. | 195/15.855 lbs,oz |
| How Wt Obtained | Stated |
| Body Mass Index | 28.13 |
| Spiritual Cultural Dietary | No |
| Spiritual Cultural Values | No |
| Spiritual Cultural Customs | No |
| Responsible Person to Drive Patient Home | FOR DIX INMATE |

**Zika Exposure Screening**

| | |
|---|---|
| Zika Screening Already Done for this Visit | No |
| Have You Traveled to Zika Area | No |

**Infection Control**

| | |
|---|---|
| N/A | Yes |

**Past Med/Surg Hx PPA**

| | |
|---|---|
| Gastrointestinal | GERD/Heartburn |
| Other Diseases | REMOVED SMALL BOWEL AND APPENDIX DUE TO GUN SHOT |
| Pt Medical Hx Comment | HX OF BLEEDING ULCER |
| Past Surgical History | Appendectomy |
| Previous Anesthesia Complication | None Known |
| Pain 1 Scale | 0 |
| Pain 1 tool used | Numeric |
| Currently Participating in Clinical Trial? | No |
| Medical Problems Mother | Diabetes |
| Medical Problems Father | Not Known |
| Pst Surgical Comment | KIDNEY REPAIR DUE TO GUN SHOT WOUNDS |

**Immediate PreProcedure**

| | |
|---|---|
| Source of Info | Self, Healthcare Provider |
| Last PO/Per Tube Intake - Liquids | 11/29/2018 22:00 |

SFMC Moses, Joshua ENC# 401800705694 OPT DAS 11/30/2018 eOutpatient Assessments 11/30/2018

**Assessment Report**

| | | | |
|---|---|---|---|
| Pt Name: | MOSES, JOSHUA | MRN: | 000000449637 |
| Pt ID: | 2018034482 | Acct No: | 401800705694 |
| DOB: | 05/11/1981 | Age/Sex: | 37Y/M |
| Adm Date: | 11/30/2018 | Atn Dr: | CHOWDHURY, BHANWAR MD |
| Dsch Date: | | | |
| Entity: | ST Francis Medical Center | | |

**Outpatient Pre Procedure Assessment**

| | | | |
|---|---|---|---|
| Assessment Sts | Complete | Collected DTime | 11/30/2018 11:00 |
| Collected By | SUZANNE BRZEZYNSKI, RN | | |

**Immediate PreProcedure**

| | |
|---|---|
| BP #1 | 120/76 |
| Pulse | 82 |
| Respirations | 14 |
| Pulse Ox (%) | 100 |
| Oriented To | Person, Place, Time |
| Pain 2 Scale | 0 |
| Pain 2 tool used | Numeric |
| Temperature | 36.4 Cel |

**Fall Risk**

| | |
|---|---|
| Confusion / disorientation / impulsivity | No confusion / disorientation / impulsivity |
| Symptomatic depression | No symptomatic depression |
| Altered Elimination | No altered elimination |
| Vertigo/Dizziness | No dizziness / vertigo |
| Gender (Male) | Gender (Male) |
| Administered Epileptics | No administered antiepileptics |
| Administered Benzodiazepines | No administered benzodiazepines |
| Get up and go test | Ability to rise in a single movement - No loss of balance with steps |
| Get Up Zero | 0 |
| Get Up Zero2 | 0 |
| Fall Risk Total for order forms | 1 |
| Fall Risk Total Score | 1 |

**Risk Screening**

| | |
|---|---|
| Alcohol Use? | No |
| Drinks in Past Year | Never (0) |
| Audit C Total | 0 |
| Smoking History | Never Smoker |
| Smoking Cessation Program? | Written Material |
| Are you worried about your safety at home? | No |
| Is there anyone hitting, hurting, or causing you to feel unsafe? | No |
| Are you concerned that you might hurt someone else? | No |
| Do you feel you are being taken advantage of by anyone | No |
| Do you have any history of physical or sexual abuse? | No |
| Have you wished you were dead or wished you could not wake up? | No |
| Have you actually had any thoughts of killing yourself? | No |
| Have you ever done anything or prepared to end your life? | No |
| Homicide Ideations? | No |
| Hidden field for trigger calculation | 0 |
| Hidden field to adjust audit C total | 1 |

SFMC Moses, Joshua ENC# 401800705694 OPT DAS 11/30/2018 eOutpatient Assessments 11/30/2018

**Assessment Report**

| | | | |
|---|---|---|---|
| Pt Name: | MOSES, JOSHUA | MRN: | 000000449637 |
| Pt ID: | 2018034482 | Acct No: | 401800705694 |
| DOB: | 05/11/1981 | Age/Sex: | 37Y/M |
| Adm Date: | 11/30/2018 | Atn Dr: | CHOWDHURY, BHANWAR MD |
| Dsch Date: | | | |
| Entity: | ST Francis Medical Center | | |

**Outpatient Pre Procedure Assessment**

| | | | |
|---|---|---|---|
| Assessment Sts | Complete | Collected DTime | 11/30/2018 11:00 |
| Collected By | SUZANNE BRZEZYNSKI, RN | | |

**Risk Screening**

| | |
|---|---|
| Hidden field2 for trigger calculation | 0 |

**Vascular Access Devices**

| | |
|---|---|
| VAD NA | Yes |

Clinical Note:

**PAT Education**

| | | | |
|---|---|---|---|
| Assessment Sts | Complete | Collected DTime | 11/30/2018 10:59 |
| Collected By | SUZANNE BRZEZYNSKI, RN | | |

**PAT Education**

| | |
|---|---|
| Education related to | Pre-op care / routine, Procedure |
| Patient will verbalize | Pre-op care / routine |
| Patient Education Interventions | Answer patient's questions related to surgery |

Clinical Note:

## St. Francis Medical Center

601 Hamilton Avenue
Trenton, New Jersey 08629-1986
Tel: (609) 599-5290 Fax: (609) 599-6243

Robert L. Moser, MD FCAP
Medical Director of Pathology

## Surgical Pathology Report

| | | | |
|---|---|---|---|
| Patient Name: | MOSES, JOSHUA | Case #: | SF18-2392 |
| Med. Rec. #: | 449637 | Date Taken: | 11/30/2018 |
| DOB: | 5/11/1981 (Age: 37) | Account #: | 401800705694 |
| Gender: | M | Location: | MNS (SFN) |
| Attending Physician: | Bhanwarlal Chowdhury, MD | Client: | SFN |
| Submitting Physician: | Bhanwarlal Chowdhury, MD | Inmate ID: 55716066 | |
| Copy To: | FORT DIX | | |

**PROCEDURE**
EGD AND BIOPSY

**SOURCE OF SPECIMEN**
A: Antrum

**SPECIFIC QUESTION(S) ASKED**
R/O H. PYLORI

**PRE-OP DIAGNOSIS**
GERD

**POST-OP DIAGNOSIS**
GERD

**GROSS DESCRIPTION**
The patient's name on the specimen container matches the name on the requisition form. The specimen is received in formalin labeled "antrum" and consists of two fragments of tan tissue measuring 0.1-0.3 cm. RLM/sc

**FINAL DIAGNOSIS**
GASTRIC ANTRUM (BIOPSY):
SLIGHT CHRONIC INFLAMMATION IN BENIGN GASTRIC ANTRAL MUCOSA.
SPECIAL STAIN IS NEGATIVE FOR HELICOBACTER ORGANISMS. NO EVIDENCE OF NEOPLASM.

**COMMENT**
Control slide(s) for the above special stain(s) showed the expected results.

Electronically Signed By: Leslie Machano, MD 12/7/2018
B1 S2 SS1-1 LDM/sc

St.Francis MEDICAL CENTER

601 Hamilton Avenue
Trenton, NJ 08629

Consent for: DIAGNOSTIC OR TREATMENT PROCEDURE

I hereby authorize Dr. Chowdhury and/or his other associates and such assistants as may be selected by him/her to perform the following diagnostic and treatment procedure:

Esophagogastroduodenoscopy, biopsy, and Colonoscopy, biopsy, polypectomy dilation with moderate sedation

I have been informed of:

- The nature and purpose of the proposed procedure
- The potential benefits of the proposed procedure
- The risks and consequences of the procedure including all side effects
- The alternative to the procedure and their risks, benefits and side effects related to the alternative and potential problems that might occur during recuperation.
- The risk related to not receiving the proposed care, treatment and services
- The likelihood of achieving my treatment goals

I acknowledge that no guarantee or assurance has been made as to the results that may be obtained.

I consent to the administration of local anesthesia and/or conscious sedation deemed necessary and desirable by my attending physician for the diagnostic and treatment procedure(s) contemplated.

I have discussed, in terms I can understand, my condition and treatment with Dr. Chowdhury and all my questions have been answered to my full satisfaction. I consent to, Authorize and request the staff of SFMC to examine and dispose of tissue/fluid that may be removed during my procedure. I understand that such tissue parts may be photographed during the procedure and/or be preserved for diagnosis, scientific or teaching purposes.

11/30/18 DATE — 1200 TIME AM PM — Signature of Patient

Witness Signature Only

AUTHORIZATION FOR MINORS AND THOSE INCOMPETENT OR UNABLE TO SIGN

I certify to act for the above named patient, and do so consent to the procedure as designated above.

DATE — TIME AM PM — Signature of Authorized Person — Relationship to Patient

EXPLANATION BY PHYSICIAN

I hereby certify that I have adequately explained the surgery or procedure as designated above to the patient or authorized representative and he/she has consented to such diagnostic and treatment procedures.

11-30-18 DATE — 1200 TIME AM PM — Signature Physician

St.Francis MEDICAL CENTER

ANESTHESIA CONSENT
DEPARTMENT OF ANESTHESIA

I authorize and direct a member of the Department of Anesthesia, to administer anesthesia appropriate to my condition and monitor vital bodily functions. I understand that a Certified Registered Nurse Anesthetist (CRNA) may be part of my anesthesia care team. I have had explained to me and I agree to permit the administration of one or more of the following alternative forms of anesthesia:

- ☐ General Anesthesia – Including intravenous agents and inhaled gases which will cause unconsciousness.
- ☐ Regional Anesthesia – Including needle injections near major nerves, which will temporarily cause me to lose pain sensations in certain areas of my body.
- ☒ Local Anesthesia – Including local anesthetic agents with or without intravenously administered sedatives.

If my regional or local anesthesia is not satisfactory to my surgeon or me, I consent to the administration of general anesthesia. I understand that during the course of an operation, unforeseen changes in my condition may arise which would necessitate changes in the care being provided to me. In that case, the anesthesiologists will act in my behalf with safety as the first priority.

I understand that anesthesia involves risks in addition to the risks of the procedure itself. Common side effects of anesthesia include nausea and vomiting, headache, backache, muscle aches, and sore throat or hoarseness, and soft tissue swelling. In addition, even minor surgery may carry with it major unforeseen anesthetic risks. The risks and complications include, but not limited to: dreams or recall of intraoperative events, corneal abrasions, damage to mouth, teeth, or vocal cords, pneumonia, numbness, pain or paralysis, damage to veins, arteries, liver or kidneys, adverse drug reactions, and in rare cases, permanent brain damage, heart attack, stroke, or death. I understand these risks apply to me whether I have a general, regional or local anesthetic.

If I am pregnant, I understand that elective surgery and procedures should be postponed until after the baby is born, as all anesthetics can cross the placenta and may affect my unborn child. Although fetal complications of anesthesia during pregnancy are rare, the risks to my baby include, but are not limited to, birth defects, premature labor, permanent brain damage, and death.

I certify that I have, to the best of my ability, told the anesthesiologist obtaining consent of all major illnesses I have had, of all past anesthetic complications known to me, of any drug allergies I have, and of all medications I have taken within the past year. I have also responded truthfully to any additional questions asked by the anesthesiologist.

The nature and purpose of the anesthesia has been explained to me. I have had the opportunity to ask questions and the answers and additional information provided have met with my satisfaction. I acknowledge that no guarantee has been made as to the result that may be obtained.

Signature of Patient — Witness to Patient Signature — 11/30/18 Date — 1125 Time AM PM

Authorization for Minors and Those Incompetent or Unable to Sign:
I certify to act for the above named patient, and do consent to the administration of anesthesia as designated above.

Date — Time — Signature of Authorized Person — Relationship to the Patient

Witness — City and State — Witness to Signature

Anesthesiologist: I hereby certify that I have adequately explained the administration of anesthesia as designated above to the patient or authorized signatory. I reviewed the risks and benefits of each type of anesthesia, and the patient understands and agrees to proceed.

11/30/18 Date — 1125 Time — Anesthesiologist

St.Francis MEDICAL CENTER

PATIENT AUTHORIZATION

CONSENT FOR TREATMENT

I consent to be treated by/admitted to this St. Francis Medical Center facility. While I am a patient, I permit my doctor(s), the Hospital employees, and all persons caring for me to treat me in ways they judge are beneficial to me. I understand that this routine care may include, but is not limited to, laboratory tests, diagnostic procedures, examinations, medical treatment, wound photography, administration of drugs and specialist consultation. I understand that no guarantees have been made to me about the outcome of this care.

In the event that one of my health care providers sustains an exposure to my blood or body fluids during my hospital visit, I consent to the drawing of my blood and performance of a rapid blood test for antibodies to the HIV (known to cause AIDS). This preliminary test will allow determination of whether urgent health care intervention for my health care provider is needed. I will be informed about the results of any such testing, which will become part of my medical record.

FINANCIAL RESPONSIBILITIES

I understand that my insurance company may require authorization prior to my examination and treatment. If my insurance company does not grant such authorization and I still desire to be treated at St. Francis Medical Center, I agree to be personally responsible for any and all bills incurred by me for such services. For and in consideration of services rendered, I agree to pay when billed for any and all charges not covered by valid insurance. A deposit has been requested of me if I have been classified as a self-pay patient, if I have less than 100% insurance coverage, or if I am responsible for deductibles and/or copays.

I further agree that St. Francis Medical Center, including its business associates, may contact me by telephone at any telephone number provided by me or associated with my record, including cell phone numbers, which could result in charges to me. St. Francis Medical Center may also contact me by sending text messages or emails, using the contact information I provide. Methods of contact may include using pre-recorded/artificial voice messages and/or use of an automatic dialing device, or its equivalent, as applicable.

CONTACT INFORMATION

I agree that St. Francis Medical Center, including its business associates, may contact me by telephone at any telephone number provided by me or associated with my record, including cell phone numbers, which could result in charges to me. St. Francis Medical Center may also contact me by sending text messages or emails, using the contact information I provide. Methods of contact may include using pre-recorded/artificial voice messages and/or use of an automatic dialing device, or its equivalent.

ASSIGNMENT OF BENEFITS

I authorize payment directly to St. Francis Medical Center of the Hospital expense benefits otherwise payable to me under the terms of my policy, but not to exceed the balance due for services performed during this period of treatment. I agree that I am personally responsible for the payment of any balance remaining on the hospital bill after payment of that bill by my insurance company. If my insurance company refuses to pay any charges reflected on the bill, for whatever reason, I agree to be responsible for payment of the entire bill.

RELEASE OF INFORMATION

I hereby authorize the release or disclosure of all medical records or other information from my Hospital records relating to my (or the patient's) identity and treatment to any insurance company, governmental agency, managed care organization or any other entity or person that may be required to pay all or part of the costs of my (or the patient's) treatment, hospitalization and/or outpatient care. This information may include, but is not limited to, History and physical, progress notes, doctors' orders, laboratory, operative and/or radiology reports, nurses' notes, consultations and emergency department records, x-ray, and physical findings, prognosis and diagnosis (including psychiatric, alcohol and drug abuse, acquired immunodeficiency syndrome (AIDS)) and/or tests and their results relating to infection with human immunodeficiency virus (HIV). I also authorize the release or disclosure of information to any healthcare professional, including physicians and any health oversight agencies for Hospital-related activities authorized by law. I also authorize the sharing of information from my Hospital record with other healthcare providers and suppliers for purposes of the Hospital obtaining information about my past medical care. I agree that my name will be made available to a representative of any faith community identified by me during my stay at the Hospital.

I also authorize St. Francis Medical Center to release or disclose all medical records or other information to a caregiver whom I designate, to assist me with instructions after my discharge from the hospital.

05-004 SRC 092019

St.Francis MEDICAL CENTER

PERSONAL VALUABLES

I understand that St. Francis Medical Center and its employees and agents cannot provide continual security for personal items and are not responsible for the loss of, or damage to, any money or articles or personal property (such as jewelry, dentures, eyeglasses, hearing aids, etc.) and that these items should be sent home with family or friends. If it should be necessary to keep money or jewelry here, it should be stored in the appropriate safe at the facility. I accept full responsibility for any items that I retain in my possession during my Hospital stay.

LANGUAGE TRANSLATION ASSISTANCE

I understand that assistance is available for patients and families who do not speak English, are deaf or hard of hearing. Services provided for deaf or hard of hearing may include, but not be limited to, a qualified sign language interpreter, telecommunication device, and/or telephone amplification equipment. All services are provided free of charge.

CHARITY CARE

I have been informed of the availability of charity care and reduced charge charity care as required by such state regulations.

INDEPENDENT PHYSICIANS/BILLING INFORMATION

I understand that certain physicians on the Medical Staff are not employees or agents of the Hospital, but are independent contractors to the Hospital. Examples of these independent contractors include anesthesiologists, radiologists, pathologists, and emergency room physicians. In addition, many other physician members of the Medical Staff are also not employed by the Hospital, but practice independently. These physicians may include my personal physician(s), as well as specialists who may treat me during my Hospital stay, such as cardiologists, neurologists and surgeons.

I understand that I will receive a bill from St. Francis Medical Center for Hospital-related services rendered during my stay, which may include a bill for professional services of physicians who are employees of Lourdes. I further understand that I may also receive a separate bill(s) for professional services from any physicians mentioned above who practice independently at the Hospital. These bills are in addition to the bill I will receive from St. Francis Medical Center.

TEACHING INSTITUTION

I acknowledge and understand that the Hospital is a teaching institution and I authorize students in medical and allied health training programs to assist in my care and I agree that my medical record may be used for teaching purposes.

PATIENT RIGHTS

I acknowledge receipt of patient rights and responsibilities upon admission.

NOTICE OF PRIVACY PRACTICES:

I have been given a copy of the St. Francis Medical Center Notice of Privacy Practices, version effective April 14 2003. The notice describes how my personal health information may be used or disclosed. I understand that I should read it carefully and am aware that the notice may be changed at any time. I am also aware that I can request additional copies at any time.

TRICARE/CHAMPUS PATIENTS

I acknowledge receipt of "An Important Message from Tricare" upon admission.

My signature below indicates that I have read and agree to all the provisions of this Patient Authorization.

Patient Signature — Date — Time

Signature of Person Authorized to sign for Patient — Relationship — Date — Time

Witness to Signature Only — Date — Time

UNABLE TO OBTAIN SIGNATURE (DOCUMENT ALL ATTEMPTS)

**If Patient signature is not obtained, this information has been left at the bedside.**

Signature — Date — Time

05-004 SRC 092019

SFMC Moses, Joshua ERC# 4018007056894 OPT OAS 11/30/2018 Anesthesia - scanned 11/30/2018

ANESTHESIA RECORD
St. Francis Medical Center
Trenton, NJ

Anesthesiologist X
Date 11/30/18

MAC / SPIN / EPI
GEN / I.V. REG / NERVE BLOCK

Premeds:

Dx: Gerd / Past Polyp — Screening
Procedure: EGD, Colonoscopy — Past normal

INDUCTION

Laryngoscopy
Blade
Tube

POSITIONING
EYE CARE

FLUID SUMMARY
RL / NS / Other
EBL / Urine

PACU: BP 118/64 HR 72 RR 16 Sa O2 99%

MEDICAL RECORDS (YELLOW) FILE COPY (WHITE)

SFMC Moses, Joshua ERC# 4018007056894 OPT OAS 11/30/2018 Anesthesia - scanned 11/30/2018

PREANESTHETIC EVALUATION

OPERATION PROPOSED: EGD/Colon

AGE 37 WEIGHT 196 HEIGHT 5'10"

DRUG ALLERGIES: NKDA

DRUG THERAPY

LAB DATA: Hg HCT
CXR
EKG
NA BUN CR Glu
PT / PTT

PATIENT/FAMILY ANESTHETIC Hx

SPECIAL INFORMATION

ASA PHYSICAL STATUS 1 2 3 4 5 E

CONSENT OBTAINED ☑ YES ☐ NO

ASSESSMENT AND PLAN: Plan MAC

EXAMINER M.D. X DATE 11/30/18

PRE INDUCTION ASSESSMENT/EXAMINATION COMPLETED AND IS AS ABOVE
ANESTHESIA PLAN ☐ CHANGED ☐ UNCHANGED DATE 11/30/18 TIME 1130 INITIALS

POST ANESTHESIA - RECOVERY
☑ Discharge from Post Anesthesia - Recovery when criteria has been met.

SIGNATURE
DATE 11/30/18 TIME 1315

DENTITION/HEAD, NECK, MOUTH, EYES, AIRWAY
RESPIRATORY SYSTEM
CARDIOVASCULAR SYSTEM
NEURO-PSYCHIATRIC
RENAL
GASTROINTESTINAL - HEPATIC
ENDOCRINE, METABOLIC, OTHER

POST ANESTHETIC EVALUATION
☐ MENTAL STATUS recovered to baseline / pt is participating
☐ VITAL SIGNS Stable in normal range
☐ OXYGEN SATURATION Stable in acceptable range
☐ CARDIOVASCULAR and HYDRATION STATUS stable
☐ RESPIRATIONS spontaneous, stable, AIRWAY patent
☐ VENTILATORY SUPPORT
☐ TEMPERATURE Stable in normal range
☐ PAIN control satisfactory
☐ NAUSEA / VOMITING control satisfactory
COMMENTS:

SIGNATURE
DATE 11/30/18 TIME 1315

PATIENT NAME

SFMC Moses, Joshua ERC# 4018007056894 OPT OAS 11/30/2018 Anesthesia - scanned 11/30/2018

St. Francis Medical Center - Trenton, NJ
Sedation Record
Pre-Procedure Assessment

Intended Procedure: EGD & Colonoscopy
Allergies: NKA
Date: 11/30/18 Time: 1130

NPO: 1600

| | Yes | No | Checklist | Yes | No | Comments/Location |
|---|---|---|---|---|---|---|
| NPO | | | Glasses | | | |
| I.D. Band/D.O.B. Verified | | | Lenses | | | |
| Consent Procedure | | | Dentures | | | |
| Assessment for Sedation | | | Hearing Aid | | | |
| H & P Note | | | Jewelry | | | |
| Med. Consult | | | Prosthesis | | | |
| Preg. | | | | | | |
| Labs | | | Person to take patient home/Name | | | |
| X-Ray | | | Phone # | | | |

| PERTINENT HISTORY | Yes | No | COMMENTS |
|---|---|---|---|
| Neurological history/problems | | | |
| Cardiac history/problems | | | |
| Integumentary history/problems | | | |
| Pulmonary history/problems (Smoker) | | | |
| Renal history/problems | | | |
| Endocrine history/problems | | | |
| Musculoskeletal history/problems | | | |
| Gastrointestinal history/problems | | | |
| Immunizations Current | | | |
| History of Recent Infections | | | |
| Previous Surgery | | | |
| Previous Anesthesia | | | |
| Growth Development/Wnl | | | |
| Airway Assessment Completed | | | |
| Pain on Admission | | | (Circle) 0 1 2 3 4 5 6 7 8 9 10 |

Current Medications/Supplements — Medication / Dose / Last Dose

Pre-Procedure Vital Signs
Temp 36.4 — Height 5'10"
BP 129/76 — Weight 196
Pulse 62 — Weight Loss/Gain
Resp 14 — Diet
Pulse Oximeter 100 — O2

Level of Consciousness: ☐ Alert ☐ Oriented ☐ Disoriented ☐ Lethargic
☐ Ambulates Independently ☐ Needs Assistance
Assistive device

IV Record: Existing @ Site: / Time hung
New Start @ site: / Solution:

PRE-PROCEDURE EDUCATION: ☐ Patient unable to respond or responds inappropriately
☐ Procedure/plan of care explained to patient/s.o. ☐ Patient/s.o. correctly re-states teaching
Cultural Issues Impacting Patient Learning: Language

Nurses Notes

RN Signature
Form # 20113 (Rev. 5/06)

SFMC Moses, Joshua ERC# 4018007056894 OPT OAS 11/30/2018 Anesthesia - scanned 11/30/2018

PAGE 2

St. Francis Medical Center
Trenton, NJ

Date: 11/30/18 Time in Room 1315
Procedure: EGD Colon
Location: OR 2
Resuscitation equipment checked by:
Physician: Chowdhury RN Monitor:
Other staff: S. Macomber

| Key | | Level of Sedation (LOS) |
|---|---|---|
| | 1 - Pre Procedure | -5 = Sleep, easy to arouse |
| | 2 - Intra Procedure (q 5 minutes) | 1 = Alert |
| | 3 - Post Procedure | 2 = Occasionally drowsy, easy to arouse |
| | | 3 = Frequently drowsy |
| | | 4 = Somnolent, difficult to arouse |

"TIME OUT"
☑ Correct Patient ☑ Correct Procedure
If Applicable: ☐ Correct Site / Side ☐ Implants ☑ Supplies Equipment
Names:

| Phase of Procedure | Time | Time Out | $O_2$ L | BP | HR | Rhythm | RR | Pulse Ox | LOS | PAIN | Medications | Dose | Route | Given By |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Anesthesia | | | | | | | | | | | | |

St. Francis Medical Center
Trenton, NJ

Date:

| Phase of Procedure | Time | O2 | BP | HR | Rhythm | RR | Pulse Ox | LOS | PAIN | Medications | Dose | Route | Given By |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 1140 | 2L | 150/81 | 65 | SB | 15 | 100 | 1 | 0 | | | | |
| 3 | 1300 | RA | 119/80 | 64 | SB | 17 | 100 | 1 | 0 | | | | |
| 3 | 1315 | RA | 120/76 | 68 | SR | 16 | 99 | 1 | 0 | | | | |

RN Initial/Signature: RN Initial/Signature:
Cautery Unit #; Coag; Cut; Pad Site; Dilators; Sizes; APC #; Setting; Heater Probe #; Joules; Water Setting; Injection med; Total Amt; Banding/Clips
Scope/Model: GIF Q180 2318195 CF 180 2105465
Specimens: None ☐ Site: Antrum
Biopsy ☐ Hot Biopsy ☐ Polyp ☐ Frozen Section ☐ Clo ☐
C & S ☐ AFB & fungus ☐ Cytology ☐ Brushings ☐ TBNA ☐ TB Biopsy ☐
Other ☐
Type of Contrast: Amount Given: Puncture Site:
Hemostasis Method: Manual ☐ C Clamp ☐ Hematoma: ☐ Yes ☐ No
Vascular Seal: Sandbag: ☐ Yes ☐ No
Sheath Site: Drsg Applied: ☐ Yes ☐ No

Nurses Notes: Airway, vitals and meds are monitored and managed by Anesthesia. EGD @ 1214 ended @ 1226 colon started @ 1229 cecum @ 1235 ended @ 1242, pt tolerated well @ passing gas to PACU @ 1245, report to Carol RN, will continue to monitor.

RN Signature:

St. Francis Medical Center
Trenton, NJ

Date:

RECOVERY/POST PROCEDURE

| Aldrete Scoring: | Behavioral Criteria | Adm | 15 | 30 | Disch |
|---|---|---|---|---|---|
| A. Activity Level | 2 Able to move four extremities voluntarily or on command<br>1 Able to move two extremities voluntarily or on command<br>0 Not able to move extremities voluntarily or on command | 2 | 2 | 2 | 2 |
| B. Respiration | 2 Able to breathe and cough freely<br>1 Dyspneic, shallow or limited breathing<br>0 Apneic | 2 | 2 | 2 | 2 |
| C. Circulation | 2 Blood Pressure +/- 20 mm of the preanesthesia level<br>1 Blood Pressure +/- 20-50 mm of the preanesthesia level<br>0 Blood Pressure +/- 50 mm of the preanesthesia level | 2 | 2 | 2 | 2 |
| D. Consciousness | 2 Fully awake<br>1 Arousable on calling<br>0 Not responding | 2 | 2 | 2 | 2 |
| E. Color | 2 Normal<br>1 Pale, dusky, blotchy<br>0 Cyanotic | 2 | 2 | 2 | 2 |
| | Total Score | 10 | 10 | 10 | 10 |
| | Initials | | | | |

Intake: IV 500 PO 120 Total 620 Time Discontinued 1320 Output: Urine 0m Other Total

Nurses Notes:
[illegible handwritten notes]

Discharge Summary:
Pain Scale on Discharge: (circle) 0 1 2 3 4 5 6 7 8 9 10 Time Discharged 1325
Recovery/Discharge Criteria Met: ☒ Yes Condition: Stable ☒ Yes
Discharged to: ☐ Home ☐ Unit ☐ Other
Discharge Via: ☒ Ambulatory ☐ W/chair ☐ Stretcher ☐ Assistive Device
Patient/s.o. Correctly re-states Instructions ☒ Yes
Instructions/Report given to: RN SIGNATURE:

St. Francis Medical Center

691 Hamilton Ave Trenton, NJ 08629

| | | | |
|---|---|---|---|
| **Patient Name:** | Joshua Moses | **Date of Birth:** | 5/11/1981 |
| **Age:** | 37 | **Gender:** | Male |
| **MRN:** | 000000449637 | **Procedure Date:** | 11/30/2018 12:15 PM |
| **Attending MD:** | Bhanwarlal Chowdhury, MD | **Account Number:** | 401800705694 |

**Addendum (appears at end of report if more than 0)** 0

**Procedure:** Upper GI endoscopy
**Indications:** Suspected peptic ulcer
**Providers:** Bhanwarlal Chowdhury, MD, Gary Liu, RN
**Referring MD:** PRADIP PATEL, MD
**Medications:** See the Anesthesia note for documentation of the administered medications
**Estimated Blood Loss:** Estimated blood loss: none.

**Procedure:** The patient was NPO, and an intravenous was inserted. Universal time out was done. EKG, pulse oximetry and blood pressure were monitored through out the procedure.The scope was passed under direct vision. Throughout the procedure, the patient's blood pressure, pulse, and oxygen saturations were monitored continuously. The Endoscope was introduced through the mouth, and advanced to the second part of duodenum. The upper GI endoscopy was accomplished without difficulty. The patient tolerated the procedure well.

**Findings:**

The examined esophagus was normal.

The entire examined stomach was normal. Biopsies were taken with a cold forceps for Helicobacter pylori testing.

The examined duodenum was normal.

**Scope In:**
**Scope Out:**
**Add'l Images:**

**Impression:** - Normal esophagus.

Endoscopy Department

SFMC Moses, Joshua ERC# 401800705694 OPT GAS 11/30/2018 Endoscopy Record - Bhanwarlal Chowdhury, MD, Gary Liu, RN 11/30/2018

*601 Hamilton Ave Trenton, NJ 08629*

| | | | |
|---|---|---|---|
| **Patient Name:** | Joshua Moses | **Date of Birth:** | 5/11/1981 |
| **Age:** | 37 | **Gender:** | Male |
| **MRN:** | 000000449637 | **Procedure Date:** | 11/30/2018 12:15 PM |
| **Attending MD:** | Bhanwarlal Chowdhury, MD | **Account Number:** | 401800705694 |

- Normal stomach. Biopsied.
- Normal examined duodenum.

**Recommendation:** - Await pathology results.

Bhanwarlal Chowdhury, MD

Bhanwarlal Chowdhury, MD
Signed Date: 11/30/2018 12:52:45 PM
This report has been electronically signed by Bhanwarlal Chowdhury, MD
**Note Initiated On:** 11/30/2018 12:15:21 PM

*Endoscopy Department*

Powered by Provation MD
Page 2 of 2 Printed by: [illegible] on 9/17/2021 1:30:10 PM -04:00
Page 2 of 2
CHOWDHURY 00032

SFMC Moses, Joshua ERC# 401800705694 OPT GAS 11/30/2018 Endoscopy Record - Bhanwarlal Chowdhury, MD, Gary Liu, RN 11/30/2018

St.Francis MEDICAL CENTER

*601 Hamilton Ave Trenton, NJ 08629*

| | | | |
|---|---|---|---|
| **Patient Name:** | Joshua Moses | **Date of Birth:** | 5/11/1981 |
| **Age:** | 37 | **Gender:** | Male |
| **MRN:** | 000000449637 | **Procedure Date:** | 11/30/2018 12:17 PM |
| **Attending MD:** | Bhanwarlal Chowdhury, MD | **Account Number:** | 401800705694 |

**Addendum (appears at end of report if more than 0)** 0

**Procedure:** Colonoscopy
**Indications:** Screening for colorectal malignant neoplasm
**Providers:** Bhanwarlal Chowdhury, MD, Gary Liu, RN
**Referring MD:** PRADIP PATEL, MD
**Medications:** See the Anesthesia note for documentation of the administered medications
**Complications:** No immediate complications.
**Estimated Blood Loss:** Estimated blood loss: none.

**Procedure:** The patient was NPO, and an intravenous was inserted. Universal time out was done. EKG, pulse oximetry and blood pressure were monitored through out the procedure. The scope was passed under direct vision. Throughout the procedure, the patient's blood pressure, pulse, and oxygen saturations were monitored continuously. The Colonoscope was introduced through the anus and advanced to the cecum, identified by appendiceal orifice and ileocecal valve. The colonoscopy was performed without difficulty. The patient tolerated the procedure well. The quality of the bowel preparation was adequate.

**Findings:**

The perianal and digital rectal examinations were normal.

The colon (entire examined portion) appeared normal.

**Scope In:** 12:29:28 PM
**Scope Out:** 12:42:02 PM
**Scope Withdrawal Time:** 6 Minutes 19 Seconds

**Add'l Images:**

**Impression:** - The entire examined colon is normal.

*Endoscopy Department*

Powered by Provation MD
Page 1 of 2 Printed by: [illegible] on 9/17/2021 1:30:10 PM -04:00
Page 1 of 2
CHOWDHURY 00033

SFMC Moses, Joshua ERC# 401800705694 OPT GAS 11/30/2018 Endoscopy Record - Bhanwarlal Chowdhury, MD, Gary Liu, RN 11/30/2018

St.Francis MEDICAL CENTER

*601 Hamilton Ave Trenton, NJ 08629*

| | | | |
|---|---|---|---|
| **Patient Name:** | Joshua Moses | **Date of Birth:** | 5/11/1981 |
| **Age:** | 37 | **Gender:** | Male |
| **MRN:** | 000000449637 | **Procedure Date:** | 11/30/2018 12:17 PM |
| **Attending MD:** | Bhanwarlal Chowdhury, MD | **Account Number:** | 401800705694 |

- No specimens collected.

**Recommendation:** - Repeat colonoscopy in 10 years for screening purposes.

Bhanwarlal Chowdhury, MD

Bhanwarlal Chowdhury, MD
Signed Date: 11/30/2018 12:50:13 PM
This report has been electronically signed by Bhanwarlal Chowdhury, MD
**Note Initiated On:** 11/30/2018 12:17:23 PM

*Endoscopy Department*

Powered by Provation MD
Page 2 of 2 Printed by: [illegible] on 9/17/2021 1:30:10 PM -04:00
Page 2 of 2
CHOWDHURY 00034

SFMC Moses, Joshua ERC# 401800705694 OPT GAS 11/30/2018 Pre-Post Procedure 11/30/2018

St.Francis MEDICAL CENTER

401800705694 MOSES JOSHUA CHOWDHURY, BHANWARLAL MD 11/30 5/11/1981 M 37

## Universal Protocol Checklist

Procedure: Colonoscopy [illegible] Date 11/30/18 Outpatient Arrival Time 1051

☐ Left ☐ Right ☐ Bilateral ☐ Level ☐ Multiples ☐ No Laterality/Level

If Conscious Sedation, is assessment done and signed by physician Y N N/A

*If at any time there is a question or discrepancy regarding any category, the procedure will be held until the question/discrepancy can be resolved and clarification obtained.*
*Process # 1 and # 2 must be completed prior to the Patient entering the Procedure/Surgical Suite.*

1. Please initial **Verification** of (through documentation, discussion with patient, and site marking)

| Unit | Holding | Procedure | Action |
|---|---|---|---|
| [initials] | GL | GL | Correct Patient (Name and Date of Birth) |
| [initials] | GL | GL | Correct Procedure |
| | — | — | Correct Site (if Applicable) |
| | GL | GL | Correct Informed Consent Dated, timed and signed by provider |
| | GL | GL | Pre-anesthesia assessment and consent Dated, timed and signed by provider |
| | — | — | Blood Informed Consent Dated, timed and signed by provider |
| | GL | GL | Physician's history and physical on chart, 30 days old or less and updated with in 24 hours after inpatient admission or prior to surgery whichever comes first |
| | — | — | Lab Results available if applicable and properly labeled |
| | — | — | X-rays available if applicable and properly labeled |
| | — | — | Implants, Special equipment Available as Requested and on site. |
| | — | — | Blood Products available if requested. |

| | | |
|---|---|---|
| Unit [illegible] | Signature [signature] | Time 1051 |
| Holding | Signature [signature] | Time 1200 |
| Procedure | Signature [signature] | Time 1220 |

2. **Site Marked** by Provider/Physician.

| YES | N/A | Action |
|---|---|---|
| — | GL | Procedure site marked with Provider's Initials. Multiple sites are labeled and marked according to the surgical procedure consent. |
| | GL | Site mark was not marked due to: |
| | GL | ☐ Site marking not required |
| | GL | ☐ Provider is in continuous attendance with the patient |
| | GL | ☐ Refused by Patient. Place temporary blue stripe wrist band on the side of the procedure. The band will contain the patient's name, date of birth, intended procedure and site/side. |

Signature [signature] Time 1220

1-SFMC-0000 Page 1 of 2

Page 1 of 2 Printed by: [illegible] on 9/17/2021 1:30:10 PM -04:00
CHOWDHURY 00035

SFMC Moses, Joshua SRC# 651800705494 OPT OAS 11/30/2018 Pre-Post Procedure 11/30/2018

St. Francis Medical Center

MOSES, JOSHUA — CHOWDHURY, BHAWNA MD

I. **Time Out:** Remove temporary wrist band (if used) and utilize the bracelet for site/side verification during the "timeout." Just before the procedure begins and in the location of where the procedure will take place. All team members will agree by verbal affirmation to each element.

| YES | N/A | Action | YES | N/A | Action |
|---|---|---|---|---|---|
| GL | | Correct Patient | GL | | Relevant images and results properly labeled and appropriately displayed |
| GL | | Correct Position | GL | | Allergies or Precautions based on patient history or Medication Use. |
| | GL | Correct Site, if applicable, Correct Side | | GL | Administration of Antibiotic if ordered. |
| GL | | Correct Procedure | GL | | Fluids available for irrigation if ordered. |
| | GL | Team Members introduce themselves and state role verbally | GL | | Accurate procedure consent |
| | | | GL | | Agreement on Procedure to be done |
| | | Signature [signature] | | | Time 1220 |

Members Present: Chowdhury Surgeon/Physician G. Liu RN K. Gallagher Scrub

Anesthesiologist S. Macomber CRNA Other

II. Antibiotics

| YES | N/A | Action |
|---|---|---|
| | GL | 1. Does medical record incision time match the anesthesia record for incision time? |
| | GL | 2. Has antibiotic prophylaxis been documented within the last 60 minutes prior to incision time? Confirmed by Anesthesia and re-dosing discussed. |
| | | Signature [signature] RN Time 1242 |

III. Sign-out

| YES | N/A | |
|---|---|---|
| | | The nurse verbally confirms: |
| GL | | ☒ The name of the procedure |
| | GL | ☐ Completion of instrument, sponge and needle counts |
| GL | | ☒ Specimen labeling (read specimen labels aloud, including patient name) |
| | | Signature [signature] Time 1242 |

Members Present: Chowdhury Surgeon/Physician G. Liu RN K. Gallagher Scrub

Anesthesiologist S. Macomber CRNA Other

## Bureau of Prisons
## Health Services
## Consultation Request

Inmate Name: MOSES, JOSHUA Reg #: 55716-066 Complex: FTD
Date of Birth: 05/11/1981 Sex: M

Report of Consultation: Urology Subtype: Follow Up Consult
Inmate Name: MOSES, JOSHUA Reg #: 55716-066
Date of Birth: 05/11/1981 Sex: M
Institution: FORT DIX FCI, 5756 HARTFORD & POINTVILLE RD, FORT DIX, New Jersey 08640, 6097231100

Assessment:
- Short gut Syndrome
- Recurrent nephrolithiasis
→ ? [illegible]

Plan: [illegible handwriting]

Signature Date [signature]

Completed By:

Report may be hand-written or (preferably) typed on this form. If dictated on office or hospital letterhead to follow, please indicate essential findings or recommendations to be acted upon pending final report.

Follow-up services and primary responsibility for inmate health care remains with Bureau of Prisons staff. While discussion of diagnostic/treatment options with the inmate may be appropriate, they are subject to review by the inmate's primary care provider, the institution utilization review committee and/or the BOP National Formulary.

Please notify institution prior to scheduling surgery dates or follow-up appointments.

Inmate not to be informed of appointment dates.

EXHIBIT Chow-7 7/27/23

## Bureau of Prisons
## Health Services
## Cosign/Review

Inmate Name: MOSES, JOSHUA Reg #: 55716-066
Date of Birth: 05/11/1981 Sex: M Race: BLACK
Scanned Date: 07/19/2019 12:26 EST Facility: FTD

Reviewed by Sood, Ravi MD on 07/19/2019 13:23.

RECEIVED 08/15/2019 18:00AM
08/15/19 18:02:49 MaplCare Page 025

## Bureau of Prisons
## Health Services
## Consultation Request

Inmate Name: MOSES, JOSHUA Reg #: 55716-066 Complex: FTD
Date of Birth: 05/11/1981 Sex: M

Report of Consultation: Gastroenterology Subtype: Follow Up Evaluation
Inmate Name: MOSES, JOSHUA Reg #: 55716-066
Date of Birth: 05/11/1981 Sex: M
Institution: FORT DIX FCI, 5756 HARTFORD & POINTVILLE RD, FORT DIX, New Jersey 08640, 6097231100

8-21-19

Assessment: GI Consult done
H/o short bowel syndrome, chronic diarrhea, abd. pain on + off. occ. vomiting, wt loss.
O/E Abd: soft, mid line scar of prior surgery, no palpable masses. BS- normal
Plan: or abd. stools c/w...
A: Ch. constipation, diarrhea, short bowel
Rec: 1. Colace 200 mg po daily
2. Fiber 2 tbsp po daily
3. Bentyl 10 mg 0-8° PRN for abd. cramps.
Dr. Sood, thanks B Chowdhury MD

Signature Date

Completed By:

Report may be hand-written or (preferably) typed on this form. If dictated on office or hospital letterhead to follow, please indicate essential findings or recommendations to be acted upon pending final report.

Follow-up services and primary responsibility for inmate health care remains with Bureau of Prisons staff. While discussion of diagnostic/treatment options with the inmate may be appropriate, they are subject to review by the inmate's primary care provider, the institution utilization review committee and/or the BOP National Formulary.

Please notify institution prior to scheduling surgery dates or follow-up appointments.

Inmate not to be informed of appointment dates.

EXHIBIT
Chow-8
7/27/23

LMA LifeCare Physicians of Hamilton
1225 White Horse-Mercerville
Hamilton, NJ 08619
Tel: (609) 581-6060

LMA Clinic Note

Name: JOSHUA MOSES
Date of Birth: 05/11/1981
Date of Service: 08/27/2019

MR#: T1573235
Pt. Acct#: T1573235
Dictated By: RAJIV SHAH, MD

HISTORY OF PRESENT ILLNESS:
This is a 38-year-old male here for evaluation of intermittent abdominal pain, nausea, vomiting and constipation approximately 2 months' duration. He says he has nausea even with liquids.

PAST MEDICAL HISTORY:
Gunshot wound.

PAST SURGICAL HISTORY:
Multiple abdominal surgeries and chest surgery after which he had a large part of his small bowel removed and some part of his colon and he has been diagnosed with short gut syndrome.

MEDICATIONS:
He is on:
1. Acetaminophen.
2. Omeprazole.

ALLERGIES:
1. CYMBALTA.
2. DICYCLOMINE.

PHYSICAL EXAMINATION:
GENERAL: He is alert and oriented.
ABDOMEN: Soft, nondistended, slightly tender in the midline where the scars, otherwise his midline scars well healed. No evidence of any hernias. He had a CAT scan done according to him 2-3 weeks ago, report is unavailable at the systems.

IMPRESSION AND PLAN:
So my impression is the patient most likely has a partial small-bowel obstruction from adhesions, also may be due to short gut syndrome. He needs a GI evaluation for medical management and the CT scan report should be faxed to my office for evaluation and he may need a small bowel series to evaluate the overall small intestine in the colon after his multiple surgeries.

ELECTRONICALLY SIGNED BY RAJIV SHAH, MD ON 09/04/2019 15:52:27
RAJIV SHAH, MD

RS/ ln / Job #: 096244 / DID: 1573235
DD: 08/27/2019

US_DMD_001616

LMA LifeCare Physicians of Hamilton
1225 White Horse-Mercerville
Hamilton, NJ 08609
Tel: (609) 581-6060

LMA Clinic Note

Name: JOSHUA MOSES
Date of Birth: 05/11/1981
Date of Service: 08/27/2019

MR#: T1573235
Pt. Acct#: T1573235
Dictated By: RAJIV SHAH, MD

DT: 08/28/2019

US_DMD_001617

RECEIVED 10/09/2019 01:00PM

10/03/19 13:02:58 RapiCare-3205731128S -> Rapicare Inc Page 016

**Bureau of Prisons**
**Health Services**
**Consultation Request**

Inmate Name: MOSES, JOSHUA — Reg #: 55716-050 — Complex: FTD
Date of Birth: 05/11/1981 — Sex: M

Report of Consultation: Gastroenterology — Subtype: Initial Evaluation
Inmate Name: MOSES, JOSHUA — Reg #: 55716-050
Date of Birth: 05/11/1981 — Sex: M
Institution: FORT DIX FCI
5756 HARTFORD & POINTVILLE RD
FORT DIX,New Jersey 08640
6097231100

10-3-19

Assessment: GI Consult done.
H/O bowel resection, short bowel syndrome. Adhesions causing GI symptoms. Has lost weight.
O/E: Abd: soft, long mid line scar.
No palpable masses. LS not palpable.

Plan: Rec: 1. Ensure 1 can twice daily
2. multivitamins 1 tab. daily
3. Low lactose diet.

Signature/Date: Dr. Scott, thanks.

Completed By: [illegible] MD

Report may be hand-written or (preferably) typed on this form. If dictated on office or hospital letterhead to follow, please indicate essential findings or recommendations to be acted upon pending final report.

Follow-up services and primary responsibility for inmate health care remains with Bureau of Prisons staff. While discussion of diagnostic/treatment options with the inmate may be appropriate, they are subject to review by the inmate's primary care provider, the institution utilization review committee and/or the BOP National Formulary.

Please notify institution prior to scheduling surgery dates or follow-up appointments.

Inmate not to be informed of appointment dates.

Generated [illegible] by [illegible] — Bureau of Prisons - FTD

EXHIBIT
Chow-10
7/27/23

US_DMD_001610